# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, DISABILITY RIGHTS FLORIDA, and COMMON CAUSE, | Civ. No. _____ |
| *Plaintiffs*, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| LAUREL M. LEE, in her official capacity as Secretary of State of Florida, | |
| *Defendant*. | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

This lawsuit challenges Florida's newly enacted law, Senate Bill 90, which illegally and unconstitutionally burdens the right to vote. Plaintiffs allege as follows:

## I.   PRELIMINARY STATEMENT AND NATURE OF THE CASE

1.     It is well established that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

2.     Eleven million Floridians exercised their right to vote in the 2020 general election—the highest voter turnout in nearly three decades. This turnout occurred notwithstanding the ongoing once-in-a-century global pandemic caused by COVID-19. Within this context, Defendant Secretary of State Laurel Lee applauded Governor Ron DeSantis and the Department of State for successfully running three "safe, secure, and orderly elections" throughout 2020.[1]

3.     Despite alarmingly high COVID-19 infection rates, voters of color—in particular, Black voters—were especially motivated to participate in Florida's elections in 2020, with widespread reliance on vote-by-mail ("VBM") ballots, drop

---

[1] Press Release, Florida Sec'y of State Laurel M. Lee Credits Governor DeSantis for Successful Election Year, (Dec. 23, 2020), https://dos.myflorida.com/communications/press-releases/2020/florida-secretary-of-state-laurel-m-lee-credits-governor-desantis-for-successful-election-year/.

boxes, and early voting. Twice as many Black voters cast VBM ballots in 2020 as compared to previous years, and the proportion of VBM ballots cast by Black voters increased by over 28% from the 2016 election.

4.     This unprecedented turnout and engagement were met with a swift response from the Florida Legislature. Deploying baseless claims of "voter fraud," the Legislature enacted Senate Bill 90 ("SB 90"), which was passed on April 29, 2021, and signed into law by Governor Ron DeSantis on May 6, 2021. This law contains a sweeping set of provisions that restrict and burden voting access. SB 90's restrictive provisions include: (a) new and burdensome identification requirements for voters requesting VBM ballots; (b) restrictions and burdensome requirements for standing VBM applications; (c) severe limitations on where, when, and how drop boxes can be used; (d) limitations on third-party VBM ballot return; and (e) a new expansion of the term "solicitation" to encompass all "activities" carried out within an expanded zone around polling places, early voting locations, or drop boxes, with either the effect or the intent of "influencing" a voter. The latter provision's vagueness and overbreadth could prohibit individuals from providing relief to Florida voters waiting in long lines, including free food, water, and other assistance.

5.     The 2021 voter suppression law is just the latest in a long line of voter suppression laws targeting Florida's Black voters, Latino voters, and voters with disabilities. For far too long, Florida's lawmakers and elected officials have created

a vast array of hurdles that have made it more difficult for these and other voters to make their voices heard.

6.     From 1972 to 2012, when multiple counties in Florida were required under the Voting Rights Act of 1965 ("VRA") to seek federal clearance for changes to their election laws, Florida's racially discriminatory practices required federal intervention numerous times.[2]

7.     In recent years, Florida has gone to great lengths to suppress the political participation of people of color by, *inter alia*, imposing new restrictions, including voter identification requirements; engaging in racially motivated voter purges and redistricting; imposing new barriers preventing the reenfranchisement of formerly incarcerated persons until they paid legal fines, even when they could not afford to do so; and routinely closing voting sites in predominantly Black and brown communities.[3]

---

[2] *See, e.g.*, Letter from Ralph F. Boyd, Jr., Assistant Att'y Gen., to John M. McKay, President of the Fla. Senate and Tom Feeney, Speaker of the Fla. House of Reps. 1 (July 1, 2002); Letter from Bill Lann Lee, Chief, Voting Sec., to George L. Waas, Assistant Att'y Gen. State of Fla. (June 1, 1999); Letter from Bill Lann Lee, Acting Assistant Att'y Gen., to Robert A. Butterworth, Att'y Gen., State of Fla. (Aug. 14, 1998); Letter from John R. Dunne, Assistant Att'y Gen., Civil Rights Div., to Robert A. Butterworth, Att'y Gen., State of Fla. 2 (June 16, 1992).

[3] *See, e.g., League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018); *Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012); *Brown v. Florida,* 208 F. Supp. 2d 1344 (S.D. Fla. 2002); *DeGrandy v. Wetherell*, 815 F. Supp. 1550 (N.D. Fla. 1992).

8.     Each of the challenged provisions in SB 90 places undue burdens on the right to vote. Taken together, the burden is even more severe: by making it more difficult for voters to obtain and return VBM ballots, SB 90 will force more voters to attempt to vote in person, leading to longer lines and wait times for all voters, and outright disenfranchisement for some. In turn, SB 90 may criminalize the efforts of those who seek to provide basic sustenance to the voters who are forced to wait in these longer lines.

9.     While this law affects all voters, the brunt of the harm will be borne by Black voters, Latino voters, and voters with disabilities. Black and Latino Floridians are more likely to lack the limited forms of identification that are now required to request VBM ballots; are less likely to be able to take time off work to return VBM ballots during work hours; and are less likely to have access to a car, and therefore more likely to rely on third-party VBM ballot return. Black and Latino voters, in particular, tend to encounter longer lines when voting in person, are therefore more likely to need water and food to make the longer waits tolerable, and have come to rely on the assistance provided by nonprofit groups to those waiting in line to vote.

10.     Voters with disabilities will also be disproportionately burdened by SB 90. Given accessibility issues at polling sites throughout the state, many disabled voters are unable to vote in person, and rely exclusively on VBM ballots and drop boxes to cast their ballots. In the process of applying for VBM ballots in the first

place, many disabled voters face accessibility challenges, whether they seek to make a standing application in person, online, or by telephone, and would be significantly burdened by having to make such requests twice as frequently in order to vote under SB 90's new provisions. Many disabled voters, including those living in group residential facilities, rely on caregivers and other non-family members to collect and return their VBM ballots. Additionally, disabled voters who choose to vote in person—for whom there are no guarantees that they will be approved to move to the front of a line or be provided with a chair while they wait—often face significantly increased burdens when required to wait in long lines to vote.

11.    SB 90's curtailment of the availability of VBM removes an important option for vulnerable voters with no legitimate purpose, and will discriminatorily harm Black and Latino voters, voters with disabilities, and other voters who rely on VBM ballots to access the franchise.

12.    As a result, SB 90's provisions described above—both individually and in their aggregate effect—violate the rights of Black and Latino voters under Section 2 of the VRA.

13.    These provisions—individually and in their aggregate effect—also unlawfully violate the rights of millions of disabled Florida voters under Title II of the Americans with Disabilities Act.

14.     SB 90's vague and overbroad prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter" exposes volunteers to criminal liability merely for giving simple forms of basic relief (such as free food and water) to voters waiting in long lines. This provision unduly burdens Florida voters' exercise of their constitutional rights to freely associate and express protected speech, and therefore violates the First Amendment. This provision impermissibly restricts Plaintiff Florida NAACP from engaging in expressive conduct, such as providing water and other basic resources to voters waiting in line to communicate that their individual votes matter and that it is important to follow through with casting their ballots despite long wait times and other obstacles to doing so. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1238 (11th Cir. 2018).

15.     SB 90's challenged provisions further violate the right to vote of *all* Florida voters, as protected by the First and Fourteenth Amendments to the United States Constitution. Any state restriction on the right to vote, no matter how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 191 (2008) (quotation marks omitted).

16.    No state interests justify the severe burdens imposed by SB 90. Plaintiffs thus seek declaratory and injunctive relief to enjoin Florida's restrictive and wholly unnecessary encroachment on this fundamental right.

## II.    PARTIES

### A.    Plaintiffs

17.    Plaintiff Florida State Conference of the National Association for the Advancement of Colored People Branches and Youth Units ("Florida NAACP") is a nonprofit, nonpartisan civil rights organization in Florida. Founded in 1909, Florida NAACP is the oldest civil rights organization in Florida, and serves as the umbrella organization for local branch units throughout the state. The Florida NAACP's 12,000 members are predominately Black and other minority individuals, and include registered voters who reside throughout the state. Its mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. For decades the Florida NAACP has engaged heavily in statewide voter registration, public education, and advocacy concerning the right to vote in order to encourage civic and electoral participation among its members and other voters.

