# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA STATE CONFERENCE OF THE NAACP, DISABILITY RIGHTS FLORIDA, and COMMON CAUSE, | Civ. No. 4:21-cv-00187 |
| *Plaintiffs*, | |
| v. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| LAUREL M. LEE, in her official capacity as Secretary of State of Florida; KIM A. BARTON, in her official capacity as Supervisor of Elections for Alachua County; CHRISTOPHER MILTON, in his official capacity as Supervisor of Elections for Baker County; MARK ANDERSEN, in his official capacity as Supervisor of Elections for Bay County; AMANDA SEYFANG, in her official capacity as Supervisor of Elections for Bradford County; LORI SCOTT, in her official capacity as Supervisors of Elections for Brevard County; JOE SCOTT, in his official capacity as Supervisor of Elections for Broward County; SHARON CHASON, in her official capacity as Supervisor of Elections for Calhoun County; PAUL A. STAMOULIS, in his official capacity as Supervisor of Elections for Charlotte County; MAUREEN "MO" BAIRD, in her official capacity as Supervisor of Elections for Citrus County; CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for Clay County; JENNIFER J. EDWARDS, in her official capacity as Supervisors of Elections for Collier County; TOMI STINSON BROWN, in her official capacity as Supervisor of Elections for Columbia County; MARK F. NEGLEY, in her official capacity as Supervisor of Elections for DeSoto County; STARLET CANNON in her official capacity as Supervisor of Elections for Dixie County; MIKE HOGAN, in his official capacity as Supervisor of Elections for Duval County; DAVID H. STAFFORD, in his official capacity as | |

Supervisor of Elections for Escambia County; KAITI
LENHART, in her official capacity as Supervisor of
Elections for Flagler County; HEATHER RILEY, in her
official capacity as Supervisor of Elections for Franklin
County; SHIRLEY G. KNIGHT, in her official capacity as
Supervisor of Elections for Gadsden County; CONNIE
SANCHEZ, in her official capacity as Supervisor of
Elections for Gilchrist County; ALETRIS FARNAM, in her
official capacity as Supervisor of Elections for Glades
County; JOHN HANLON, in his official capacity as
Supervisor of Elections for Gulf County; LAURA HUTTO,
in her official capacity as Supervisor of Elections for
Hamilton County; DIANE SMITH, in her official capacity as
Supervisor of Elections for Hardee County; BRENDA
HOOTS, in her official capacity as Supervisor of Elections
for HENDRY County; SHIRLEY ANDERSON, in her
official capacity as Supervisor of Elections for Hernando
County; PENNY OGG, in her official capacity as Supervisor
of Elections for Highlands County; CRAIG LATIMER, in
his official capacity as Supervisor of Elections for
Hillsborough County; THERISA MEADOWS, in her official
capacity as Supervisor of Elections for Holmes County;
LESLIE ROSSWAY SWAN, in her official capacity as
Supervisor of Elections for Indian River County; CAROL A.
DUNAWAY, in her official capacity as Supervisor of
Elections for Jackson County; MARTY BISHOP, in his
official capacity as Supervisor of Elections for Jefferson
County; TRAVIS HART, in his official capacity as
Supervisor of Elections for Lafayette County; ALAN HAYS,
in his official capacity as Supervisor of Elections for Lake
County; TOMMY DOYLE, in his official capacity as
Supervisor of Elections for Lee County; MARK S.
EARLEY, in his official capacity as Supervisor of Elections
for Leon County; TAMMY JONES, in her official capacity
as Supervisor of Elections for Levy County; GRANT
CONYERS, in his official capacity as Supervisor of
Elections for Liberty County; HEATH DRIGGERS, in his
official capacity as Supervisor of Elections for Madison
County; MICHAEL BENNETT, in his official capacity as
Supervisor of Elections for Manatee County; WESLEY

WILCOX, in his official capacity as Supervisor of Elections for Marion County; VICKI DAVIS, in her official capacity as Supervisor of Elections for Martin County; CHRISTINA WHITE, in her official capacity as Supervisor of Elections for Miami-Dade County; JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for Monroe County; JANET H. ADKINS, in her official capacity as Supervisor of Elections for Nassau County; PAUL A. LUX, in his official capacity as Supervisor of Elections for Okaloosa County; MELISSA ARNOLD, in her official capacity as Supervisor of Elections for Okeechobee County; BILL COWLES, in his official capacity as Supervisor of Elections for Orange County; MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for Osceola County; WENDY SARTORY LINK, in her official capacity as Supervisor of Elections for Palm Beach; BRIAN E. CORLEY, in his official capacity as Supervisor of Elections for Pasco County; JULIE MARCUS, in her official capacity as Supervisor of Elections for Pinellas County; LORI EDWARDS, in her official capacity as Supervisor of Elections for Polk County; CHARLES OVERTURF, in his official capacity as Supervisor of Elections for Putnam County; TAPPIE A. VILLANE, in her official capacity as Supervisor of Elections for Santa Rosa County; RON TURNER, in his official capacity as Supervisor of Elections for Sarasota County; CHRIS ANDERSON, in his official capacity as Supervisor of Elections for Seminole County; VICKY OAKES, in her official capacity as Supervisor of Elections for St. Johns County; GERTRUDE WALKER, in her official capacity as Supervisor of Elections for St. Lucie County; WILLIAM "BILL" KEEN, in his official capacity as Supervisor of Elections for Sumter County; JENNIFER MUSGROVE KINSEY, in her official capacity as Supervisor of Elections for Suwannee County; DANA SOUTHERLAND, in her official capacity as Supervisor of Elections for Taylor County; DEBORAH K. OSBORNE, in her official capacity as Supervisor of Elections for Union County; LISA LEWIS, in her official capacity as Supervisor of Elections for Volusia County; JOSEPH "JOE" MORGAN, in his official capacity as Supervisor of Elections

for Wakulla County; BOBBY BEASLEY, in his official capacity as Supervisor of Elections for Walton County; CAROL F. RUDD, in her official capacity as Supervisor of Elections for Washington County.

*Defendants*.

## **TABLE OF CONTENTS**

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF ............................................................................................1

I.   PRELIMINARY STATEMENT AND NATURE OF THE CASE...................1

II.  PARTIES ...........................................................................................7

   A.  Plaintiffs.........................................................................................7

   B.  Defendants ...................................................................................13

III. JURISDICTION AND VENUE ........................................................23

IV.  FACTUAL ALLEGATIONS ............................................................24

   A.  Florida Has a Long, Ongoing History of Racially Discriminatory Voting Restrictions. ...............................................................................24

   B.  Black Voters Participated in the 2020 Election at High Rates, and Took Advantage of Mail-In and Drop Box Voting. .................................29

   C.  Florida Election Officials Have No Adequate Justification for Enacting the Challenged Provisions, and Proffered Justifications Are Pretextual. ...........30

   D.  The Florida Legislature Passed SB 90 in a Rushed Process Characterized by Procedural Deviations That Excluded Members of the Public. .....................32

   E.  SB 90 Imposes Restrictions on the Right to Vote. ........................................37

     1.   Drop Box Restrictions................................................................39

     2.   Volunteer Assistance Ban ........................................................41

     3.   Vote-by-Mail Application Restriction .................................44

     4.   Voting Line Relief Restrictions .............................................45

   F.  Florida Has No Legitimate Interest in the Challenged Provisions That Justified the Burdens Imposed.........................................................52

iv

V.  CLAIMS FOR RELIEF ......................................................................56

    COUNT I .............................................................................................56

    COUNT II ...........................................................................................61

    COUNT III ..........................................................................................63

    COUNT IV ..........................................................................................67

    COUNT V ............................................................................................69

    COUNT VI ..........................................................................................71

    COUNT VII .........................................................................................74

PRAYER FOR RELIEF .........................................................................82

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This lawsuit challenges Florida's newly enacted law, Senate Bill 90, which illegally and unconstitutionally burdens the right to vote. Plaintiffs allege as follows:

## I.   PRELIMINARY STATEMENT AND NATURE OF THE CASE

1.     It is well established that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

2.     Eleven million Floridians exercised their right to vote in the 2020 general election—the highest voter turnout in nearly three decades. This turnout occurred notwithstanding the ongoing once-in-a-century global pandemic caused by COVID-19. Within this context, Defendant Secretary of State Laurel M. Lee applauded Governor Ron DeSantis and the Department of State for successfully running three "safe, secure, and orderly elections" throughout 2020.[1]

3.     Despite alarmingly high COVID-19 infection rates, voters of color—in particular Black voters—were especially motivated to participate in Florida's

---

[1] Press Release, Florida Sec'y of State Laurel M. Lee Credits Governor DeSantis for Successful         Election         Year,         (Dec.         23,         2020), https://dos.myflorida.com/communications/
press-releases/2020/florida-secretary-of-state-laurel-m-lee-credits-governor-desantis-for-successful-election-year/.

elections in 2020, with widespread reliance on vote-by-mail ("VBM") ballots, drop boxes, and early voting. Twice as many Black voters cast VBM ballots in 2020 as compared to previous years, and the proportion of VBM ballots cast by Black voters increased by over 28% from the 2016 election.

4.    This unprecedented turnout and engagement were met with a swift response from the Florida Legislature. Deploying baseless claims of "voter fraud," the Legislature enacted Senate Bill 90 ("SB 90"), which was passed on April 29, 2021 and signed into law by Governor Ron DeSantis on May 6, 2021. This law contains a sweeping set of provisions that restrict and burden voting access. SB 90's restrictive provisions (collectively, the "Challenged Provisions") include: (a) severe limitations on where, when, and how drop boxes can be used (the "Drop Box Restrictions," SB 90 Section 28); (b) limitations on third-party VBM ballot return (the "Volunteer Assistance Ban," SB 90 Section 32); (c) needless restrictions on standing VBM applications (the "Vote-by-Mail Application Restrictions," SB 90 Section 24); and (d) a new expansion of the term "solicitation" to encompass all "activities" carried out within an expanded zone around polling places, early voting locations, or drop boxes, with either the effect or the intent of "influencing" a voter (the "Voting Line Relief Restrictions," SB 90 Section 29). The Voting Line Relief Restrictions are vague and overbroad and will prohibit individuals, including

2

Plaintiffs and their members, from providing relief, including free food, water, and other assistance, to Florida voters waiting in long lines.

5.     SB 90 is just the latest in a long line of voter suppression laws targeting Florida's Black voters, Latino voters, elderly voters and voters with disabilities. For far too long, Florida's lawmakers and elected officials have created a vast array of hurdles that have made it more difficult for these and other voters to make their voices heard.

6.     From 1972 to 2012, when multiple counties in Florida were required under the Voting Rights Act of 1965 ("VRA") to seek federal clearance for changes to their election laws, Florida's racially discriminatory practices required federal intervention numerous times.[2]

7.     In recent years, Florida has gone to great lengths to suppress the political participation of people of color by, *inter alia*, imposing new restrictions on voting, including voter identification requirements; engaging in racially motivated voter purges and redistricting; imposing new barriers preventing the re-

---

[2] *See, e.g.*, Letter from Ralph F. Boyd, Jr., Assistant Att'y Gen., to John M. McKay, President of the Fla. Senate and Tom Feeney, Speaker of the Fla. House of Reps. 1 (July 1, 2002); Letter from Bill Lann Lee, Chief, Voting Sec., to George L. Waas, Assistant Att'y Gen. State of Fla. (June 1, 1999); Letter from Bill Lann Lee, Acting Assistant Att'y Gen., to Robert A. Butterworth, Att'y Gen., State of Fla. (Aug. 14, 1998); Letter from John R. Dunne, Assistant Att'y Gen., Civil Rights Div., to Robert A. Butterworth, Att'y Gen., State of Fla. 2 (June 16, 1992).

enfranchisement of formerly incarcerated persons until they paid legal fines, even when they could not afford to do so; and routinely closing voting sites in predominantly Black and brown communities.[3]

8.     Each of the Challenged Provisions in SB 90 places undue burdens on the right to vote. Taken together, the burden is even more severe: by making it more difficult for voters to obtain and return VBM ballots, SB 90 will force more voters to attempt to vote in person, leading to longer lines and wait times for all voters, and outright disenfranchisement for some. In turn, SB 90 may criminalize the efforts of those who seek to provide basic sustenance to the voters who are forced to wait in these longer lines.

9.     While the Challenged Provisions affect all voters, the brunt of the harm will be borne by Black voters, Latino voters, elderly voters, and voters with disabilities. Black and Latino Floridians are less likely to be able to take time off work to return VBM ballots during work hours, and are less likely to have access to a car, and are therefore more likely to rely on third-party VBM ballot return or drop boxes. Black and Latino voters in particular tend to encounter longer lines when voting in person, are therefore more likely to need water and food to make the longer

---

[3] *See, e.g., League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018) (*"LWV of Fla."*); *Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) (three-judge court) (per curiam); *Brown v. Florida,* 208 F. Supp. 2d 1344 (S.D. Fla. 2002); *De Grandy v. Wetherell*, 815 F. Supp. 1550 (N.D. Fla. 1992).

waits tolerable, and have come to rely on the assistance provided by nonprofit groups to those waiting in line to vote.

