IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE
OF THE NAACP, et. al.,

      *Plaintiffs*,

v.                          Case No.:  4:21cv187-MW/MAF

LAUREL M. LEE, in her official
capacity as Florida Secretary of
State, et al.,

      *Defendants*,

and

NATIONAL REPUBLICAN
SENATORIAL COMMITTEE and
REPUBLICAN NATIONAL
COMMITTEE,

      *Intervenor-Defendants.*
_____/

## <u>ORDER ON MOTION TO DISMISS</u>

This is a voting rights case. Plaintiffs are nonprofit groups who challenge "Florida's newly enacted law, Senate Bill 90" ("SB 90"), which they allege "illegally and unconstitutionally burdens the right to vote." ECF No. 45 at 6. Plaintiffs allege that while the challenged provisions in SB 90 affect all voters, "the brunt of the harm will be borne by Black voters, Latino voters, elderly voters, and voters with disabilities." *Id*. ¶ 9. Plaintiffs have sued Florida's Secretary of State, Laurel Lee,

and Florida's 67 county Supervisors of Elections. Defendant Lee has moved to dismiss Plaintiffs' amended complaint. ECF No. 92.

This Court has considered, without hearing, Defendant Lee's motion to dismiss, *id.*, her memorandum in support, ECF No. 92-1, all other attachments, and Plaintiffs' response in opposition to the motion, ECF No. 147. [1] This Court has also reviewed the parties' supplemental briefing related to Plaintiffs' Article III standing to proceed against Defendant Lee. ECF Nos. 148 and 166. For the reasons set out below, Defendant Lee's motion is **GRANTED in part** and **DENIED in part**.

I

Plaintiffs Florida State Conference of the NAACP ("Florida NAACP"), Disability Rights Florida ("DRF"), and Common Cause filed their amended complaint on June 11, 2021, alleging six counts against Defendant Lee (Counts I, II, III, VI, VII, and VIII) and nine counts against Defendant Supervisors (Counts I–IX). ECF No. 45. Before discussing Plaintiffs' claims in more detail, some background

---

[1] On June 16, 2021, Defendant Lee moved to consolidate this case with other election cases before this Court. ECF No. 49. This Court granted the motion in part and consolidated this case with others for *discovery purposes only*. ECF No. 59. This Court specifically noted that "[a]ny motions to dismiss, for summary judgment, or other motions not related to discovery must be filed in its corresponding case, *not* in the parent case." *Id.* at 2 (emphasis in original). However, Defendant Lee ignored this Court's order and filed an "omnibus" memorandum with each motion to dismiss in each of the consolidated election cases before this Court. Accordingly, this Court will clarify its prior directive. Even if you file a separate motion for each case, you must also file a separate memorandum addressing *only* that case. Otherwise, going forward, this Court will deny without prejudice any substantive motions raising "omnibus" arguments in the same manner as Defendant Lee's "omnibus" memorandum in support of her motions to dismiss.

information regarding Plaintiffs and their alleged injuries is necessary.

A

Starting with the Florida NAACP, Plaintiffs allege that it is "a nonprofit, nonpartisan civil rights organization in Florida," indeed "the oldest civil rights organization in Florida, [that] serves as the umbrella organization for local branch units throughout the state." *Id*. ¶ 17. The organization's mission "is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination." *Id*. The organization has "[f]or decades . . . engaged heavily in statewide voter registration, public education, and advocacy concerning the right to vote in order to encourage civic and electoral participation among its members and other voters." *Id*.

The Florida NAACP has about 12,000 members who "are predominantly Black and other minority individuals, and include registered voters who reside throughout the state." *Id*. Plaintiffs allege that "SB 90's restrictive provisions will severely burden or deny [the Florida NAACP's members'] right to vote . . . by imposing restrictions," including limitations on "standing [vote-by-mail] applications; severe limitations on where, when, and how drop boxes can be used; strict limitations on third-party [vote-by-mail] ballot return; and potential criminal penalties for individuals who provide free food and water or other assistance to voters." *Id.* ¶ 18.

3

The Florida NAACP also alleges that the challenged provisions "make it substantially more difficult for the Florida NAACP to engage in its civic mission." *Id*. ¶ 19. "For instance, in recent elections, the Florida NAACP engaged in large-scale ballot return efforts in which voters brought their completed [vote-by-mail] ballots to churches or local NAACP chapter meetings," where the organization's members then returned the completed ballots to the Supervisors of Elections' offices or drop boxes on the voters' behalf. *Id*. Florida NAACP members also volunteer to provide food and water "to voters waiting in long lines in Black communities across the state," which may now be a crime under one of the challenged provisions. *Id*. Finally, Plaintiffs allege that the challenged provisions will "require the Florida NAACP to divert time, money, and resources away from other activities, such as programming and initiatives concerning the school-to-prison pipeline and eliminating academic and educational inequities and mass incarceration," to now "assist and educate its members and other Florida voters who are burdened by the Challenged Provisions." *Id*. For these reasons, the challenged provisions "adversely impact[] the Florida NAACP's operations." *Id*.

As to DRF, Plaintiffs allege that it is "an independent, nonprofit corporation designated by law as Florida's federally funded protection and advocacy system . . . for individuals with disabilities." *Id.* ¶ 20. Federal law authorizes DRF "to pursue legal, administrative, and other appropriate remedies to ensure the protection of, and

advocacy for, the rights of individuals with disabilities." *Id*. DRF's "work includes significant efforts devoted to political participation of people with disabilities and the challenges they face when voting[.]" *Id*. "DRF engages in legislative and public advocacy on these issues, directly engages with and trains election officials and voters on expanding voting accessibility, promotes robust voter registration, and engages in voter hotline and voter education efforts." *Id*. ¶ 21.

DRF alleges that the challenged provisions in SB 90 will severely burden or deny their constituents' right to vote "by imposing restrictions for standing [vote-by-mail] applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party [vote-by-mail] ballot return; and potential criminal penalties for individuals who provide relief, such as free food and water or other assistance, to people standing in line to vote." *Id*. ¶ 22. As a result, "[t]hese restrictions will also make it substantially more difficult for DRF to engage in its civic engagement mission," and will "require DRF to divert time, money, and resources away" from numerous other activities, "to work including, but not limited to, conducting public education for voters with disabilities to understand the new restrictions on [vote-by-mail] access," "providing public guidance on the collection and return of ballots for voters with disabilities," and "conducting statewide outreach to facilities and people with disabilities whose abilities to receive and return ballots will be curtailed." *Id*.

With respect to Common Cause, Plaintiffs allege that it "is a nonpartisan, nonprofit citizen lobby . . . devoted to electoral reform, ethics in government, and the protection of citizens' rights in national, state, and local elections." *Id.* ¶ 23. Common Cause has about 55,000 Florida members and it "advocates for policies at the state and local level to ensure that elections are free, fair, and accessible." *Id.* "Common Cause also encourages and supports voter participation in elections by, among other things, engaging in voter education and outreach efforts," "acting as a lead coordinator for the nonpartisan Florida Election Protection Coalition," "monitoring and correcting election-related disinformation online," and "funding translation of election information into Spanish and Haitian Creole for non-English-speaking voters." *Id.*

Common Cause alleges that the challenged provisions in SB 90 will severely burden or deny their members' right to vote "by imposing restrictions for standing [vote-by-mail] applications; severe limitations on where, when, and how drop boxes can be used; limitations on third-party [vote-by-mail] ballot return; and potential criminal penalties for individuals who provide free food or water or other assistance." *Id.* ¶ 24. Common Cause also alleges these provisions "make it substantially more difficult . . . to engage in its civic engagement mission in Florida," and also forces Common Cause divert its resources from other activities like planning "to engage in public education and advocacy concerning the redistricting

process in Florida," to "voter engagement and education programming," "recruiting more volunteers, temporary staff, and contractors to inform and educate voters about their rights as they are affected by the new law," and "hiring these staff members earlier in the election cycle than originally planned." *Id*. In addition, Common Cause alleges that SB 90 now "necessitate[s] capacity-building and investment of Common Cause resources in programming, staffing, volunteer management, and voter education in order to directly assist voters in navigating the burdensome restrictions on [voting-by-mail] imposed by SB 90." *Id*.

B

Plaintiffs' amended complaint includes a detailed description of Florida's history of racially discriminatory voting restrictions. *Id*. ¶¶ 37–45. Juxtaposed with this history are allegations of near record-high rates of voter participation during the 2020 general election in Florida. *Id*. ¶¶ 46–48. Plaintiffs assert that an overall turnout of 77 percent was the highest rate in the past 28 years, including 4.6 million Floridians who voted by mail—44% of the 11 million votes cast. *Id*. ¶¶ 46–47. According to Plaintiffs, over 1.5 million Florida voters used ballot drop boxes in the 2020 general election. Of these many Florida voters, Plaintiffs allege that 522,038 Black voters cast vote-by-mail ballots, which was over twice the number of such ballots that Black voters cast in 2018 and 2016. *Id*. ¶ 48.

Plaintiffs also allege that Defendant Lee applauded Governor DeSantis and

7

the Department of State "for successfully running three 'safe, secure, and orderly elections' throughout 2020" despite the challenges posed by record voter turnout during a raging pandemic. *Id.* ¶ 2. Relatedly, Plaintiffs allege that "there is no evidence of any fraud or significant irregularities in any of the 2020 elections in Florida." *Id.* ¶ 50. Plus, Plaintiffs assert there "was similarly zero evidence of significant fraud or irregularities in the 2020 general election," *id.* ¶ 51, and cite the National Association of State Election Directors, which "affirmed the 'security and integrity' of the 2020 election and noted that 'the November 3d election was the most secure in American history.' " *Id.* But, Plaintiffs say, "[a]gainst this backdrop of high turnout and [vote-by-mail] use among Black voters, and the security of Florida's 2020 elections, the Florida Legislature considered, and ultimately passed, SB 90." *Id.* ¶ 52.

