# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**FLORIDA STATE CONFERENCE OF
THE NAACP, et al.,**

     *Plaintiffs,*

     v.                   Case No. 4:21-CV-187

**LAUREL M. LEE, in her official
capacity as FLORIDA SECRETARY
OF STATE, et al.,**

     *Defendants.*

_____/


**FLORIDA RISING TOGETHER, et al.,**

     *Plaintiffs,*

     v.                   Case No. 4:21-CV-201

**LAUREL M. LEE, in her official
capacity as FLORIDA SECRETARY
OF STATE, et al.,**

     *Defendants.*

_____/


# MOTION TO QUASH SUBPOENAS FOR THE DEPOSITION
# TESTIMONY OF SEVEN MEMBERS OF THE FLORIDA LEGISLATURE
# <u>AND INCORPORATED MEMORANDUM OF LAW</u>

# INTRODUCTION

In this litigation, one of Plaintiffs'[1] central claims is that the enactment of Senate Bill 90 ("S.B. 90") was driven by illicit legislative purpose. To shore up that claim, Plaintiffs have served subpoenas on seven members of the Florida Legislature ("the Members") seeking documents and deposition testimony about the bill's passage.[2] In response, the Members have largely agreed to produce the documents Plaintiffs seek, which were already available to them under applicable public-records laws, but object on legislative-privilege grounds to the "far more intrusive" request for testimony. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 1:15-CV-559, 2016 WL 11660626, at *7 (M.D.N.C. Dec. 20, 2016).

Less than 10 years ago, a judge of this Court quashed deposition subpoenas directed at members of the Florida Legislature in another voting rights case because, if allowed to proceed, the depositions would have invaded their legislative privilege. *See Florida v. United States*, 886 F. Supp. 2d 1301 (N.D. Fla. 2012) (Hinkle, J.). Since then, all three "courts of appeals that have considered a private party's request

---

[1] At Plaintiffs' request, and to ensure orderly litigation of these issues, the Members have filed this motion in both the Florida Rising and NAACP cases.

[2] The Florida Rising Plaintiffs subpoenaed Senators Jeff Brandes, Joe Gruters, and Kathleen Passidomo and Representatives Blaise Ingoglia and Erin Grall. The NAACP Plaintiffs subpoenaed Senators Dennis Baxley and Jim Boyd. This motion addresses the subpoenas in the collective and refers to the Florida Rising and NAACP Plaintiffs, collectively, as "Plaintiffs." *See* Exhs. A-G.

for such discovery in a civil case have found it barred by the common-law legislative privilege." *Am. Trucking Ass'ns, Inc. v. Alviti*, No. 20-2120, 2021 WL 4272556, at *8 (1st Cir. Sept. 21, 2021) (citing *In re Hubbard*, 803 F.3d 1298, 1311–12 (11th Cir. 2015), *and Lee v. City of L.A.*, 908 F.3d 1175, 1186–88 (9th Cir. 2018)). The Members ask this Court to do the same.

## ARGUMENT

### I.   THE DEPOSITION SUBPOENAS SHOULD BE QUASHED BECAUSE THEY ARE BARRED BY LEGISLATIVE PRIVILEGE.

Under Rule 45 of the Federal Rules of Civil Procedure, "[o]n timely motion," a district court "must quash or modify a subpoena" that "requires disclosure of privileged" material, Fed. R. Civ. P. 45(d)(3)(A)(iii), including a subpoena that would violate legislative privilege, *see Hubbard*, 803 F.3d at 1307.[3]

As the Eleventh Circuit has explained, legislative privilege bars "inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *Hubbard*, 803 F.3d at 1310 (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972) (internal quotation marks omitted)). Here, Plaintiffs claim that S.B. 90 violates the Fourteenth and Fifteenth Amendments and Section 2 of the

---

[3] The earliest of the depositions at issue was originally noticed for October 19, 2021. The parties met-and-conferred in an effort to avoid the need for motions practice as required by Local Rule 7.1(B). On October 13, they agreed that the depositions would not go forward as noticed and no new dates would be set pending briefing and resolution of a motion to quash, which the parties agreed the Members would file on or before October 20, 2021.