18.    SB 90's restrictive provisions will severely burden or deny the right to vote of the Florida NAACP's members by imposing new and burdensome identification requirements for voters requesting VBM ballots; restrictions and

burdensome requirements for standing VBM applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party VBM ballot return; and potential criminal penalties for individuals who provide free food and water or other assistance to voters.

19.     These restrictions also make it substantially more difficult for the Florida NAACP to engage in its civic engagement mission. For instance, in recent elections, the Florida NAACP engaged in large-scale ballot return efforts in which voters brought their completed VBM ballots to churches or local NAACP chapter meetings. Florida NAACP members then returned those completed ballots to the county supervisor of elections ("SOE") offices or drop boxes on the voters' behalf. These activities would be severely curtailed by SB 90. Volunteers with the Florida NAACP also provided food and water to voters waiting in long lines in Black communities across the state, which—under a new provision in SB 90—may now be a crime. SB 90 will also require the Florida NAACP to divert time, money, and resources away from other activities, such as programming and initiatives concerning the school-to-prison pipeline, eliminating academic and educational inequities and mass incarceration, in order to assist its members and other Florida voters who are burdened by the provisions of SB 90. Therefore, SB 90 adversely impacts the Florida NAACP's operations.

20.    Plaintiff Disability Rights Florida ("DRF") is an independent, nonprofit corporation designated by law as Florida's federally funded protection and advocacy system ("P&A system") for individuals with disabilities. In this capacity, DRF is authorized by federal law to pursue legal, administrative, and other appropriate remedies to ensure the protection of and advocacy for the rights of individuals with disabilities. These constituents include the millions of disabled registered voters throughout the state. DRF also advocates for the rights and interests of those with disabilities who seek to register to vote. DRF's work includes legal advocacy and rights protection for children and adults with disabilities throughout Florida. This work includes significant efforts devoted to the political participation of people with disabilities and the challenges they face when voting, including inaccessible polling sites and ballots, and limited or non-existent supervised facility voting options for people with disabilities residing in residential facilities.

21.    DRF engages in legislative and public advocacy on these issues, directly engages with and trains election officials and voters on expanding voting accessibility, promotes robust voter registration, and engages in voter hotline and voter education efforts. DRF plays a leadership role in multiple statewide coalitions and task forces. DRF is currently a member of a statewide accessible VBM task force devoted to proposing and evaluating recommendations to the state regarding its commitment, via settlement agreement, to provide accessible VBM in every

county prior to the 2022 midterm primary elections, though Florida has already had an obligation to provide accessible VBM for nearly two decades under state law. These efforts have also included an Accessible VBM Pilot Project that was conducted in five counties during the 2020 general election and was implemented to introduce partially accessible VBM balloting options for voters with disabilities.

22.    SB 90's restrictive provisions will severely burden or deny the right to vote of DRF's constituents by imposing new and burdensome identification requirements for voters requesting VBM ballots; restrictions and burdensome requirements for standing VBM applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party VBM ballot return; and potential criminal penalties for individuals who provide free food and water or other assistance. These restrictions also make it substantially more difficult for DRF to engage in its civic engagement mission. SB 90 will also require DRF to divert time, money, and resources away from other activities, including efforts to engage with election officials to expand accessibility, advocating for more accessible VBM access throughout the state, and pursuing lobbying efforts to increase supervised facility voting. Instead, the resources that would be used for those programs and efforts will be redirected to work including, but not limited to, conducting public education for voters with disabilities to understand the new restrictions on VBM access and providing public guidance on the collection and return of ballots for

disabled voters in light of SB 90's new criminal penalties, and conducting statewide outreach to facilities and people with disabilities whose abilities to receive and return ballots will be curtailed.

23.     Plaintiff Common Cause is a nonpartisan, nonprofit citizen lobby. Common Cause is devoted to electoral reform, ethics in government, and the protection of citizens' rights in national, state, and local elections. Common Cause has approximately 55,000 members in Florida. Common Cause advocates for policies at the state and local level to ensure that elections are free, fair, and accessible. Common Cause also encourages and supports voter participation in elections by, among other things, engaging in voter education and outreach efforts; acting as a lead coordinator for the nonpartisan Florida Election Protection Coalition; monitoring and correcting election-related disinformation online; and funding translation of election information into Spanish and Haitian Creole for non-English-speaking voters.

24.     SB 90's restrictive provisions will severely burden or deny the right to vote of Common Cause's Florida members by imposing new and burdensome identification requirements for voters requesting VBM ballots; restrictions and burdensome requirements for standing VBM applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party VBM ballot return; and potential criminal penalties for individuals who provide free food

and water or other assistance. These restrictions also make it substantially more difficult for Common Cause to engage in its civic engagement mission in Florida. SB 90 will also force Common Cause to divert time, money, and resources away from other activities, such as its plans to engage in public education and advocacy concerning the redistricting process in Florida. Instead, Common Cause will be required to devote increased resources to its voter engagement and education programming, including by recruiting more volunteers, temporary staff, and contractors to inform and educate voters about their rights as they are affected by the new law, and hiring these staff members earlier in the election cycle than originally planned. Moreover, while Common Cause has not previously funded programs to provide direct support to assist voters in securing or returning their VBM applications, SB 90 will now necessitate capacity-building and investment of Common Cause resources in programming, staffing, volunteer management, and voter education in order to directly assist voters in navigating the burdensome restrictions on VBM imposed by SB 90.

**B.**  **Defendant**

25.    Defendant Laurel M. Lee is the Secretary of State of Florida. As the "chief elections officer of the State," it is Defendant Lee's "responsibility to . . . [o]btain and maintain uniformity in the interpretation and implementation of the election laws," Fla. Stat. § 97.012(1); to adopt rules to implement new laws,

including SB 90; to enforce compliance with the Florida Election Code and with rules adopted by the Department of State, *id*. § 97.012(14), to "[c]reate and administer a statewide voter registration system as required by the Help America Vote Act of 2002," *id*. § 97.012(11); to "[p]rovide written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State," *id*. § 97.012(16); and to perform other tasks as set by state law. These responsibilities extend to elections conducted by mail. For example, for an election to be conducted by mail, the Secretary of State must "approve[] a written plan for the conduct of the election." *Id*. § 101.6102(1)(a)(3). Defendant Lee is sued in her official capacity.

26.     The Division of Elections is a component of the Florida Department of State, Fla. Stat. § 20.10(2)(a), responsible for providing provides "administrative support to the Secretary of State, Florida's Chief Election Officer, to ensure that Florida has fair and accurate elections."[4]

27.     In particular, SB 90 directs the Division of Elections to implement and enforce the provision restricting access to drop boxes. For example, Section 28 of SB 90 provides, "If any drop box is left accessible for ballot receipt other than as

---

[4] Fla, Dep't of State, Div. of Elec., *About Us*,
https://dos.myflorida.com/elections/about-us/ (last visited May 3, 2021).

authorized by this section, the supervisor is subject to a civil penalty of $25,000. The [D]ivision [of Elections] is authorized to enforce this provision."

### III.   <u>JURISDICTION AND VENUE</u>

28.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

29.     The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1343(a) because it seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Voting Rights Act, 52 U.S.C. § 10301, and 28 U.S.C. § 1331 because it arises under the laws of the United States.

30.     This Court has personal jurisdiction over Defendant, who is sued in her official capacity only.

31.     Venue is proper in the U.S. District Court for the Northern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this district and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

32.     Plaintiffs Florida State Conference of the NAACP, Disability Rights Florida, and Common Cause all operate within this district and division.

33.     This Court has the authority to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## IV.   FACTUAL ALLEGATIONS

### A. Florida Has a Long, Ongoing History of Racially Discriminatory Voting Restrictions.

34.     SB 90 builds on a long history of invidious discriminatory voting practices by the State of Florida. Courts and scholars have consistently recognized and acknowledged this history of discrimination and disenfranchisement dating back to the post-Civil War period.