10.     Voters with disabilities will also be disproportionately burdened by the Challenged Provisions. Given accessibility issues at polling sites throughout the state, many voters with disabilities are unable to vote in person and rely exclusively on VBM ballots and drop boxes to cast their ballots. In the process of applying for VBM ballots in the first place, many voters with disabilities face accessibility challenges, whether they seek to make a standing application in person, online, or by telephone, and would be significantly burdened by having to make such requests twice as frequently in order to vote under the Challenged Provisions. Many voters with disabilities, including those living in group residential facilities, rely on caregivers and other non-family members to collect and return their VBM ballots. Additionally, voters with disabilities who choose to vote in person—for whom there are no guarantees that they will be approved to move to the front of a line or be provided with a chair while they wait—often face significantly increased burdens when required to wait in long lines to vote.

11.     SB 90's curtailment of the availability of VBM and drop boxes removes an important option for vulnerable voters with no legitimate purpose, and will discriminatorily harm Black and Latino voters, voters with disabilities, and other voters who rely on VBM ballots and drop boxes to access the franchise.

5

12.     As a result, the Challenged Provisions both individually and in their aggregate effect—violate the rights of Black and Latino voters under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments to the United States Constitution.

13.     The Challenged Provisions—individually and in their aggregate effect—also unlawfully violate the rights of millions of Florida voters with disabilities under Title II of the Americans with Disabilities Act ("ADA"). Further, the Voting Line Relief Restrictions and the Volunteer Assistance Ban violate those same voters' rights under Section 208 of the VRA.

14.     The Voting Line Relief Restrictions, which prohibit people from "engaging in any activity with the intent to influence or effect of influencing a voter," is vague and overbroad, and exposes volunteers to criminal liability merely for giving simple forms of basic relief (such as free food and water) to voters waiting in long lines. This provision unduly burdens Florida voters' exercise of their constitutional rights to freely associate and express protected speech, and therefore violates the First Amendment of the United States Constitution. This provision impermissibly restricts Plaintiff Florida NAACP and its members from engaging in expressive conduct, such as providing water and other basic resources to voters waiting in line to communicate that their individual votes matter and that it is important to follow through with casting their ballots despite long wait times and

other obstacles to doing so. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1238 (11th Cir. 2018).

15. All of the Challenged Provisions further violate the right to vote of *all* Florida voters, as protected by the First and Fourteenth Amendments to the United States Constitution. Any state restriction on the right to vote, no matter how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (citation marks omitted).

16. No state interests justify the severe burdens imposed by the Challenged Provisions. Plaintiffs thus seek declaratory and injunctive relief to enjoin Florida's restrictive and wholly unnecessary encroachment on this fundamental right.

## II.   <u>PARTIES</u>

### A.   <u>Plaintiffs</u>

17. Plaintiff Florida State Conference of the National Association for the Advancement of Colored People Branches and Youth Units ("Florida NAACP") is a nonprofit, nonpartisan civil rights organization in Florida. Founded in 1909, Florida NAACP is the oldest civil rights organization in Florida, and serves as the umbrella organization for local branch units throughout the state. The Florida NAACP's approximately 12,000 members are predominately Black and other minority individuals, and include registered voters who reside throughout the state.

Its mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. For decades the Florida NAACP has engaged heavily in statewide voter registration, public education, and advocacy concerning the right to vote in order to encourage civic and electoral participation among its members and other voters.

18.    SB 90's restrictive provisions will severely burden or deny the right to vote of the Florida NAACP's members by imposing restrictions for standing VBM applications; severe limitations on where, when, and how drop boxes can be used; strict limitations on third-party VBM ballot return; and potential criminal penalties for individuals who provide free food and water or other assistance to voters.

19.    These restrictions also make it substantially more difficult for the Florida NAACP to engage in its civic engagement mission. For instance, in recent elections, the Florida NAACP engaged in large-scale ballot return efforts in which voters brought their completed VBM ballots to churches or local NAACP chapter meetings. Florida NAACP members then returned those completed ballots to the county supervisor of elections ("SOE") offices or drop boxes on the voters' behalf. This activity that would be severely curtailed by SB 90, and, in particular, the Challenged Provisions. Volunteers with the Florida NAACP also provided food and water to voters waiting in long lines in Black communities across the state, which—under the Voting Line Relief Restrictions—may now be a crime. SB 90 will also

require the Florida NAACP to divert time, money, and resources away from other activities, such as programming and initiatives concerning the school-to-prison pipeline and eliminating academic and educational inequities and mass incarceration, in order to assist and educate its members and other Florida voters who are burdened by the Challenged Provisions. Therefore, SB 90 adversely impacts the Florida NAACP's operations.

20.     Plaintiff Disability Rights Florida ("DRF") is an independent, nonprofit corporation designated by law as Florida's federally funded protection and advocacy system ("P&A system") for individuals with disabilities. In this capacity, DRF is authorized by federal law to pursue legal, administrative, and other appropriate remedies to ensure the protection of, and advocacy for, the rights of individuals with disabilities. These constituents include the millions of registered voters with disabilities throughout the state. DRF also advocates for the rights and interests of people with disabilities who seek to register to vote. DRF's work includes legal advocacy and rights protection for children and adults with disabilities throughout Florida. This work includes significant efforts devoted to the political participation of people with disabilities and the challenges they face when voting, including inaccessible polling sites and ballots, and limited or non-existent supervised facility voting options for people with disabilities residing in residential facilities.

21.    DRF engages in legislative and public advocacy on these issues, directly engages with and trains election officials and voters on expanding voting accessibility, promotes robust voter registration, and engages in voter hotline and voter education efforts. DRF plays a leadership role in multiple statewide coalitions and task forces. DRF is currently a member of a statewide accessible VBM task force devoted to proposing and evaluating recommendations to the state regarding its commitment, via settlement agreement, to provide accessible VBM in every county prior to the 2022 midterm primary elections, though Florida has already had an obligation to provide accessible VBM for nearly two decades under state law. These efforts have also included an Accessible VBM Pilot Project that was conducted in five counties during the 2020 general election and was implemented to introduce partially accessible VBM balloting options for voters with disabilities.

22.    The Challenged Provisions will severely burden or deny the right to vote of DRF's constituents by imposing restrictions for standing VBM applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party VBM ballot return; and potential criminal penalties for individuals who provide relief, such as free food and water or other assistance, to people standing in line to vote. These restrictions also make it substantially more difficult for DRF to engage in its civic engagement mission. SB 90 will also require DRF to divert time, money, and resources away from other activities, including efforts to engage with

election officials to expand accessibility, advocating for more accessible VBM access throughout the state, and pursuing lobbying efforts to increase supervised facility voting. Instead, the resources that would be used for those programs and efforts will be redirected to work including, but not limited to, conducting public education for voters with disabilities to understand the new restrictions on VBM access and providing public guidance on the collection and return of ballots for voters with disabilities in light of SB 90's new criminal penalties, and conducting statewide outreach to facilities and people with disabilities whose abilities to receive and return ballots will be curtailed.

23.    Plaintiff Common Cause is a nonpartisan, nonprofit citizen lobby. Common Cause is devoted to electoral reform, ethics in government, and the protection of citizens' rights in national, state, and local elections. Common Cause has approximately 55,000 members in Florida. Common Cause advocates for policies at the state and local level to ensure that elections are free, fair, and accessible. Common Cause also encourages and supports voter participation in elections by, among other things, engaging in voter education and outreach efforts; acting as a lead coordinator for the nonpartisan Florida Election Protection Coalition; monitoring and correcting election-related disinformation online; and funding translation of election information into Spanish and Haitian Creole for non-English-speaking voters.

11

24.    The Challenged Provisions will severely burden or deny the right to vote of Common Cause's Florida members by imposing restrictions for standing VBM applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party VBM ballot return; and potential criminal penalties for individuals who provide free food and water or other assistance. These restrictions also make it substantially more difficult for Common Cause to engage in its civic engagement mission in Florida. SB 90 will also force Common Cause to divert time, money, and resources away from other activities, such as its plans to engage in public education and advocacy concerning the redistricting process in Florida. Instead, Common Cause will be required to devote increased resources to its voter engagement and education programming, including by recruiting more volunteers, temporary staff, and contractors to inform and educate voters about their rights as they are affected by the new law, and hiring these staff members earlier in the election cycle than originally planned. Moreover, while Common Cause has not previously funded programs to provide direct support to assist voters in securing or returning their VBM applications, SB 90 will now necessitate capacity-building and investment of Common Cause resources in programming, staffing, volunteer management, and voter education in order to directly assist voters in navigating the burdensome restrictions on VBM imposed by SB 90.

## B.    <u>Defendants</u>

25.    Defendant Laurel M. Lee is the Secretary of State of Florida. As the "chief election officer of the state," it is Defendant Lee's "responsibility to . . . [o]btain and maintain uniformity in the interpretation and implementation of the election laws," Fla. Stat. § 97.012(1); to adopt rules to implement new laws, including SB 90; to enforce compliance with the Florida Election Code and with rules adopted by the Department of State, *id*. § 97.012(14), to "[c]reate and administer a statewide voter registration system as required by the Help America Vote Act of 2002," *id*. § 97.012(11); to "[p]rovide written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State," *id*. § 97.012(16); and to perform other tasks as set by state law. These responsibilities extend to elections conducted by mail. For example, for an election to be conducted by mail, the Secretary of State must "approve[] a written plan for the conduct of the election." *Id*. § 101.6102(1)(a)(3). Defendant Lee is sued in her official capacity.

26.    The Division of Elections is a component of the Florida Department of State, Fla. Stat. § 20.10(2)(a), and provides "administrative support to the Secretary

13

of State, Florida's Chief Election Officer, to ensure that Florida has fair and accurate elections."[4]

27.    Defendant Lee's office has exercised and will continue to exercise extensive oversight with respect to the county Supervisors of Elections and election rules generally. Among other things, the Department of State and its Division of Elections have in the past promulgated numerous rules[5] and a polling place procedures manual[6] that regulates and instructs as to vote-by-mail, drop boxes, regulation of order at polling places, compliance with rules pertaining to disability protections, and various other aspects of the voting process and voting access. The Department of State has also provided instruction sessions to facilitate uniform implementation of the election laws and rules, including without limitation through a September 16, 2020 workshop session with the Supervisors of Elections.[7]

28.    SB 90 directs the Division of Elections to enforce the provision restricting access to drop boxes. For example, Section 28 of SB 90 provides: "If any drop box is left accessible for ballot receipt other than as authorized by this section,

---

[4]    Fla, Dep't of State, Div. of Elec., *About Us*, https://dos.myflorida.com/elections/about-us/ (last visited May 3, 2021).

[5]  Fla. Dep't of State, *Elections, Individual Rules,* https://www.flrules.org/gateway/ChapterHome.asp?Chapter=1S-2.

[6] Fla. Dep't of State, *Polling Place Procedures Manual*, https://files.floridados.gov/media/703005/adopted-clean-de11_pollplaceprocmanual.pdf.

[7]    The Florida Channel, *9/16/20 Supervisor of Elections' Workshop*, https://thefloridachannel.org/videos/9-16-20-supervisor-of-elections-workshop/.

the supervisor is subject to a civil penalty of $25,000. The [D]ivision [of Elections] is authorized to enforce this provision."

29.    In her official capacity as Secretary of State, Defendant Lee is responsible for, through her office's Division of Elections, enforcing compliance with the Drop Box Restrictions by subjecting Supervisors of Election to the aforementioned $25,000 penalty for violations. Fla. Stat. § 101.69(3).