The amended complaint sets a timeline of events leading up to SB 90's enactment, asserting that "[t]he Florida Legislature rushed to pass SB 90, and Governor DeSantis rushed to sign it, amid extraordinary procedural deviations from the usual legislative process." *Id.* ¶ 53. Specifically, Senator Dennis Baxley introduced the bill in the Florida Senate on February 3, 2021. *Id.* ¶ 54. Representative Blaise Ingoglia introduced a similar House Bill on March 23, 2021. *Id.* ¶ 55. Despite the COVID-19 pandemic, "no legislative committee offered members of the public the option to provide testimony remotely." *Id.* ¶ 56. Instead, "[m]embers of the

public testifying before the Senate committees were required to travel to [FSU's Civic Center], from which their testimony was virtually livestreamed," to the committee members. *Id*. ¶ 57. Similarly, Florida's House committees required members of the public to travel to the Florida Capitol to testify in person. *Id*. Both Common Cause and DRF requested accommodations to permit remote or virtual testimony, but their requests were denied. *Id*. ¶ 59. "As a result," Plaintiffs allege, "many members of the public who were at higher risk for COVID-19, including members of the disability rights community, were shut out of the legislative process altogether." *Id*. ¶ 56.

In addition, Plaintiffs allege that "[p]ublic testimony was especially limited during the April 14, 2021 meeting on SB 90 before the Senate Committee on Rules," where members of the public "were permitted to testify for only one minute." *Id.* ¶ 62. "Many members of the public had their microphone disconnected the moment their testimony exceeded sixty seconds." *Id*. According to Plaintiffs, "[t]he strict limitations imposed on members of the public testifying on SB 90 was inconsistent with the committee's practice for members of the public testifying on other bills," including "bills considered the same day[.]" *Id*.

At the April 14th meeting, "the Committee considered for the first time and adopted a 'strike all' amendment that replaced the text of SB 90" with new language that was over three times the length of the original bill. *Id*. ¶ 63. "This new

amendment was first posted on the Senate website on April 13, 2021—the day before it was considered and adopted by the Committee," which Plaintiffs allege denied the public time to review and meaningfully comment on the new language. *Id.*

Plaintiffs also allege that consideration of the similar House bill was "even more rushed," noting that at the bill's hearing, the Committee Chair restricted questions that each committee member could ask the bill sponsor, cut off committee members mid-sentence, and abruptly closed questioning as a member was posing her first question. *Id.* ¶ 64. The Chair ultimately "limited debate on the amended bill to 30 seconds for each committee member," although "[n]one of the other nine bills considered during this hearing was subjected to this rushed treatment." *Id.* Likewise, Plaintiffs allege that at that same meeting, "the Committee refused to permit any testimony from members of the public," on the House bill, even though at least 15 people had traveled to the Capitol" to do so and "[t]he Committee permitted testimony from members of the public . . . on numerous other bills." *Id.* ¶ 65.

Plaintiffs allege that throughout the House and Senate bills' consideration, lawmakers "were presented with extensive evidence" of the ways the bills "would impose disproportionate burdens or barriers on Black voters, Latino voters, elderly voters, and voters with disabilities." *Id.* ¶ 72. Some lawmakers "proposed numerous amendments that would have mitigated the restrictive and discriminatory impacts of the proposed legislation," but "[b]oth chambers . . . rejected the vast majority of

10

these ameliorative amendments." *Id*.

On April 29, 2021, following a second "rushed" amendment process in the Florida Senate, the Florida House passed the new version of SB 90 that had passed the Senate only less than four hours earlier. *Id*. ¶¶ 69–70. Governor DeSantis signed the bill into law on May 6, 2021. *Id*. ¶ 71. The law took effect immediately, "a departure from the normal legislative process set forth in the Florida Constitution, which provides that laws passed by the Legislature 'shall take effect on the sixtieth day' following the end of the legislative session." *Id*. ¶ 73. When this amendment was originally adopted, "the sponsor provided no justification for deviation from the typical processes besides stating that it was 'a policy decision.' " *Id*.

C

Plaintiffs allege that SB 90's challenged provisions "individually and collectively impose burdens and barriers on the right to vote and disproportionately harm Black voters, Latino voters, and voters with disabilities[.]" *Id*. ¶ 75; *see also id*. ¶¶ 77–114. These provisions include the following statutes, as amended by SB 90:

(1) Section 101.69, Florida Statutes (2021), pertaining to the return of vote-by-mail ballots to drop boxes and requiring an employee of the Supervisor of Elections' office to continuously monitor any secure drop box at an office of the Supervisor when the drop box is accessible for deposit of ballots, among

11

other changes, and imposing a $25,000 civil penalty if any drop box is left accessible for ballot receipt other than as authorized;

(2) Section 104.0616(2), Florida Statutes (2021), which provides that any person who distributes, orders, requests, collects, delivers or otherwise physically possesses more than two vote-by-mail ballots per election in addition to their own ballot or a ballot belonging to an immediate family member commits a first-degree misdemeanor;

(3) Section 101.62(1)(a), Florida Statutes (2021), which reduces the number of election cycles for which a request to vote-by-mail is good from two election cycles to one general election cycle; and

(4) Section 102.031(4)(a)–(b), Florida Statutes (2021), which prohibits anyone from "engaging in any activity with the intent to influence or effect of influencing a voter" inside a polling place or within 150 feet of a drop box or the entrance to any polling place.

II

Defendant Lee moves to dismiss Plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). As it must, this Court first addresses threshold jurisdictional issues. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir.

12

2009) (citation omitted). A facial challenge occurs when, as here, defendants base their challenge to subject matter jurisdiction solely on the allegations in the complaint. *Id.* In considering Defendant Lee's facial challenge, this Court must take Plaintiffs' allegations as true. *Id.*

A

Defendant Lee argues that Plaintiffs lack standing to bring their ADA and section 208 claims. ECF No. 92-1 at 34–36, 43–44. In response to this Court's order to show cause, she further argues that Plaintiffs lack standing to challenge the vote by mail repeat request requirement, and the third-party vote by mail return and voting line relief restrictions. ECF No. 166 at 2. Either way, regardless of what Defendant Lee says, this Court has an independent responsibility to ensure Plaintiffs have standing to bring all of their claims. *E.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). So this Court considers whether Plaintiffs have standing to bring each claim they assert.

To establish standing, Plaintiffs must show (1) that they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And they must do so for each statutory provision they challenge. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists

13

as to each challenged provision even in a case where the plaintiffs established harm under one provision of the statute"). Plaintiffs proceed under two theories of standing, organizational standing and associational standing. This Court discusses each in turn, starting with organizational standing.

An organization may have standing to assert claims based on injuries to itself if that organization is affected in a tangible way. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))). Here, Plaintiffs proceed under a diversion-of-resources theory. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

In addition to organizational standing, an organization may have associational standing to sue on its members' behalf when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir.

2021) ("*GBM*"). As discussed below, Plaintiffs' members have standing as to the challenged provisions of SB 90. Additionally, this lawsuit is germane to Plaintiffs, whose core purposes involve registering voters, voter education, encouraging electoral participation, and advocating for accessibility for Florida voters. Finally, neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003); *GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

In addressing both forms of standing, this Court starts with the injury requirement as to each of the challenged provisions.

### 1. *Injury*

#### i.   Section 101.69, Florida Statutes (2021)

Plaintiffs allege that section 101.69's new drop box restrictions "place extreme restrictions on the location, availability, and operating hours of ballot drop boxes, and disproportionately burden Black voters, Latin voters, and voters with disabilities." ECF No. 45 ¶ 77. This section now requires drop boxes to be monitored in person by an employee of the Supervisor of Elections and imposes a $25,000 civil penalty against any Supervisor who does not comply with the monitoring requirements. §§ 101.69(2)(a), (3), Fla. Stat. (2021). In addition, drop boxes that are not located at the Supervisor of Elections main office or branch office are only

available during early voting hours. §§ 101.69(2)(a), (2)(c)1., Fla. Stat. (2021). The Division of Elections, within Defendant Lee's Department of State, is responsible for enforcing the $25,000 penalty provision. § 101.69(3), Fla. Stat. (2021).

Plaintiffs allege that voters have come to rely on drop boxes as a safe option for casting a ballot. ECF No. 45 ¶ 78. Plaintiffs claim the new restrictions limiting when, where, and how Supervisors of Elections can offer drop boxes as a voting option, with the threat of a $25,000 fine from Defendant Lee's Division of Elections against any Supervisor who flouts them, will disproportionately burden Black and Latino voters with stricter and more unpredictable work schedules and less flexibility when it comes to transportation during voting hours. *Id.* ¶ 80. Plaintiffs also allege these restrictions burden voters with disabilities and compound "the many ongoing accessibility burdens that voters with disabilities continue to face in utilizing [vote-by-mail] ballots despite longstanding accessibility requirements" under Florida law. *Id.* ¶ 81.

According to Plaintiffs, the new restrictions will limit the options for voters to return their requested vote-by-mail ballots to a drop box, because the law now requires Supervisors of Elections to shut down most drop boxes at the conclusion of the early voting period or face a $25,000 penalty from the Department of State.