Voting Rights Act, asserting that it "was adopted with the racially discriminatory intent to raise obstacles to voting for people of color, including Black and Latino voters." Florida Rising ECF 59 ¶ 177 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).[4] Counsel for Plaintiffs have represented that the depositions they seek are intended to elicit testimony to support that allegation, and their document requests confirm the nature of the questions they seek to ask. Specifically, they seek documents that discuss "S.B. 90" and its companion House Bill (with an emphasis on "bill analyses"); "election law changes" and the "polic[y]" concerns that motivate them (such as "voter fraud"); "the legislative process for considering, debating, or enacting" such legislation, and communications with various policy institutions and political organizations about possible legislation. *E.g.*, Exh. H at 14–15; *see also* Exhs. I–N. In other words, the admitted purpose of the depositions is "inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *Hubbard*, 803 F.3d at 1310. Thus, as in *Hubbard*, "the factual heart of" the only claims to which the depositions are potentially relevant "and the scope of the legislative

---

[4] *See also* Florida Rising ECF 59 ¶ 168 ("SB 90 violates Section 2 of the Voting Rights Act because these provisions were adopted for the purpose of denying voters of color full and equal access to the political process."); NAACP ECF 45 ¶ 128 (same); Florida Rising ECF 59 ¶ 182 ("SB 90 violates the Fifteenth Amendment . . . because Defendants intentionally enacted and intend to administer and enforce the [challenged provisions] to deny and abridge the right to vote on account of race or color."); *see* NAACP ECF 45 ¶ 202 (same).

privilege [a]re one and the same." *Id.* at 1311.[5] Accordingly, the depositions cannot be allowed to proceed.

Despite all that, Plaintiffs have identified two reasons they believe that depositions should proceed. *First*, Plaintiffs assert that the privilege is "qualified" and must yield in cases like theirs. To the contrary, the privilege is not qualified in civil cases. And in any event, as Judge Hinkle explained in *Florida v. United States*, "even if the state legislative privilege is qualified in civil as well as criminal cases, there is no reason not to recognize the privilege here. Voting Rights Act cases are important, but so are equal-protection challenges to many other state laws, and there is nothing unique about the issues of legislative purpose and privilege in Voting Rights Act cases." 886 F. Supp. 2d at 1304.

*Second*, Plaintiffs contend that legislative privilege is inapplicable to communications between the Members and individuals outside the Legislature that they do not view as confidential. But "the maintenance of confidentiality is not the fundamental concern of the legislative privilege." *Pulte Home Corp. v. Montgomery Cnty.*, No. GJH-14-3955, 2017 WL 2361167, at *8 (D. Md. May 31, 2017). "The legislative privilege is principally framed to ensure that legislators are free to make difficult decisions on controversial issues without fear that their decision-making

---

[5] During the Parties' meet-and-confer discussions, counsel for Plaintiffs did not identify any reason for the depositions other than to explore legislative motive.

process will be later scrutinized or that their time will be consumed with responding to discovery requests in litigation." *Id.* Consistent with that difference, it is well-settled that "[m]eeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation, and participating in party caucuses to form a united position on matters of legislative policy" "are also a routine and legitimate part of the modern-day legislative process" and are therefore within the scope of the privilege. *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) (cleaned up).

### A.      Legislative privilege is absolute in civil cases.

Plaintiffs apparently contend that legislative privilege may be overcome in important cases like theirs. But it is well-established that "a state legislator's common-law . . . immunity from civil suit" is "absolute." *United States v. Gillock*, 445 U.S. 360, 372 (1980) (discussing *Tenney v. Brandhove*, 341 U.S. 367 (1951)). And there is no reason to treat the "parallel concept" of "[l]egislative privilege" differently. *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011).

While immunity from suit and immunity from compelled testimony because of legislative privilege are different concepts, they have the same origins and protect the same interests. As the Ninth Circuit has explained, *Tenney*'s "logic" in affording

state legislators absolute immunity from suit "supports extending the corollary legislative privilege from compulsory testimony to state and local officials as well" because both doctrines serve to avoid "the distraction of diverting [legislators'] time, energy, and attention from their legislative tasks to defend the litigation." *Lee*, 908 F.3d at 1187 (cleaned up).