35.     As soon as the Fourteenth Amendment to the United States Constitution granted Black men the right to vote in 1868, discriminatory practices were "employed by the State of Florida to prevent African-Americans from having a political voice."[5]

36.     From 1885 to 1900, Florida enacted a raft of laws to disenfranchise Black people and block their participation in the political process, using "such mechanisms as multiple ballot box laws, tissue ballots or 'little jokers,' the secret

---

[5] *Johnson v. Mortham*, 926 F. Supp. 1460, 1476 (N.D. Fla. 1996); *see also Davis v. Chiles*, 139 F.3d 1414, 1418 n.10 (11th Cir. 1998) ("Florida has had a history of racially discriminatory voting practices and that continuing socio-economic disparities are hindering blacks' participation in the political process in these districts."); *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992) (three-judge court) ("A longstanding general history of official discrimination against minorities has influenced Florida's electoral process" and "adversely affected the ability of minorities to participate in the political process.").

ballot, the 'white primary,' the poll tax, run-off elections, at-large elections, multiple-member elections, and gerrymandering." *Johnson*, 926 F. Supp. at 1476.

37.     As the Florida Legislature enacted such discriminatory laws, Black voter registration, voter participation, and office-holding rates declined precipitously. Black voter turnout in Florida collapsed from 88% in 1880 to 14% by 1892. Black turnout then continued to drop until it fell to just 2% in 1912. In addition to laws on the books, widespread violence, harassment, terrorism, and intimidation also prevented Black Floridians from participating in the electoral process throughout the 20th century.[6]

38.     Although the VRA extended access to the franchise, Black participation in the political process continued to be inhibited. Indeed, five Florida counties were covered by the remedial preclearance requirement of Section 5 of the VRA: Collier, Hardee, Hendry, Hillsborough, and Monroe.[7]

39.     With the new millennium came renewed attempts to restrict the Black vote in Florida. For example, in 2000, the State of Florida improperly removed at least 1,100 eligible voters from the voting rolls after identifying them as convicted

---

[6] *See, e.g.*, Robert Stephens, *The Truth Laid Bare,* Pegasus, Univ. of Cent. Fla. (Fall 2020), https://www.ucf.edu/pegasus/the-truth-laid-bare/ (describing the Ocoee Massacre in which at least 30 Black people were murdered by a white mob after July Perry, a Black man, exercised his right to vote).

[7] *Jurisdictions Previously Covered by Section 5*, U.S. Dep't of Justice, Civil Rights Div., https://www.justice.gov/crt/jurisdictions-previously-covered-section-5 (last visited May 3, 2021).

felons.[8] As a result, many eligible voters were turned away at the polls.[9] Of the voters dropped from the rolls in this botched voter purge, 41% were Black.[10] In Miami-Dade County, for example, "more than 65 percent of the names on the purge list were African Americans, who represented only 20.4 percent of the population."[11] The State of Florida was required to develop a new program for identifying potential voters with felony convictions, and to restore hundreds of voters to the voting rolls.[12]

40.   In 2011, then-Governor Rick Scott signed HB 1355 into law. HB 1355 reduced the number of early voting days in Florida from 14 to 8, allowed supervisors of elections to cut the number of early voting hours in half, and eliminated early voting on the Sunday before Election Day.

41.   The law was introduced and enacted after Black voters used early voting at high rates in the 2008 election: "More than half of African-American votes in Florida were cast during the early voting period."[13] Invoking the then-active VRA

---

[8] *Study Shows 1,100 Voters Wrongly Purged from Rolls*, Tampa Bay Times (Sept. 9, 2005) https://www.tampabay.com/archive/2001/05/27/study-shows-1100-voters-wrongly-purged-from-rolls.

[9] Katie Sanders, *Florida Voters Mistakenly Purged in 2000*, Tampa Bay Times (June 14, 2012), https://www.tampabay.com/news/politics/stateroundup/florida-voters-mistakenly-purged-in-2000/1235456/.

[10] *Id.*

[11] *Id.*

[12] *See id.*

[13] Michael Ellement, Note, *Blocking the Ballot: Why Florida's New Voting Restrictions Demonstrate A Need for Continued Enforcement of the Voting Rights Act Preclearance Requirement*, 2 CATH. U. L. REV. 541, 556 (2013).

preclearance requirement, the United States Department of Justice blocked the rules from taking effect in Collier, Hendry, Osceola, Polk, and Lee counties.[14]

42.    On November 6, 2018, Florida voters overwhelmingly voted to pass Amendment 4, a citizens' initiative that amended the state Constitution to repeal lifetime disenfranchisement and automatically restore the voting rights for most people convicted of felonies upon completion of their sentences. Until the passage of Amendment 4, Florida was one of only four states to impose a lifetime voting ban on any person convicted of a felony crime. Scholarship firmly establishes that "felon disenfranchisement is inextricably tied to the United States history of racial discrimination," with "many felon disenfranchisement provisions [added] to state constitutions in the post-Civil War era as a means to disenfranchise former slaves who had been granted the right to vote under the Reconstruction Amendments."[15] During the spring 2019 legislative session, the Florida Legislature enacted a new law, which severely restricted the reach of Amendment 4 by requiring returning citizens to pay all legal financial obligations (such as fines, fees, restitution, and court costs) before becoming eligible for automatic restoration of their voting rights, regardless of whether these returning citizens were able to pay. *See* SB 7066, 2019

---

[14] *Florida v. United States*, 885 F. Supp. 2d 299, 303 (D.D.C. 2012) (three-judge court) (per curiam) (holding that ". . . the State has failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters").
[15] Dalia Figueredo, *Affording The Franchise: Amendment 4 & The Senate Bill 7066 Litigation*, 72 FLA. L. REV. 1135, 1136 (2020).

Leg., Reg. Sess. § 25 (Fla. 2019); *see also* Fla. Stat. § 98.0751. In May 2020, the U.S. District Court for the Northern District of Florida determined that the state's "pay-to-vote system," as applied to returning citizens who were genuinely unable to pay legal financial obligations, violated the Fourteenth Amendment's Equal Protection Clause. *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1215–31 (N.D. Fla. 2020). On appeal, however, a divided Eleventh Circuit reversed and vacated the District Court's decision. *Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020).

43.     Until very recently, the ability of Black voters and other qualified voters in Florida to cast ballots was also threatened by unchecked discretion held by election officials to reject VBM ballots from eligible voters deemed "noncompliant." As this Court has held, this absolute power to throw out votes was facially unconstitutional because it unduly burdened the fundamental right of Florida citizens to vote and have their votes counted. *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022 (N.D. Fla. 2018) ("The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes constitutional muster. The answer is simple. It does not."), *appeal dismissed as moot*, 950 F.3d 790 (11th Cir. 2020).

**B.**     **Black Voters Participated in the 2020 Election at High Rates, and Took Unprecedented Advantage of Mail-In and Drop Box Voting.**

44.     Turnout in the 2020 general election was 77 percent—the highest in 28 years in Florida, and among the highest in the state's history.[16]

45.     Turnout was also historic among Black voters.[17] Approximately 4.6 million Floridians voted by mail in the 2020 general election, accounting for about 44% of the 11 million votes cast.[18] Almost 1.5 million Florida voters used ballot drop boxes in the 2020 general election.[19]

46.     Significant numbers of Black Floridians voted by mail: 522,038 Black voters cast VBM ballots, more than double the number of VBM ballots cast by Black

---

[16] *Elections Data: Voter Turnout*, Fla. Dep't of State, Div. of Elections, https://www.dos.myflorida.com/elections/data-statistics/elections-data/voter-turnout/; Steve Patrick, *Florida Voters' Turnout Highest In 28 Years*, WJXT (Nov. 10, 2020), https://www.news4jax.com/vote-2020/2020/11/04/florida-voters-turnout-highest-in-28-years/.

[17] *See* Jenese Harris, *Historic Black Voter Turnout in 2020 Presidential Election*, WJXT (Nov. 4, 2020), https://www.news4jax.com/vote-2020/2020/11/10/historic-black-voter-turnout-in-2020-presidential-election/.

[18] Jeffrey Schweers, *As GOP Looks To Restrict Florida Mail Ballots, Advocates Unveil Report That Process Worked*, Tallahassee Democrat, Mar. 9, 2021, https://www.tallahassee.com/story/news/local/state/2021/03/09/florida-mail-ballots-voting-election-security-restrictions-drop-box-ban/4642096001/.