30.    Each of the following Defendants (listed *infra*, ¶¶ 30.a–30.ooo is a Supervisor of Elections for a County in Florida. Each of the following Defendants (listed *infra*, ¶¶ 30.a–30.ooo) is named in his or her official capacity as a Supervisor of Elections. As a Supervisor of Elections, each of the following Defendants (listed *infra*, ¶¶ 30.a–30.ooo) is responsible for accepting and processing requests for vote-by-mail ballots, recording the identification provided in connection with vote-by-mail requests, and sending out vote-by-mail ballots in the County in which he or she serves. Fla. Stat. § 101.62(1)-(3). As a Supervisor of Elections, each of the following Defendants (listed *infra*, ¶¶ 30.a–30.ooo) is also charged with "designat[ing]" the 150-foot zones in which providing food, water, or other relief for people in line to vote is proscribed, "mark[ing] the boundaries" for said zones, "inform[ing] the clerk of the area within which soliciting is unlawful," and "ensur[ing] order at the polling places," including through effecting removal of violators "from the 150-foot zone surrounding the polling place." Fla. Stat. § 102.031(4). As a Supervisor of Elections,

each of the following Defendants (listed *infra* ¶¶ 30.a–30.ooo) is also responsible for dispatching and receiving vote-by-mail ballots, Fla. Stat. § 101.6103; coordinating the return of ballots via drop boxes, designating drop box sites, monitoring drop boxes, and placing drop boxes. Fla. Stat. § 101.69(2). Each of the following Defendants (listed *infra* ¶¶ 30.a–30.ooo) therefore enforces the Vote-by-Mail Application Restrictions, the Drop Box Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions in the County in which he or she serves as Supervisor of Elections:

    a.    KIM A. BARTON, in her official capacity as Supervisor of Elections for Alachua County;

    b.    CHRISTOPHER MILTON, in his official capacity as Supervisor of Elections for BAKER County;

    c.    MARK ANDERSEN, in his official capacity as Supervisor of Elections for Bay County;

    d.    AMANDA SEYFANG, in her official capacity as Supervisor of Elections for Bradford County;

    e.    LORI SCOTT, in her official capacity as Supervisors of Elections for Brevard County;

    f.    JOE SCOTT, in his official capacity as Supervisor of Elections for Broward County;

g.    SHARON CHASON, in her official capacity as Supervisor of Elections for Calhoun County;

h.    PAUL A. STAMOULIS, in his official capacity as Supervisor of Elections for Charlotte County;

i.    MAUREEN "MO" BAIRD, in her official capacity as Supervisor of Elections for Citrus County;

j.    CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for Clay County;

k.    JENNIFER J. EDWARDS, in her official capacity as Supervisors of Elections for Collier County;

l.    TOMI STINSON BROWN, in her official capacity as Supervisor of Elections for Columbia County;

m.    MARK F. NEGLEY, in his official capacity as Supervisor of Elections for DeSoto County;

n.    STARLET CANNON, in her official capacity as Supervisor of Elections for Dixie County;

o.    MIKE HOGAN, in his official capacity as Supervisor of Elections for Duval County;

p.    DAVID H. STAFFORD, in his official capacity as Supervisor of Elections for Escambia County;

q.    KAITI LENHART, in her official capacity as Supervisor of Elections for Flagler County;

r.    HEATHER RILEY, in her official capacity as Supervisor of Elections for Franklin County;

s.    SHIRLEY G. KNIGHT, in her official capacity as Supervisor of Elections for Gadsden County;

t.    CONNIE SANCHEZ, in her official capacity as Supervisor of Elections for Gilchrist County;

u.    ALETRIS FARNAM, in her official capacity as Supervisor of Elections for Glades County;

v.    JOHN HANLON, in his official capacity as Supervisor of Elections for Gulf County;

w.    LAURA HUTTO, in her official capacity as Supervisor of Elections for Hamilton County;

x.    DIANE SMITH, in her official capacity as Supervisor of Elections for Hardee County;

y.    BRENDA HOOTS, in her official capacity as Supervisor of Elections for Hendry County;

z.    SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for Hernando County;

aa.     PENNY OGG, in her official capacity as Supervisor of Elections for Highlands County;

bb.     CRAIG LATIMER, in his official capacity as Supervisor of Elections for Hillsborough County;

cc.     THERISA MEADOWS, in her official capacity as Supervisor of Elections for Holmes County;

dd.     LESLIE ROSSWAY SWAN, in her official capacity as Supervisor of Elections for Indian River County;

ee.     CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for Jackson County;

ff.     MARTY BISHOP, in his official capacity as Supervisor of Elections for Jefferson County;

gg.     TRAVIS HART, in his official capacity as Supervisor of Elections for Lafayette County;

hh.     ALAN HAYS, in his official capacity as Supervisor of Elections for Lake County;

ii.     TOMMY DOYLE, in his official capacity as Supervisor of Elections for Lee County;

jj.     MARK S. EARLEY, in his official capacity as Supervisor of Elections for Leon County;

kk.    TAMMY JONES, in her official capacity as Supervisor of Elections for Levy County;

ll.    GRANT CONYERS, in his official capacity as Supervisor of Elections for Liberty County;

mm.  HEATH DRIGGERS, in his official capacity as Supervisor of Elections for Madison County;

nn.    MICHAEL BENNETT, in his official capacity as Supervisor of Elections for Manatee County;

oo.    WESLEY WILCOX, in his official capacity as Supervisor of Elections for Marion County;

pp.    VICKI DAVIS, in her official capacity as Supervisor of Elections for Martin County;

qq.    CHRISTINA WHITE, in her official capacity as Supervisor of Elections for Miami-Dade County;

rr.    JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for Monroe County;

ss.    JANET H. ADKINS, in her official capacity as Supervisor of Elections for Nassau County;

tt.    PAUL A. LUX, in his official capacity as Supervisor of Elections for Okaloosa County;

uu.    MELISSA ARNOLD, in her official capacity as Supervisor of Elections for Okeechobee County;

vv.    BILL COWLES, in his official capacity as Supervisor of Elections for Orange County;

ww.    MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for Osceola County;

xx.    WENDY SARTORY LINK, in her official capacity as Supervisor of Elections for Palm Beach County;

yy.    BRIAN E. CORLEY, in her official capacity as Supervisor of Elections for Pasco County;

zz.    JULIE MARCUS, in her official capacity as Supervisor of Elections for Pinellas County;

aaa.    LORI EDWARDS, in her official capacity as Supervisor of Elections for Polk County;

bbb.    CHARLES OVERTURF, in his official capacity as Supervisor of Elections for Putnam County;

ccc.    TAPPIE A. VILLANE, in her official capacity as Supervisor of Elections for Santa Rosa County;

ddd.    RON TURNER, in his official capacity as Supervisor of Elections for Sarasota County;

eee.  CHRIS ANDERSON, in his official capacity as Supervisor of Elections for Seminole County;

fff.  VICKY OAKES, in her official capacity as Supervisor of Elections for St. Johns County;

ggg.  GERTRUDE WALKER, in her official capacity as Supervisor of Elections for St. Lucie County;

hhh.  WILLIAM "BILL" KEEN, in his official capacity as Supervisor of Elections for Sumter County;

iii.  JENNIFER MUSGROVE KINSEY, in her official capacity as Supervisor of Elections for Suwannee County;

jjj.  DANA SOUTHERLAND, in her official capacity as Supervisor of Elections for Taylor County;

kkk.  DEBORAH K. OSBORNE, in her official capacity as Supervisor of Elections for Union County;

lll.  LISA LEWIS, in her official capacity as Supervisor of Elections for Volusia County;

mmm. JOSEPH "JOE" MORGAN, in his official capacity as Supervisor of Elections for Wakulla County;

nnn.  BOBBY BEASLEY, in his official capacity as Supervisor of Elections for Walton County;

ooo.    CAROL F. RUDD, in her official capacity as Supervisor of
Elections for Washington County.

## III.    JURISDICTION AND VENUE

31.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress
the deprivation under color of state law of rights secured by the United States
Constitution.

32.    The Court has original jurisdiction over the subject matter of this action
pursuant to 28 U.S.C. § 1343(a) because it seeks to redress the deprivation, under
color of state law, of rights, privileges and immunities secured by the Voting Rights
Act, 52 U.S.C. § 10301, and 28 U.S.C. § 1331 because it arises under the laws of the
United States.

33.    This Court has personal jurisdiction over Defendants, who are each
sued in their official capacities only.

34.    Venue is proper in the U.S. District Court for the Northern District of
Florida pursuant to 28 U.S.C. § 1391(b)(2) because Defendant Laurel M. Lee resides
in this district and a substantial part of the events that gave rise to Plaintiffs' claims
occurred in this judicial district.

35.    Plaintiffs Florida State Conference of the NAACP, Disability Rights
Florida, and Common Cause all operate within this district and division.

36.   This Court has the authority to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## IV.   FACTUAL ALLEGATIONS

### A.   Florida Has a Long, Ongoing History of Racially Discriminatory Voting Restrictions.

37.   SB 90 builds on a long history of invidious discriminatory voting practices by the State of Florida. Courts and scholars have consistently recognized and acknowledged this history of discrimination and disenfranchisement dating back to the post-Civil War period. As soon as the Fourteenth Amendment to the United States Constitution granted Black men the right to vote in 1868, discriminatory practices were "employed by the State of Florida to prevent African-Americans from having a political voice."[8]

38.   From 1885 to 1900, Florida enacted a raft of laws to disenfranchise Black people and block their participation in the political process, using "such mechanisms as multiple ballot box laws, tissue ballots or 'little jokers,' the secret

---

[8] *Johnson v. Mortham*, 926 F. Supp. 1460, 1476 (N.D. Fla. 1996); *see also Davis v. Chiles*, 139 F.3d 1414, 1418 n.10 (11th Cir. 1998) ("Florida has had a history of racially discriminatory voting practices and that continuing socio-economic disparities are hindering blacks' participation in the political process in these districts."); *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992) (three-judge court) ("A longstanding general history of official discrimination against minorities has influenced Florida's electoral process" and "adversely affected the ability of minorities to participate in the political process.").

ballot, the 'white primary,' the poll tax, run-off elections, at-large elections, multiple-member elections, and gerrymandering." *Johnson*, 926 F. Supp. at 1476.

39.    As the Florida Legislature enacted such discriminatory laws, Black voter registration, voter participation, and office-holding rates declined precipitously. Black voter turnout in Florida collapsed from 88% in 1880 to 14% by 1892. Black turnout then continued to drop until it fell to just 2% in 1912. In addition to laws on the books, widespread violence, harassment, terrorism, and intimidation also prevented Black Floridians from participating in the electoral process throughout the 20th century.[9]

40.    Although the VRA extended access to the franchise, Black participation in the political process continued to be inhibited. Indeed, five Florida counties were covered by the remedial preclearance requirement of Section 5 of the VRA: Collier, Hardee, Hendry, Hillsborough, and Monroe.[10]

41.    With the new millennium came renewed attempts to restrict the Black vote in Florida. For example, in 2000, the State of Florida improperly removed at

---

[9] *See, e.g.*, Robert Stephens, *The Truth Laid Bare,* Pegasus, Univ. of Cent. Fla. (Fall 2020), https://www.ucf.edu/pegasus/the-truth-laid-bare/ (describing the Ocoee Massacre in which at least 30 Black people were murdered by a white mob after July Perry, a Black man, exercised his right to vote).

[10] U.S. Dep't of Just., Civil Rights Div., *Jurisdictions Previously Covered by Section 5*, https://www.justice.gov/crt/jurisdictions-previously-covered-section-5 (last visited June 11, 2021).

least 1,100 eligible voters from the voting rolls after identifying them as convicted felons.[11] As a result, many eligible voters were turned away at the polls.[12] Of the voters dropped from the rolls in this botched voter purge, 41% were Black.[13] In Miami-Dade County, for example, "more than 65 percent of the names on the purge list were African Americans, who represented only 20.4 percent of the population."[14] The State of Florida was required to develop a new program for identifying potential voters with felony convictions, and to restore hundreds of voters to the voting rolls.[15]

42.     In 2011, then-Governor Rick Scott signed HB 1355 into law. HB 1355 reduced the number of early voting days in Florida from fourteen to eight, allowed Supervisors of Elections to cut the number of early voting hours in half, and eliminated early voting on the Sunday before Election Day.

43.     The law was introduced and enacted after Black voters used early voting at high rates in the 2008 election: "More than half of African-American votes

---

[11] Tampa Bay Times, *Study Shows 1,100 Voters Wrongly Purged from Rolls*, (Sept. 9, 2005) https://www.tampabay.com/archive/2001/05/27/study-shows-1100-voters-wrongly-purged-from-rolls.

[12] Katie Sanders, *Florida Voters Mistakenly Purged in 2000*, Tampa Bay Times (June 14, 2012), https://www.tampabay.com/news/politics/stateroundup/florida-voters-mistakenly-purged-in-2000/1235456/.

[13] *Id.*

[14] *Id.*

[15] *See id.*

in Florida were cast during the early voting period."[16] Invoking the then-active VRA preclearance requirement, the United States Department of Justice blocked the rules from taking effect in Collier, Hendry, Osceola, Polk, and Lee counties.[17]

44.    On November 6, 2018, Florida voters overwhelmingly voted to pass Amendment 4, a citizens' initiative that amended the state Constitution to repeal lifetime disenfranchisement and automatically restore the voting rights of most people convicted of felonies upon completion of their sentences. Until the passage of Amendment 4, Florida was one of only four states to impose a lifetime voting ban on any person convicted of a felony crime. Scholarship firmly establishes that "felon disenfranchisement is inextricably tied to the United States history of racial discrimination," with "many felon disenfranchisement provisions [added] to state constitutions in the post-Civil War era as a means to disenfranchise former slaves who had been granted the right to vote under the Reconstruction Amendments."[18] During the spring 2019 legislative session, the Florida Legislature enacted a new law which severely restricted the reach of Amendment 4 by requiring returning citizens

---

[16] Michael Ellement, Note, *Blocking the Ballot: Why Florida's New Voting Restrictions Demonstrate A Need for Continued Enforcement of the Voting Rights Act Preclearance Requirement*, 2 CATH. U. L. REV. 541, 556 (2013).

[17] *Florida*, 885 F. Supp. 2d at 303 (holding that "the State has failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters").