Plaintiffs have each alleged that SB 90 requires them to divert time, money, and resources away from other specified activities to assist and educate their

members and other Florida voters about the new law, including for Common Cause the creation of entirely new programming, staffing, volunteer management, and voter education to directly assist voters in navigating the new restrictions on voting-by-mail. *Id.* ¶¶ 19, 22, 24. In addition, Plaintiffs have alleged that their Florida members' and constituents' right to vote is severely burdened by this new restriction based on the limited hours and days during which many drop boxes will be available to their members.[2] Because section 101.69, as amended by SB 90, arguably burdens Plaintiffs' Florida members' right to vote by limiting available options to return their ballots and because Plaintiffs have been forced to divert resources to respond to this new law, Plaintiffs sufficiently allege organizational and associational injuries as to section 101.69.[3]

---

[2] Plaintiff DRF does not allege that it has members. Instead, DRF alleges it has "constituents." ECF No. 45 ¶ 20 ("These constituents include the millions of registered voters with disabilities throughout the state."). It appears this is a distinction without a difference—in a separate suit in this district that DRF brought on behalf of its "constituents," Judge Winsor held that DRF had associational standing to pursue its ADA claims on behalf of deaf constituents. *See Yelapi v. DeSantis*, -- F. Supp. 3d --, 2021 WL 1918784, *3 n.4 (N.D. Fla. 2021) ("I conclude DRF has associational standing because its members have standing and this case is germane to DRF's purpose. Moreover, once one plaintiff has standing to pursue injunctive or declaratory relief, it is not necessary to determine if the other plaintiffs have standing.") (citations omitted)).

[3] Several courts have reached the same conclusion in similar assessments. *See Common Cause Ind. v. Lawson*, 937 F. 3d 944, 952–53 (7th Cir. 2019) ("Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of unwanted demands on their resources.") (citing cases from the Fifth, Sixth, Ninth, and Eleventh Circuits). *See also OCA-Greater Houston v. Texas*, 867 F. 3d 604, 612 (5th Cir. 2017) (upholding organizational standing for non-profit based on injury—albeit "not large" one—resulting from extra time spent educating voters about a new voting law instead of organization's normal "get out the vote" activities with membership); *Nat'l Council of La Raza v. Cegavske*, 800 F. 3d 1032, 1040–41 (9th Cir. 2015) ("Resources Plaintiffs put toward registering

ii.    Section 104.0616(2), Florida Statutes (2021)

Plaintiffs allege that section 104.0616, as amended by SB 90, "imposes onerous restrictions on who may return a completed [vote-by-mail] ballot on behalf of a voter and how many such . . . ballots any person may return on behalf of voters." ECF No. 45 ¶ 85. Plaintiffs contend this new law severely limits "volunteer efforts to assist voters," and "the efforts of caregivers and other individuals who assist non-family members who are unable to return their ballots themselves." *Id.* ¶ 87. Additionally, Plaintiffs claim that "[t]hird-party ballot return is especially important for Black and Latino voters, who are less likely to have access to a vehicle and less likely to be able to secure time off work, and who, therefore have more difficulty returning [vote-by-mail] ballots without assistance." *Id.* ¶ 88. Moreover, "[v]oters of color who live in more crowded households with non-family members will also be impacted," and "[a]s a consequence, Black and Latino voters will be disproportionately burdened by this provision." *Id.* ¶¶ 90–91.

Similarly, "third-party ballot return" is important for voters with disabilities, "who are more likely to have difficulty returning their ballot on their own and more likely to require assistance from a third party." *Id.* ¶ 92. Plaintiffs allege that "[m]any

---

someone who would likely have been registered by the State had it complied with the NVRA, are resources they would have spent on some other aspect of their organizational purpose—such as registering voters the NVRA's provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals. Contrary to the district judge's view, Plaintiffs have not alleged that they are simply going about their 'business as usual,' unaffected by the State's conduct.").

voters with disabilities rely exclusively on caregivers and other non-family members to collect and return their [vote-by-mail] ballots," as do many "elderly voters and voters with disabilities who live in group facilities in which staff collect and return [vote-by-mail] ballots on behalf of residents." *Id*.

Because this new law makes it a crime to collect more than two ballots from others outside of one's immediate family, Plaintiffs' members are now unable to continue their volunteer assistance efforts to help their constituents vote. For instance, Florida NAACP will no longer be able to "engage[] in large-scale ballot return efforts in which voters [bring] their completed [vote-by-mail ballots to churches or local NAACP chapter meetings," where Florida NAACP members complete the ballot return process for them. *Id*. ¶ 19. Moreover, electoral engagement and access is core to Plaintiffs' organizational purpose, and as Plaintiffs allege, this new law forces them to divert resources to respond to the new restriction and educate their members and other Florida voters about its impact. Because section 104.0616(2), as amended by SB 90, arguably burdens Plaintiffs' Florida members' right to vote by limiting available options to return their ballots and because Plaintiffs have been forced to divert resources to respond to this new law, Plaintiffs sufficiently allege organizational and associational standing as to section 104.0616(2).

iii.    Section 101.62(1)(a), Florida Statutes (2021)

Plaintiffs allege that section 101.62(1)(a), as amended by SB 90, "forces voters to renew [vote-by-mail] requests each general election cycle, ending the 'standing' [vote-by-mail] applications that were valid for up to two general election cycles (four years) for the many voters who prefer to vote by mail." *Id.* ¶ 93. This new law now requires these voters to "request their [vote-by-mail] ballots twice as often as previously required," and imposes "new burdens on many voters with disabilities, who will be forced to contend with the logistical challenges of completing a [vote-by-mail] ballot request twice as often." *Id*. ¶ 94. Plaintiffs assert this new requirement also burdens those who routinely vote by mail, "including Black voters, Latino voters, and voters with disabilities—all of whom used [vote-by-mail] ballots in record numbers in the last election." *Id*. ¶ 94.

Relevant here, the Eleventh Circuit has held that "[t]he slightness of [the voters'] burden . . . is not dispositive." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). Instead, "a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Id*. (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). In this case, Plaintiffs allege that the new vote-by-mail request requirement is more than a mere "trifle," especially for voters with disabilities, and they have also sufficiently alleged that they have organizational standing under a diversion-of-resources theory.

20

*See Billups*, 554 F.3d at 1351–52 (holding that even when a voter possesses an acceptable identification, they may still challenge a voter ID law because they are required to produce that photo identification to vote in person).

      iv.    Section 102.031(4)(a)–(b), Florida Statutes (2021)

Finally, with respect to section 102.031(4)(a)–(b), as amended by SB 90, Plaintiffs allege the new provision prohibits any non-Supervisor of Elections employee or volunteer from "engaging in any activity with the intent to influence or effect of influencing a voter," including "by offering items—such as food or water— to voters" who are standing in long lines or bad weather at polling places. ECF No. 45 ¶ 99. Plaintiffs further allege that providing such relief to voters waiting in long lines "is expressive speech, not mere charity," whereby "the volunteers express the importance of casting a ballot, and affirm individuals' value as a person and a voter." *Id*. ¶ 113.

Plaintiffs also allege that long lines at polling places regularly occur in Florida, *id*. ¶¶ 104–05, 109–11, particularly in some of Florida's largest counties, and such lines have the measured effect of depressing voter turnout. Because of the burdens that long lines place on would-be voters, organizations, like Plaintiff Florida NAACP and its members, "often provide relief to voters waiting in long lines—who are disproportionately Black and Latino voters—by offering water, coffee, snacks,

chairs, and other assistance, and by verbally encouraging voters to stay in line despite the difficulty of extended waits." *Id*. ¶ 112.

Plaintiffs allege that this new law will "forc[e] voters to choose between their health, their time, and their job," and exercising their right to cast a ballot. *Id*. ¶ 109. Further, Plaintiffs allege this new restriction defining "solicitation" to include "any activity" that has the effect of influencing a voter does not provide sufficient notice to Plaintiffs or their members of whether their conduct falls within that prohibition and unconstitutionally prohibits Florida NAACP's members and others from engaging in protected speech with potential voters. *Id*. ¶¶ 172–76, 180–84. Here, Plaintiffs have adequately alleged organizational and associational injury, particularly with respect to Plaintiff Florida NAACP under this challenged statute.[4]

---

[4] The party invoking federal jurisdiction bears the burden of proving standing." *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Critically, "each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.' " *Id.* (quoting *Lujan*, 504 U.S. at 561). "Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Id.* "However, when standing is raised at the summary judgment stage, the plaintiff must 'set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken as true.' " *Id.* (quoting *Lujan*, 504 U.S. 561). This Court reiterates this well-worn standard to make plain that Plaintiffs must present evidence moving forward. Moreover, Plaintiffs must be mindful that generalized testimony about a diversion of resources may not be enough at the summary judgment stage or later to prove that the organizational plaintiffs have been injured under a diversion-of-resources theory. *See, e.g.*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) ("Although resource diversion is a concrete injury, neither Kazin nor Cecil explained what activities the Committee or Priorities USA would divert resources away from in order to spend additional resources on combatting the primacy effect, as precedent requires." (emphasis in original)). Here, although Plaintiffs' detailed factual allegations may survive a motion to dismiss, Plaintiffs must substitute their allegations with sufficient, detailed, and relevant evidence at summary judgment and later.

Having decided, as to each of the four challenged provisions, that the amended complaint alleges enough facts to satisfy the injury-in-fact requirement at the pleading stage, this Court turns to the second element of standing, causation.

## 2. *Causation*

As described above, this Court is satisfied that Plaintiffs have alleged an injury-in-fact as to each of the challenged provisions. But an injury-in-fact is not enough, Plaintiffs must also show causation and redressability. *Lujan*, 504 U.S. at 560.