The Fourth Circuit, too, has said that the "privilege against compulsory evidentiary process exists to safeguard [lawmakers'] immunity and to further encourage the republican values it promotes." *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181 (citation omitted). Legislative immunity from suit "shields [legislators] from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box." *Id.* Legislative immunity from testimony as a result of legislative privilege is likewise necessary because a "'litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive.'" *Id.* (quoting *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988)). In other words, application of legislative privilege to preclude testimony prevents an end-run around the immunity from suit and, in that way, "[t]he privilege protects the legislative process itself." *Hubbard*, 803 F.3d at 1308. In its absence, litigants unable to sue legislators directly would be free to harass them all the same through non-party discovery.

The view that the legislative privilege is absolute in civil cases is supported by the Eleventh Circuit's decision in *Hubbard*. There, the court explained that "the privilege extends to discovery requests, even when the lawmaker is not a named party in the suit," because "complying with such requests detracts from the performance of official duties." *Hubbard*, 803 F.3d at 1310 (citing *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181). Although the court stopped short of addressing whether the privilege may sometimes yield in civil cases (because it was unnecessary to do so),[6] the court adopted its privilege framework from the Supreme Court's absolute-immunity cases, explaining that "state lawmakers possess a legislative privilege that is 'similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause.'" *Hubbard*, 803 F.3d at 1310 n.11 (citing *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980)). Free of the distinction between state and federal legislators, the court also relied heavily on two D.C. Circuit opinions holding that the privilege shielding members of Congress from non-party discovery is, like their legislative immunity, "absolute." *See MINPECO*, 844 F.2d at 862 (citing *Miller v. Transamerican Press, Inc.*, 709 F.2d 525, 529 (9th Cir 1983)); *see Brown & Williamson Tobacco Corp. v. Williams*, 62

---

[6] *Hubbard*, 803 F.3d at 1313 (concluding that, in any event, the plaintiffs had "not presented a cognizable" claim, so there could be "no important federal interest at stake . . . to justify intruding upon the lawmakers' legislative privileges" (cleaned up)).

F.3d 408, 416 (D.C. Cir. 1995) ("[T]he legislative privilege is 'absolute' where it applies at all."(citation omitted)); *see Hubbard*, 803 F.3d at 1308–10 (discussing *MINPECO* and *Brown*).

Cases that reject an absolute legislative privilege in the civil context almost universally misread one of two cases—*United States v. Gillock* or *Village of Arlington Heights v. Metropolitan Housing Development Corporation*—to stand for the proposition that legislative privilege sometimes yields in civil cases. *See*, *e.g.*, *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003); *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323 (E.D. Va. 2015).[7]

Those courts point to *Gillock* for its statement that "where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields." 445 U.S. at 373. But *Gillock* did not disturb the Supreme Court's previous holding in *Tenney* that "a state legislator's common-law . . . immunity from civil suit" is "absolute." *Id.* at 372. In rejecting the privilege claim, the Court noted that *Tenney* and its progeny "have drawn the line at civil actions." *Id.* at 373.

---

[7] Such decisions are limited almost exclusively to the redistricting context. *See*, *e.g.*, *Rodriguez*, 280 F. Supp. 2d at 100–01; *Bethune-Hill*, 114 F. Supp. 3d at 336 ("Several federal courts have taken the same, or a similar, approach in finding that the privilege is a qualified one in redistricting cases."); *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 304 (D. Md. 1992) ("Legislative redistricting is a *sui generis* process. While it is an exercise of legislative power, it is not a routine exercise of that power."). Regardless, the better view is that the privilege never yields in civil cases.

And that was no arbitrary line: Among the privilege's "historic roots" and "interrelated rationales," *id.* at 369, was a long tradition of "prosecutions of state and local officials, including state legislators, using evidence of their official acts," *id.* at 373 n.11. Thus, absolute civil immunity "presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Id.* at 372.