[19] Christina A. Cassidy, *GOP Targets Ballot Drop Boxes In Georgia, Florida, Elsewhere*, Associated Press (Apr. 19, 2021), https://apnews.com/article/donald-trump-georgia-elections-coronavirus-pandemic-gubernatorial-elections-c083f5e0af7855c9dbb5a1659840c4a9.

voters in 2018 and 2016.[20] Moreover, the proportion of VBM ballots cast by Black voters increased by over 28% since the 2016 presidential election.

47.     As Florida election officials have repeatedly recognized, voting by mail in Florida is extremely secure. In December 2020, Defendant Lee herself affirmed that Florida had "successfully administered three safe, secure and orderly elections" in 2020 with "an unprecedented level of funding, collaboration, and strategic planning."[21] Defendant Lee further stated that Florida was able to successfully "secure the elections and provide confidence in the integrity [of] our results."[22] Governor DeSantis has touted Florida's election conduct in 2020 as a model for election integrity and security.[23]

48.     Furthermore, there is no evidence of any fraud or significant irregularities in any of the 2020 elections in Florida.[24]

---

[20] Daniel A. Smith, *Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election,* Report for All Voting is Local 10 (2021), https://bit.ly/33cfLuQ, *supra*; Anna Baringer, et al., *Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus*, 19 ELECTION L.J. 289, 306 (2020), https://bit.ly/3uRtVgw.

[21] Press Release, *supra* n. 1.

[22] *Id.*

[23] Skyler Swisher & Anthony Man, *Gov. DeSantis Called Florida a Model For Election Integrity. Now He's Pushing Voting Changes That Could Help His Reelection Chances*, S. Fla. Sun-Sentinel (Feb. 19, 2021), https://www.sun-sentinel.com/news/politics/fl-ne-desantis-election-reform-ss-prem-20210219-3cuq4ehtavdulov7khuboo7asi-story.html.

[24] Arielle Mitropoulos & Will McDuffie, *State Officials Say They're Baffled, Offended by False Election Claims*, ABC News (Nov. 17, 2020)

49.    There was similarly zero evidence of significant fraud or irregularities in the 2020 general election overall. The U.S. Cybersecurity and Infrastructure Security Agency, U.S. Election Assistance Commission, National Association of Secretaries of State, and National Association of State Election Directors affirmed the "security and integrity" of the 2020 election and noted that "[t]he November 3rd election was the most secure in American history."[25]

50.    Against this backdrop of high turnout and VBM use among Black voters, and the security of Florida's 2020 elections, the Florida Legislature considered, and ultimately passed, SB 90.

## C.    The Florida Legislature Passed SB 90 in a Rushed Process Characterized by Procedural Deviations That Excluded Members of the Public.

51.    The Florida Legislature rushed to pass SB 90, and Governor DeSantis signed it, amid extraordinary procedural deviations from the usual legislative process.

52.    On February 3, 2021, Senator Dennis Baxley introduced SB 90 in the state Senate.

---

https://abcnews.go.com/Politics/state-officials-theyre-baffled-offended-false-election-claims/story?id=74243567.

[25] Press Release, U.S. Cybersec. & Infrastructure Sec. Agency, Joint Statement From Elections Infrastructure Gov't Coordinating Council & The Election Infrastructure Sector Coordinating Exec. Comms. (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election/.

53.    On March 23, 2021, Representative Blaise Ingoglia introduced HB 7041 in the state House. HB 7041 contained many of the same provisions as SB 90 and was classified on the state Senate website as a "related bill."

54.    Notwithstanding the COVID-19 pandemic and the safety risks associated with travel and in-person testimony, no legislative committee offered members of the public the option to provide testimony remotely. As a result, many members of the public who were at higher risk for COVID-19, including many members of the disability rights community, were shut out of the legislative process altogether.

55.    Members of the public testifying before Senate committees were required to travel to the Donald L. Tucker Civic Center at Florida State University ("Civic Center"), from which their testimony was virtually livestreamed to the members of the legislative committees. Although members of the public were not permitted to appear before Senate committees in person, they still had to travel from across the state and gather indoors at the Civic Center to provide testimony.

56.    Members of the public testifying before House committees were required to travel to the Florida State Capitol in Tallahassee to testify before House committees in person.

57.    On February 1, 2021, Plaintiff Common Cause sent a letter to legislative leaders on behalf of a coalition of 36 organizations calling for the

Legislature to, among other things, permit legislative testimony by members of the public via video or teleconference. On February 23 and April 2, 2021, Plaintiff Disability Rights Florida placed formal requests with the House and Senate Sergeants at Arms seeking accommodations to be permitted to provide virtual testimony to legislative committees. These requests were denied.

58.    This prohibition on remote testimony is inconsistent with the best practices that other state legislatures across the country have embraced to ensure that members of the public have an opportunity to provide input into the legislative process during the COVID-19 pandemic. It is also inconsistent with the practices of other government bodies in Florida, including state agencies and local governments.

59.    The committee meetings in which SB 90 and HB 7041 were addressed were conducted in a rushed manner, often with limited time for deliberation, debate, and public testimony.

60.    Public testimony was especially limited during the April 14, 2021 meeting on SB 90 before the Senate Committee on Rules. Members of the public who traveled to the Civic Center from across the state were permitted to testify for only one minute. Many members of the public had their microphone disconnected the moment their testimony exceeded sixty seconds. The strict limitations imposed on members of the public testifying on SB 90 was inconsistent with the Committee's

practice for members of the public testifying on other bills—including bills considered that same day—who were not subjected to the same time limits.

61.    In that same meeting, the Committee considered for the first time and adopted a "strike all" amendment that replaced the text of SB 90—which had previously had only 344 lines of text—with new lengthy language containing 1,031 lines of text. This new amendment was first posted on the Senate website on April 13, 2021—the day before it was considered and adopted by the Committee—thereby denying members of the public sufficient time to review and meaningfully comment on the new language.

62.    The consideration of HB 7041 in the House was even more rushed. During a hearing on April 19, 2021, before the House Committee on State Affairs, the Committee Chair restricted the number of questions each committee member was permitted to ask of HB 7041's sponsor, at times cutting off committee members mid-sentence. At one point, the Committee Chair abruptly closed questioning on a proposed amendment just as a committee member posed her first question on the amendment, and before the amendment's sponsor could answer it. After the Committee considered 11 amendments to HB 7041 through this rushed process, the Chair limited debate on the amended bill to 30 seconds for each committee member. None of the other nine bills considered during this hearing was subjected to this rushed treatment.

63.     In that same meeting, the Committee refused to permit any testimony from members of the public on HB 7041, even though at least 15 people had traveled to the Capitol to provide testimony on the bill in person. The Committee permitted testimony from members of the public on numerous other bills.

64.     On April 26, 2021, the Senate passed SB 90 notwithstanding bipartisan opposition, sending SB 90 back to the House for consideration.

65.     On April 27, 2021 at 1:33 A.M., Representative Ingoglia proposed a "strike all" amendment to SB 90 for consideration on the House floor that replaced the text of SB 90—which had expanded to 1,143 lines of text—with new lengthy language containing 1,313 lines of text, some of which was taken from HB 7041. Later that same day, the House considered for the first time—and adopted—Representative Ingoglia's "strike all" amendment that was only first introduced early that morning.

66.     On April 28, 2021—the very next day—the House of Representatives passed its amended version of SB 90, following a rushed and limited debate, and formally sent the amended bill to the Senate that evening.

67.     In the morning of April 29, Senator Hutson introduced an amendment to the House's version of SB 90. Senator Hutson's amendment, however, was quickly removed from the Senate website and was not available to the public. A new version of Senator Huston's amendment was introduced at 3:27 P.M., which deleted

and replaced the vast majority (1,170 lines) of the bill. With virtually no time to analyze, deliberate, or debate Senator Hutson's amended version of SB 90, the bill was adopted and voted out of the Senate at 5:22 P.M., less than two hours after it was first introduced.

68.     Later that evening—again in a rushed process with virtually no time for analysis, deliberation, or debate—the House took up consideration of the new version of SB 90 that had just passed the Senate, which was passed by the House at 9:02 P.M.

69.     On May 6, 2021, SB 90 was signed into law by Governor Ron DeSantis.

70.     Throughout the consideration of SB 90 and HB 7041 in various committees and on the floor of both the House and the Senate, Senators and Representatives were presented with extensive evidence of the ways in which the provisions of SB 90 and HB 7041 would impose disproportionate burdens or barriers on Black voters, Latino voters, and voters with disabilities. Some Senators and Representatives proposed numerous amendments that would have mitigated the restrictive and discriminatory impacts of the proposed legislation. Both chambers, however, rejected the vast majority of these ameliorative amendments.