[18] Dalia Figueredo, *Affording The Franchise: Amendment 4 & The Senate Bill 7066 Litigation*, 72 FLA. L. REV. 1135, 1136 (2020).

to pay all legal financial obligations (such as fines, fees, restitution, and court costs) before becoming eligible for automatic restoration of their voting rights, regardless of whether these returning citizens were able to pay. *See* S.B. 7066, 2019 Leg., Reg. Sess. § 25 (Fla. 2019); *see also* Fla. Stat. § 98.0751. In May 2020, the U.S. District Court for the Northern District of Florida determined that the state's "pay-to-vote system," as applied to returning citizens who were genuinely unable to pay legal financial obligations violated the Fourteenth Amendment's Equal Protection Clause. *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1215–31 (N.D. Fla. 2020). On appeal, however, a divided Eleventh Circuit reversed and vacated the District Court's decision. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1025 (11th Cir. 2020) (en banc).

45.    Until very recently, the ability of Black voters and other qualified voters in Florida to cast ballots was also threatened by unchecked discretion held by election officials to reject VBM ballots from eligible voters deemed "noncompliant." As this Court has held, this absolute power to throw out votes was facially unconstitutional because it unduly burdened the fundamental right of Florida citizens to vote and have their votes counted. *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022 (N.D. Fla. 2018) ("The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes

constitutional muster. The answer is simple. It does not."), *appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) (per curiam).

## B. Black Voters Participated in the 2020 Election at High Rates, and Took Advantage of Mail-In and Drop Box Voting.

46.    Turnout in the 2020 general election was 77 percent—the highest in 28 years in Florida, and among the highest in the state's history.[19]

47.    Turnout was also historic among Black voters.[20] Approximately 4.6 million Floridians voted by mail in the 2020 general election, accounting for about 44% of the 11 million votes cast.[21] Almost 1.5 million Florida voters used ballot drop boxes in the 2020 general election.[22]

---

[19] Fla. Dep't of State, Div. of Elections, *Elections Data: Voter Turnout*, https://www.dos.myflorida.com/elections/data-statistics/elections-data/voter-turnout/; Steve Patrick, *Florida Voters' Turnout Highest In 28 Years*, WJXT (Nov. 10, 2020), https://www.news4jax.com/vote-2020/2020/11/04/florida-voters-turnout-highest-in-28-years/.

[20] *See* Jenese Harris, *Historic Black Voter Turnout in 2020 Presidential Election*, WJXT (Nov. 4, 2020), https://www.news4jax.com/vote-2020/2020/11/10/historic-black-voter-turnout-in-2020-presidential-election/.

[21] Jeffrey Schweers, *As GOP Looks To Restrict Florida Mail Ballots, Advocates Unveil Report That Process Worked*, Tallahassee Democrat, Mar. 9, 2021, https://www.tallahassee.com/story/news/local/state/2021/03/09/florida-mail-ballots-voting-election-security-restrictions-drop-box-ban/4642096001/.

[22] Christina A. Cassidy, *GOP Targets Ballot Drop Boxes In Georgia, Florida, Elsewhere*, Associated Press (Apr. 19, 2021), https://apnews.com/article/donald-

48.    Significant numbers of Black Floridians voted by mail: 522,038 Black voters cast VBM ballots, more than double the number of VBM ballots cast by Black voters in 2018 and 2016.[23] Moreover, the proportion of VBM ballots cast by Black voters increased by over 28% since the 2016 presidential election.

### C.    Florida Election Officials Have No Adequate Justification for Enacting the Challenged Provisions, and Proffered Justifications Are Pretextual.

49.    As Florida election officials have repeatedly recognized, voting by mail in Florida is extremely secure. In December 2020, Defendant Lee herself affirmed that Florida had "successfully administered three safe, secure and orderly elections" in 2020 with "an unprecedented level of funding, collaboration, and strategic planning."[24] Defendant Lee further stated that Florida was able to successfully "secure the elections and provide confidence in the integrity our results."[25] Governor

---

trump-georgia-elections-coronavirus-pandemic-gubernatorial-elections-c083f5e0af7855c9dbb5a1659840c4a9.

[23] Daniel A. Smith, *Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election,* Report for All Voting is Local 10 (2021), https://bit.ly/33cfLuQ, *supra*; Anna Baringer, et al., *Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus*, 19 ELECTION L.J. 289, 306 (2020), https://bit.ly/3uRtVgw.

[24] Press Release, *supra* n.1.

[25] *Id.*

DeSantis has touted Florida's election conduct in 2020 as a model for election integrity and security.[26]

50.    Furthermore, there is no evidence of any fraud or significant irregularities in any of the 2020 elections in Florida.[27]

51.    There was similarly zero evidence of significant fraud or irregularities in the 2020 general election overall. The U.S. Cybersecurity and Infrastructure Security Agency, U.S. Election Assistance Commission, National Association of Secretaries of State, and National Association of State Election Directors affirmed the "security and integrity" of the 2020 election and noted that "[t]he November 3rd election was the most secure in American history."[28]

---

[26] Skyler Swisher & Anthony Man, *Gov. DeSantis Called Florida a Model For Election Integrity. Now He's Pushing Voting Changes That Could Help His Reelection Chances*, S. Fla. Sun-Sentinel (Feb. 19, 2021), https://www.sun-sentinel.com/news/politics/fl-ne-desantis-election-reform-ss-prem-20210219-3cuq4ehtavdulov7khuboo7asi-story.html.

[27] *See, e.g.,* Arielle Mitropoulos & Will McDuffie, *State Officials Say They're Baffled, Offended by False Election Claims*, ABC News (Nov. 17, 2020) https://abcnews.go.com/Politics/state-officials-theyre-baffled-offended-false-election-claims/story?id=74243567.

[28] Press Release, U.S. Cybersec. & Infrastructure Sec. Agency, Joint Statement From Elections Infrastructure Gov't Coordinating Council & The Election Infrastructure Sector Coordinating Exec. Comms. (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election/.

52.     Against this backdrop of high turnout and VBM use among Black voters, and the security of Florida's 2020 elections, the Florida Legislature considered, and ultimately passed, SB 90.

> **D.     The Florida Legislature Passed SB 90 in a Rushed Process Characterized by Procedural Deviations That Excluded Members of the Public.**

53.     The Florida Legislature rushed to pass SB 90, and Governor DeSantis rushed to sign it, amid extraordinary procedural deviations from the usual legislative process.

54.     On February 3, 2021, Senator Dennis Baxley introduced SB 90 in the state Senate.

55.     On March 23, 2021, Representative Blaise Ingoglia introduced HB 7041 in the state House. HB 7041 contained many of the same provisions as SB 90 and was classified on the state Senate website as a "related bill."

56.     Notwithstanding the COVID-19 pandemic and the safety risks associated with travel and in-person testimony, no legislative committee offered members of the public the option to provide testimony remotely. As a result, many members of the public who were at higher risk for COVID-19, including many members of the disability rights community, were shut out of the legislative process altogether.

57.     Members of the public testifying before Senate committees were required to travel to the Donald L. Tucker Civic Center at Florida State University ("Civic Center"), from which their testimony was virtually livestreamed to the members of the legislative committees. Although members of the public were not permitted to appear before Senate committees in person, they still had to travel from across the state and gather indoors at the Civic Center to provide testimony.

58.     Members of the public testifying before House committees were required to travel to the Florida State Capitol in Tallahassee to testify before House committees in person.

59.     On February 1, 2021, Plaintiff Common Cause sent a letter to legislative leaders on behalf of a coalition of 36 organizations calling for the legislature to, among other things, permit legislative testimony by members of the public via video or teleconference. On February 23 and April 2, 2021, Plaintiff Disability Rights Florida placed formal requests with the House and Senate Sergeants at Arms seeking accommodations to be permitted to provide virtual testimony to legislative committees. These requests were denied.

60.     This prohibition on remote testimony is inconsistent with the best practices that other state legislatures across the country have embraced to ensure that members of the public have an opportunity to provide input into the legislative

process during the COVID-19 pandemic. It is also inconsistent with the practices of other government bodies in Florida, including state agencies and local governments.

61.    The committee meetings in which SB 90 and HB 7041 were addressed were conducted in a rushed manner, often with limited time for deliberation, debate, and public testimony.

62.    Public testimony was especially limited during the April 14, 2021 meeting on SB 90 before the Senate Committee on Rules. Members of the public who traveled to the Civic Center from across the state were permitted to testify for only one minute. Many members of the public had their microphone disconnected the moment their testimony exceeded sixty seconds. The strict limitations imposed on members of the public testifying on SB 90 was inconsistent with the committee's practice for members of the public testifying on other bills—including bills considered that same day—who were not subjected to the same time limits.

63.    In that same meeting, the Committee considered for the first time and adopted a "strike all" amendment that replaced the text of SB 90—which had previously had only 344 lines of text—with new lengthy language containing 1,031 lines of text. This new amendment was first posted on the Senate website on April 13, 2021—the day before it was considered and adopted by the Committee—thereby denying members of the public sufficient time to review and meaningfully comment on the new language.

64.    The consideration of HB 7041 in the House was even more rushed. During the bill's hearing on April 19, 2021 before the House Committee on State Affairs, the Committee Chair restricted the number of questions each committee member was permitted to ask of HB 7041's sponsor, at times cutting off committee members mid-sentence. At one point, the Committee Chair abruptly closed questioning on a proposed amendment just as a committee member posed her first question on the amendment, and before the amendment's sponsor could answer it. After the Committee considered 11 amendments to HB 7041 through this rushed process, the Chair limited debate on the amended bill to 30 seconds for each committee member. None of the other nine bills considered during this hearing was subjected to this rushed treatment.

65.    In that same meeting, the Committee refused to permit any testimony from members of the public on HB 7041, even though at least 15 people had traveled to the Capitol to provide testimony on the bill in person. The Committee permitted testimony from members of the public to testify on numerous other bills.

66.    On April 26, 2021, the Senate passed SB 90 notwithstanding opposition, sending SB 90 back to the House for consideration.

67.    On April 27, 2021 at 1:33 A.M., Representative Ingoglia proposed a "strike all" amendment to SB 90 for consideration on the House floor that replaced the text of SB 90—which at that point had expanded to 1,143 lines of text—with

35

new lengthy language containing 1,313 lines of text, some of which were taken from HB 7041. Later that day, the House considered for the first time—and adopted—Representative Ingoglia's "strike all" amendment that was first introduced only early that morning.

68.    On April 28, 2021—the very next day—the House of Representatives passed its amended version of SB 90, following a rushed and limited debate, and formally sent the amended bill to the Senate that evening.

69.    In the morning of April 29, 2021 Senator Hutson introduced an amendment to the House's version of SB 90. Senator Hutson's amendment, however, was quickly removed from the Senate website and was not available to the public. A new version of Senator Huston's amendment was introduced at 3:27 P.M., which deleted and replaced the vast majority (1,170 lines) of the bill. With virtually no time to analyze, deliberate, or debate Senator Hutson's amended version of SB 90, the bill was adopted and voted out of the Senate at 5:22 P.M., less than two hours after it was first introduced.

70.    Later that evening—again in a rushed process with virtually no time for analysis, deliberation, or debate—the House took up consideration of the new version of SB 90 that had just passed the Senate. That new version, was passed by the House at 9:02 P.M.

71.    On May 6, 2021, SB 90 was signed into law by Governor Ron DeSantis.

72.    Throughout the consideration of SB 90 and HB 7041 in various committees and on the floor of both the House and the Senate, Senators and Representatives were presented with extensive evidence of the ways in which the provisions of SB 90 and HB 7041 would impose disproportionate burdens or barriers on Black voters, Latino voters, elderly voters, and voters with disabilities. Some Senators and Representatives proposed numerous amendments that would have mitigated the restrictive and discriminatory impacts of the proposed legislation. Both chambers, however, rejected the vast majority of these ameliorative amendments.

73.    Under Section 33 of SB 90, the act took effect immediately upon signing by the governor, a departure from the normal legislative process set forth in the Florida Constitution, which provides that laws passed by the Legislature "shall take effect on the sixtieth day" following the end of the legislative session. Fla. Const. art. III, § 9. During the committee meeting in which this amendment was adopted, the sponsor provided no justification for deviation from the typical processes besides stating that it was "a policy decision."

### E.    SB 90 Imposes Restrictions on the Right to Vote.

74.    Within months of the 2020 general election, and in response to high voter participation, the Florida Legislature passed SB 90 to restrict many of the safe and secure options by which Florida voters—and especially Florida's Black voters, Latino voters, and voters with disabilities—exercised their right to vote.

75.     The Challenged Provisions individually and collectively impose burdens and barriers on the right to vote and disproportionately harm Black voters, Latino voters, and voters with disabilities:

      a.      **Drop Box Restrictions** (SB 90 Section 28): Curtails the locations, availability, and operating hours of ballot drop boxes;

      b.      **Volunteer Assistance Ban** (SB 90 Section 32): Effectively bars volunteer organizations from helping voters return their vote-by-mail ballots;

      c.      **Vote-by-Mail Application Restrictions** (SB 90 Section 24): Halves the lifespan of "standing" vote-by-mail requests by requiring voters to submit new vote-by-mail applications every general election cycle rather than every two cycles;

      d.      **Voting Line Relief Restrictions** (SB 90 Section 29): Exposes volunteers to potential criminal liability for giving food or water to voters waiting in line.