First, causation. Plaintiffs must establish causation by showing that "their injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). In other words, Plaintiffs must show that their injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

To do so, Plaintiffs need only show "that there is a substantial likelihood of causation." *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978). This is not an exacting standard; "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). And thus "[a] plaintiff . . . need not show (or, as here, allege) that 'the defendant's actions are the very last step in the chain of causation.' " *Wilding*, 941

F.3d at 1126 (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

In this case, Plaintiffs claims against Defendant Lee are limited to challenging the new drop box restrictions and civil penalty provisions under section 101.69, Florida Statutes (2021). Their asserted injuries, including the diversion of resources to respond to the new restrictions on drop boxes and the burdens such restrictions will place on voters who will have fewer drop box options, are traceable to Defendant Lee's enforcement authority under this new law. Specifically, Defendant Lee's Division of Elections is granted specific authority to impose a $25,000 civil penalty against any Supervisor of Elections who leaves a drop box "accessible for ballot receipt other than as authorized by this section." § 101.69(3), Fla. Stat. (2021). In turn, this serves as a specific deterrent to Supervisors of Elections who would otherwise offer more drop box options beyond the statutorily required drop boxes at the Supervisors' main office, permanent branch office, and early voting sites. *See* § 101.69(2)(a), Fla. Stat. (2021) ("Secure drop boxes *shall* be placed at the main office of the supervisor, at each permanent branch office of the supervisor, and at each early voting site. Secure drop boxes *may* also be placed at any other site that

would otherwise qualify as an early voting site under s. 101.657(1)." (emphasis added)).

Defendant Lee's argument to the contrary is unavailing. With specific reference only to Plaintiffs' ADA claim, Defendant Lee asserts Plaintiffs "plead[] no facts showing the Secretary's involvement or causation of the alleged harms." ECF No. 92 at 35. But Defendant Lee is incorrect. In fact, Plaintiffs specifically allege that "SB 90 directs the Division of Elections to enforce the provision restricting access to drop boxes." ECF No. 45 ¶ 28. Plaintiffs cite section 101.69(3), which creates the $25,000 civil penalty that the Division of Elections has authority to enforce. *Id*. Further, Plaintiffs allege that "[i]n her official capacity as Secretary of State, Defendant Lee is responsible for, through her office's Division of Elections, enforcing compliance with the Drop Box Restrictions by subjecting Supervisors of Elections to the aforementioned $25,000 penalty for violations." *Id*. ¶ 29. Accordingly, I conclude that Plaintiffs have established that their alleged injuries are traceable to Defendant Lee through her enforcement authority specifically provided for under section 101.69(3), Florida Statutes. *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (en banc) ("The causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.") (quoting *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015))).

25

Plaintiffs' remaining claims are directed at each of the county Supervisors of Elections, who are each directly and statutorily responsible for implementing and enforcing the relevant laws—except for section 104.0616(2), which makes it a crime to possess more than two vote-by-mail ballots aside from one's own and any immediate family member's ballot.[5] With respect to the drop box restrictions discussed above, the Defendant Supervisors are directly responsible for offering drop boxes and complying with the statute limiting the locations, operating hours, and monitoring of such drop boxes. § 101.69, Fla. Stat. Similarly, though no one has argued otherwise, Defendant Supervisors are responsible for implementing statutes governing vote-by-mail ballot requests and directly enforce the challenged provision requiring repeat requests. *See* § 101.62, Fla. Stat. Defendant Supervisors are likewise responsible for designating the "no-solicitation zone" and marking its boundaries. § 102.031(4)(a), Fla. Stat. (2021). Defendant Supervisors are also statutorily authorized to "take any reasonable action necessary to ensure order at the polling places, including, but not limited to, having disruptive and unruly persons removed by law enforcement officers from the polling room or place or from the 150-foot zone surrounding the polling place." § 102.031(4)(c), Fla. Stat. (2021).

---

[5] The Supervisors of Elections have not moved to dismiss. However, this Court has an independent responsibility to determine whether it has jurisdiction to hear Plaintiffs' claims, which includes whether Plaintiffs have standing to challenge each of the provisions at issue in this case.

Unlike the three provisions discussed above that require the Defendant Supervisors' compliance therewith, Plaintiffs have not alleged, nor has this Court identified, any statutory requirement that connects the Defendant Supervisors to Plaintiffs' alleged injuries under section 104.0616(2). This challenged provision simply makes it a crime, punishable as a first-degree misdemeanor, to distribute, order, request, collect, deliver, or otherwise physically possess more than two vote-by-mail ballots other than your own or your immediate family member's ballot. Absent a showing that the Supervisors are part of the causal chain resulting in Plaintiffs' alleged injuries, Plaintiffs cannot satisfy the causation element. For example, at least one group of possible proper defendants would be the State Attorneys who the Florida Constitution tasks with enforcing a criminal statute like section 104.0616(2). Plaintiffs, however, have not sued any State Attorneys.

Moreover, this Court has not identified any statute that requires Defendant Supervisors to record or confirm the identities of volunteers who assist voters in returning vote-by-mail ballots or to report any suspected violation of section 104.0616(2) to the appropriate authorities. Nor have Plaintiffs alleged any facts from which this Court could reasonably infer that Defendant Supervisors have or will collect or confirm such information to aid in the prosecution of individuals suspected of violating the challenged provision. I therefor conclude that Plaintiffs' alleged injuries are traceable to the Defendant Supervisors with respect to sections 101.69,

101.62(1)(a), and 102.031(4)(a)–(b); however, Plaintiffs' injuries are not traceable to the Defendant Supervisors with respect to section 104.0616(2). Accordingly, Plaintiffs' claims against the Defendant Supervisors challenging section 104.0616(2), Florida Statutes (2021) are **DISMISSED for lack of standing**.

Having concluded that Plaintiffs' injuries as to the drop box restrictions are traceable to the Defendant Supervisors and Defendant Lee, and their injuries as to the "line warming" ban and the "repeat vote-by-mail request" requirement are also traceable to the Defendant Supervisors, this Court turns to the third element of standing, redressability.

### 3. *Redressability*

The redressability prong "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). A "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79.

Here, enjoining Defendant Lee from using her powers to impose a $25,000 civil penalty on any Supervisor who offers drop boxes in violation of section 101.69 will go a long way towards redressing Plaintiffs' and their members' injuries. To understand why, one need only ask what practical effect such an order would have. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (finding redressability where a favorable ruling's "practical consequence" was to make it more likely "that the

plaintiff would obtain relief that directly redresses the injury suffered"). Enjoining Defendant Lee would remove the threat of punishment for Supervisors who offer drop boxes in violation of Florida law, even if such Supervisors are acting in compliance with a court order. Indeed, if this Court were to order the Supervisors not to comply with the challenged drop box restrictions, they would have to choose between complying with this Court's order and facing a $25,000 penalty from the Department of State's Division of Elections. Moreover, enjoining Defendant Lee and her agents or employees from enforcing the civil penalty provision also removes a major deterrent for Supervisors who would otherwise offer drop boxes but do not want to run the risk of violating the strict terms of the statute's monitoring requirements. And it makes no difference that, were Defendant Lee enjoined, some Defendant Supervisors might still comply with the drop box restrictions absent an order from this or any other court. "Article III . . . does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *see also I. L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014).

As for the Defendant Supervisors, the practical effect of enjoining them from complying with the challenged drop box restrictions is that Defendant Supervisors will no longer be limited to providing voters with drop boxes that must be always monitored in person and open only during early voting hours. Similarly, enjoining Defendant Supervisors from enforcing the "repeat request" requirement for voters

requesting vote-by-mail ballots and from prohibiting "any activity with the intent to influence or effect of influencing a voter" within the non-solicitation zone at polling places, will have a similar practical effect with respect to Plaintiffs' alleged injuries. An injunction against enforcing the "repeat request" requirement would redress Plaintiffs' injuries involving having to request a vote-by-mail ballot twice as often as before and a court order prohibiting enforcement of the new solicitation restriction would prohibit the Defendant Supervisors from reporting Plaintiffs' members and volunteers who wish to engage with voters at drop boxes and polling places as they have done in the past.

Accordingly, I conclude that Plaintiffs have sufficiently alleged, at the pleading stage, that they have standing to pursue their claims challenging the drop box restrictions against Defendant Lee and the Defendant Supervisors. In addition, I conclude Plaintiffs have standing to pursue their claims challenging the "repeat request" requirement and the "line warming" ban against the Defendant Supervisors.

### III

### A

In her omnibus motion to dismiss, Defendant Lee first moves to dismiss all claims alleging that SB 90 places an undue burden on the right to vote.[6] ECF No.

---

[6] As the parties well know, in evaluating Defendant Lee's motion, this Court accepts the allegations in the amended complaint as true and construes them in the light most favorable to Plaintiffs. *See Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). "To withstand a

92-1 at 5–12. Here, with respect to the statutes against which Plaintiffs have standing to proceed, Count II alleges that the drop box, third-party vote by mail return, and voting line relief restrictions unduly burden the right to vote in violation of the First and Fourteenth Amendments. ECF No. 45 ¶¶ 142–51. Because Plaintiffs bring Count II against Defendant Lee only as to the drop box restrictions, she lacks standing to defend the latter two restrictions. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1265 (11th Cir. 2015) (explaining that "the requirement that a party establish its standing to litigate applies not only to plaintiffs but also defendants"); *Fleetwood Servs., LLC v. Ram Cap. Funding LLC*, No. 20-cv-5120 (LJL), 2021 WL 1987320, at *2 (S.D.N.Y. May 18, 2021) ("[I]t is axiomatic that for a defendant to move to dismiss a cause of action for failure to state a claim for relief, the complaint must actually assert that cause of action against the defendant."). No other parties before this Court adopt Defendant Lee's arguments with respect to the statutes she lacks standing to defend in Count II. And so, this Court focuses solely on the drop box restrictions.