The Supreme Court read both *Tenney* and *Gillock* the same way later the same year *Gillock* was decided: Other than in "criminal actions," the Court has "generally . . . equated the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressmen under the Constitution." *Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980). That is how the Eleventh Circuit has understood *Gillock*, too, holding that "for purposes of the legislative privilege, there is a fundamental difference between civil actions by private plaintiffs and criminal prosecutions by the federal government." *Hubbard*, 803 F.3d at 1311–12; *see also Florida*, 886 F. Supp. 2d at 1304 (noting that *Gillock* drew a line between civil and criminal cases). In short, *Gillock* means what it says: The Supreme Court has drawn "drawn the line at civil actions" for absolute legislative privilege. *Gillock*, 445 U.S. at 373.[8]

---

[8] If the privilege could ever be qualified in civil cases, at most it would only be so in cases in which the federal government has asserted "interests" akin to the federal criminal bribery prosecution that *Gillock* involved, 445 U.S. at 373, such as when the United States brings a civil suit to enforce a federal statute, *see Am.*

*Arlington Heights* offers no better basis to qualify the legislative privilege in civil cases. There, the Court identified categories of evidence that may be relevant to show that a legislative body acted with racially discriminatory purpose. The Court noted that in "some extraordinary instances" officials "might be called to the stand at trial to testify concerning the purpose of the official action," cautioning that "even then such testimony frequently will be barred by [a governmental] privilege." 429 U.S. at 268. Some courts have seized on that sentence to support their view that in "extraordinary" civil cases, legislative privilege must yield. But that is not what the Court said. Rather, it said that in "extraordinary instances" parties might ask for such testimony, but "even then" it "frequently will be barred." That simply recognizes the unexceptional proposition that not all such testimony is "barred by privilege" (as it would not be if, for example, a legislator testified voluntarily, *see Florida*, 886 F. Supp. 2d at 1302). If anything, the statement leaves the issue open while warning civil plaintiffs not to get their hopes up because such testimony "frequently will" be barred.

---

*Trucking Ass'ns*, 2021 WL 4272556, at *7 (distinguishing *Gillock* in a suit that was "neither a federal criminal case nor a civil case in which the federal government is a party"); *Brown & Williamson Tobacco Corp.*, 62 F.3d at 419–20 ("[T]he testimonial privilege might be less stringently applied when inconsistent with a sovereign interest, but is 'absolute' in all other contexts."). A private civil suit such as this one involves no such interest.

That reading is consistent with the two citations the Court appended to the passage—*Tenney*, which establishes the absolute legislative immunity of state officials in civil cases,[9] and *United States v. Nixon*, 418 U.S. 683 (1974), which rejects absolute executive privilege in a federal criminal case. Those citations indicate that if *Arlington Heights* did anything other than leave the issue open, it presaged the civil-criminal distinction that the Court made explicit in *Gillock*. And indeed, that appears to be how *Gillock* understood *Arlington Heights* when it noted just four years later that "*Tenney* and subsequent cases on official immunity," one of which was, of course, *Arlington Heights*, "have drawn the line at civil actions." *Gillock*, 445 U.S. at 373.

### B. Even if legislative privilege is qualified in civil cases, it bars the testimony sought in this case.

**1.** Even if legislative privilege yields in certain "extraordinary" civil cases, this is not such a case. To be clear, no one doubts that Plaintiffs' claims are important. But as the First Circuit recently explained—assuming without deciding that the privilege is qualified—if "the mere assertion of a federal claim," "even one that addresses a central concern of the Framers," were "sufficient" to overcome the privilege, then "the privilege would be pretty much unavailable largely whenever it is needed." *Am. Trucking Ass'ns*, 2021 WL 4272556, at *8.

---

[9] *Gillock*, 445 U.S. at 372 (noting *Tenney*'s holding that "a state legislator's common-law . . . immunity from civil suit" is "absolute").