71.     Under Section 33 of SB 90, the Act took effect immediately upon signing by the governor, a departure from the normal legislative process set forth in the Florida Constitution, which provides that laws passed by the Legislature

generally "take effect on the sixtieth day" following the end of the legislative session. Fla. Const., art. III, § 9. During the committee meeting in which this amendment was adopted, the sponsor provided no justification for deviation from the typical processes besides stating that it was "a policy decision."

## D.     SB 90 Imposes Restrictions on the Right to Vote.

72.     Within months of the 2020 general election, and in response to high voter participation, the Florida Legislature passed SB 90 to restrict many of the safe and secure options by which Florida voters—and especially Florida's Black voters, Latino voters, and voters with disabilities—exercised their right to vote.

73.     The following centerpiece provisions of SB 90 (collectively, the "Challenged Provisions") individually and collectively impose burdens and barriers on the right to vote and disproportionately harm Black voters, Latino voters, and voters with disabilities:

> a.  Imposing a new requirement that voters requesting a VBM ballot must "provide either his or her Florida driver license number or Florida identification card number or the last four digits of his or her social security number" to receive such a ballot, and prohibiting voters who have none of these forms of identification from requesting VBM ballots;

b. Halving the lifespan of "standing" VBM requests by requiring voters to submit new VBM applications every general election cycle rather than every two general election cycles;

c. Imposing new limitations on persons returning a completed sealed and signed VBM ballot on behalf of a voter;

d. Restricting the locations, availability, and operating hours of ballot drop boxes; and

e. Expanding the definition of a criminal "solicitation" for any person, except a supervisor of elections employee or supervisor of elections volunteer, to prohibit "engaging in any activity with the intent to influence or effect of influencing a voter." This standard may lead to criminal liability for any person who gives or attempt to give any item—including food or water—to a voter waiting in line to vote.

74.    Each Challenged Provision, alone and in combination, burdens the right to vote of all Florida voters, with disproportionate impacts on Black voters, Latino voters, and voters with disabilities.

**1. Identification Requirement for VBM Ballot Requests.**

75.    SB 90 imposes new requirements upon voters for requesting a VBM ballot, demanding that a voter "provide either his or her Florida driver license

number or Florida identification card number or the last four digits of his or her social security number" to receive a VBM ballot.

76.     SB 90 makes no exception for voters who may not have these forms of identification—a significant departure from both state and federal laws governing voter registration, as well as extensive regulations promulgated by the Defendant Secretary of State governing Florida's voter registration process, which all provide that eligible voters who lack a driver's license, state identification card, or Social Security number are permitted to register to vote. Even SB 90's voter registration requirements continue to permit voters who do not possess any of these three forms of identification to register to vote by completing an attestation. But under SB 90, voters in this situation are not permitted to request a VBM ballot.

77.     This provision burdens eligible Floridian voters who lack such forms of identification, including a driver's license or state identification card. Black voters and Latino voters (including especially recently naturalized citizens), and voters with disabilities will bear the brunt of the burden. According to a national study, millions of U.S. citizens lack a driver's license or other government-issued identification, and "poor, elderly, and minority citizens" are "less likely to possess these forms of documentation than the general population."[26] Upon information and

---

[26] Brennan Ctr. for Justice, *Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification*, 1 (Nov. 2006), https://bit.ly/3eOTZTo.

belief, the same is true in Florida – elderly, Black and Latino voters lack the identification necessary to comply with this new requirement. Further, upon information and belief, many Floridians may be uncomfortable providing their Social Security information or lack the confidence that local election officials would be able to securely maintain their sensitive personal information.

78.     Many voters—especially recently naturalized citizens—may not possess a Social Security number (in addition to lacking a driver's license or state identification card) but are nevertheless eligible voters. This provision of SB 90 would completely bar these voters from requesting a VBM ballot.

79.     This provision of SB 90 serves no legitimate purpose and will disproportionately burden or exclude Black voters, Latino voters, and voters with disabilities.

**2. Limitations on Standing VBM Requests.**

80.     SB 90 forces voters to renew VBM requests each general election cycle, ending the "standing" VBM applications that were valid for up to two general election cycles (four years) for the many voters who prefer to vote by mail.

81.     This provision substantially burdens those who routinely cast VBM ballots, including Black voters, Latino voters, and voters with disabilities—all of whom used VBM ballots in record numbers in the last election. These voters will now be required to request their VBM ballots twice as often as previously required.

This provision will also impose new burdens on many disabled voters, who will be forced to contend with the logistical challenges of completing a VBM ballot request twice as often. In particular, this will require organizations such as Plaintiffs to increase training regarding compliance with this provision and assist voters who now must request their VBM ballot twice as often.

82.     Furthermore, this provision is unnecessary because Florida law, before the enactment of SB 90, already contained procedures for updating and verifying voter registration addresses to ensure that VBM ballots reach only the voters who have requested them.

83.     There is no evidence that a significant number of voters received VBM ballots in error in past elections, nor of any systemic or widespread fraud caused or enabled by Florida's provision of standing VBM applications.

### 3. Limitations on Third-Party Return of VBM Ballots.

84.     SB 90 also imposes onerous restrictions on who may return a completed VBM ballot on behalf of a voter and how many ballots any person may return.

85.     Under previous law, a third party could return a completed VBM ballot for a voter, so long as the third party was not paid for returning the ballot. Fla. Stat. § 104.0616 (it was a criminal offense for any person to provide, offer to provide, or accept "a *pecuniary or other benefit in exchange for* distributing, ordering, requesting, collecting, delivering, or otherwise physically possessing more than two

vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member.") (emphasis added).

86.     Section 32 of SB 90 restricts this provision, making it a criminal offense for *any person*—even a volunteer—to "distribute[], order[], request[], collect[], deliver[], or otherwise physically possess[] more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member." As a consequence, volunteer efforts to assist voters by returning completed VBM ballots to SOE offices or drop boxes will be severely limited, as will the efforts of caregivers and other individuals who assist non-family members who are unable to return their ballots.

87.     Third-party ballot return is especially important for Black voters and Latino voters, who are less likely to have access to a vehicle, less likely to be able to secure time off work, and therefore, have more difficulty returning VBM ballots without assistance.

88.     For example, according to the 2019 American Community Survey ("ACS"), 10.4% of Black Floridians and 7.3% of Latino Floridians lack access to a car, as compared to 4.8% of White Floridians. Black and Latino voters are also more likely to work in the service industry, construction, transportation, and other occupations that are less likely to have paid time off to allow them to vote in person or return a VBM ballot during early voting hours.

89.     According to the ACS, Black and Latino Floridians are also more likely to have nonrelative household members, and therefore will have more difficulty in finding someone to return their third-party ballot under the law's new restrictive provisions: 14.6% of Black households and 12.9% of Latino households are nonrelatives, as compared to only 6.5% of white households. Voters of color who live in more crowded households with nonrelatives will also be impacted. For example, the percentage of Black Floridians living with more than one person per room in their household is over four times that of white Floridians, with the corresponding percentage for Latino Floridians over five times that of white Floridians.

90.     As such, Black and Latino voters will be disproportionately burdened by this provision.

91.     Third-party ballot return is also important for voters with disabilities, who are more likely to have difficulty returning their ballot on their own and more likely to require assistance from a third party. Many disabled voters rely exclusively on caregivers and other non-family members to collect and return their VBM ballots, as do many elderly and disabled voters who live in group facilities in which staff collect and return VBM ballots on behalf of residents.

### 4. Restrictions on Drop Box Availability.

92.     SB 90's extreme restrictions on the location, availability, and operating hours of ballot drop boxes disproportionately burden Black voters, Latino voters, and voters with disabilities.

93.     Voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and an important option for casting a ballot. Drop boxes have been endorsed by the United States Department of Homeland Security as a "secure and convenient means for voters to return their mail ballot" and the Department recommends their usage.