76.     Each Challenged Provision, alone and in combination, burdens the right to vote of all Florida voters, with disproportionate impacts on Black voters, Latino voters, and voters with disabilities.

### 1. Drop Box Restrictions

77.    SB 90's Drop Box Restrictions place extreme restrictions on the location, availability, and operating hours of ballot drop boxes, and disproportionately burden Black voters, Latino voters, and voters with disabilities.

78.    Voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and an important option for casting a ballot. Drop boxes have been endorsed by the United States Department of Homeland Security as a "secure and convenient means for voters to return their mail ballot" and the Department recommends their usage.

79.    Section 28 of SB 90 newly requires drop boxes to "be monitored in person by" an SOE employee at all times and imposes a $25,000 civil penalty against any supervisor if "any drop box is left accessible for ballot receipt" contrary to the law's provisions. Drop boxes that are not located within a SOE main office or branch office may only be made available during early voting days and hours. These provisions, individually and in the aggregate, significantly restrict the availability of drop boxes to voters, despite the fact that many drop boxes have been successfully monitored throughout the state by 24-hour video surveillance with no instances of fraud or other issues. These restrictions will also impact the availability of "drive through" drop boxes, which permit voters, including voters with disabilities, to drop off their ballot without leaving their cars.

80.     These restrictions on drop boxes will have a disproportionately heavy impact on Black and Latino voters, who tend to have stricter and more unpredictable work obligations that limit their availability during normal voting hours, and who tend to encounter longer lines at their designated polling places. These restrictions will also disproportionately burden individuals who have less flexibility in choosing to travel to a drop box exclusively during early voting hours. For example, the percentage of Black Florida workers who rely on public transportation (not including taxis) to commute is nearly six times the percentage of white workers. In contrast, the percentage of white Florida workers whose jobs can be performed at home is over twice that of Black workers.

81.     Similarly, these restrictions will also burden voters with disabilities for whom casting an in-person ballot during early voting or on Election Day remains difficult, and further compound the many ongoing accessibility burdens that voters with disabilities continue to face in utilizing VBM ballots despite longstanding accessibility requirements under Fla. Sta. § 101.662.

82.     SB 90 also restricts the days on which drop boxes may be used by providing that drop boxes may only be available on early voting days, with a limited exception for drop boxes placed at SOE offices. This restriction will especially burden voters who do not receive their VBM ballots until the final days before the election. These voters will lack sufficient time to mail their VBM ballots because

Florida law requires that all VBM ballots must be received by the SOE by 7 P.M. on the day of the election. These voters will have limited options to return their ballot to a drop box, because SB 90 will force SOEs to shut down most drop boxes at the conclusion of the early voting period.

83.    As a result of widely reported and persistent failures at the United States Postal Service ("USPS"), many voters have justifiable concerns about returning their VBM ballot by mail and are only comfortable returning their VBM ballot to a secure drop box.

84.    SB 90 states that there shall be an "equal opportunity" to utilize secure drop boxes, but in fact these restrictions on drop boxes have the effect of disproportionately impacting voters with disabilities, and Black and Latino voters.

### 2. Volunteer Assistance Ban

85.    SB 90's Volunteer Assistance Ban imposes onerous restrictions on who may return a completed VBM ballot on behalf of a voter and how many such VBM ballots any person may return on behalf of voters.

86.    Under previous law, a third party could return a completed VBM ballot for a voter, so long as the third party was not compensated for returning the ballot. Fla. Stat. § 104.0616 (making it a criminal offense for any person to provide, offer to provide, or accept "a *pecuniary or other benefit in exchange for* distributing, ordering, requesting, collecting, delivering, or otherwise physically possessing more

41

than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member.") (emphasis added).

87.    Section 32 of SB 90 expands this provision to prohibit even *uncompensated* third-party ballot returns, making it a criminal offense for *any person*—even a volunteer—to "distribute[], order[], request[], collect[], deliver[], or otherwise physically possess[] more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member." As a consequence, volunteer efforts to assist voters by returning completed VBM ballots to SOE offices or drop boxes will be severely limited, as will the efforts of caregivers and other individuals who assist non-family members who are unable to return their ballots themselves.

88.    Third-party ballot return is especially important for Black and Latino voters, who are less likely to have access to a vehicle and less likely to be able to secure time off work, and who therefore, have more difficulty returning VBM ballots without assistance.

89.    For example, 10.4% of Black Floridians and 7.3% of Latino Floridians lack access to a car, as compared to 4.8% of White Floridians. Black and Latino voters are also more likely to work in service industries or in construction, transportation, and other occupations that are less likely to have paid time off to allow them to vote in person or return a VBM ballot during early voting hours.

42

90.     According to the ACS, Black and Latino Floridians are also more likely to live with non-family members, and therefore will have more difficulty in finding someone to return their third-party ballot under the law's new restrictive provisions: 14.6% of Black households and 12.9% of Latino households are include non-family members, as compared to only 6.5% of white households. Voters of color who live in more crowded households with non-family members will also be impacted. For example, the percentage of Black Floridians living with more than one person per room in their household is over four times that of white Floridians, with the corresponding percentage for Latino Floridians over five times that of white Floridians.

91.     As a consequence, Black and Latino voters will be disproportionately burdened by this provision.

92.     Third-party ballot return is also important for voters with disabilities, who are more likely to have difficulty returning their ballot on their own and more likely to require assistance from a third party. Many voters with disabilities rely exclusively on caregivers and other non-family members to collect and return their VBM ballots, as do many elderly voters and voters with disabilities who live in group facilities in which staff collect and return VBM ballots on behalf of residents.

### 3.  Vote-by-Mail Application Restriction

93.     SB 90's Vote-by-Mail Application Restriction forces voters to renew VBM requests each general election cycle, ending the "standing" VBM applications that were valid for up to two general election cycles (four years) for the many voters who prefer to vote by mail.

94.     This provision substantially burdens those who routinely cast VBM ballots, including Black voters, Latino voters, and voters with disabilities—all of whom used VBM ballots in record numbers in the last election. These voters will now be required to request their VBM ballots twice as often as previously required. This provision will also impose new burdens on many voters with disabilities, who will be forced to contend with the logistical challenges of completing a VBM ballot request twice as often. In particular, this will require organizations such as Plaintiffs to increase training regarding compliance with this provision and assist voters who now must request their VBM ballot twice as often.

95.     Furthermore, this provision is unnecessary because Florida law, before the enactment of SB 90, already contained procedures for updating and verifying voter registration addresses to ensure that VBM ballots reach only the voters who have requested them.

96.     There is no evidence that a significant number of voters received VBM ballots in error in past elections, nor of any systemic, material or widespread fraud caused or enabled by Florida's provision of standing VBM applications.

### 4. Voting Line Relief Restrictions

97.     Section 29 of SB 90 amended Fla. Stat. § 102.031 (on "unlawful solicitation of voters") prohibits "engaging in any activity with the intent to influence or effect of influencing a voter." *Id.* § 102.031(4)(b). The same section also applies the "soliciting" restriction to within 150 feet of drop boxes, an expansion of the existing 150-foot zone, covering the space outside "the entrance to any polling place, a polling room where the polling place is also a polling room, an early voting site, or an office of the supervisor where vote-by-mail ballots are requested and printed on demand." *Id.* § 102.031(4)(a).

98.     Section 29 of SB 90 carves out an exception to this prohibition: "The terms 'solicit' or 'solicitation' may not be construed to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters."

99.     The law does not provide any exception or exclusion stating that a person (other than an SOE employee or SOE volunteer) does not "solicit" or "engag[e] in any activity with the intent to influence or effect of influencing a voter," Fla. Stat. § 102.031(4)(b), by offering items—such as food or water—to voters, even

those standing in long lines at polling places for hours on end, potentially in intense heat or inclement weather.

100.   Prior to SB 90's enactment, Florida law already prohibited improper solicitation, specifying that "'solicit' or 'solicitation' shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except [for exit polling]; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item." Fla. Stat. § 102.031(4)(b).

101.   SB 90 does not clarify what conduct violates the new Voting Line Relief Restrictions. Further, the phrase "any activity" is necessarily expansive. Voting Line Relief Restrictions are therefore vague because it is not clear precisely what the provision criminalizes and overbroad because its restrictions likely criminalize constitutionally protected expression.

102.   The sponsors of SB 90 articulated no cognizable justification for the prohibition, and did not explain what "activities" within the 150-foot zone would be considered to have the "effect of influencing a voter."

103.   Expert studies confirm that "high turnout in battleground states like Florida . . . means long lines at polling places."[29] Long lines have a direct impact and cost on voters. This includes voters being unable to cast a ballot due to problems related to polling place management, including long lines.[30]

104.   Long lines "make voters irritable and frustrated, leading some to avoid voting altogether or to leave before voting, producing uncounted numbers of lost votes."[31] Survey reports from 2008 and 2012 indicate that Florida had "some of the longest voter waiting times in the nation in these two elections"—an average of 29 minutes and 45 minutes, respectively.

105.   Even longer lines are regularly reported in Florida. In 2012, Miami voters waited in lines that extended for many city blocks for more than six hours to

---

[29] CALTECH/MIT, *The Voting Technology Project: Looking Back, Looking Ahead*, Caltech/MIT Voting Tech. Project (July 2016), https://vote.caltech.edu/documents/164/VTP_July_Report_with_cover.pdf, at 10.

[30] Matthew Weil et al., *The 2018 Voting Experience: Polling Place Lines*, Bipartisan Pol'y Ctr., Nov. 2019, https://bipartisanpolicy.org/wp-content/uploads/2019/11/The-2018-Votin-Experience.pdf, at 6.

[31] *Voting Technology Project*, at 10.

cast a ballot during the early-voting period.[32] Similar extreme delays occurred in

2012 in Broward County.[33]

106.   The burdens of these lines do not fall evenly on Florida voters. Rather,

the burdens are disproportionally, and most severely, felt by Black and Latino voters.

As one national study found, "the more voters in a precinct who are non-white, the

longer the wait times."[34] Data from the 2018 Cooperative Congressional Election

Study shows that nationwide, "African American (11.5 minutes) and Hispanic (11.7

minutes) voters waited longer, on average, than white voters (8.8 minutes)."[35]

107.   Voters with disabilities also face significant burdens from having to

wait in long lines as they navigate polling sites that already present numerous

physical accessibility barriers.

108.   The burdens of 150-foot zones that effectively preclude voting line

relief are especially onerous in dense urban areas. Senator Baxley acknowledged as

---

[32] Esteban Roman, *For Some Florida Voters, Six-Hour Wait Time To Cast A Ballot In Florida, Early Voters Wait In Line For Hours*, ABC News/Univision (Nov. 2, 2012), https://abcnews.go.com/ABC_Univision/early-florida-voters-wait-long-hours-line-vote/story?id=17630774.

[33] Marc Freeman et al., *South Florida Voting: Long Lines Drag Voting Late Into The Night*, S. Fla. Sun-Sentinel (NOV. 7, 2012), https://www.sun-sentinel.com/news/fl-xpm-2012-11-07-fl-election-day-at-the-polls-20121106-story.html.

[34] Weil et al., *2018 Voting Experience: Polling Place Lines*, at 6. *See also* at 21.

[35] *Id*. at 7.

much, commenting during a floor debate that he "realize[d] this is challenging in many more developed urbanized areas where sometimes the spacing is pretty high."[36] In a dense urban area, locations 150 feet from a polling place or drop box may be filled with buildings and other impediments, such as major roads, that all but preclude interaction with people in line to vote.

109.   By forcing voters to choose between their health, their time, and their job, these laws impinge upon voters' fundamental right to cast a ballot. A long line to vote does not just discourage people from casting a ballot that day: it also deters them from voting in the future. Statistical evidence shows nearly 200,000 people did not vote in the 2014 elections due to long lines in 2012.[37] In Florida specifically, long lines have a major effect on voter turnout. A 2013 analysis examined voter patterns and precinct-closing times in Florida's 25 largest counties (home to 86% of Florida's registered voters) during the November 6, 2012 general election.[38] It determined that at least 201,000 would-be Florida voters likely gave up in frustration

---

[36]   Florida   Senate   Floor   Debate   (April   22,   2021), https://thefloridachannel.org/videos/4-22-21-senate-session-part-1/.

[37] Stephen Scott Pettigrew, *Long Lines and Voter Purges: The Logistics of Running Elections in America* (Harvard Univ. Ph.D dissertation, 2017), https://dash.harvard.edu/bitstream/handle/1/40046499/PETTIGREW-DISSERTATION-2017.pdf.