---

motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plaintiff's allegations must amount to 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

Challenges to election laws are evaluated using the sliding scale standard set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test is designed to balance the fundamental right to vote against the reality that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The test requires this Court to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule" while "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). The greater burden the law imposes on the right to vote, the greater the scrutiny this Court must apply. Laws that impose " 'severe' restrictions . . . must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Laws that impose "reasonable, nondiscriminatory restrictions," on the other hand, are subject to a more-forgiving review, under which the "state's important regulatory interests" will generally justify the restrictions. *Anderson*, 460 U.S. at 788. But, no matter how slight the burden, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to

justify the limitation.' " *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).

Because the *Anderson-Burdick* test "emphasizes the relevance of context and specific circumstances," it is particularly difficult to apply at the motion to dismiss stage. *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020); *see also Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985). And any court foolhardy enough to attempt such a stunt is liable to find itself "in the position of Lady Justice: blindfolded and stuck holding empty scales." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 736 (9th Cir. 2015) (McKeown, J., concurring).

Against this backdrop, Defendant Lee nonetheless urges this Court to dismiss Plaintiffs' undue burden claim. This case is different, she argues, for two reasons. *First*, she argues that regulations on vote-by-mail ballots do not implicate the right to vote at all. ECF No. 92-1 at 7. *Second*, she argues that Plaintiffs' claims fail because they focus on the burdens placed on "vulnerable" voters instead of the electorate as a whole. *Id.* at 10. She is wrong on both points.

This Court begins with Defendant Lee's first argument. Relying entirely on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), she argues that "unless a restriction on vote-by-mail 'absolutely prohibit[s]' someone from voting, the right to vote is not at stake." ECF No. 92-1 at 7 (quoting

*McDonald*, 394 U.S. at 809). Though Defendant Lee argues at length that the Supreme Court has not abrogated *McDonald*, *see id.* at 7–10, her argument has a more fundamental problem; namely, that she grossly overreads *McDonald*.

In *McDonald*, pretrial detainees in the Cook County jail sued Chicago's election board, arguing—in part—that an Illinois law that allowed inmates from outside Cook County to receive absentee ballots while denying them to those from Cook County violated the Equal Protection Clause. *McDonald*, 394 U.S. at 806. A three-judge district court panel granted the board's motion for summary judgment, and the plaintiffs appealed directly to the Supreme Court. *Id.*

Writing for the unanimous Court, Chief Justice Warren explained that the first step was to "determine . . . how stringent a standard to use" in evaluating the challenged law. *Id.* Rational basis review applied, the *McDonald* Court determined, because the challenged classification was not based on wealth or race and because there was "nothing in the record to indicate that the Illinois statutory scheme has an impact on [the plaintiffs'] ability to exercise the fundamental right to vote." *Id.* at 807. In a footnote, the Court emphasized that, because the plaintiffs had offered no evidence, for all the Court knew, Illinois might "furnish the jails with special polling booths or facilities on election day, or provide guarded transportation to the polls themselves for certain inmates, or entertain motions for temporary reductions in bail to allow some inmates to get to the polls on their own." *Id.* at 809 n.6. Because the

34

state might offer pretrial detainees an equally convenient method of voting, the only thing before the Court was "a claimed right to receive absentee ballots." *Id.* The Court explained that it would not assume that the state in fact denied the plaintiffs the right to vote "with nothing in the record to support such an assumption." *Id.* at 808. And so, the *McDonald* Court concluded that the challenged statute did not implicate the right to vote. *Id.*

Four years later, in *Goosby v. Osser*, the Court addressed a nearly identical claim. 409 U.S. 512, 514 (1973). This time around, pretrial detainees in the Philadelphia County jail brought suit against Pennsylvania's Attorney General and Secretary of State. The plaintiffs argued that Pennsylvania's election laws denied them the right to vote because Pennsylvania "neither permit[ed] [plaintiffs] to leave prison to register and vote, nor provide[d] facilities for the purpose at the prisons," and Pennsylvania law "expressly prohibit[ed] persons 'confined in penal institutions' from voting by absentee ballot." *Id.* at 514. *Goosby* rejected the argument that *McDonald* foreclosed the plaintiffs' claims. In so doing, *Goosby* emphasized that *McDonald* turned on the lack of record evidence that Illinois refused to "make the franchise available by other means." *Id.* at 520. By contrast, in *Goosby*, the record was clear that the state provided no alternatives. *Id.* at 522. Satisfied that *McDonald* did not control, the *Goosby* Court remanded the plaintiffs' claims to a three-judge district court panel for consideration. *Id.*

35

The very next year, the Court addressed the issue yet again. This time, the plaintiffs were pretrial detainees in Monroe County, New York. *O'Brien v. Skinner*, 414 U.S. 524, 525 (1974). The facts in *Skinner* were nearly identical to *McDonald*. *See id.* at 525–27. Distinguishing *McDonald*, the *Skinner* Court explained that *McDonald* "rested on failure of proof." *Id.* at 529. But, presented with evidence that New York did not allow the plaintiffs "to use the absentee ballot," and that it denied them "any alternative means of casting their vote," the *Skinner* Court held the statute unconstitutional. *Id.* at 530.

As other circuits have explained, this line of cases does not "require proof that there was no possibility that the plaintiffs would find a way to adjust and vote through the remaining options." *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 541 (6th Cir. 2014). Instead, it stands for the unremarkable proposition that, when plaintiffs proffer no evidence that the challenged law burdens their right to vote, rational basis review applies. *See Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012).

Although *McDonald* came long before *Anderson-Burdick*, when put in context, it fits neatly within that test. Under *Anderson-Burdick*, when plaintiffs fail to show that the law creates more than a de minimis burden, rational basis review applies. And if a plaintiff offers no evidence that the challenged law burdens the right to vote, the court cannot assume that such a burden exists. *See Namphy v.*

36

*DeSantis*, 493 F. Supp. 3d 1130, 1145 (N.D. Fla. 2020) (noting that, in applying *Anderson-Burdick*, "this Court . . . is limited to the evidence before it"). It is for that proposition that *McDonald* stands and nothing more.

Given that *McDonald* did not—in one sentence—create a sweeping vote-by-mail exception to the Constitution, it should come as no surprise that the Eleventh Circuit has repeatedly applied *Anderson-Burdick* to restrictions on mail-in voting. *See, e.g., Lee*, 915 F.3d at 1318 (using *Anderson-Burdick* to evaluate "the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters"). Just last year, when addressing the constitutionality of Georgia's absentee ballot deadline, the Eleventh Circuit remarked, "[t]he standard is clear: '[W]e must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*.'" *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (quoting *Jacobson*, 974 F.3d at 1261).[7]

In sum, Defendant Lee's argument that restrictions on mail-in ballots do not implicate the right to vote is unsound and unsupported by precedent. Having so concluded, this Court turns to her second argument; namely, that Plaintiffs' claims

---

[7] In support of her position, Defendant Lee cites Judge Lagoa's concurrence from *New Georgia Project*. In so doing, Defendant Lee puts words in Judge Lagoa's mouth. In her concurrence, Judge Lagoa *agreed* that *Anderson-Burdick* applied to the challenge before the court. *New Ga. Project*, 976 F.3d at 1288 (Lagoa, J., concurring). She took a different tack and cited *McDonald* to argue that there is no liberty interest in voting absentee, and thus, in her view, the district court had erred in applying the factors set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 1289.

fail because they focus on the burdens placed on "vulnerable" voters instead of the electorate as a whole.

If Defendant Lee's second argument looks familiar, it is because this Court has already rejected it. *See League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*."). Still, this Court will briefly address it here.

Defendant Lee's argument relies entirely on Justice Scalia's concurrence in *Crawford*. Joined by Justices Thomas and Alito, Justice Scalia concurred in the judgment, but took issue with Justice Steven's opinion because it "assume[d] [the] premise that the voter-identification law 'may have imposed a special burden on' some voters, . . . but [held] that [the] petitioners ha[d] not assembled evidence to show that the special burden is severe enough to warrant strict scrutiny" instead of considering the law's "reasonably foreseeable effect on *voters generally*." *Crawford*, 553 U.S. at 204, 208 (Scalia, J., concurring) (emphasis in original). But Justice Scalia's concurrence is not the law. Instead, "Justice Stevens's plurality opinion controls . . . because it is the narrowest majority position."[8] *ACLU of N.M. v.*

---

[8] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted).

*Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008); *see also GBM*, 992 F.3d at 1320 (applying Justice Stevens's opinion).

If anything, *Crawford* supports, not forecloses, the conclusion that disparate impact matters. "[A] majority of the justices in *Crawford* either did not expressly reject or in fact endorsed the idea that a burden on only a subgroup of voters could trigger balancing review under *Anderson-Burdick*." *Ohio State Conf. of NAACP*, 768 F.3d at 544. The Eleventh Circuit has applied *Anderson-Burdick* this way as well. *See Lee*, 915 F.3d at 1319 (evaluating the "burden . . . on vote-by-mail and provisional voters' fundamental right to vote"). And if there was any lingering doubt, *Anderson* itself "assessed the burden imposed by the challenged law by looking to its impact on a subgroup of voters." *Ohio State Conf. of NAACP*, 768 F.3d at 544 (citing *Anderson*, 460 U.S. at 792).

Beyond citing Justice Scalia's concurrence as if it were law, Defendant Lee offers zero authority supporting her position. Thus, given the above and in the absence of any authority to the contrary, this Court reiterates what it said before, "[d]isparate impact matters under *Anderson-Burdick*." *League of Women Voters*, 314 F. Supp. 3d at 1216.