Plaintiffs will no doubt argue that voting-rights cases are different, but Judge Hinkle already rejected that argument. In *Florida v. United States*, the State sought preclearance of new voting laws under Section 5 of the Voting Rights Act, and intervenors who opposed preclearance moved to compel the deposition testimony of members of the Legislature. 886 F. Supp. 2d at 1302. Although recognizing that "Voting Rights Act cases are important" and that "legislative purpose" was relevant to the claims, Judge Hinkle denied the motion. *Id.* at 1304. He explained that "even if the state legislative privilege is qualified in civil as well as criminal cases, there is no reason not to recognize the privilege here." *Id.* "Voting Rights Act cases are important, but so are equal-protection challenges to many other state laws, and there is nothing unique about the issues of legislative purpose and privilege in Voting Rights Act cases." *Id.*

The Ninth Circuit recently reached the same conclusion in a redistricting case in which the plaintiffs sought to depose local officials in support of their racial gerrymandering claims. *Lee*, 908 F.3d at 1178. Without deciding whether legislative privilege is "only a qualified right" in civil cases, *id.* at 1187, the court upheld the officials' privilege assertion. The court explained: "*Arlington Heights* itself . . . involved an equal protection claim alleging racial discrimination—putting the government's intent directly at issue—but nonetheless suggested that such a claim was not, in and of itself, within the subset of 'extraordinary instances' that

12

might justify an exception to the privilege." *Id.* at 1188. Thus, although "claims of racial gerrymandering involve serious allegations," they did not justify a "substantial intrusion into the legislative process." *Id.* (internal quotation marks omitted).

**2.** As in *American Trucking*, *Florida v. United States*, and *Lee*, nothing about this case presents an "extraordinary circumstance" that would justify setting the privilege aside. Plaintiffs allege various "departure[s] from the normal legislative process," NAACP ECF 45 ¶ 37, but there is nothing extraordinary about that. *See Lee*, 908 F.3d at 1178 (upholding the privilege despite noting the "political maneuvering" that ordinarily accompanies the redistricting process). Legislative proceedings are inherently political, and the fact that aspects of the process "are politically motivated, or conducted behind closed doors, does not take away from the legislative character of the process." *Almonte*, 478 F.3d at 107 (cleaned up). Moreover, any such departures are a matter of public record and serve only to reduce the need for deposition testimony. *See Benisek v. Lamone*, 263 F. Supp. 3d 551, 553 (D. Md. 2017) (considering the "availability of other evidence" in determining whether the privilege was overcome).

If anything, the circumstances of this case cut strongly against depositions. For one thing, the Members have largely agreed to provide the documents Plaintiffs seek. *Cf. In re U.S.*, 985 F.2d 510, 512 (11th Cir. 1993) ("The reason for requiring exigency before allowing the testimony of high officials is obvious. High ranking

government officials have greater duties and time constraints than other witnesses."). Plaintiffs' deposition subpoenas are, moreover, redundant of discovery they seek from other nonparties. For example, Plaintiffs just won a motion to compel discovery from the Heritage Foundation, including discovery regarding the Foundation's communications with the Legislature. *See* Order on Motion to Compel, *Florida State Conference of Branches & Youth Units of the NAACP v. Lee*, No. 9:21-mc-81824-DMM, ECF 12 (S.D. Fla. Oct. 19, 2021). That is a category of documents Plaintiffs sought from the Members, too, and presumably is one of the topics they seek to explore in the depositions at issue. *See*, *e.g.*, Exh. H at 14-15; *see also* Exhs. I–N. These multiple alternative avenues of proof greatly reduce the need to depose legislators.

**3.** In asking whether legislative privilege has been overcome, some courts have deployed an ad hoc balancing test that considers five-factors: "(1) [the] relevance of the evidence sought, (2) [the] availability of other evidence, (3) the seriousness of the litigation and the issues involved, (4) the role of the State in the case, and (5) the purposes of the privilege." *Benisek*, 263 F. Supp. 3d at 553. That test has been recently borrowed from the official-information-privilege context. *See Rodriguez*, 280 F. Supp. 2d at 101 (citing *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979)). This Court should decline to adopt it here. For one thing, the test's cross-pollination between privileges is not merely "bad wine of

14

recent vintage," *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring), but is also substantively unjustifiable because the official-information privilege, unlike legislative privilege, "is a discretionary one that depends upon *ad hoc* considerations of competing policy claims." *United States v. Article of Drug Consisting of 30 Individually Cartoned Jars, More or Less, Labeled in Part: "Ahead Hair Restorer for New Hair Growth"*, 43 F.R.D. 181, 190 (D. Del. 1967). That is consistent with the approach of several Circuits, which have upheld assertions of legislative privilege without recourse to the five-factor test, while assuming (without deciding) that the privilege is qualified in civil cases. *E.g.*, *Am. Trucking Ass'ns*, 2021 WL 4272556, at *8; *Lee*, 908 F.3d at 1187–88.