94.     Section 28 of SB 90 requires drop boxes to "be monitored in person by" an SOE employee at all times and imposes a $25,000 civil penalty against any supervisor if "any drop box is left accessible for ballot receipt" contrary to the law's provisions. Drop boxes that are not located within a SOE main office or branch office may only be made available during early voting days and hours. These provisions, individually and in the aggregate, significantly restrict the availability of drop boxes to voters, despite the fact that many drop boxes have been successfully monitored throughout the state by 24-hour video surveillance with no instances of fraud or other issues. These restrictions will also impact the availability of "drive through" drop boxes, which permit voters, including disabled voters, to drop off their ballot without leaving their cars.

95.     These restrictions on drop boxes will have a disproportionately heavy impact on Black and Latino voters, who tend to have stricter and more unpredictable work obligations that limit their availability during normal voting hours, and who tend to encounter longer lines at polling places. These restrictions will also disproportionately burden individuals who have less flexibility to travel to a drop box exclusively during early voting hours. For example, the percentage of Black Florida workers who rely on public transportation (not including taxis) to commute is nearly six times the percentage of white workers. In contrast, the percentage of white Florida workers whose jobs traditionally permitted them to work at home is over twice that of Black workers.

96.     Similarly, these restrictions will also burden disabled voters for whom casting an in-person ballot during early voting or on Election Day remains difficult, and further compound the many ongoing accessibility burdens that disabled voters continue to face in utilizing VBM ballots despite longstanding accessibility requirements under § 101.662, Fla. Sta.

97.     SB 90 also restricts the days on which drop boxes may be used by providing that drop boxes may only be available on early voting days, with a limited exception for drop boxes placed at SOE offices. This restriction will especially burden voters who do not receive their VBM ballot until the final days before the election. These voters will lack sufficient time to mail their VBM ballots because

Florida law requires that all VBM ballots must be received by the SOE by 7 P.M. on the day of the election. These voters will have limited options to return their ballot to a drop box, because SB 90 will force SOEs to shut down most drop boxes at the conclusion of the early voting period.

98.     As a result of widely reported and persistent failures at the United States Postal Service ("USPS"), many voters have justifiable concerns about returning their VBM ballot by mail and are only comfortable returning their VBM ballot to a secure drop box.

99.     SB 90 states that there shall be an "equal opportunity" to utilize secure drop boxes, but in fact these restrictions on drop boxes have the effect of disproportionately impacting disabled voters, and Black and Latino voters.

**5. Vague and Overbroad Criminal Prohibition Against "Influencing" a Voter Within 150-Foot Zone.**

100.    SB 90 likely restricts the provision of basic items, such as food and water, to voters waiting in line. Section 29 of SB 90 amended Fla. Stat. § 102.031 (on "unlawful solicitation of voters") to prohibit "engaging in any activity with the intent to influence or effect of influencing a voter." The same section also applies the "soliciting" ban to within 150 feet of drop boxes, an expansion of the existing 150-foot zone covering the space outside "the entrance to any polling place, a polling room where the polling place is also a polling room, an early voting site, or an office of the supervisor where vote-by-mail ballots are requested and printed on demand."

37

101.   Section 29 of SB 90 carves out an exception to this prohibition: "The terms 'solicit' or 'solicitation' may not be construed to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters."

102.   The law does not provide any exception or exclusion stating that a person (other than an SOE employee or volunteer) does not "solicit" or "engag[e] in any activity with the intent to influence or effect of influencing a voter" by offering items—even food or water—to voters, even those standing in long lines at polling places for hours on end, potentially in intense heat or inclement weather.

103.   Prior to SB 90's enactment, Florida law already prohibited improper solicitation, specifying that "'solicit' or 'solicitation' shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except [for exit polling]; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item." Fla. Stat. § 102.031.

104.   In enacting the new SB 90 prohibition, the sponsors of the legislation articulated no cognizable justification for the prohibition, and did not explain what "activities" within the 150-foot zone would be considered to have the "effect of influencing a voter."

105.   Expert studies confirm that "high turnout in battleground states like Florida . . . means long lines at polling places."[27] Long lines have a direct impact and cost on voters. This includes voters being unable to cast a ballot due to problems related to polling place management, including long lines.[28]

106.   Long lines "make voters irritable and frustrated, leading some to avoid voting altogether or to leave before voting, producing uncounted numbers of lost votes." *Voting Technology Project*, at 10. Survey reports from 2008 and 2012 indicate that Florida had "some of the longest voter waiting times in the nation in these two elections"—an average of 29 minutes and 45 minutes, respectively.

107.   Even longer lines are regularly reported in Florida. In 2012, Miami voters waited in lines that extended for many city blocks for more than six hours to cast a ballot during the early-voting period.[29] Similar extreme delays occurred in 2012 in Broward County.[30]

---

[27] *The Voting Technology Project: Looking Back, Looking Ahead*, Caltech/MIT Voting Tech. Project (July 2016), https://vote.caltech.edu/documents/164/VTP_July_Report_with_cover.pdf, at 10.
[28] Matthew Weil et al., *The 2018 Voting Experience: Polling Place Lines*, Bipartisan Pol'y Ctr., Nov. 2019, https://bipartisanpolicy.org/wp-content/uploads/2019/11/The-2018-Votin-Experience.pdf, at 6.
[29] Esteban Roman, *For Some Florida Voters, Six-Hour Wait Time To Cast A Ballot In Florida, Early Voters Wait In Line For Hours*, ABC News/Univision (Nov. 2, 2012), https://abcnews.go.com/ABC_Univision/early-florida-voters-wait-long-hours-line-vote/story?id=17630774.
[30] Marc Freeman et al., *South Florida Voting: Long Lines Drag Voting Late Into The Night*, S. Fla. Sun-Sentinel (Nov. 7, 2012), https://www.sun-

108.   The burdens of these lines do not fall evenly on Florida voters. Rather, the burdens are disproportionally, and most severely, felt by Black and Latino voters. As one national study found, "the more voters in a precinct who are non-white, the longer the wait times."[31] Data from the 2018 Cooperative Congressional Election Study shows that nationwide, "African American (11.5 minutes) and Hispanic (11.7 minutes) voters waited longer, on average, than white voters (8.8 minutes)."[32]

109.   Disabled voters also face significant burdens from having to wait in long lines as they navigate polling sites that already present numerous forms of physical accessibility barriers.

110.   By forcing voters to choose between their health, their time, or their job, these laws impinge upon voters' fundamental right to cast a ballot. A long line to vote does not just discourage people from casting a ballot that day: it also discourages them from voting in the future. Statistical evidence shows nearly 200,000 people failed to vote in the 2014 elections due to long lines in 2012.[33] In Florida specifically, long lines have a major effect on voter turnout. A 2013 analysis

---

sentinel.com/news/fl-xpm-2012-11-07-fl-election-day-at-the-polls-20121106-story.html.

[31] Weil et al., *2018 Voting Experience: Polling Place Lines*, at 6. *See also* at 21.

[32] *Id*. at 7.

[33] Stephen Scott Pettigrew, *Long Lines and Voter Purges: The Logistics of Running Elections in America* (Harvard Univ. Ph.D. dissertation, 2017), https://dash.harvard.edu/bitstream/handle/1/40046499/PETTIGREW-DISSERTATION-2017.pdf.

examined voter patterns and precinct-closing times in Florida's 25 largest counties (home to 86% of Florida's registered voters) during the November 6, 2012 general election.[34] It determined that at least 201,000 would-be Florida voters likely gave up in frustration due to long lines, and that "the lengthy lines lowered actual turnout by roughly 2.3 percent per hour of delay."[35]

111.   In Broward County in 2018, long lines and 90-minute waits were typical for voters on the final day of early voting.[36]

112.   Long lines were also reported during the November 2020 general election in Florida.[37] SB 90's restrictions on casting a VBM ballot will have a

---

[34] Scott Powers & David Damron, *Analysis: 201,000 in Florida Didn't Vote Because of Long Lines*, Orlando Sentinel, Jan. 29, 2013, https://www.orlandosentinel.com/business/os-xpm-2013-01-29-os-voter-lines-statewide-20130118-story.html.

[35] *Id.*

[36] Susannah Bryan, *Voters Waited In Long Lines On Last Day of Early Voting*, S. FLA. Sun-Sentinel, Nov. 4, 2018, https://www.sun-sentinel.com/news/politics/fl-ne-early-voting-last-day-20181104-story.html.