[38] Scott Powers & David Damron, *Analysis: 201,000 in Florida Didn't Vote Because of Long Lines*, Orlando Sentinel, Jan. 29, 2013, https://www.orlandosentinel.com/business/os-xpm-2013-01-29-os-voter-lines-statewide-20130118-story.html.

due to long lines, and that "the lengthy lines lowered actual turnout by roughly 2.3 percent per hour of delay."[39]

110.   In Broward County in 2018, long lines and 90-minute waits were typical for voters on the final day of early voting.[40]

111.   Long lines were also reported during the November 2020 general election in Florida.[41] SB 90's restrictions on casting a VBM ballot will have a spillover effect, pushing more voters to cast ballots in person, further increasing the risk of long lines that require voters to wait for hours.

112.   Because state officials allow these long lines to occur, numerous nonpartisan organizations and their members, including Plaintiff Florida NAACP

---

[39] *Id.*

[40] Susannah Bryan, *Voters Waited In Long Lines On Last Day of Early Voting*, S. FLA. Sun-Sentinel, NOV. 4, 2018, https://www.sun-sentinel.com/news/politics/fl-ne-early-voting-last-day-20181104-story.html.

[41] Franklin White, *Long Lines, High Turnout on Last Day of Early Voting in South Florida*, 7 News, WSVN, Nov. 2, 2020, https://wsvn.com/news/politics/long-lines-high-turnout-on-last-day-of-early-voting-in-south-florida/ ("long lines in Miramar"), Matt Fernandez, *More Long Voting Lines This Weekend in Central Florida*, Spectrum News 13, Oct. 25, 2020 (in Apopka, some voters reported "waited more than an hour"), https://www.mynews13.com/fl/orlando/politics/2020/10/24/more-long-voting-lines-this-weekend-in-central-florida; Jake Allen, Michael Braun, Frank Gluck, *Long Lines and Rain Didn't Dampen Turnout on First Day of Early Voting in Lee and Collier*, Fort Myers News-Press, Oct. 19, 2020 ("Many voting stations had lines exceeding 45 minutes"), https://www.news-press.com/story/news/politics/elections/2020/10/19/early-voting-florida-2020-fort-myers-naples-cape-coral-lehigh-acres-estero-vote-election/3709337001/.

and its members, often provide relief to voters waiting in long lines—who are disproportionately Black and Latino voters—by offering water, coffee, snacks, chairs, and other assistance, and by verbally encouraging voters to stay in line despite the difficulty of extended waits. These activities are especially important when locations are the busiest and the weather is the hottest.

113.   Providing relief to voters is expressive speech, not mere charity. By providing voters with water, food and other relief items while they wait in line, the volunteers express the importance of casting a ballot, and affirm individuals' value as a person and a voter. Volunteers create a sense of community, reminding voters that voting is both a joyful act and a civic responsibility.

114.   No evidence was provided during the House or Senate committee hearings to justify criminalizing "all activity"—including, possibly, the nonpartisan provision of free food, water, and similar basic resources to voters standing in line. For example, no evidence was provided to suggest that offerings influence a voter or justify restricting nonpartisan volunteers from coming within 150 feet of a polling location entrance to do so. Similarly, no evidence was provided to demonstrate that the existing criminal prohibitions on solicitation were insufficient to deter any efforts to engage in partisan or disruptive conduct while people were waiting to vote.

F. **Florida Has No Legitimate Interest in the Challenged Provisions That Justified the Burdens Imposed.**

115.   As stated above, the Florida Legislature enacted SB 90 despite the absence of *any* evidence of fraud or irregularities in the 2020 Florida elections, much less any fraud or irregularity that would have changed the outcome of any election.

116.   Senator Baxley repeatedly suggested that SB 90 was necessary to prevent fraud or irregularities, but admitted that he lacked any evidence that SB 90 would actually prevent or deter supposed fraud, saying only that, "The challenge is that you don't know what you don't know."[42]

117.   At one Senate hearing, Senator Baxley proffered the following glib rationale for SB 90's restrictions: "Some people ask why and I say why not? Let's try it."[43]

118.   Governor Ron DeSantis touted Florida as a model for election integrity and security while at the same time signing SB 90 into law.[44] Notably, in his March 2, 2021 State of the State address, Governor DeSantis stated: "[W]e should take a

---

[42] Man, S. FLA. Sun-Sentinel, *supra*.

[43] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021), https://www.flsenate.gov/media/videoplayer?EventID=1_3wpkrnbb-202102161230&Redirect=true.

[44] Skyler Swisher & Anthony Man, *Gov. DeSantis Called Florida a Model For Election Integrity. Now He's Pushing Voting Changes That Could Help His Reelection Chances*, S. Fla. Sun-Sentinel, Feb. 19, 2021, https://www.sun-sentinel.com/news/politics/fl-ne-desantis-election-reform-ss-prem-20210219-3cuq4ehtavdulov7khuboo7asi-story.html.

moment to enjoy the fact that Florida ran perhaps the most transparent and efficient election in the nation in 2020."[45]

119.   Neither the sponsors of the legislation nor Defendants have articulated or demonstrated how the Challenged Provisions would prevent purported "fraud."[46] In fact, some Supervisors of Elections publicly opposed the bill. Broward County Supervisor of Elections Joe Scott noted that the challenged provisions of the Act amount to "massive voter suppression" and could have a major impact. Mark Earley, the Leon County Supervisor of Elections and vice president of the Florida Supervisors of Elections, told Florida legislators at a hearing, "We are against this bill, vehemently. This bill appears to be setting us up for another 2012, when we had long lines, chaos and confusion."[47]

120.   Other opponents of the bill repeatedly articulated that the bill would impose racial disparities and burden the ability of people with disabilities to vote. Representative Anna Eskamani urged lawmakers to consider the effects of the bill on those "who face systematic historic hurdles to the ballot box," including "people

---

[45] Transcript of Gov. Ron DeSantis State of the State Address (March 2, 2021), https://www.flgov.com/2021/03/02/governor-ron-desantis-state-of-the-state-address-2/.

[46] Man, S. Fla. Sun-Sentinel, *supra* (the Act's sponsors acknowledged that "they couldn't identify any problems in last year's record-setting vote by mail that would be fixed by the changes they advanced"; Senator Baxley admitted that the 2020 elections were "excellent, excellent" and conducted with "very high credibility.").

[47] Man, S. Fla. Sun-Sentinel, *supra*.

of color and Floridians who are living in poverty. Floridians with disabilities, Floridians who speak English as a second language, non-traditional families, seniors on a fixed income, Floridians caught in a digital divide, workers on the night shift, our students, the homeless. . . . These are all different Floridians who have faced in the past and the present systematic barriers to voting. Several provisions within this bill do[] not do right by those communities of people."[48] Lawmakers also called attention to the fact that this law would affect voting age people with disabilities and the elderly who have difficult driving or getting out of their homes.[49]

121. During the Senate Floor debate, Senator Lori Berman directly questioned Senator Baxley about the bill's disparate impact on black voters. Citing a Stanford MIT Healthy Elections Project study that examined Florida voting data from the 2020 general election, Senator Berman asked Senator Baxley about its findings that "the racial group that had the greatest increase of voting by mail from the last Presidential election was black voters. It was up 7%." Turning to Senator Baxley, she asked, "Are you aware that the restrictions in this legislation including

---

[48]   Florida   House   Third   Reading   &   Passage   (April   28,   2021), https://thefloridachannel.org/videos/4-28-21-house-session-part-2/.
[49] *Id.*

those related to drop box and access to voter assistance will have a disparate impact on black voters?"[50]

122.   Senator Baxley did not answer her question: "I really have a hard time hearing somebody even say that. There is nothing in this bill that disenfranchises anyone. *Now to look at patterns of use and say well, you may have to go about it a little different way, there's a learning curve,* I think we have tremendous access. Compared to many states across the country we have amazing access. It's just a matter of helping people understand how they utilize that access."

123.   In opposing the Challenged Provisions on the House Floor, Representative Christopher Benjamin summarized how those provisions would not advance the integrity of elections, but would instead (consistent with Florida's unfortunate history) set up obstacles to vote in the various methods that minority voters relied upon to cast ballots in historic numbers in 2020.

124.   Per Representative Benjamin:

> And our current election in 2020 we had unprecedented numbers of black folks participate in our elections. They used drop boxes. They used volunteers to tend to

---

[50]   Florida   Senate   Floor   Debate   (April   22,   2021), https://thefloridachannel.org/videos/4-22-21-senate-session-part-1/   (emphasis added). Senator Powell raised a similar question to Senator Baxley during the Senate Committee on Rules debate. Given the increase in black voter turnout, he asked whether Senator Baxley thought that "that by putting these measures in place it would be helpful to reduce that black overt turnout." Senator Baxley responded that "that's not the intention," and adding that "I don't buy the whole Jim Crow story." Fla.   S.   Comm.   on   Rules   (April   14,   2021),   https://www.flsenate.gov/ media/videoplayer?EventID=1_05khpsef-202104140900&Redirect=true.

people in the lines. We used people to assist our elderly in getting their votes to the drop boxes or getting them to the polls and now we turn around and although our law says nothing about black folks[,] [i]t says it will apply to everyone equally[,] [w]e know that it will have a disparate impact on folks like me. But it is of no surprise because that's our history. Our history has been to systematically through subtleties that seem uninvasive exclude our most vulnerable. Exclude those who have … need the most representation. So I say to you today, we can see clearly, you, uncover your eyes so you can see too. That this Bill doesn't make elections better. It doesn't make elections easier. It continues a system that we have historically used to exclude.[51]

## V. CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, et seq.

**(Discriminatory Results as to the Drop Box Restrictions Against Defendant Laurel M. Lee)**

**(Discriminatory Results as to the Drop Box Restrictions, Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions Against Each and Every Supervisor of Elections Listed *supra*, ¶¶ 30.a –30.ooo)**

125. Plaintiffs re-allege and incorporate by reference each allegation contained paragraphs 1 through 124 as though fully set forth herein.

---

[51] Florida House Third Reading & Passage (April 28, 2021), https://thefloridachannel.org/videos/4-28-21-house-session-part-2/.

126.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

127.   "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

128.   A violation of Section 2 may be based either on a finding of discriminatory purpose motivating a challenged governmental action or on a finding of a discriminatory result from the challenged governmental action. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997).

129.   A violation of Section 2 occurs when, "based on the totality of the circumstances, it is shown that the political processes . . . are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

130.   As alleged in paragraphs 37–45, Florida has a long and well-established history of racially discriminatory voting restrictions.

131.  As alleged in paragraphs 46–48, SB 90 was enacted at a time when Black and Latino voters were increasingly using means of voting that are being limited or restricted entirely in SB 90.

132.  As alleged in paragraphs 46–48, SB 90 was introduced and enacted immediately following the November 2020 general election, in which Black voters and Latino voters disproportionately and at historically high levels availed themselves of the means of voting and other activities that are being limited or prohibited by the Challenged Provisions of SB 90.

133.  As reflected by the totality of the circumstances surrounding the enactment of SB 90, and the other facts alleged herein, *see* paragraphs 37–73, 115–24 (including the social, economic, and historical conditions in Florida affecting Black and Latino voters in Florida), the Challenged Provisions will (a) disproportionately and adversely affect the right to vote of Black and Latino voters and (b) diminish the opportunities of Black and Latino voters to vote and to elect their preferred representatives.

134.  As alleged in paragraphs 53–73, in passing SB 90, the Florida Legislature deviated from procedural norms in rushing the bill to passage. Among other things, the Legislature repeatedly curtailed opportunities for public testimony, while permitting testimony on other bills; constrained and severely limited opportunities for members of the legislature to debate provisions of SB 90 before

rushing to conduct votes; and failed to provide members of the legislature and members of the public with the typical amount of notice of new versions of the legislation before enacting those amendments, which is necessary to permit analysis, public comment, and deliberation.

135.   The legislators who introduced, sponsored, and/or voted to enact SB 90 were on notice of the likely and foreseeable disparate impact of the Challenged Provisions on Black and Latino voters. *See* ¶¶ 120–24.

136.   The legislators who introduced, sponsored, and/or voted to enact SB 90 lacked any adequate justification for doing so. As alleged in paragraphs 49–52 and 115–24, there was zero evidence of significant fraud or irregularities in the 2020 general election overall. Assertions that SB 90 was enacted to address or limit fraud or irregularities in voting are pretextual.

137.   The Challenged Provisions will irreparably harm Plaintiffs and their members by denying, unduly burdening, or abridging their right to vote in the ways alleged *see supra*, ¶¶ 77–114.

138.   There are less discriminatory, less intrusive, and less burdensome alternatives to each and every Challenged Provision, including simply maintaining the status quo.

139.   By enforcing the Drop Box Restrictions as alleged in paragraphs 25–29, Defendant Laurel M. Lee has denied and is continuing to deny Plaintiffs' rights protected by the Voting Rights Act, as alleged *supra* ¶¶ 125–38.

140.   By enforcing and implementing the Drop Box Restriction, the Volunteer Assistance Ban, the Vote-by-Mail Application Restrictions, and the Voting Line Relief Restrictions as alleged *supra* ¶ 30, each and every Supervisor of Elections listed *Supra*, ¶¶ 30.a–30.ooo, has denied and is continuing to deny Plaintiffs' rights protected by the Voting Rights, *see supra* ¶¶ 125–38.