Defendant Lee often finds herself on the receiving end of lawsuits challenging Florida's election laws. So this Court can hardly blame her for finding the "New" *Anderson-Burdick* test she has concocted more refreshing. But, unless and until the

Supreme Court changes the formula, this Court will vend exclusively *Anderson-Burdick* "Classic." Secretary Lee's motion to dismiss is **DENIED** as to Count II of Plaintiffs' amended complaint.

B

Next, Defendant Lee targets Plaintiffs' discriminatory results claim under section 2 of the Voting Rights Act. Passed nearly 95 years after the Fifteenth Amendment first promised the right to vote regardless of race, "[t]he Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 308–09 (1966). Such discrimination was, and remains, "an insidious and pervasive evil[,] . . . perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.* at 309. Plaintiffs allege that SB 90 is yet another link in that long, shameful chain of insidious and ingenious attempts to defy the promise of equal voting rights for all.

Specifically, as to Defendant Lee, Count I of Plaintiffs' amended complaint alleges that the drop box restrictions violates section 2 because, "the Challenged Provision[] will (a) disproportionately and adversely affect the right to vote of Black and Latino voters and (b) diminish the opportunities of Black and Latino voters to vote and to elect their preferred representatives." ECF No. 45 ¶ 133.

40

In moving to dismiss Count I, Defendant Lee argues that "Plaintiffs Complaint[] fail[s] to include enough non-speculative, non-conclusory allegations of discriminatory effect to survive *Twombly*, *Iqbal*, and the U.S. Supreme Court's test in [*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)]." ECF No. 122-1 at 22.[9] As explained above, Defendant Lee only has standing to defend the drop box restrictions and no other parties adopt her arguments, so this Court's analysis is likewise limited.

In evaluating Plaintiffs' claims, this Court starts with section 2's text. *See Brnovich*, 141 S. Ct. at 2336; *GBM*, 992 F.3d at 1328. It provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading

---

[9] Against this Court's directive that the four challenges to SB 90 currently before this Court are consolidated for discovery purposes *only*, *see* ECF No. 59 ("To be clear, these . . . cases are consolidated for discovery purposes only."), Defendant Lee filed an omnibus motion to dismiss. Then, the Plaintiffs in every other case filed amended complaints, rendering the motion to dismiss moot in those cases. Because Plaintiffs here, however, had already amended their complaint, the motion to dismiss is not moot. Defendant Lee then filed a second omnibus motion to dismiss in the other three cases. In the interim, the Supreme Court decided *Brnovich*, which is highly relevant to Plaintiffs' discriminatory results claim under section 2 of the Voting Rights Act.

The practical effect of all this is that Defendant Lee's renewed motion to dismiss in other cases discusses *Brnovich* in great detail, while her motion in this case does not. Because *Brnovich* controls, this Court will address the issue as if she filed her new post-*Brnovich* arguments in this case as well. Accordingly, this Court cites to Defendant Lee's arguments raised in ECF No. 122-1 of 4:21cv201.

to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

52 U.S.C. § 10301(a)–(b).

So "in looking into the totality of the circumstances, if 'members of a protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,' a violation is shown." *GBM*, 992 F.3d at 1329 (quoting *Chisom v. Roemer*, 501 U.S. 380, 388 (1991)). Put another way, section 2 is violated when minority voters are denied "meaningful access to the political process[.]" *Osburn v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994)). But how exactly are courts to determine when that occurs?

In *Brnovich*, the Supreme Court "for the first time appl[ied] § 2 of the Voting Rights Act . . . to regulations that govern how ballots are collected and counted." 141 S. Ct. at 2330. At the outset, the Court "decline[d] . . . to announce a test to govern all [Voting Rights Act] claims involving rules . . . that specify the time, place, or manner for casting ballots." *Id.* at 2336. Having so qualified its ruling, the Court went on to "identify certain guideposts" that can help courts decide section 2 cases. *Id.* These "guideposts" are (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs" from standard practice in 1982,

(3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interest served by the challenged rule." *Id.* at 2338–40.

The Court made clear that this list was non-exhaustive. *Id.* at 2338. And, given that section 2 requires courts to consider "the totality of circumstances," it is axiomatic that no one factor controls. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (explaining that, when considering vote dilution claims under section 2, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." (quoting S.Rep., at 29, U.S. Code Cong. & Admin. News 1982, p. 207)).[10] Plus, the Court explained that, while they are "less helpful," the factors set out in *Gingles* remain relevant—especially "that minority group members suffered discrimination in the past . . . and that effects of that discrimination persist." *Id.* at 2340 ("We do not suggest that these factors should be disregarded"); *contra GBM*, 992 F.3d at 1331 ("As a threshold matter, we question the applicability of *Gingles* to this case.").

---

[10] *See also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, -- F.4th --, No. 19-13604, 2021 WL 3870708, at *11 (11th Cir. 2021) (explaining that, when considering whether voluntary cessation moots a case, no factor is dispositive because "the question is whether the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation." (cleaned up)); *DeJesus v. Lewis*, -- F.4th --, No. 18-11649, 2021 WL 4269920, at *14 (11th Cir. 2021) (explaining that, when considering motions to appoint counsel in a civil case, "[n]o single factor is dispositive, but the totality of the circumstances may tip the balance in favor of appointing counsel").

Finally, the Court paused to recognize that section 2 "applies to a broad range of voting rules, practices and procedures; that an 'abridgment' of the right to vote under § 2 does not require outright denial of the right; that § 2 does not demand proof of discriminatory purpose; and that a 'facially neutral' law or practice may violate [section 2]." *Id.* at 2341.

Working through each *Brnovich* factor, Defendant Lee argues that Plaintiffs' "qualitative" and "quantitative" allegations are insufficient—when considering the opportunities provided by Florida's entire voting system—to show that SB 90 disproportionally impacts Black and Latino voters, that Florida's election code makes it substantially easier to vote now than it did in 1982, that Plaintiffs do not sufficiently plead the size of the burden SB 90 places on minority voters, and that Florida has a "*per se*" interest in preventing voter fraud. ECF No. 122-1 at 14–28.

But just as she does in the undue burden context, Defendant Lee puts the cart before the horse; these are summary judgment arguments, at best. *Cf. Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) (stating that "[s]ummary judgment in [section 2] cases presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent"). For example, the district court decided *Brnovich* after "a ten-day bench trial" that involved at least 7 expert witnesses, 33 lay witnesses, and 11

44

witnesses who testified by deposition. *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 832, 833–38 (D. Ariz. 2018).

Even if it were appropriate to address Plaintiffs' claims on the merits now, Defendant Lee's arguments fail because they are built on a faulty foundation. That is, Defendant Lee assumes that Plaintiffs must allege facts satisfying each *Brnovich* factor. But the *Brnovich* factors are merely "guideposts." *Brnovich*, 141 S. Ct. at 2336. Even at trial, failure on some factors is not dispositive. *Gingles*, 478 U.S. at 45. It should thus go without saying that *Brnovich* did not set out a rigid pleading standard that section 2 plaintiffs must meet.

With that in mind, Plaintiffs' amended complaint, though perhaps somewhat on the thin side, includes enough factual allegations to support a claim under section 2.[11] For example, Plaintiffs direct extensive allegations towards the first and third *Brnovich* factors. *See, e.g.*, ECF No. 45 ¶ 80 (alleging that "[t]hese restrictions on drop boxes will have a disproportionately heavy impact on Black and Latino voters, who tend to have stricter and more unpredictable work obligations that limit their availability during normal voting hours, and who tend to encounter longer lines at their designated polling places" and that "[t]hese restrictions will also

---

[11] In response to Defendant Lee's motion to dismiss, Plaintiffs indicated that, although they contend that they have alleged sufficient facts, they "nevertheless intend to seek leave to amend . . . in light of *Brnovich*." ECF No. 147 at 25. Plaintiffs filed their response in July, but they have not yet moved for leave to amend. Accordingly, this Court takes Plaintiffs' allegations as they are.

disproportionately burden individuals who have less flexibility in choosing to travel to a drop box exclusively during early voting hours. For example, the percentage of Black Florida workers who rely on public transportation (not including taxis) to commute is nearly six times the percentage of white workers").

Plaintiffs also include allegations addressing the most relevant *Gingles* factors. *See, e.g.*, *id.* ¶¶ 37–45 (discussing Florida's "long history of invidious discriminatory voting practices"). And while the Eleventh Circuit has cautioned against "allowing the old, outdated intentions of previous generations to taint [the state's] ability to enact voting legislation," *GBM*, 992 F.3d at 1332, here Plaintiffs have at least plausibly alleged that the old, outdated intentions of the current generation are tainting Florida's election code, *see, e.g.*, ECF No. 45 ¶¶ 41–43 (giving examples of discriminatory voting practices in Florida over the past several decades); *cf. City of S. Miami v. DeSantis*, -- F. Supp. 3d -- , No. 19-cv-22927, 2021 WL 4272017, at *49 (S.D. Fla. Sept. 21, 2021) (finding "that the Legislature enacted [anti-sanctuary city legislation] to promote and ratify . . . racist views").

To be sure, other factors cut against Plaintiffs. For example, it appears that Florida makes it easier to vote now than it did in 1982. Plus, the Supreme Court has held that preventing voter fraud is "a valid and important state interest." *Brnovich*, 141 S. Ct. at 2340. Of course, Plaintiffs contend that SB 90 does not serve *any* legitimate state interest. *See, e.g.*, ECF No. 45 ¶¶ 115–24 (alleging that the stated

interests supporting SB 90 are pretextual). And nothing in *Brnovich* suggests that the words "voter fraud" are a mysterious and powerful incantation that instantly incinerates even the most fearsome section 2 claims. Instead, as in any other case, Plaintiffs must be given the opportunity to *prove* what they allege—that SB 90 does not prevent voter fraud, prophylactically or otherwise. *See Duke v. Cleland*, 5 F.3d 1399, 1405 n.6 (11th Cir. 1993) (declining to weigh Georgia's asserted interests at the motion to dismiss stage because "[t]he existence of a state interest . . . is a matter of proof.").