Regardless, the five "factors will weigh against disclosure and in favor of upholding the privilege in all but the extraordinary case." *Citizens Union of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 156 (S.D.N.Y. 2017). And here, all five factors weigh in favor of upholding the privilege.

*Relevance of the evidence*. Deposition testimony is unlikely to be particularly helpful in this case. As Judge Hinkle noted in *Florida v. United States*, although such "testimony may say enough to move the needle at least a little, and relevance requires nothing more," a "single legislator's testimony on the legislator's own purpose, or a single legislator's opinion testimony about other legislators' purpose, may not say much about the actual overall legislative purpose." 886 F. Supp. 2d at 1302. That

view is consistent with the Eleventh Circuit's "skepticism that . . . discriminatory intent could be ascertained from the statements of one legislator." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021). As the court explained, it is "questionable whether the sponsor speaks for all legislators," as the "vote of a sponsor is only one vote" in a Legislature of many. *Id.* "The Supreme Court," too, "has warned against relying too heavily on" testimony about "individual lawmakers' motives." *Am. Trucking Ass'ns*, 2021 WL 4272556, at *9. After all, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it," and when the constitutionality of a duly-enacted statute is in play, the "stakes are sufficiently high" for courts "to eschew guesswork." *United States v. O'Brien*, 391 U.S. 367, 384 (1968).

*Availability of other evidence*. Likewise, there is other, more relevant evidence available to Plaintiffs. *Citizens Union*, 269 F. Supp. 3d at 167 (noting that the "legislative record" is often the "more directly relevant information"). *Arlington Heights* identified eight evidentiary considerations relevant to claims of racially discriminatory purpose:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators[;] . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries*, 992 F.3d at 1321–22. Given those multiple avenues of proof, deposition testimony is unlikely to be particularly probative, especially because the Members have agreed to produce documents. Indeed, *Arlington Heights* itself—which establishes the test Plaintiffs intend to use to prove their claims, *see* Florida Rising ECF 59 ¶ 177; NAACP ECF 45 ¶ 190—contemplates that such testimony will be sought only in "extraordinary instances." 429 U.S. at 268. Such proof plainly is not at the core of these claims.

*Seriousness of the litigation*. This litigation, like all voting-rights litigation, is serious. But the seriousness of the case should be measured against the kind of interest that justified abrogating the privilege in *Gillock*, which was a federal criminal bribery prosecution of a state legislator. *See* 445 U.S. at 372–73. So measured, this factor cuts against Plaintiffs. After all, "no representative of the federal government asserts any interest in overbearing the assertion of the legislative privilege in this case." *Am. Trucking Ass'ns*, 2021 WL 4272556, at *7. That matters because "[a]n official federal investigation into potential abuses of federal [law] is a far cry from a private lawsuit attacking a facially valid state statute by attempting to discover the subjective motivations of some of the legislative leaders and the governor who supported it." *Hubbard*, 803 F.3d at 1309 n.10. Where, as here, a private plaintiff asserts private claims, the "courts of appeals that have considered

[the] private party's request for such discovery . . . have found it barred by the common-law legislative privilege." *Am. Trucking Ass'ns*, 2021 WL 4272556, at *7.

*The role of the State in the case*. This factor makes much more sense in the official-information-privilege context, where courts ask about the "the role of the government in the litigation." *Rodriguez*, 280 F. Supp. 2d at 101. Governments are, of course, involved in litigation in a variety of ways. But legislative privilege typically arises only when, as here, plaintiffs challenge legislative action and seek to inquire into legislative motive. In that context, the factor would weigh against the privilege in every case where there are "charge[s] of governmental misconduct" or "perversion of governmental power." *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 329 (D.D.C 1966). That is the heart of every case in which legislative privilege is asserted. *See Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege.").