[37] Franklin White, *Long Lines, High Turnout on Last Day of Early Voting in South Florida*, 7 News, WSVN, Nov. 2, 2020, https://wsvn.com/news/politics/long-lines-high-turnout-on-last-day-of-early-voting-in-south-florida/ ("long lines in Miramar"), Matt Fernandez, *More Long Voting Lines This Weekend in Central Florida*, Spectrum News 13, Oct. 25, 2020 (in Apopka, some voters reported "waited more than an hour"), https://www.mynews13.com/fl/orlando/politics/2020/10/24/more-long-voting-lines-this-weekend-in-central-florida; Jake Allen, Michael Braun, Frank Gluck, *Long Lines and Rain Didn't Dampen Turnout on First Day of Early Voting in Lee and Collier*, Fort Myers News-Press, Oct. 19, 2020 ("Many voting stations had lines exceeding 45 minutes"), https://www.news-press.com/story/news/politics/elections/2020/10/19/early-voting-florida-2020-fort-myers-naples-cape-coral-lehigh-acres-estero-vote-election/3709337001/.

spillover effect, pushing more voters to cast ballots in person, further increasing the risk of long lines that require voters to wait for hours.

113.   Because state officials allow these long lines to occur, numerous nonpartisan organizations and their members, including Plaintiff Florida NAACP and its members, often provide relief to voters waiting in long lines—who are disproportionately Black and Latino voters—by offering water, coffee, snacks, chairs, and other assistance, and by verbally encouraging voters to stay in line despite the difficulty of extended waits. These activities are especially important when locations are the busiest and the weather is the hottest.

114.   Providing relief to voters is free speech, not mere charity. By providing voters with water, food and other relief items while they wait in line, the volunteers express the importance of casting a ballot, and affirm individuals' value as a person and a voter. Volunteers create a sense of community, reminding voters that voting is both a joyful act and a civic responsibility.

115.   No evidence was provided during the House or Senate committee hearings to justify criminalizing the nonpartisan provision of free food, water, and similar basic resources to voters standing in line. No evidence was provided to suggest that such offerings influence a voter or justify restricting nonpartisan volunteers from coming within 150 feet of a polling location entrance to do so. Similarly, no evidence was provided to demonstrate that the existing criminal

prohibitions on solicitation were insufficient to deter any efforts to engage in partisan or disruptive conduct while people were waiting to vote.

**E.    Florida Has No Legitimate Interest in the Challenged Provisions That Justified the Burdens Imposed.**

116.   As stated above, the Florida Legislature enacted SB 90 despite the absence of *any* evidence of fraud or irregularities in the 2020 Florida elections, much less any fraud or irregularity that would have changed the outcome of any election.

117.   Senator Baxley repeatedly suggested that SB 90 was necessary to prevent fraud or irregularities, but admitted that he lacked any evidence that SB 90 would actually prevent or deter supposed fraud, saying only that, "The challenge is that you don't know what you don't know."[38]

118.   Governor DeSantis touted Florida as a model for election integrity and security while at the same time signing SB 90 into law.[39]

119.   Neither the sponsors of the legislation nor Defendant have articulated or demonstrated how the Challenged Provisions would prevent purported "fraud."[40] Broward County Supervisor of Elections Joe Scott noted that the challenged provisions of the Act amount to "massive voter suppression" and could have a major

---

[38] Man, S. FLA. Sun-Sentinel, *supra* note 23.

[39] *Id.*

[40] *See id.* (the Act's sponsors acknowledged that "they couldn't identify any problems in last year's record-setting vote by mail that would be fixed by the changes they advanced"; Senator Baxley admitted that the 2020 elections were "excellent, excellent" and conducted with "very high credibility.").

43

impact. Mark Earley, the Leon County Supervisor of Elections and vice president of the Florida Supervisors of Elections, told Florida legislators at a hearing, "We are against this bill, vehemently. This bill appears to be setting us up for another 2012, when we had long lines, chaos and confusion."[41]

## V.    CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, et seq.
**(Discriminatory Results)**

120.   Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

121.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

122.   "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

---

[41] Man, S. Fla. Sun-Sentinel, *supra* note 23.

123.  A violation of Section 2 may be based either on a finding of discriminatory purpose motivating a challenged governmental action or on a finding of a discriminatory result from the challenged governmental action. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997).

124.  A violation of Section 2 occurs when, "based on the totality of the circumstances, it is shown that the political processes . . . are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

125.  As detailed herein, Florida has a long, well-established history of racially discriminatory voting restrictions.

126.  As detailed herein, SB 90 was enacted at a time when Black and Latino voters were increasingly using means of voting that are being limited or restricted entirely in SB 90.

127.  As detailed herein, SB 90 was introduced and enacted immediately following the November 2020 general election, in which Black voters and Latino voters disproportionately and at historically high levels availed themselves of the means of voting and other activities that are being limited or prohibited by the Challenged Provisions of SB 90.

128.   As reflected by the totality of the circumstances surrounding the enactment of SB 90, and the other facts set forth herein (including the social, economic, and historical conditions in Florida affecting Black and Latino voters in Florida), the Challenged Provisions will (a) disproportionately and adversely affect the right to vote of Black and Latino voters and (b) diminish the opportunities of Black and Latino voters to vote and to elect their preferred representatives.

129.   As detailed herein, in passing SB 90, the Florida Legislature deviated from procedural norms in its rushing the bill to passage. Among other things, the Legislature repeatedly curtailed opportunities for public testimony, while permitting testimony on other bills; constrained and severely limited opportunities for members of the legislature to debate provisions of SB 90 before rushing to conduct votes; and failed to provide members of the legislature and members of the public with the typical amount of notice of new versions of the legislation before enacting those amendments, which is necessary to permit analysis, public comment, and deliberation.

130.   The legislators who introduced, sponsored, and voted to enact SB 90 were on notice of the likely and foreseeable disparate impact of the Challenged Provisions on Black and Latino voters.

131.   Implementation of SB 90 will irreparably harm Plaintiffs and their members by denying, unduly burdening, or abridging their right to vote.

132.  There are less discriminatory, less intrusive, and less burdensome alternatives to each and every Challenged Provision, including simply maintaining the status quo, which would leave undisturbed an election system Defendant Lee characterized as "safe, secure and orderly."

133.  By engaging in the acts and omissions alleged herein, Defendant has denied and continues to deny Plaintiffs' rights protected by the Voting Rights Act.

134.  Defendant will continue to violate Plaintiffs' rights under the Voting Rights Act absent relief from this Court.

## COUNT II

### First and Fourteenth Amendment
### U.S. Const. amend. XIV, 42 U.S.C. § 1983
### (Undue Burden on the Right to Vote
### in Violation of the U.S. Constitution)

135.  Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

136.  The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

137.  This fundamental right to vote is rooted in "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters,

regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

138. The government cannot unreasonably burden the right to vote. If the character and magnitude of the injury inflicted upon voting rights outweigh the state interests justifying the challenged restriction, then the restriction is unconstitutional. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). In evaluating burdens on the right to vote, "[i]t matters . . . whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups." *LWV of Fla.,* 314 F. Supp. 3d at 1216.

139. Defendant's implementation and enforcement of the Challenged Provisions will unreasonably and severely burden all voters, but these burdens are especially severe for Black voters, Latino voters, and voters with disabilities. Accordingly, the Challenged Provisions should be evaluated under a heightened level of scrutiny.

140. Defendant has no legitimate interest in the Challenged Provisions that justifies *any* burden on the right to vote, let alone the severe burdens that the Challenged Provisions impose on Plaintiffs and on all Florida voters. None of the burdens imposed by the Challenged Provisions are necessary to achieve, let alone reasonably related to, any sufficiently weighty legitimate governmental interest. The

purported justifications for SB 90 (*e.g.,* to prevent voter fraud) are pretextual and unsupported by any evidence in the legislative record.

141.   Even if the Challenged Provisions serve some permissible goal, Defendant cannot explain why this goal could not be substantially achieved through some other means that does not impose burdens on the right to vote.

## COUNT III

### Title II of the Americans with Disabilities Act
### (42 U.S.C. § 12131, et seq.)
### (Failure to Provide Reasonable Accommodations)

142.   Plaintiffs re-allege and reincorporate by reference all prior and subsequent paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

143.   Voting is a fundamental right, but historically, people with disabilities have been excluded from this core aspect of citizenship. *See* U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, *The Americans With Disabilities Act and Other Federal Laws Protecting the Rights of Voters With Disabilities* 1, https://www.justice.gov/file/69411/download (last visited Apr. 25, 2021).