141.   Each Defendant has denied and is continuing to violate Plaintiffs' rights under the Voting Rights Act absent relief from this Court.

## COUNT II

### U.S. Const. amend. I, XIV; 42 U.S.C. § 1983
**(Undue Burden on the Right to Vote
in Violation of the U.S. Constitution)**

**(As to the Drop Box Restrictions Against Defendant Laurel M. Lee)**

**(As to the Drop Box Restrictions, Vote-by-Mail Application Restrictions, the
Volunteer Assistance Ban, and the Voting Line Relief Restrictions Against
Each and Every Supervisor of Elections Listed *supra*, ¶¶ 30.a–30.ooo)**

142.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through
124 as though fully set forth herein.

143.   The United States Constitution guarantees that "all qualified voters
have a constitutionally protected right to vote . . . and to have their votes counted."
*Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

144.   This fundamental right to vote is rooted in "the right of individuals to
associate for the advancement of political beliefs, and the right of qualified voters,
regardless of their political persuasion, to cast their votes effectively." *Williams v.
Rhodes*, 393 U.S. 23, 30 (1968).

145.   The government cannot unreasonably burden the right to vote. If the
character and magnitude of the injury inflicted upon voting rights outweighs the state
interests justifying the challenged restriction, then the restriction is unconstitutional.
*Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S.
428, 434 (1992). In evaluating burdens on the right to vote, "'[i]t matters . . . whether

the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups.'" *LWV of Fla.,* 314 F. Supp. 3d at 1216 (citations omitted).

146.   Defendant Laurel Lee's implementation and enforcement of the Drop Box Restrictions as alleged in paragraphs 25–29, will unreasonably and severely burden all voters, but these burdens are especially severe for Black voters, Latino voters, and voters with disabilities. *See* ¶¶ 77–84.

147.   The Supervisors of Elections, listed *supra* ¶¶ 30.a–30.ooo, will unreasonably and severely burden all voters, but will especially burden Black voters, Latino voters, and voters with disabilities, through their implementation and enforcement of the Drop Box Restriction, the Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions by the actions alleged *supra*, ¶ 30. *See* ¶¶ 46–114.

148.   Accordingly, all Challenged Provisions against any and all Defendants should be evaluated under a heightened level of scrutiny.

149.   No Defendant has any legitimate interest in any Challenged Provisions that justifies *any* burden on the right to vote, let alone the severe burdens that the Challenged Provisions impose on Plaintiffs and on all Florida voters. None of the burdens imposed by any of the Challenged Provisions are necessary to achieve, let

alone reasonably related to, any sufficiently weighty legitimate governmental interest.

150.   The purported justifications for SB 90 (*e.g.,* to prevent voter fraud) are pretextual and unsupported by any evidence in the legislative record, *see supra*, ¶¶49–52, 115–24.

151.   Even if the Challenged Provisions serve some permissible goal, no Defendant can explain as to any Challenged Provision why any purportedly permissible goal could not be substantially achieved through some other means that does not impose burdens on the right to vote.

## COUNT III

**Title II of the Americans with Disabilities Act**
**(42 U.S.C. § 12131, et seq.)**
**(Failure to Provide Reasonable Accommodations)**

**(As the Drop Box Restrictions Against Defendant Laurel M. Lee)**

**(As to the Drop Box Restrictions, Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions Against Each and Every Supervisor of Elections Listed *supra*, ¶¶ 30.a–30.ooo)**

152.   Plaintiffs re-allege and reincorporate by reference paragraphs 1 through 124 of this Complaint as though fully set forth herein.

153.   Voting is a fundamental right, but historically, people with disabilities have been excluded from this core aspect of citizenship. *See* U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, *The Americans With Disabilities Act*

*and Other Federal Laws Protecting the Rights of Voters With Disabilities* 1, https://www.justice.gov/file/69411/download (last visited Apr. 25, 2021).

154.   The Americans with Disabilities Act ("ADA") was enacted to combat discrimination against persons with disabilities and to protect their fundamental rights, including the right to vote.

155.   Under Title II of the ADA, state and local governments are prohibited from imposing requirements on participation in public services, programs, or activities—including voting—that prevent individuals with disabilities from fully and equally enjoying those activities. *See* 42 U.S.C. § 12132.

156.   State and local governments must make reasonable modifications in policies, practices, or procedures when those modifications are necessary to avoid discrimination on the basis of disability. These requirements apply to all election policies and procedures.

157.   To protect people with disabilities against discrimination by states and other governmental authorities, Congress has abrogated the defense of sovereign immunity for claims under Title II of the ADA. *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020) (recognizing validity of ADA sovereign immunity abrogation).

158.   There is no valid justification for the burdens that any Challenged Provision imposes on voters with disabilities, which will deny voters with

disabilities equal access to the franchise and prevent such voters from exercising their fundamental right to vote.

159.   SB 90's restrictions on drop box availability add impermissible barriers to voters with disabilities' participation in elections. By requiring drop boxes to be staffed, the Challenged Provisions will limit the option to offer drop boxes outside. As a result of the staffing requirement, many election officials will place most or all drop boxes indoors where staff are already located, which may be less accessible to voters with disabilities. Voters with disabilities who have limited mobility are more likely to rely on drop boxes that are placed outdoors and are easily accessible—an option that the Challenged Provisions will severely curtail. *See* ¶ 81.

160.   The limitations on third-party return of VBM ballots are another significant barrier to the franchise for voters with disabilities. Many such voters rely on assistance from others, including volunteers and organizations, to return their ballots for them. For voters who are homebound or cannot risk exposure to crowds, these restrictions will lead to outright disenfranchisement as they may be unable to find anyone to submit their ballots for them. *See* ¶ 92.

161.   Voters with disabilities who choose to vote in person will also face greater burdens due to SB 90's vague and overbroad prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter." This provision may expose family members, caregivers, and volunteers to potential criminal

liability for aiding voters, including voters with disabilities. This criminal statute will, among other things, inhibit family members, caregivers, and others from providing food or water to a voter with diabetes, or a chair to someone with limited mobility or breathing problems. Florida voters regularly face long lines at their polling places and this problem will only intensify as voting by mail is curtailed by the other Challenged Provisions. At polling places with long lines, this ban will result in some voters with disabilities having to choose between their health and casting their vote. *See* ¶ 107.

162. Individually and together, the Challenged Provisions render the franchise not "readily accessible" for voters with disabilities and therefore violate Title II of the ADA. *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001).

163. By enforcing the Drop Box Restrictions as alleged in paragraphs 25–29, Defendant Laurel Lee denies and will continue to deny Plaintiffs' rights protected by the ADA.

164. By enforcing and implementing the Drop Box Restrictions, the Volunteer Assistance Ban, the Vote-by-Mail Application Restrictions, and the Voting Line Relief Restrictions, by the actions alleged *supra*, ¶ 30, each and every Supervisors of Elections listed *supra*, ¶¶ 30.a–30.ooo has denied and continues to deny Plaintiffs' rights protected by the ADA.

165.   Unless the requested relief is granted, Plaintiffs and those similarly situated will be discriminated against and denied adequate access to the franchise.

166.   The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. §§ 12188(a)(1)-(2).

## COUNT IV

### U.S. Const. amend. I; 42 U.S.C. § 1983
**(Freedom of Speech/Expression as to the Voting Line Relief Restrictions Against Each and Every Supervisor of Elections Listed *supra*, ¶¶ 30.a–30.ooo)**

167.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

168.   This action is brought pursuant to 42 U.S.C. § 1983 to enforce Plaintiff Florida NAACP's right under the First Amendment, as applied to the states by the Fourteenth Amendment, to freely associate and engage in protected speech and expression.

169.   Plaintiff Florida NAACP regularly dispatches volunteers throughout the state to provide food, water, and other relief to voters waiting to cast their ballots in person, as part of conveying their message concerning the importance of staying in line and the value that each individual's vote carries.

170.   Plaintiff Florida NAACP's efforts to provide relief to voters waiting in long lines is quintessential First Amendment expressive conduct. "[C]onstitutional protection is afforded to 'speech,' and acts that qualify as signs with expressive

meaning qualify as speech within the meaning of the Constitution." *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1240.

171.   Providing relief to voters waiting in line conveys distinct messages—specifically, that voters should remain in line and make their voices heard; that voting is an act that promotes community; and that each individual voter matters. By providing water, food, and other relief, Plaintiff Florida NAACP has "established an intent to express an idea through activity, and the reasonable observer would interpret [their] food [and relief] sharing events as conveying some sort of message." *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1243 (emphasis omitted) (citations omitted).

172.   The Voting Line Relief Restrictions, which bar "engaging in any activity with the intent to influence or effect of influencing a voter" in tandem with its exclusive exemption from these restrictions for supervisor of election volunteers and staff to provide items to voters in a nonpartisan capacity, bars the constitutionally protected speech and expression of Plaintiff Florida NAACP and similar organizations and volunteers as they seek to support voters, and there is no legitimate government purpose for imposing these burdens. *See* ¶¶ 97–114.

173.   The Voting Line Relief Restrictions prohibit speech and expressive conduct in traditional public fora.

174.    The Voting Line Relief Restrictions are not narrowly tailored to serve significant governmental interests.

175.    The Voting Line Relief Restrictions do not leave open ample alternative channels of communication for Plaintiff's speech and expressive conduct.

176.    By enforcing and implementing the Voting Line Relief Restrictions, by the actions alleged *supra*, ¶ 30, each Supervisor of Elections listed *supra*, ¶¶ 30.a – 30.ooo has denied and will continue to deny Plaintiffs' rights under the First Amendment.

## COUNT V

### U.S. Const. amend. XIV; 42 U.S.C. § 1983
### (Vagueness and Overbreadth as to the Voting Line Relief Restrictions Against Each and Every Supervisor of Elections Listed *Supra*, ¶¶ 30.a–30.ooo)

177.    Plaintiffs re-allege and reincorporate by reference paragraphs 1 through 124 of this Complaint and the paragraphs in the count below as though fully set forth herein.

178.    The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

179.    A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary

people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

180.   The Voting Line Relief Restrictions are unconstitutionally vague because they contain no guidance or explanation as to what "activities" would have the intention to influence or the effect of influencing a voter, nor what specifically constitutes "influence," and does not clearly provide members of the public with adequate knowledge or fair notice as to what conduct is permitted and what conduct is prohibited. *See* ¶ 97–114.

181.   The Voting Line Relief Restrictions are unconstitutionally vague because in leaving enforcement decisions to local election officials, law enforcement officers, and prosecutors, they creates a clear risk of arbitrary, selective, or inconsistent enforcement. *See* ¶ 97–114.

182.   The new Voting Line Relief Restrictions added by SB 90 are also overbroad because they infringe on and unduly burden (a) the legal and constitutional right of volunteers to engage in expressive conduct by offering food, water, chairs, or other relief to voters in any capacity without fear of criminal liability and (b) the legal and constitutional right of voters to receive such assistance, and because there is no governmental interest sufficient to outweigh these significant burdens. *See* ¶ 97–114.

183. The new Voting Line Relief Restrictions are also overbroad because they potentially criminalize any activity within the zone that has the "effect of influencing a voter" without limitation, or regard to whether such activities would have the effect of influencing a reasonable voter. *See* ¶ 97–114.

184. While the state can constitutionally regulate polling places, this provision impermissibly targets protected speech.

185. By enforcing and implementing the Voting Line Relief Restrictions, by the actions alleged *supra*, ¶ 30, each Supervisor of Elections listed *supra*, ¶¶ 30.a – 30.ooo, has denied and will continue to deny Plaintiffs' rights under the First Amendment.

## <u>COUNT VI</u>

### U.S. Const. amend. XIV; 42 U.S.C. § 1983

**(Intentional Race Discrimination as to the Drop Box Restrictions Against Defendant Laurel M. Lee)**

**(Intentional Race Discrimination as to the Drop Box Restrictions, Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and Voting Line Relief Restrictions Against Each and Every Supervisor of Elections Listed *supra*, ¶¶ 30.a–30.ooo)**

186. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

187. Section 1 of the Fourteenth Amendment to the United States Constitution provides in relevant part that "No State shall make or enforce any law

which shall abridge the privileges or immunities of citizens of the United States; nor shall any States deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

188.   Each of the Challenged Provisions violates the Fourteenth Amendment to the United States Constitution because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voters on account of race or color.

189.   Each of the Challenged Provisions was enacted, at least in part, with a racially discriminatory intent to discriminate against Black voters and other voters of color in violation of the United States Constitution.

190.   The Supreme Court has endorsed various methods of showing intentional discrimination. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Court explained that a variety of factors may be probative of intent to discriminate, including (1) the historical background of the decision; (2) the specific sequence of events leading up to its passage; (3) departures from the normal procedural sequence; (4) impact of the challenged law; and (5) the statements and actions of key legislators. *Id.* at 267–68. Courts also look to the foreseeability of the disparate impact; (7) knowledge of intent; and (8) the availability of less discriminatory alternatives. *See Greater*

*Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (2021).