In short, Defendant Lee argues that Plaintiffs must prove their case at the pleading stage. That is not so. *See* Fed. R. Civ. P. 8(a)(1) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Defendant Lee's arguments may yet win the day; at this stage, however, they are premature. Because Plaintiffs have plausibly pleaded that, considering the totality of the circumstances, the drop box restrictions denies Black and Latino voters meaningful access to the political process, the motion to dismiss Count I is **DENIED**.

C

Defendant Lee also moves to dismiss Plaintiffs' intentional discrimination claims. Counts VI through VIII of Plaintiffs' amended complaint allege that, as it relates to Defendant Lee, the drop box restrictions violates section 2 of the Voting

47

Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment because the Legislature passed it with discriminatory intent. ECF No. 45 ¶¶ 186–223.

As explained above, section 2 guarantees voters "meaningful access to the political process" regardless of race. *Osburn*, 369 F.3d at 1289. The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. And the Fifteenth Amendment guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. Amend. XV, § 1.

Though facially neutral, SB 90 may nonetheless violate the Constitution—and section 2—if the Legislature passed it with the intent to discriminate. Indeed, ostensibly neutral laws motivated by racial prejudice "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

To determine whether a facially neutral law violates the Fourteenth or Fifteenth Amendments, this Court must apply a two-prong analysis. *GBM*, 992 F.3d at 1321. Plaintiffs must first show that the law has both "a discriminatory purpose and effect." *Id.* (quoting *Burton v. City of Belle Glade*, 187 F.3d 1175, 1188–89 (11th Cir. 1999)). Once Plaintiffs satisfy the first prong, "the second prong provides that

'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.' " *Id.* (citations omitted).

To address the first prong, this Court must apply the multi-factor approach set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *See GBM*, 992 F.3d at 1321 ("The *Arlington Heights* analysis . . . applies to both Fourteenth Amendment and Fifteenth Amendment claims); *Brnovich*, 141 S. Ct. at 2349 (applying *Arlington Heights* to section 2 intent claim). The *Arlington Heights* factors are (1) the challenged law's impact (2) the law's historical background; (3) "the specific sequence of events leading up" to the law's passage, which includes "(4) procedural and substantive departure; and (5) the contemporary statements and actions of key legislators." *GBM*, 992 F.3d at 1322. This "list has been supplemented" with an additional three factors: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.* These factors are nonexhaustive, *id.*, and no one factor is controlling, *see Perkins v. West Helena*, 675 F.2d 201, 209 (8th Cir. 1982) ("In determining whether a discriminatory purpose existed, no set of factors, including those suggested in . . . *Arlington Heights*, is dispositive of the question of intent.").

Further, in applying the *Arlington Heights* factors, this Court is mindful that the discriminatory purpose need not be the " 'dominant' or 'primary' one;" rather, it

need only be a motivating factor because "[r]arely can it be said that a legislature or an administrative body operating under a broad mandate made a decision motivated by a single concern." *Arlington Heights*, 429 U.S. at 265–66. Plus, as with discriminatory results under *Brnovich*, discriminatory purpose under *Arlington Heights* is determined "from the totality of relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Here, as with her other arguments, Defendant Lee overextends by asking this Court to resolve, on a motion to dismiss, claims that require this Court to undertake a complex, fact intensive inquiry. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor."); *Arlington Heights*, 429 U.S. at 226 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *GBM*, 992 F.3d at 1322 n.33 ("The *Arlington Heights* factors require a fact intensive examination of the record."). Nonetheless, this Court will address Defendant Lee's arguments as to each *Arlington Heights* factor.

1. *Discriminatory impact*. Challenging Plaintiffs' allegations on the first factor, Defendant Lee argues that Plaintiffs' amended complaint "fails to couple impact with . . . a pattern, unexplainable on grounds other than race." ECF No. 92-1

at 14 (quoting *GBM*, 992 F.3d at 1322). But as this Court explained while discussing Plaintiffs' discriminatory results claim, Plaintiffs have sufficiently alleged that the drop box restrictions have a discriminatory impact. Perhaps anticipating that conclusion, Defendant Lee also argues that, even if Plaintiffs do allege some evidence of discriminatory impact, Plaintiffs' allegations are insufficient to create the " 'rare' case where discriminatory impact alone could be determinative." *Id.* at 15 (quoting *GBM*, 992 F.3d at 1322). But, as explained below, here discriminatory impact does not stand alone.

2. *Historical background*. In challenging Plaintiffs' allegations on this factor, Defendant Lee complains that Plaintiffs "choose to dwell on the distant past." ECF No. 92-1 at 15. If only that were so; neither history nor discriminatory voting restrictions ended in 1965. *But see Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 532 (2013). As examples, Plaintiffs provide voting restrictions of a more recent vintage.[12] *See* ECF No. 45 ¶¶ 41 ("With the new millennium came renewed attempts to restrict the Black vote in Florida. For example, in 2000, the State of Florida improperly removed at least 1,100 eligible voters from the voting rolls after identifying them as convicted felons. . . . Of the voters dropped from the rolls in this

---

[12] Plaintiffs also point to SB 7066, which they describe as "severely restrict[ing] the reach of Amendment 4" renfranchisement. ECF No. 45 ¶ 44. While certainly a troubling case, even Judge Hinkle found that, while "the issue [was] close and could reasonably be decided either way[,] . . . . [o]n balance, . . . SB7066 was not motivated by race." *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1235, 1238 (N.D. Fla. 2020). Accordingly, citations to SB 7066 do not support Plaintiffs' case.

botched voter purge, 41% were Black. In Miami-Dade County, for example, "more than 65 percent of the names on the purge list were African Americans, who represented only 20.4 percent of the population."); 43 (alleging that, in 2011, the United States Department of Justice invoked the Voting Rights Act's preclearance requirement to prevent restrictions on early voting in some Florida counties).

Far from "at best" pointing "to no intentional discrimination," Plaintiffs' allegations draw a straight, shameful line from the discriminatory laws of the 1880s to today. Whether Plaintiffs can prove such a link is another matter. At this stage, however, these allegations will do.

3. *The sequence of events*. Defendant Lee argues that "[t]he sequence of events and departure from standard procedure inquiry, as plead, is insufficient." ECF No. 92-1 at 17. Her argument is twofold. First, she argues that "the Plaintiffs attribute most of the sequence of events and departure to changes made during a once-in-a-lifetime pandemic." *Id.* Second, she argues that Plaintiffs' "claim that" using "the 'strike all' amendment was unusual or 'flawed.' . . . is not true." *Id.* Maybe recognizing the flaws in her argument, Defendant Lee also argues that "even if this Court found significant evidence of unexplainable procedural deviations, this factor alone cannot support a finding of intent." *Id.*

And Defendant Lee's argument is flawed; Plaintiffs allege enough facts to survive the motion to dismiss stage. For example, Plaintiffs allege that, during debate

in the Legislature, SB 90's sponsors could not articulate why the bill was necessary, ECF No. 45 ¶ 115–19, that the time for public comment was limited to one minute, and that members of the public were forced to testify remotely from the FSU's Civic Center, *id.* ¶¶ 57, 62. At other hearings, no public testimony was permitted at all. *Id.* ¶ 65. And while the use of a strike all amendment may not be unusual, Plaintiffs allege that here the Legislature used it in a way that added, and adopted, hundreds of lines of text in just one day. *Id.* ¶ 67. In short, Plaintiffs allege that the Legislature passed SB 90 in a short flurry of activity that allowed for essentially no public input, and barely any legislative input. *Id.* ¶¶ 68–71.

It may well be that—as Defendant Lee claims—COVID-19 made these changes necessary. At the motion to dismiss stage, however, this Court takes Plaintiffs' allegations as true and draws reasonable inferences therefrom. Applying that standard, Plaintiffs have satisfied this prong.

4. *Contemporaneous statements*. Defendant Lee next argues that "Plaintiffs cannot show discriminatory intent through statements of 'key legislators' supportive of the 2021 Law 'made contemporaneously' with its passage." ECF No. 92-1 at 18 (quoting *GBM*, 992 F.3d at 1322). Plaintiffs retort by directing this Court to portions of their amended complaint, in which they allege that Senator Baxley, the bill's sponsor, struggled to explain why SB 90 was necessary, offered "glib" rationales

"for SB 90's restrictions," and discounted the impact the law would have on minority voters. ECF No. 45 ¶¶ 117, 119, 121 n.50, 122.

While perhaps not the strongest evidence, a weak showing on one factor does not doom Plaintiffs' amended complaint. Plaintiffs have therefore pleaded sufficient facts under this factor.

5. *Foreseeability and knowledge of disparate impact.* Defendant Lee argues that Plaintiffs' allegations under this factor are insufficient because Plaintiffs "simply say[] that there exists a discriminatory impact (without even saying what that impact is)" and because Plaintiffs "rely on statements from those opposing the 2021 Law's passage." ECF No. 92-1 at 19.

As this Court explained, Plaintiffs *have* alleged discriminatory impact. Moreover, while this Court acknowledges the issues attendant with relying on opposing legislators' statements, *see Veasey v. Abbott*, 830 F.3d 216, 233 (5th Cir. 2016) ("[T]he district court mistakenly relied in part on speculation by the bill's opponents about proponents' motives (rather than evidence of their statements and actions)"), it is not irrelevant that, allegedly, a majority of the Florida Legislature was repeatedly warned that SB 90 would have a discriminatory effect, struggled to identify why the Act was necessary, and eventually said, more or less, "eh, why not?" *See* ECF No. 45 ¶¶ 115–24. *See also Veasey*, 830 F.3d at 239 (finding relevant evidence that, "[a]gainst a backdrop of warnings that [Texas's voter ID law] would

54

have a disparate impact on minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected.").