Thus, in the legislative-privilege context, courts have asked whether the State's legislative purpose "lies at the core" of the case, an inquiry that substantially overlaps with the first factor—relevance. *E.g.*, *Benisek*, 263 F. Supp. 3d at 554. As explained above, the evidence Plaintiffs seek is not highly relevant.

*Purposes of the privilege*. Finally, the purposes of the privilege weigh heavily against depositions. As discussed more fully above, the privilege is necessary because it "shields [legislators] from political wars of attrition in which their

18

opponents try to defeat them through litigation rather than at the ballot box." *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181. The privilege thus "protects the legislative process itself," *Hubbard*, 803 F.3d at 1308, in two related ways.

*First*, a Legislature may lose its "capacity to function effectively if beset by third-party discovery requests" that interfere with members' duties. *Brown & Williamson Tobacco*, 62 F.3d at 419 (citing *MINPECO*, 844 F.2d at 859–61). That concern is acute today, as lawsuits alleging illicit legislative motive become increasingly commonplace. *Second*, even when compliance would not interrupt ongoing proceedings, as in the case of former legislators, the threat of compulsory process will interfere with the legislative process "by having a chilling effect on" on members' participation. *MINPECO*, 844 F.2d at 859–60 (former Congressman); *see Hubbard*, 803 F.3d at 1309–10 (former Governor); *Miller*, 709 F.2d at 528 (former Congressman).

These concerns are especially pronounced in Florida, where the Legislature convenes for regular session just 60 days a year and state law provides only part-time compensation for legislative service, necessitating that members pursue other, full-time employment. *See* Art. III, § 3, Fla. Const. There is a short window for the Legislature to complete its business, and interference during that time is especially problematic. But even when members are not in Tallahassee for official business, the work never stops. Year-round, they must meet with constituents and engage with

policy, while also earning a living, fulfilling family obligations, and of course (as a practical matter) campaigning for re-election. Taking those considerations together, the year-round prospect of members being forced under penalty of perjury to give evidence for the purpose of impugning their own motives for any of their many legislative acts cannot be taken lightly. In the aggregate, it could easily affect how members engage with controversial legislation, if not discourage service altogether. "One must not expect uncommon courage even in legislators." *Tenney*, 341 U.S. at 377.

### C.   The privilege shields lawmakers from testifying about communications with individuals outside the Legislature.

Legislative privilege protects legislators from compelled testimony here even though one of the subjects Plaintiffs seek to probe may be the Members' communications with individuals outside the Legislature, including political and partisan organizations. Some courts have suggested that legislative privilege does not apply in such circumstances, apparently on the theory that legislators have waived the privilege with respect to such communications. *See League of Women Voters of Mich. v. Johnson*, 17-14148, 2018 WL 2335805, at *6 (E.D. Mich. May 23, 2018). "Unlike other recognized privileges, such as the attorney-client privilege," however, "the maintenance of confidentiality is not the fundamental concern of the legislative privilege." *Pulte Home Corp.*, 2017 WL 2361167, at *8. Rather, legislative privilege "is principally framed to ensure that legislators are free

to make difficult decisions on controversial issues without fear that their decision-making process will be later scrutinized or that their time will be consumed with responding to discovery requests in litigation." *Id.*; *see Clayland Farm Enters. v. Talbot Cnty.*, C.A. No. GLR-14-03412, 2018 WL 4700191, at *5 (D. Md. Oct. 1, 2018) (same). In other words, "[t]he privilege protects the legislative process itself," *Hubbard*, 803 F.3d at 1308, and requiring legislators to testify about such communications would undermine that process.

As Judge Hinkle has pointed out, a relevant "waive[r]" in this context would be a legislator's decision to testify voluntarily, *see Florida*, 886 F. Supp. 2d at 1302, regardless of whether a particular communication about which testimony is sought is deemed confidential. And Judge Hinkle did not make that point in a vacuum. The parties who sought depositions in *Florida v. United States* argued that any privilege was waived because the members there had "repeatedly exchanged information with and relied on comments from third-parties outside of the legislature, including political party officials and outside law and/or consulting firms, in conducting legislative business related to these bills." Memo. of Law in Support of Mot. to Compel, *Florida v. United States*, No.4:12-mc-0003-RH-CAS, ECF 1-1 at 12 (Jan. 13, 2012). Judge Hinkle nonetheless upheld the assertion of the privilege.