144.   The Americans with Disabilities Act ("ADA") was enacted to combat discrimination against persons with disabilities and to protect their fundamental rights, including the right to vote.

145.   Under Title II of the ADA, state and local governments are prohibited from imposing requirements on participation in public services, programs, or activities—including voting—that prevent individuals with disabilities from fully and equally enjoying those activities. *See* 42 U.S.C. § 12132.

146.   State and local governments must make reasonable modifications in policies, practices, or procedures when those modifications are necessary to avoid discrimination on the basis of disability. These requirements apply to all election policies and procedures.

147.   To protect people with disabilities against discrimination by states and other governmental authorities, Congress has abrogated the defense of sovereign immunity for claims under Title II of the ADA. *Nat'l Assoc. of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020) (recognizing validity of ADA sovereign immunity abrogation).

148.   There is no valid justification for the burdens that the Challenged Provisions impose on voters with disabilities, which will deny voters with disabilities equal access to the franchise and prevent such voters from exercising their fundamental right to vote.

149.   "Physical barriers are not the only means by which to impede accessibility." *People First of Ala. v. Merrill*, 467 F. Supp. 3d. 1179, 1220 (N.D. Ala. 2020). For example, the identification requirement for VBM ballot requests will

make it more difficult for voters with disabilities to request VBM ballots. The same requirement places a serious burden on all voters with disabilities for whom it is easier to vote from their own homes, and who require extra time to vote. This includes, for example, voters with limited mobility or visual impairments who would otherwise struggle to vote in person due to physical barriers or limitations.

150.   The restrictions on drop-box availability add impermissible barriers to voters with disabilities' participation in elections. By requiring drop boxes to be staffed, the Challenged Provisions will limit the option to offer drop boxes outside. As a result of the staffing requirement, many election officials will place most or all drop boxes indoors where staff are already located, which may be less accessible to voters with disabilities. Voters with disabilities who have limited mobility are more likely to rely on drop boxes that are placed outdoors and are easily accessible—an option that the Challenged Provisions will severely curtail.

151.   The limitations on third-party return of VBM ballots are another significant barrier to the franchise for disabled voters. Many such voters rely on assistance from others, including volunteers and organizations, to return their ballots for them. For voters who are homebound or cannot risk exposure to crowds, these restrictions will lead to outright disenfranchisement as they may be unable to find anyone to submit their ballots for them.

152.    Voters with disabilities who choose to vote in person will also face greater burdens due to SB 90's vague and overbroad prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter." This provision exposes family members, caregivers, and volunteers to potential criminal liability for aiding voters, including voters with disabilities. This criminal statute will, among other things, inhibit family members, caregivers, and others from providing food or water to a voter with diabetes, or a chair to someone with limited mobility or breathing problems. Florida voters regularly face long lines at their polling places and this problem will only intensify as voting by mail is curtailed by the other Challenged Provisions. At polling places with long lines, this ban will result in some voters with disabilities having to choose between their health and casting their vote.

153.    Individually and together, the Challenged Provisions render the franchise not "readily accessible" for voters with disabilities and therefore violate Title II of the ADA. *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001).

154.    Unless the requested relief is granted, Plaintiffs and those similarly situated will be discriminated against and denied adequate access to the franchise.

155.    The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. §§ 12188(a)(1)-(2).

## COUNT IV

### U.S. Const. amend. I; 42 U.S.C. § 1983
### (Freedom of Speech/Expression)

156.   Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs as though fully set forth herein.

157.   This action is brought pursuant to 42 U.S.C. § 1983 to enforce Plaintiff Florida NAACP's right under the First Amendment, as applied to the states by the Fourteenth Amendment, to freely associate and engage in protected speech and expression.

158.   Plaintiff Florida NAACP regularly dispatches volunteers throughout the state to provide food, water, and other relief to voters waiting to cast their ballots in person, as part of conveying their message concerning the importance of staying in line and the value that each individual's vote carries.

159.   Plaintiff Florida NAACP's efforts to provide relief to voters waiting in long lines is quintessential First Amendment expressive conduct. "[C]onstitutional protection is afforded to 'speech,' and acts that qualify as signs with expressive meaning qualify as speech within the meaning of the Constitution." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018).

160.   Providing relief to voters waiting in line conveys distinct messages—specifically, that voters should remain in line and make their voices heard; that voting is an act that promotes community; and that each individual voter matters. By

providing water, food, and other relief, Plaintiff Florida NAACP has "established an intent to express an idea through activity, and the reasonable observer would interpret [their] food [and relief] sharing events as conveying some sort of message." *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1243.

161.   SB 90's ban on "engaging in any activity with the intent to influence or effect of influencing a voter" in tandem with its exclusive exemption from this ban for supervisor of election volunteers and staff to provide items to voters in a nonpartisan capacity directly bars the constitutionally protected speech and expression of Plaintiff Florida NAACP and similar organizations and volunteers as they seek to support voters, and there is no legitimate government purpose for imposing these burdens.

162.   SB 90's ban on providing relief to voters waiting in long lines restricts speech and expressive conduct in traditional public fora.

163.   SB 90's ban on providing relief to voters waiting in long lines is not narrowly tailored to serve significant governmental interests.

164.   SB 90's ban on providing relief to voters waiting in long lines does not leave open ample alternative channels of communication for Plaintiff's speech and expressive conduct.

## COUNT V

### U.S. Const. amend. XIV; 42 U.S.C. § 1983
### (Vagueness and Overbreadth)

165.   Plaintiffs re-allege and reincorporate by reference all prior and subsequent paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

166.   The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

167.   A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

168.   SB 90, Section 29 is unconstitutionally vague because it contains no guidance or explanation as to what "activities" would have the intention to influence or the effect of influencing a voter, nor what specifically constitutes "influence." Further, this provision does not clearly provide members of the public with adequate knowledge or fair notice as to what conduct is permitted and what conduct is prohibited.

169.   SB 90, Section 29 is unconstitutionally vague because in leaving enforcement decisions to local election officials, law enforcement officers, and prosecutors, it creates a clear risk of arbitrary, selective, or inconsistent enforcement.

170.   This provision is also overbroad because it infringes on and unduly burdens (a) the legal and constitutional right of volunteers to engage in expressive conduct by offering food, water, chairs, or other relief to voters in any capacity without fear of criminal liability and (b) the legal and constitutional right of voters to receive such assistance, and because there is no governmental interest sufficient to outweigh these significant burdens.

171.   This provision is also overbroad because it potentially criminalizes any activity within the zone that had the "effect of influencing a voter" without limitation, or regard to whether such activities would have the effect of influencing a reasonable voter.

172.   While the state can constitutionally regulate polling places, this provision impermissibly targets protected speech.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendant and award Plaintiffs the following relief:

173.   An injunction barring Defendant and her agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under

their direction from enforcing each and every one of the Challenged Provisions for all voters;

174.   A declaration that Defendant's actions, as described herein, violated Section 2 of the Voting Rights Act;

175.   A declaration that Defendant's actions, as described herein, violated the First and Fourteenth Amendments to the United States Constitution;

176.   A declaration that Defendant's actions, as described herein, violated the Americans With Disabilities Act;

177.   An order requiring Defendant to pay Plaintiffs' reasonable costs, expenses, and attorneys' fees; and

178.   Any and all additional relief that this Court deems just and proper.

Respectfully submitted, this 6th day of May 2021.


Nellie L. King
(Fla. Bar No. 0099562)
The Law Offices of Nellie L. King,
P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
Nellie@CriminalDefenseFla.com
561-833-1084

Robert D. Fram*
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
415-591-7025
rfram@cov.com

P. Benjamin Duke*
Shira M. Poliak*
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1270
pbduke@cov.com

Natasha Merle
John Z. Morris*
Michael Pernick*
Morenike Fajana*
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2200
zmorris@naacpldf.org

Benjamin L. Cavataro
(Fla. Bar No. 113534)
Virginia A. Williamson*
Covington & Burling LLP
850 Tenth Street, N.W.
Washington, DC 20001
202-662-5693
bcavataro@cov.com

.

*Attorneys for Plaintiffs*

* *Pro hac vice application forthcoming*