191.   Alone and coupled with other facts, Florida's long history and ongoing record of racial discrimination in the context of voting raises a strong inference of discriminatory purpose in violation of the Fourteenth Amendment. *See* ¶¶ 37–45.

192.   Likewise the sequence of events leading up to the passage of SB 90 and the significant departures from the normal procedures, alone and coupled with other facts, raises a strong inference of discriminatory purpose in violation of the Fourteenth Amendment. *See* ¶¶ 46–73.

193.   The statements of key legislators, alone and coupled with other facts, further raises a strong inference of discriminatory purpose in violation of the Fourteenth Amendment. *See* ¶¶ 115–24.

194.   Additionally, the actual impact and the known and reasonably foreseeable discriminatory impact of SB 90 on Black voters and other voters of color, alone and coupled with other facts, raises a strong inference of discriminatory purpose in violation of the Fourteenth Amendment. *See* ¶¶ 74–76, 120–24.

195.   The tenuousness of the State's justifications for SB 90 also raise a strong inference of discriminatory purpose in violation of the Fourteenth Amendment, both by itself and coupled with other facts. *See* ¶¶ 49–52, 115–24.

196.   Less discriminatory alternatives to the Challenged Provisions are available, including, among others, maintaining the status quo.

197.   By enforcing the Drop Box Restrictions as alleged in paragraphs 25–29, Defendant Laurel Lee is, has, and will continue to intentionally discriminate against Plaintiffs in violation of the Fourteenth Amendment.

198.   By enforcing and implementing the Drop Box Restriction, the Volunteer Assistance Ban, the Vote-by-Mail Application Restrictions, and the Voting Line Relief Restrictions as alleged *supra* ¶ 30, each Supervisor of Elections listed *supra*, ¶¶ 30a – 30ooo is, has, and will continue to intentionally discriminate against Plaintiffs in violation of the Fourteenth Amendment.

199.   Each Defendant will continue to violate Plaintiffs' rights under the Fourteenth Amendment absent relief from this Court.

## COUNT VII

### U.S. Const. amend. XV; 42 U.S.C. § 1983

**(Intentional Race Discrimination in Voting as to the Drop Box Restrictions Against Defendant Laurel M. Lee)**

**(Intentional Race Discrimination in Voting as to the Drop Box Restriction, Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions Against All Supervisors of Elections Listed *supra*, ¶¶ 30.a–30.ooo)**

200.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

74

201.   The Fifteenth Amendment to the United States Constitution prohibits the denial or abridgement of the right to vote on account of race, color, or previous condition of servitude.

202.   The Voting Line Relief Restriction violates the Fifteenth Amendment because Defendants intentionally enacted, intend to operate, do operate, and do enforce the law to deny, abridge, or suppress the right to vote on account of race or color. *See* ¶¶ 97–106, 108–114.

203.   Drop Box Restrictions violates the Fifteenth Amendment because Defendants intentionally enacted, intend to operate, do operate, and do enforce the law to deny, abridge, or suppress the right to vote on account of race or color. *See* ¶¶ 77–80, 82-84.

204.   The Volunteer Assistance Ban violates the Fifteenth Amendment because Defendants intentionally enacted, intend to operate, do operate, and do enforce the law to deny, abridge, or suppress the right to vote on account of race or color. *See* ¶¶ 85-91.

205.   The Vote-by-Mail Application Restrictions violate the Fifteenth Amendment because Defendants intentionally enacted, intend to operate, do operate, and do enforce the law to deny, abridge, or suppress the right to vote on account of race or color. *See* ¶¶ 93-96.

206.   By enforcing the Drop Box Restrictions as alleged in paragraphs 25–29, Defendant Laurel Lee is, has, and will continue to intentionally discriminate against Plaintiffs in violation of the Fifteenth Amendment.

207.   By enforcing and implementing the Drop Box Restriction, the Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions as alleged *supra* ¶ 30, each Supervisor of Elections listed *supra*, ¶¶ 30.a–30.ooo is, has, and will continue to intentionally discriminate against Plaintiffs in violation of the Fifteenth Amendment.

## **COUNT VIII**

### **Violation of Section 2 of the Voting Rights Act**
### **52 U.S.C. § 10301, et seq.**

**(Intentional Race Discrimination in Voting as to the Drop Box Restrictions Against Defendant Laurel M. Lee)**

**(Intentional Race Discrimination in Voting as to Drop Box Restrictions, Vote-by-Mail Application Restrictions, the Volunteer Assistance Ban, and the Voting Line Relief Restrictions Against Each Supervisor of Elections Listed *supra*, ¶¶ 30.a–30.ooo)**

208.   Plaintiffs re-allege and incorporate by reference paragraphs 1–124 as though fully set forth herein.

209.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

210.   "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg*, 478 U.S. 30 at 47.

211.   A violation of Section 2 may be based either on a finding of discriminatory purpose motivating a challenged governmental action or on a finding of a discriminatory result from the challenged governmental action. *See Bossier Par. Sch. Bd.*, 520 U.S. at 481–82.

212.   A violation of Section 2 occurs when, "based on the totality of the circumstances, it is shown that the political processes . . . are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

213.   As alleged in paragraphs 37–45, Florida has a long and well-established history of racially discriminatory voting restrictions.

214.   As alleged in paragraphs 46–48, SB 90 was enacted at a time when Black and Latino voters were increasingly using means of voting that are being limited or restricted entirely in SB 90.

215.   As alleged in paragraphs 46–48, SB 90 was introduced and enacted immediately following the November 2020 general election, in which Black voters and Latino voters disproportionately and at historically high levels availed themselves of the means of voting and other activities that are being limited or prohibited by the Challenged Provisions of SB 90.

216.   As reflected by the totality of the circumstances surrounding the enactment of SB 90, and the other facts alleged herein (including the social, economic, and historical conditions in Florida affecting Black and Latino voters in Florida, paragraphs 76–120), a discriminatory purpose—namely, backlash to Black voters' high rates of participation in the 2020 election, *see supra* ¶¶ 46–48— motivated the enactment of SB 90 and, in particular, the Challenged Provisions.

217.   As alleged in paragraphs 53–73, in passing SB 90, the Florida Legislature deviated from procedural norms in rushing the bill to passage. Among other things, the Legislature repeatedly curtailed opportunities for public testimony, while permitting testimony on other bills; constrained and severely limited opportunities for members of the legislature to debate provisions of SB 90 before rushing to conduct votes; and failed to provide members of the legislature and members of the public with the typical amount of notice of new versions of the legislation before enacting those amendments, which is necessary to permit analysis, public comment, and deliberation.

218.   The legislators who introduced, sponsored, or/and voted to enact SB 90 lacked any adequate justification for doing so. As alleged in paragraphs 49–52, 115–24, there was zero evidence of significant fraud or irregularities in the 2020 general election overall. Assertions that SB 90 was enacted to address or limit fraud or irregularities in voting are pretextual.

219.   Implementation of the Challenged Provisions will irreparably harm Plaintiffs and their members by denying, unduly burdening, or abridging their right to vote in the ways alleged *see supra*, ¶¶ 77–114.

220.   There are less discriminatory, less intrusive, and less burdensome alternatives to each and every Challenged Provision, including simply maintaining the status quo.

221.   By enforcing the Drop Box Restrictions as alleged in paragraphs 25–29, Defendant Laurel M. Lee denies and will continue to deny Plaintiffs' rights protected by the Voting Rights Act, *see supra* ¶¶ 208–220.

222.   By enforcing and implementing the Drop Box Restriction, the Volunteer Assistance Ban, the Vote-by-Mail Application Restrictions, and the Voting Line Relief Restrictions as alleged *supra* ¶ 30, each Supervisor of Elections listed *supra*, ¶¶ 30.a–30.ooo has denied and continue to deny Plaintiffs' rights protected by the Voting Rights, *see supra* ¶¶ 208–220.

223.   Each Defendant will continue to violate Plaintiffs' rights under the Voting Rights Act absent relief from this Court.

## COUNT IX

### Violation of Section 208 of the Voting Rights Act of 1965
### 52 U.S.C. § 10508

### (Conflict Preemption as to the Line Relief Restriction and Volunteer Assistance Ban Against Each Supervisor of Elections Listed *Supra*, ¶¶ 30.a–30.ooo)

224.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

225.   Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. The Voting Rights Act defines "vote" to include "all action necessary to make a vote effective in any primary, special, or general election, including but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly." 52 U.S.C. § 10310(c)1). Accordingly, Section 208 affirmatively grants voters with disabilities the right to assistance by a person of their choice.

226.   The Line Relief Restriction prevents a voter with disabilities from receiving assistance, from a person of her choosing, to remain in line to vote. This

Restriction criminalizes assistance from a friend, non-immediate family member, or non-partisan volunteer in the form of a chair, water, food, or medication provided to a voter with disabilities. The Volunteer Assistance Ban prevents a voter with disabilities from receiving assistance, from a person of her choosing, to return her completed VBM ballot on her behalf. This ban criminalizes a friend, non-immediate family member, or non-partisan volunteer for assisting voters by returning more than two completed VBM ballots to SOE offices or drop boxes. The Line Relief Restriction and Volunteer Assistance Ban therefore deprive that voter of her right to receive assistance from a person of her choosing under Section 208.

227.   The Line Relief Restriction and Volunteer Assistance Ban criminalize the types of assistance that Plaintiffs' members historically receive, and that Plaintiffs and Plaintiffs' members historically provide to voters with disabilities. Specifically, to those voters with disabilities who are unable to return their own VBM ballots, and/or those waiting in long lines in order to cast their votes. *See supra* ¶¶ 92, 107.

228.   Because the Line Relief Restriction and Volunteer Assistance Ban criminalize the provision of assistance to voters with disabilities, specifically contemplated by Section 208, these provisions are preempted by federal law and invalid.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendants and award Plaintiffs the following relief:

229.   An injunction barring Defendant Laurel M. Lee and her agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from enforcing the Drop Box Restrictions for all voters;

230.   An injunction barring each and every Defendant-Supervisor of Elections (listed *supra* ¶¶ 30.a–30.ooo) and any of their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from enforcing and implementing the Drop Box Restriction, the Volunteer Assistance Ban, the Vote-by-Mail Application Restrictions, and the Line Relief Restriction for all voters;

231.   A declaration that all Defendants' actions as described herein, *see supra* ¶¶ 126–41, 209–23, violated Section 2 of the Voting Rights Act;

232.   A declaration that all Defendants' actions as described herein, *see supra* ¶¶ 187–99, violated the Fourteenth Amendment to the United States Constitution;

233.   A declaration that all Defendants' actions as described herein, *see supra* ¶¶ 201–07, violated the Fifteenth Amendment to the United States Constitution;

234.  A declaration that all Defendants' actions, as described herein, *see supra* ¶¶ 143–151, violated the First and Fourteenth Amendments to the United States Constitution;

235.  A declaration that all Defendants' actions, as described herein, *see supra* ¶¶ 153–66, violated the Americans With Disabilities Act;

236.  A declaration that the Supervisor of Election Defendants' actions, as described herein, *see supra* ¶¶ 168–76, the First Amendment's Free Speech and Free Expression Clause;

237.  A declaration that the Supervisor of Election Defendants' actions, as described herein, *see supra* ¶¶ 178–85, violated the Fourteenth Amendment;

238.  A declaration that all Defendants' actions, as described herein, *see supra* ¶¶ 225–28, violated Section 208 of the Voting Rights Act;

239.  An order retaining jurisdiction pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), for such a period of time as the Court deems appropriate and decree that, during such period, no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force at the time this proceeding was commenced shall be enforced unless and until the Court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in

contravention of the voting guarantees set forth in Section 1973b(f)(2) of the Voting Rights Act;

240.   An order requiring all Defendants to pay Plaintiffs' reasonable costs, expenses, and attorneys' fees; and

241.   Any and all additional relief that this Court deems just and proper.

Respectfully submitted, this 11th day of June 2021.

   /s/ Jad H. Khazem

Robert D. Fram (*pro hac vice*)
Covington & Burling LLP 415
Mission Street
San Francisco, CA 94105
415-591-7025
rfram@cov.com

P. Benjamin Duke
Shira M. Poliak*
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1270
pbduke@cov.com

Michael Pernick*
Morenike Fajana*
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2200
mfajana@naacpldf.org

Amia Trigg*
Mahogane D. Reed*
NAACP Legal Defense &
Educational Fund, Inc.

700 14th Street NW, Ste. 600
Washington, DC 20005
202-682-1300
atrigg@naacpldf.org

Benjamin L. Cavataro (Fla. Bar
No. 113534)
Jad H. Khazem (Fla. Bar No.
124408)
Virginia A. Williamson*
Morgan E. Saunders (*pro hac
vice*)
Covington & Burling LLP 850
Tenth Street, N.W.
Washington, DC 20001
202-662-5693
bcavataro@cov.com

Nellie L. King
(Fla. Bar No. 0099562)
The Law Offices of Nellie L.
King, P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
561-833-1084
Nellie@CriminalDefenseFla.com

*Attorneys for Plaintiffs*

*\*Pro hac vice application
forthcoming*