      6. *Less discriminatory alternatives*. Defendant Lee argues that Plaintiffs "only make conclusory statements concerning" less discriminatory alternatives and "simply ask for the pre-2021 status quo without alleging why that status quo is less discriminatory." ECF No. 92-1 at 20. But Plaintiffs have clearly plead that SB 90 is discriminatory. And, as Plaintiffs point out, many of SB 90's supporters have acknowledged that the pre-SB 90 status quo worked quite well. ECF No. 45 ¶¶ 2–4, 49. Plus, Plaintiffs have alleged that, during debate on SB 90 and its House equivalent, "Senators and Representatives proposed numerous amendments that would have mitigated the restrictive and discriminatory impacts of the proposed legislation," and that "[b]oth chambers . . . rejected the vast majority of these ameliorative amendments." ECF No. 45 ¶ 72. *See also Veasy*, F.3d at 237 (explaining that legislature's rejection of "ameliorative measures" is relevant under *Arlington Heights*). Accordingly, Defendant Lee's argument provides no basis to dismiss Plaintiffs' claims at this stage.

      In sum, Plaintiffs have pleaded at least some facts addressing every *Arlington Heights* factor. Given that the question is whether this Court can infer a discriminatory purpose given the totality of the circumstances, and that no one factor is dispositive, Plaintiffs have done enough at the pleading stage. That said, as this

Court has paused to say over and over again, that does *not* mean Plaintiffs can prove what they allege. Rather, this Court means just what it says; at the pleading stage, Plaintiffs have done enough.

D

Count III of Plaintiffs' amended complaint alleges that SB 90 violates Title II of the Americans with Disabilities Act. ECF No. 45 ¶¶ 152–66. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 1213. Specific to Defendant Lee, Plaintiffs allege that SB 90's drop box restrictions violates Title II. This is so, say Plaintiffs, because "SB 90's restrictions on drop box availability adds impermissible barriers to voters with disabilities' participation in elections" by reducing the number of drop boxes available and by forcing the Supervisors to place the remaining drop boxes in less accessible locations. ECF No. 45 ¶ 159.

To prevail on this claim, Plaintiffs must establish (1) that they—or their constituents—are qualified individuals with a disability; (2) that Plaintiffs' constituents were "excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or w[ere] otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination

was by reason of" their disability.[13] *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007) (citing *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001).

On the first prong, Plaintiffs must show that their constituents " 'meet[] the essential eligibility requirements' to participate in the program or services at issue 'with or without reasonable modifications.' " *Merrill*, 491 F. Supp. 3d at 1155 (quoting *United States v. Georgia*, 546 U.S. 151, 153–54 (2006)). Here, there is no suggestion that disabled Floridians are not eligible to vote by drop box. And for the second prong, there is no question that elections are a public program. *See, e.g.*, *Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1107 (11th Cir. 2011) ("As a public program, disabled citizens must be able to participate in the County's voting program."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("Voting is a quintessential public activity."). Plus, sticking with the second prong, the question is not whether Plaintiffs' constituents have been excluded from voting altogether, but rather whether voting via drop box is "readily accessible" to those with disabilities. *Merrill*, 491 F. Supp. 3d at 1159–60; *see also Lamone*, 813 F.3d at 504–05 (same). Finally, to satisfy the third prong, Plaintiffs must "establish

---

[13] Because the parties have not briefed the issue, this Court assumes without deciding that DRF can bring this claim on its constituents' behalf. *Compare Yelapi*, 2021 WL 1918784, at *3 (concluding that "DRF has associational standing" to bring Title II claims on its constituents' behalf) *with People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1158 n.66 (N.D. Ala. 2020) ("[T]he plaintiffs have not cited any authority for the proposition that an organization may assert ADA claims for injunctive relief on behalf of non-member constituents. Thus, BVM's claims under the ADA fail . . . .").

a causal link between their disabilities and the exclusion, denial of benefits, or discrimination." *Merrill*, 491 F. Supp. 3d at 1155.

Also relevant to the second and third prongs, in alleging that a public entity has discriminated against them, a Title II plaintiff may travel under one of three theories. *Lamone*, 813 F.3d at 503 n.5. These are "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Id.* Here, Plaintiffs allege a failure to accommodate. *See* ECF No. 45 at 68.

Defendant Lee does not appear to quibble with this framework; rather, she argues that Plaintiffs' claim fails on the second prong because it requires this Court to speculate both that the Supervisors will move drop boxes inside, and that, if they do, the buildings housing the drop boxes will be less accessible. ECF No. 92-1 at 38. According to Defendant Lee, this argument "piles speculation upon speculation" and therefore fails. *Id.* (quoting *D.C. ex rel. Walker v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 874 F. Supp. 2d 599, 609 (E.D. La. 2012)).

But Plaintiffs' allegations about how this new restriction will impact drop box accessibility for individuals with disabilities do not require this Court to speculate. To the contrary, Plaintiffs allege that this law *will* cause some drop boxes to become inaccessible and therefore exclude voters with disabilities from participation in public elections. *See* ECF No. 45 ¶¶ 79 ("These restrictions *will also impact* the

availability of 'drive through' drop boxes, which permit voters, including voters with disabilities, to drop off their ballot without leaving their cars."), 159 ("By requiring drop boxes to be staffed, the Challenged Provisions *will limit* the option to offer drop boxes outside. As a result of the staffing requirement, many election officials *will place* most or all drop boxes indoors where staff are already located, which may be less accessible to voters with disabilities. Voters with disabilities who have limited mobility are more likely to rely on drop boxes that are placed outdoors and are easily accessible—an option that the Challenged Provisions *will severely curtail*.") (emphasis added).

Rather than arguing whether Plaintiffs have stated a claim to relief that is plausible on its face, the parties appear to be arguing about whether Plaintiffs have a good faith basis to allege that drop boxes will be moved indoors as a result of the new staffing requirement. For example, Plaintiffs retort that their "pleading follows directly from the statute" because "it is reasonable to infer that many drop boxes will be moved indoors . . . where they can be more easily and cheaply monitored." ECF No. 147 at 44. Determining whether it is reasonable to infer that a specific fact *will* happen when Plaintiffs allege that the fact *will* happen is not the proper inquiry under Rule 12(b)(6). Instead, as this Court noted above, at the motion-to-dismiss stage, this Court takes Plaintiffs' allegations as true and construes all reasonable inferences drawn therefrom in Plaintiffs' favor. For example, from Plaintiffs' allegation that,

because of the challenged law, the Supervisors will move drop boxes inside where they will be less accessible to voters with disabilities, this Court can infer that fewer Florida voters with disabilities will be able to vote and have their votes counted.

Relatedly, Plaintiffs argue that they have alleged sufficient facts showing that moving drop boxes inside, regardless of how accessible the building might be, will render the drop boxes less accessible. *Id.*; *see also* ECF No. 45 ¶¶ 79 (alleging that "these restrictions will . . . impact the availability of 'drive through' drop boxes, which permit voters, including voters with disabilities, to drop off their ballot without leaving their cars"), 159 (alleging that "[v]oters with disabilities who have limited mobility are more likely to rely on drop boxes that are placed outdoors and are easily accessible"). That is no stretch, even the most accessible building in the world is more difficult to access than a drive-through drop box.

The bottom line is this, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation omitted). It may strike this Court—savvy as it is—that Plaintiffs may not be able to prove that the Supervisors *will* move any remaining drop boxes inside. But that is what Plaintiffs allege and that is what this Court must accept as true. "The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or

experiences in time travel." *Iqbal*, 556 U.S. at 696 (Souter, J., dissenting). But "[t]hat is not what we have here." *Id.* Contrary to what Defendant Lee suggests, Plaintiffs' allegations "qualify as factual allegations." ECF No. 92-1 at 38 n.19.[14]

While this is a close call, this Court agrees that Plaintiffs allege a plausible ADA claim that is neither fanciful nor speculative. *See Twombly*, 550 U.S. at 555 (explaining that "[f]actual allegations must be enough to raise a right to relief above the speculative level"). Plaintiffs allege that, given the high cost of non-compliance with SB 90, the Supervisors will offer fewer drop boxes. Plaintiffs also allege that, of those drop boxes that will be offered, the Supervisors will place them indoors in areas that are less accessible to voters with disabilities. This Court can reasonably infer from these allegations that, as a result of the new drop box restrictions, drop boxes will not be readily accessible to Florida voters with disabilities.

Accordingly, Defendant Lee's motion to dismiss Plaintiffs' ADA claim, Count III, is **DENIED**.

For the foregoing reasons,

**IT IS ORDERED**:

---

[14] An altogether different issue, one that Defendant Lee conflates with whether Plaintiffs have stated a claim, is whether Plaintiffs' ADA claim is ripe because it requires "speculation about contingent future events." ECF No. 92-1 at 38 n.19 (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)). This Court declines to engage with Defendant Lee's half-developed argument, which she makes in passing in a footnote.

1. Defendant Lee's motion to dismiss, ECF No. 92, is **GRANTED in part** and **DENIED in part**.

2. Plaintiffs' claims against the Defendant Supervisors challenging section 104.0616(2), Florida Statutes (2021) are **DISMISSED for lack of standing**.

3. Defendant Lee's motion to dismiss is **DENIED** as to all other claims.

**SO ORDERED on October 8, 2021.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**