Judge Hinkle's order is consistent with the decisions of three circuits holding that the privilege fully applies even if part of the testimony sought involves

lawmakers testifying about communications with interested outsiders, including partisans and lobbyists. As the Second Circuit explained, the privilege "is not limited to the casting of a vote on a resolution or bill; it covers all aspects of the legislative process, including the discussions held and alliances struck regarding a legislative matter in anticipation of a formal vote." *Almonte*, 478 F.3d at 107. "Meeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation, and participating in party caucuses to form a united position on matters of legislative policy, assist legislators in the discharge of their legislative duty." *Id.* "These activities are also a routine and legitimate part of the modern-day legislative process," and "[t]he fact that such meetings are politically motivated, or conducted behind closed doors, does not take away from the legislative character of the process." *Id.* (cleaned up). The Third and Fourth Circuits agree, as do other courts.[10]

The Eleventh Circuit implicitly reached the same conclusion in *Hubbard*. Because "the factual heart of" the only remaining claim "and the scope of the legislative privilege were one and the same," the court concluded that the district

---

[10] *See Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) ("Meeting with 'interest' groups, professional or amateur, regardless of their motivation" is privileged because it "is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider."); *see Kalinoski v. Lackawanna Cnty.*, 511 F. App'x 208, 213 (3d Cir. 2013) (similar); *Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007).

court abused its discretion by requiring a privilege log, seeing "no need for the lawmakers to peruse the subpoenaed documents, to specifically designate and describe which documents were covered by the legislative privilege, or to explain why the privilege applied to those documents." *Hubbard*, 803 F.3d at 1311. In other words, there was no need for a document-by-document assessment because the entire inquiry was barred, even though some of the documents at issue very likely were communications with lobbyists or other outsiders. This Court should likewise quash the depositions here in their entirety. *See Thompson v. Merrill*, 2:16-CV-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020) (relying on *Hubbard* to conclude that third-party communications were within the scope of the privilege).

To do otherwise would functionally nullify the privilege. "If the legislative privilege, like the principle of legislative immunity, is truly such that its importance is difficult to overstate, waiver cannot be premised on an action that courts have characterized as 'part and parcel' of the modern legislative process." *Pulte Home Corp.*, 2017 WL 2361167, at *8 (citing *Bethune-Hill*, 114 F. Supp. 3d at 332, and *Bruce*, 631 F.2d at 280). That is, if communications with outsiders indeed waive the privilege, it is difficult to see what of the privilege remains given the existence of modern public records laws and legislators' ubiquitous effort to communicate with the public regarding official business.

## CONCLUSION

For the foregoing reasons, this Court should quash the deposition subpoenas in their entirety.

Respectfully submitted.

ASHLEY MOODY
ATTORNEY GENERAL

*/s/ Daniel W. Bell*
HENRY C. WHITAKER (FBN 1031175)
   *Solicitor General*
DANIEL W. BELL (FBN 1008587)
   *Chief Deputy Solicitor General*
EVAN EZRAY (FBN 1008228)
   *Deputy Solicitor General*

Office of the Attorney General
State of Florida
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3665
Facsimile: (850) 413-7555
Daniel.Bell@myfloridalegal.com

*Counsel for Senators Jeff Brandes,
Joe Gruters, Kathleen Passidomo,
Dennis Baxley, and Jim Boyd and
Representatives Blaise Ingoglia and
Erin Grall*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(F) of the Local Rules of the Northern District of Florida, I certify that the foregoing Motion and Incorporated Memorandum contains 5,814 words.

/s/ *Daniel W. Bell*
Daniel W. Bell

## CERTIFICATE OF CONFERENCE

Pursuant to Rule 7.1(C) of the Local Rules of the Northern District of Florida, I certify that undersigned counsel conferred in good faith with counsel for Plaintiffs in an effort to resolve the issues raised in this motion, as required by Local Rule 7.1(B).

/s/ *Daniel W. Bell*
Daniel W. Bell

## CERTIFICATE OF SERVICE

I certify that on this 20th day of October 2021, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

/s/ *Daniel W. Bell*
Daniel W. Bell