## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, COMMON CAUSE, and DISABILITY RIGHTS FLORIDA, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 4:21-cv-187-MW-MAF |
| LAUREL M. LEE, in her official capacity as Secretary of State of Florida, *et al.*, | |
| Defendants, | |
| and | |
| REPUBLICAN NATIONAL COMMITTEE, *et al.*, | |
| Intervenor-Defendants. | |

## DEFENDANTS' CORRECTED MEMORANDUM OF LAW
## IN SUPPORT OF SUMMARY JUDGMENT*

\* Due to technical difficulties, counsel for the Secretary could not upload exhibits referenced in the memorandum of law onto the Court's CM/ECF system until after 11:59PM on November 12, 2021. This corrected memorandum updates only the citations to exhibits later uploaded to this Court's CM/ECF system early on the morning of November 13, 2021.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

I.    Introduction ............................................................................. 1

II.   Statement of Facts ................................................................... 3

III.  Relevant Legal Standard ......................................................... 4

IV.   Argument ................................................................................ 5

      A.   Plaintiffs Lack Standing ................................................. 6

      B.   Plaintiffs are unable to establish intentional race-based
           discrimination under the Fourteenth and Fifteenth Amendments,
           and Section 2 of the Voting Rights Act................................. 9

      C.   Defendants are entitled to summary judgment on Plaintiffs'
           discriminatory effect claims under Section 2 of the Voting Rights
           Act. ...................................................................................27

      D.   The drop box, vote-by-mail request, and non-solicitation
           provisions pass the *Anderson/Burdick* test...........................36

      E.   Defendants are entitled to summary judgment for Plaintiffs' ADA
           claims...............................................................................47

      F.   Plaintiffs Fail to Demonstrate Preemption of the 2021 Law by
           Section 208 of the Voting Rights Act. ...................................51

      G.    The non-solicitation provision complies with the First
           Amendment. ......................................................................54

      H.   The non-solicitation provision is neither vague nor overbroad. .............61

V.    CONCLUSION.........................................................................67

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ....................................................16

*Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093 (11th Cir. 2011) ..........................................................................................................47, 51

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...........................................2

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................4

*Arizona v. United States*, 567 U.S. 387 (2012)..........................................53

*Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252 (1977) .....................................11, 13, 15

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006)...............41

*Bar-Navon v. Brevard Cty. Sch. Bd.*, 290 F. App'x 273 (11th Cir. 2008) .............56

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) .................................56

*Benitez v. Georgia Dep't of Cmty. Health*, 2007 WL. 9710227 (N.D. Ga. Oct. 3) .............................................................................................14

*Brnovich v. DNC*, 210 L. 3d. 2d 753 (2021).......................................*passim*

*Brnovich*, 2021 WL. 2690267.................................................................61

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973).........................................66

*Burdick v. Takushi*, 504 U.S. 428 (1992).........................................2, 37, 38

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021) ..................56, 58

*Burson v. Freeman*, 504 U.S. 191 (1992)...........................................59, 61

*Butts v. N.Y.C.*, 779 F.2d 141 (2d Cir. 1985).........................................23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................5

*Chisom v. Roemer*, 501 U.S. 380 (1991) .................................................................11

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979).........................................19

*Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009).................22, 38, 42

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)..........................*passim*

*D.C. ex rel. Walker v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 874 F. Supp. 2d 599 (E.D. La. 2012) ............................................................49

*DNC v. Reagan*, 904 F.3d 686 (9th Cir. 2018) ......................................................20

*Daunt v. Benson*, 956 F.3d 396 (6th Cir. 2020).....................................................38

*Democratic Party of Hawaii v. Nago*, 833 F.3d 1119 (9th Cir. 2016)....................38

*Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057 (9th Cir. 2016)....................57

*Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324 (11th Cir. 2001) ........53

*Fla. St. Conf. of NAACP v. Browning*, 569 F. Supp. 2d 1237 (N.D. Fla. 2008) ...........................................................................................33, 35

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ......................................................42

*Friends of Lake View Sch. Dist. Inc. No. 25 of Phillips Cty. v. Beebe*, 578 F.3d 753 (8th Cir. 2009) .......................................................................................24

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235 (11th Cir. 2018).................................................................58, 59, 60

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th at (11th Cir. 2021)...........................................................................................61

iii

*Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299 (11th Cir. 2021) ..................................................................................................*passim*

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)...........................................................63

*Hill v. Colorado*, 530 U.S. 703 (2000) ..............................................................60, 61

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ....................................................66

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) ....................63

*Inclusive Communities Proj., Inc. v. Heartland Cmty. Ass'n, Inc.*, 824 F. App'x 210, 220 (5th Cir. 2020)..........................................................................17

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) ...................5, 6, 38

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ...................................................58

*League of Women Voters of Minn.*, 2021 WL. 1175234 .........................................40

*League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL. 1175234 (D. Minn. Mar. 29) ........................................................................................39

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020).....................................................22, 39

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................5

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020)...........................................40, 41, 42

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ........................................................13, 24

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................................60

*McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217 (11th Cir. 2002)........................51, 52

*McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969).............................40

*MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) ............63

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018)..............................................59

iv

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986)..........................................43

*Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) ......................................57

*New Ga. Proj. v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020)...........................37

*Parker v. Levy*, 417 U.S. 733 (1974) ......................................................................62

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772 (8th
   Cir. 2009).............................................................................................................54

*Rollerson v. Port Freeport*, 2019 WL 4394584 (S.D. Tex. Sept. 13) ....................16

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) .........................................................38

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) .................................................22

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ...................................................................56

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022 (9th
   Cir. 2006).............................................................................................................58

*Shelby County v. Holder*, 570 U.S. 529 (2013) ......................................................14

*Smith v. Goguen*, 415 U.S. 566 (1974) ...................................................................65

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).......................39, 40

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) .........................................55

*United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738
   (6th Cir. 2004).....................................................................................................62

*United States v. Salerno*, 481 U.S. 739 (1987).......................................................65

*Universal Express, Inc. v. United States S.E.C.*, 177 Fed. App'x. 52 (11th
   Cir. 2006).............................................................................................................17

*Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990)....................................................5

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) .........39

## STATUTES, RULES AND REGULATIONS

52 U.S.C. § 10301 .................................................................................10, 28

52 U.S.C. § 10302 ........................................................................................51

52 U.S.C. § 10504 ........................................................................................51

52 U.S.C. § 10508 ...............................................................................51, 53, 54

42 U.S.C. § 12132 ........................................................................................47

45 C.F.R. § 84.4 ...........................................................................................50

28 C.F.R. § 35.130 .......................................................................................50

Fla. Stat. §102.031 ...............................................................................*passim*

Fla. Stat. § 101.011 .....................................................................................32

Fla. Stat. § 101.62 .................................................................................1, 25

Fla. Stat. § 101.69 .........................................................................................1

Fla. Stat. § 101.657 .....................................................................................32

Fla. Stat. § 102.031(4).......................................................................1, 50, 64

Fla. Stat. Ann. § 97.063 (1982).....................................................................32

Ch. 96-57, § 4, Laws of Fla. .........................................................................33

Ch. 2001-40, § 53, Laws of Fla. ...................................................................33

Ch. 2004-232, § 1, Laws of Fla. ...................................................................33

S. Rep. No. 417, 97th Cong., 2d Sess. .........................................................54

## I.    <u>Introduction</u>

Plaintiffs Disability Rights Florida, Common Cause, and Florida State Conference of the NAACP allege that four sections of Chapter 2021-11, Laws of Florida ("2021 Law") violate federal law.  *See* Case No. 187, ECF 45.  Only three sections of Florida's election reform legislation remain here. *See* ECF 249.

The three remaining sections amend the following statutes: (1) Section 101.62(1)(a), Florida Statutes, which requires voters to renew their request for a vote-by-mail ballot every election cycle ("**vote-by-mail request provision**"); (2) Section 101.69(2)-(3), Florida Statutes, which provides a uniform and secure statewide standard for the use of drop boxes used to return vote-by-mail ballots ("**drop box standard**"); and (3) Section 102.031(4)(a)-(b), Florida Statutes, which prohibits anyone from "engaging in any activity with the intent to influence or effect of influencing a voter" inside a polling place or within 150 feet of a drop box or entrance of any polling place ("**non-solicitation provision**").

The Secretary and the Supervisors[1] (collectively "Defendants"), each in their official capacities, move for summary judgment on all remaining counts related to the three provisions.  Defendants address Plaintiffs' standing; the intentional race-

---

[1] Alan Hays and Tommy Doyle, the Supervisors of Elections for Lake County and Lee County, join in the defense of the vote-by-mail request and non-solicitation provisions. Therefore, the Supervisors join sections I through IV(H) of the Motion and Memorandum to the extent those two provisions are at issue.

based discrimination claims under the Fourteenth and Fifteenth Amendments, and Section 2 of the VRA ("VRA") in Counts I, VI, VII, and VIII, ECF 45 ¶¶ 125-141, 186-223; the First and Fourteenth Amendment claims in Count II, using the *Anderson/Burdick*[2] framework, *id.* ¶¶ 142-151; claims brought under Title II of the Americans with Disabilities Act ("ADA") and Section 208 of the VRA in Counts III and IX, *id.* ¶¶ 152-166, 224-228; the First Amendment "speech and expression" claim in Count IV directed at the non-solicitation provision, *id* ¶¶ 167-176; and the First and Fourteenth Amendment "overbr[eadth] and vague[ness]" claim in Count V directed at the non-solicitation provision, *id.* ¶¶ 177-185.

## II.    <u>Statement of Facts</u>

Legislatures have plenary authority to set the time, manner, and place of elections under the federal and state constitutions. The Florida Legislature passed, and the Governor signed, Senate Bill 90 ("SB90"), codified as Chapter 2021-11 Laws of Florida ("2021 Law"), consistent with that grant of authority.

The 2021 Law was not enacted in a vacuum. It was introduced against the following backdrop: Several attempts to enact last-minute changes to election rules through emergency actions or court orders; national attention to allegations of election fraud made in the wake of the 2020 election; concerns about the fairness of

---

[2] *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

elections, *see* ECF 283-15, Exh. D at 10; and even an incident where an individual impermissibly altered Governor DeSantis' voter registration, Gary Fineout, Politico, *Florida man charged after altering governor's voter registration*.[3]   Then, there is Florida, with its own history of voter fraud. *See, e.g.*, ECF 283-1at 11.  The Florida Legislature thus enacted certain revisions to its laws to proactively address issues of voter security. SB90—which became the 2021 Law—was introduced on Feb. 3, 2021. ECF 283-8 at 1. The process by which the legislature enacted the law was average in all respects except for the ongoing pandemic that required some changes to the public engagement process. After four months of amendments and debate, Governor DeSantis approved SB 90 on May 6, 2021. *Id.* at 6.

Even after SB90, voting in Florida is either as easy or easier than voting in most states. ECF 283-1¶¶ 8-15. Specifically, Florida's rules respecting early voting and vote-by-mail have become progressively easier since the 1980s. *Id.* ¶ 9. Florida's requirement that drop boxes be made available to voters puts Florida in the rarefied air of only ten states allowing this method of voting. *Id*. ¶ 10. Florida's third-party voter registration rules are consistent with the "vast majority of states that impose requirements on" third-party voter registration organizations ("3PVROs") and Florida's fourteen-day deadline for returning registration forms is longer than the

---

[3] https://www.politico.com/states/florida/story/2020/10/28/florida-man-charged-after-altering-governors-voter-registration-1331838.

average permitted by other states. *Id*. ¶ 12. Florida's absentee ballot verification rules are well within the norm of all states and "[o]nly four states (other than states that conduct all or mostly all-mail elections) have [ID] verification checks that are less strenuous" than Florida's. *Id*. at 13. Florida's rule that a no-excuse absentee ballot be requested every two years "makes Florida the most lenient state among the thirty-eight states that regulate absentee voting in some way short of a no-excuse permanent absentee or all-mail voting." *Id*. ¶ 14. Finally, Florida's non-solicitation rules "mirror the vast majority of state rules across the country" prohibiting the influencing of voters within a certain distance of polling places. *Id*. ¶ 15.

Provisions of the 2021 Law that Plaintiffs' challenge are simply reasonable, rational, and constitutional voting regulations. Notwithstanding these facts, Plaintiffs filed suit.

### III.   <u>Relevant Legal Standard</u>

Summary judgment is appropriate when, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disputes are "'genuine'…if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts are those that might affect the outcome of the case under the governing substantive law, not those that "are irrelevant or unnecessary." *Id.* The nonmoving party also

has an obligation to come forward with "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## IV.   <u>Argument</u>

Plaintiffs "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision," *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020), "by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Assuming one or more of the Plaintiffs have established standing, this Court should still enter summary judgment in favor of Defendants on the merits of the remaining claims. Plaintiffs fail to produce evidence sufficient to show intentional race-based discrimination or discriminatory effects. The drop box, vote-by-mail request, and non-solicitation provisions easily pass the *Anderson/Burdick* test. The non-solicitation provision satisfies the requirements of the First Amendment. Vagueness and overbreadth claims against the non-solicitation provision are without merit. And the ADA and VRA claims are ripe for summary judgment in favor of Defendants.

## A.    Plaintiffs Lack Standing.

Plaintiffs' burden to establish Article III standing increases at the summary judgment stage for each of their claims.

Also, because incorporated entities have no right to vote, they must prove standing by showing either harm to their members or harm to themselves as organizations. *Jacobson*, 974 F.3d at 1248-49. Associational standing requires that "an organization… prove that its members would otherwise have standing to sue in their own right." *Id.* at 1249.  Relatedly, "an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in projects by forcing the organization to divert resources to counter those illegal acts." *Id.* at 1250. Specifically, a Plaintiff must show what the organization would "divert resources away *from* in order to spend additional resources on combating" the alleged illegal acts. *Id.*

Because none of Plaintiffs' experts have quantified the magnitude of any burden on Plaintiffs, Plaintiffs fail to demonstrate concrete, particularized injury-in-fact that satisfies Article III.

### 1.    *Disability Rights Florida*

Plaintiff Disability Rights Florida ("DRF") alleges that it is a nonprofit that advocates for the voting rights of individuals with disabilities, including helping with inaccessible polling sites and ballots. *See* ECF 45 ¶ 20. DRF also alleges that it trains

election officials on expanding voting accessibility, promotes robust voter registration, and engages in voter education efforts. *Id.* ¶ 21.

DRF claims that the 2021 Law will make it more difficult for DRF to engage in its mission and will require DRF to divert resources toward advocating for more accessible voting-by-mail (VBM) throughout Florida. *Id.* ¶ 22. However, DRF's deposition confirmed that its ability to assist voters with disabilities in future elections will remain unaffected by the 2021 Law. *See* ECF 283-18 at 56-63 (detailing the collaborative relationship DRF has had with the Division of Elections and county supervisors, and explaining Director Matthews has "always showed a willingness to work with us"); *id.* at 82-83 (confirming that disabled voters can still have their absentee ballots delivered by a friend, family member, or volunteer under the 2021 Law). In addition, the deposition confirmed that DRF's allegations about diversion of resources are unsupported. *Id*. at 11-12 (noting that DRF's total federal grants have grown from $6 million to $8 million in the last four years). DRF will have the capacity to continue making the commitments it has made previously.

Finally, DRF failed to explain how its members have been burdened by the 2021 Law because multiple voting options remain available. *E.g.*, *id.* at 71-72 (noting that a person's choice of voting method is not "always just [a] need[].... very often they're preferences"); *id.* at 51 (conceding that DRF has not sought any legal relief related to inaccessible voting sites in Florida within the last five years).

In short, DRF lacks standing.

## 2.   *Common Cause*

Plaintiff Common Cause alleges it is a nonprofit citizen lobby that advocates for free, fair, and accessible elections in Florida. ECF 45 ¶ 23. Common Cause alleges that it encourages and supports voter participation by engaging in voter education and outreach efforts, and funding translation of election information for non-English-speaking voters. *Id.*

Common Cause claims that the 2021 Law will "severely burden or deny the right to vote of Common Cause's Florida members" by means of the challenged provisions here, and that these "will force Common Cause to divert time, money, and resources away from other activities[.]" *Id.* ¶ 24.

However, Common Cause's deposition undermines these allegations because it "do[es] not collect demographic information on our members" and so lacks the information needed to quantity the harm allegedly caused by the 2021 Law.  ECF 283-3 at 24-25.  Common Cause also testified that it has not yet established its budget for 2022, so it could not provide "an exact number" detailing resources allegedly diverted.  *Id.* at 27, 30-31. Common Cause further conceded that the organization "do[es] not keep record of all of our interactions with voters," and so lacked any information concerning the number of voters it has assisted in the past or will assist in the future. *Id.* at 29.

Common Cause lacks standing.

### 3.    *Florida State Conference of the NAACP*

Plaintiff Florida State Conference of the National Association for the Advancement of Colored People ("Florida NAACP") alleges the impact of the 2021 Law "will severely burden or deny the right to vote of the Florida NAACP's members" by means of the challenged provisions here.  *Id.* ¶ 18.

However, the Florida NAACP's deposition revealed that it does not have information on the number of its members who lack all three permissible forms of personally identifying information, a necessary showing for establishing the burden of the vote-by-mail request provision. ECF 283-20 at 120.  Further, no member of the NAACP has indicated that they will be unable to vote in the 2022 election because of their race.  *Id.* at 16.  NAACP also testified that it will continue its voter education efforts as before and is "not going to use [the 2021 Law] as an excuse" to halt those efforts.  *Id.* at 19-20.

Florida NAACP lacks an injury-in-fact.

### B.    **Plaintiffs are unable to establish intentional race-based discrimination under the Fourteenth and Fifteenth Amendments, and Section 2 of the Voting Rights Act.**

Plaintiffs' intentional racial discrimination claims against Defendants fail. Racial discrimination claims under the Fourteenth and Fifteenth Amendments "require[] proof of *both* an intent to discriminate and actual discriminatory effect."

*Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021).  Courts assess both claims under a two-step framework.  "Plaintiffs must first show that the State's decision or act had a discriminatory purpose and effect." *Id.* Without evidence of "both intent *and* effect," Plaintiffs' "constitutional claims fail" at step one. *Id.* If Plaintiffs clear that first threshold, "'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without th[e] [racial discrimination] factor.'" *Id.*

Furthermore, Section 2 of the VRA (52 U.S.C. § 10301) requires Plaintiffs to either demonstrate proof of intent or demonstrate "that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race."[4] *Chisom v. Roemer*, 501 U.S. 380, 394 (1991).

The test in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* governs all intent claims at issue here.  429 U.S. 252, 265 (1977).[5]

---

[4] Defendants assume for the purposes of this filing that Section 2 of the VRA allows for an intent claim. They reserve the right to argue in this and other cases that the plain language of Section 2 allows for only an effect claim if it allows for a cause of action at all. *See Brnovich v. DNC*, 210 L. 3d. 2d 753, 786 (2021) (Gorsuch, J., concurring).

[5] Because Plaintiffs cannot prove *effect* since any alleged burdens of Florida's election laws amount to no more than "the usual burdens of voting," *Brnovich*, 210 L. Ed. at 773, 778-79, 781, the analysis of discriminatory intent is unnecessary, *Greater Birmingham*, 992 F.3d at 1321. In so far as it *is* necessary, Plaintiffs' intent claims are also mostly complaints about "the usual burdens of voting." *Cf. Brnovich*, 210 L. Ed. at 773, 778-79.

*Arlington Heights* requires courts to assess:

> (1) [T]he impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.

*Greater Birmingham*, 992 F.3d at 1321-22. The key question is whether "the legislature as a whole was imbued with racial motives." *See Brnovich*, 210 L. 3d. 2d at 785. Because Plaintiffs have failed to point to any evidence of discriminatory intent in this case, much less evidence sufficient to create a genuine issue of material fact, Defendants are entitled to judgment on the racial intent claims.

### 1.    *The Impact of the Challenged Law.*

For discriminatory impact to carry the day, Plaintiffs must couple impact with sufficient factual allegations to "establish a pattern, unexplainable on grounds other than race." *Greater Birmingham*, 992 F.3d at 1322 (quotation omitted). Plaintiffs' evidence fails to establish that "clear pattern." *Id.*; *Brnovich*, 210 L. Ed. 2d at 785.

Plaintiffs cite to no evidence that minority voters cannot follow the rules and procedures imposed by the 2021 Law, or that any voter cannot vote because of the law. *Cf.* ECF 283-28 at 146-147 (explaining that nothing in SB90 will prevent Lee County voters from registering and voting); ECF 283-26 at 142 (same in Pasco County); ECF 283-23 at 194 (same in Hillsborough County). Plaintiffs attempt to

quantify the supposed impacts of the law, but this ultimately amounts to a mere conclusory assertion that there will be a discriminatory impact; when pressed on the question, their experts acknowledged they do not know how much of an impact will result, or that marginal differential impacts may exist but they are extremely minor. *E.g.*, ECF 283-9 at 136-37, 159, 191, 220 (admitting that the impact of the 2021 Law's provisions on minority voters cannot be quantified); ECF 283-15 at 147-150 (acknowledging she did not know whether marginal differences between rates of minority voters and white voters using drop boxes, returning ballots by USPS, and waiting to vote in person were statistically significant). That Plaintiffs cannot muster evidence of disparate impacts (or magnitude of impacts) of any practical significance fatally undermines their claim that the Florida legislature must have *known* about such alleged impacts.

Disparate impacts alone are typically insufficient to show intentional discrimination anyway. *Benitez v. Georgia Dep't of Cmty. Health*, 2007 WL 9710227, at *4 (N.D. Ga. Oct. 3); *Arlington Heights*, 429 U.S. at 264-65. Plaintiffs do not deny that SB90 is facially race-neutral. Courts will not "'regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*.'" *Greater Birmingham*, 992 F.3d at 1327.

Because this is not the "rare" case where impacts alone are determinative, *id.* at 1322, this factor weighs strongly in favor of dismissal.

## 2.   *The Historical Background.*

Courts "cannot accept official actions taken long ago as evidence of current intent." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). The historical background inquiry thus does not involve "an unlimited look-back to the past discrimination" that, "in the manner of original sin, condemn[s] governmental action that is not itself unlawful." *Greater Birmingham*, 992 F.3d at 1323-26. Instead, there must be a close tie to the 2021 Law. *Id.*

History cited by Plaintiffs does not stem from "the precise circumstances" surrounding SB90's passage; it predates SB90. *Id.* at 1325. That history cannot be used to prevent Florida from enacting otherwise valid election reforms. *Id.* Plaintiffs' evidence under this factor is therefore inadequate.

Specifically, Plaintiffs allege that "[f]rom 1972 to 2012… multiple counties in Florida were required under the [VRA] to seek federal [pre]clearance for changes to their election laws," ECF 45 ¶ 6, but neglect to mention that the State of Florida, as a whole, has never been a covered jurisdiction.[6] Plaintiffs also attempt to connect the past with today's Florida by invoking post-reconstruction history. *E.g.*, ECF 45 ¶¶ 37-40; ECF 283-30 at 7-11; ECF 283-9 at 169-171. Many of their other

---

[6] Plaintiffs also attempt to minimize the importance of *Shelby County v. Holder* that held the coverage formula under Section 4 of the VRA unconstitutional. 570 U.S. 529 (2013). What directly follows from this is that the Florida jurisdictions that were covered were covered *unconstitutionally*.

allegations simply distort the past, *e.g.*, ECF 45 ¶ 41 (mistaken voter purge), or attempt to allude to a discriminatory dimension where there was none, ECF 45 ¶ 42 (adjusting early voting day).  The historical background actually connected to the law points to no intentional discrimination.

Claims about high Black and Hispanic use of vote-by-mail ballots in 2020 similarly ask this Court to infer that the Florida Legislature changed the rules because, during *one* election in the midst of a global pandemic, more people overall, including Black and Hispanic voters, used vote-by-mail ballots; and that Blacks and Hispanics in Florida form a monolithic voting bloc that votes against the political party that currently has majorities in the Florida Legislature. *See, e.g.*, ECF 45 ¶¶ 2-3.  Statements about minority party voters using drop boxes more than majority party voters, *see* ECF 283-15 at 148-49 (noting 1.3 point difference in drop box use), also prove inconsequential because "partisan motives are not the same as racial motives." *Brnovich*, 210 L. Ed. 2d at 785; *see also Greater Birmingham*, 992 F.3d at 1326-27 (noting "partisan reasons" fail to provide the requisite historical background for racial intent).

References to past cases also fail because, again, there is no demonstrated link to the 2021 Law. Some of these cases failed to find racial animus, and others included no discussion of racial discrimination claims at all.  *E.g.,* ECF 45 ¶¶ 7 n.3, 44-45; ECF 283-9 at 224-25, 232; ECF 283-30 at 42, 49-52.

### 3.      *Sequence of Events Leading to Passage and Any Procedural and Substantive Departures.*

Plaintiffs must adduce evidence of racial discrimination in "the precise circumstances surrounding the passage of the [challenged] law." *Greater Birmingham*, 992 F.3d at 1325. *Arlington Heights* tells us that "[t]he specific sequence of events leading up to the challenged decision also may shed *some* light on the decisionmaker's purposes."  429 U.S. at 267 (emphasis added).  The word "some" means that, even if this Court found significant evidence of unexplainable procedural deviations, this factor alone cannot support a finding of intent. Plaintiffs must prove that *the policymakers* had the impermissible intent. *Id.* That means "the legislature as a whole." *Brnovich*, 210 L. Ed. 2d at 785. But "determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham*, 992 F.3d at 1324. And the plaintiff must overcome a presumption that the legislature acted in good faith. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

Additionally, because the legislature had "valid neutral justifications… for [SB90]"—"combatting voter fraud, increasing confidence in elections, and modernizing [Florida's] elections procedures"—most of Plaintiffs' remaining evidence is irrelevant.  *Greater Birmingham*, 992 F.3d at 1326-27.  It does not matter whether SB90 was passed, for example, "at the end of the… legislative session," after "truncated debate," on a "strictly party-line vote," or with "no black legislators" voting for it.  *Id.*   Plaintiffs identify no relevant procedural irregularities. That

15

opponents of SB90 complained about "the brevity of the legislative process" is not the kind of allegation that can "overcome the presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2328-29.

In all events, Plaintiffs' evidence fails to establish racial discrimination because the alleged irregularities would have affected "all individuals" equally, not some "identifiable minority group." *Rollerson v. Port Freeport*, 2019 WL 4394584, at *8 (S.D. Tex. Sept. 13). Plaintiffs "[n]otably" do not allege that those procedural departures ever materialized into "substantive departures." *Greater Birmingham*, 992 F.3d at 1326 n.39.  The measures that ultimately passed mirror laws that exist in other States, and Plaintiffs do not claim that these reforms would be illegal if they were passed in, say, New York or Delaware.

Regardless, for these two prongs of *Arlington Heights*, most of the Plaintiffs' arguments can be attributed to changes made in response to a once-in-a-generation pandemic. *Cf.* ECF 45 ¶¶ 2-3.  For instance, SB90's timing is not suspect because it was enacted after the pandemic triggered a wave of election litigation and a dramatic increase in absentee-by-mail ballots. It "should come as no surprise" then that Florida would want to address voting laws relevant to this topic at this time. *See Inclusive Communities Proj., Inc. v. Heartland Cmty. Ass'n, Inc.*, 824 F. App'x 210, 220 (5th Cir. 2020).

Plaintiffs' claim that the "strike all" amendment was unusual or "flawed," *see id.* ¶¶ 63, 67, is also not true.  The Florida Legislature has frequently used the "strike all" tool.  In 2021, the Florida Legislature has used the tool 359 times on 260 bills, *i.e.*, on 8.4% of all bills during the 2021 Regular Session, and 440 times on 268 bills, *i.e.*, on 7.6% of all bills during the 2020 Regular Session.[7]  Indeed, prior to the 2021 and 2020 sessions, strike all amendments were commonly used by legislators in Florida for convenience and efficiency purposes. *See* ECF 283-25 at 189-190; ECF 283-24 at 216.

Statements made during political campaigns are irrelevant for similar reasons.  These statements—"remote in time and made in unrelated contexts"—"do not qualify as contemporary statements probative of" the Florida Legislature's motive for passing SB90. *DHS*, 140 S. Ct. at 1916.

### 4.   *Contemporaneous Statements of Key Legislators.*

Nor can Plaintiffs show discriminatory intent through statements of "key legislators" "made contemporaneously" with the 2021 Law's passage.  *Greater Birmingham*, 992 F.3d at 1322.  Key legislators like Senate Sponsor Baxley are

---

[7] This Court may take judicial notice of public records. *See Universal Express, Inc. v. United States SEC*, 177 Fed. App'x. 52, 53 (11th Cir. 2006) (unpublished).  This information is available from the Florida Legislature's website at https://www.flsenate.gov/Session/Bills/2021?chamber=both&searchOnlyCurrentVersion=True&isIncludeAmendments=False&isFirstReference=True&citationType=FL%20Statutes&pageNumber=1 (last visited Nov. 11, 2021), using the search terms "strike all" and "delete all" for "All Bill Versions" in both "Senate and House".

alleged to have said that "[w]e are doing this bill because it becomes clear as you look across the country that there is a lot of confusion from many people on different fronts." ECF 59 ¶ 91. Senator Baxley is also alleged to have said that the 2021 Law was needed to address "some issues going on around the country, different places, and we want to be proactive and prevent things from going awry, rather than waiting to have some kind of debacle to recover from." *Id.* (alteration omitted). Statements like these demonstrate a proactive approach to addressing issues—not an intent to discriminate. After all, the Florida Legislature "was not obligated to wait for something similar to happen closer to home." *Brnovich*, 210 L. Ed. 2d at 783. The statements simply evidence the State's commitment to the "integrity of its election procedures"—to minimizing voter fraud and protecting voters against undue influence from third parties. *Brnovich*, 210 L. Ed. 2d at 762-63, 777, 782-83.

Plaintiffs' expert also asserts that legislators who supported SB90 made contemporaneous statements consistent with "racial resentment" during the legislative session by using terms like "responsibility" and "lazy" in reference to voters failing to vote despite having four different voting methods and ample time available to them in Florida. *See* ECF 283-15 at 185-192. However, when asked whether racial resentment can be disentangled from principles of individualism, initiative, and personal responsibility traditionally associated with conservatism, Plaintiffs' expert made conclusory assertions that they can be, but failed to articulate

a clear principle, *see id.* at 185-194, and ultimately acknowledged she did not know what was in that legislator's head at the time he said those words. *See id.* at 198-99.

Again, however, what matters is the intent of "the legislature as a whole." *Brnovich*, 141 S. Ct. at 2350. Legislators "who vote to adopt a bill are not the agents of the bill's sponsor or proponents," *id.*, and this Court cannot treat the intent of individual legislators "as *the* legally dispositive intent of the entire body of the [Florida] legislature on [SB90]," *Greater Birmingham*, 992 F.3d at 1325. Defendants fail to point to any statements that would be sufficient to carry this burden.

### 5. *Foreseeability and Knowledge of Disparate Impact.*

Plaintiffs are also unable to demonstrate foreseeability or knowledge of a disparate impact. This inquiry requires that a disparate effect be both "foreseeable" and "anticipated." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979). Importantly, "[d]isparate impact and foreseeable consequences, without more, do not constitute a constitutional violation." *Id.* at 464.

As an initial matter, federal law gives Florida ample leeway to revise election laws to boost voter confidence; to streamline elections by promoting uniformity, to reduce the burden on election officials to prevent improper interference, political pressure, or intimidation; and to make it hard to cheat. These purposes are race neutral and entirely legitimate. *See Brnovich*, 141 S. Ct. at 2349-50 (preventing fraud, voter intimidation, and undue influence); *Crawford v. Marion Cty. Election*

*Bd.*, 553 U.S. 181, 191-97 (2008) (improving procedures, preventing fraud, and promoting confidence).

Plaintiffs' objection that any concern with fraud was tenuous given the lack of evidence of voter fraud in the 2020 election cycle does not survive *Brnovich*. 141 S. Ct. at 2348. More broadly, "concerns regarding fraud" do not morph from a legitimate state interest into "a facade for racial discrimination" whenever the legislature fails to cross some imaginary evidentiary threshold. *DNC v. Reagan*, 904 F.3d 686, 719 (9th Cir. 2018). States can pass election reforms to prevent fraud without "*any* evidentiary showing," *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (emphasis added), and can act prophylactically to prevent fraud "without waiting for it to occur and be detected within its own borders," *Brnovich*, 141 S. Ct. at 2348. Both the Carter-Baker Commission and the Supreme Court have already confirmed, after all, that "[f]raud is a real risk," especially with absentee voting. *Id.* at 2347-48. Even if all these concerns with fraud were "mistaken," Plaintiffs cite no evidence to suggest they aren't "sincere." *Brnovich*, 141 S. Ct. at 2350. In any case, Plaintiffs simply ignore Florida's "independent" interest in restoring "public confidence in the integrity of the electoral process." *Crawford*, 553 U.S. at 197.

Lastly, discrimination is not a plausible conclusion from Plaintiffs' evidence in light of obvious alternative explanations. The most obvious alternative

explanation is that the legislature thought SB90 was good policy. Plaintiffs' evidence does nothing to pierce the presumption that these statements and findings were made in good faith. Indeed, legislators can have "a serious legislative debate on the wisdom of early mail-in voting" without incurring liability for intentional discrimination. *Brnovich*, 141 S. Ct. at 2349-50. Florida cannot be liable for expressing the same concerns over absentee-voting fraud that both the Supreme Court and the Carter-Baker Commission have credited.

The most telling indication that SB90 is about policy, not racial discrimination, is the fact that Plaintiffs challenge only portions of the bill. If racial discrimination were the motivation behind SB90, then that motivation would taint the entire bill. But Plaintiffs refuse to go that far, because they know that many provisions of SB90 make it easier to vote. *See* ECF 283-1 ¶¶ 8-16. For example, SB90 requires all supervisors of elections to provide drop boxes and set their locations at least 30 days before an election. *Id.* ¶ 33. It also allows *anyone* to return up to two absentee ballots on behalf of other voters (and allows anyone to return an unlimited number for their immediate family members). *Id.* ¶ 40. If Plaintiffs are right that minority voters suffer longer wait times and prefer to vote absentee, then it "raises the question": "'why would a racially biased legislature'" adopt reforms that make these options *easier*? *Greater Birmingham*, 992 F.3d at 1324. Plaintiffs' evidence provides no answers.

While SB90 surely reflects the legislature's sincere views about policy, another explanation for it besides race—partisanship—is just as obvious. Section 2 addresses discrimination "on account of race or color," 52 U.S.C. §10301(a), and "partisan motives are not the same as racial motives," *Brnovich*, 141 S. Ct. at 2349; *see Rucho v. Common Cause*, 139 S. Ct. 2484, 2503 (2019) ("securing partisan advantage" is a "permissible intent"). Yet Plaintiffs' own evidence alleges partisan motivations throughout—from one expert affirming that *partisanship* shapes beliefs about voter confidence, ECF 283-15 at 110, to another expert acknowledging that "race and partisanship are closely connected together" such that motivations are difficult to disentangle. ECF 283-9 at 93.   Every bit of Plaintiffs' evidence implicating race is equally consistent with partisanship; Plaintiffs never make any effort to disentangle the two; and Occam's razor suggests that partisan motives are the predominant explanation. *Cf. Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020).

Plaintiffs' allegations then amount to little more than legal conclusions– claims of discriminatory impacts without an explanation or quantification of those impacts.  *E.g.*, ECF 45 ¶¶ 135, 194; ECF 283-30 at 61 (asserting without support that SB90 "will plainly affect Black and Hispanic voters far more than white voters, a fact the legislature and governor had to know").

Additionally, Plaintiffs' failure to show that the Florida Legislature *knew* about the disparate impacts on minority voters is also unsurprising because the evidence now shows impacts to be either unquantifiable or *de minimis* at best.[8]

Divining the legislature's purported "knowledge" based on arguments and testimony provided by *opponents* of SB90 does not solve Plaintiffs' problem. "The Supreme Court has… repeatedly cautioned… against placing too much emphasis on the contemporaneous views of a bill's opponents"; the "speculations and accusations of… opponents simply do not support an inference of the kind of racial animus discussed in… *Arlington Heights*." *Butts v. N.Y.C.*, 779 F.2d 141, 147 (2d Cir. 1985). Plaintiffs' reliance on statements from those opposing the 2021 Law's passage, *see* ECF 45 ¶¶ 119-124, are thus unavailing; legislators are not required to take the word of their political opponents at face value especially when those opponents presented no objective evidence of a foreseeable and anticipated impact. *See Brnovich,* 210 L. Ed. at 785.  Section 2 does not give the opponents of election reform a heckler's veto; a bill's supporters can simply disbelieve the arguments and predictions of the other side. *Cf. Brnovich*, 210 L. Ed. at 784-85; *Greater Birmingham*, 992 F.3d at 1327 (refusing to infer that the legislature had "foreknowledge" of disparate impacts because its proffered justifications were legitimate).

---

[8] *See* ECF 283-9 at 136-37, 159, 191, 220; ECF 283-15 at 147-150.

Additionally, a legislature's knowledge that a law will have disparate impacts is not intentional discrimination. *See Friends of Lake View Sch. Dist. Inc. No. 25 of Phillips Cty. v. Beebe*, 578 F.3d 753, 761-62 (8th Cir. 2009). Intentional discrimination means the legislature passed a particular law "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey*, 481 U.S. at 298. Plaintiffs' evidence establishes nothing like that—an allegation that would be implausible anyway given the States' "wide discretion" in crafting election laws and Florida's "legitimate reasons" for choosing these reforms. *Id.* at 298-99. As the Supreme Court explained in *Brnovich*, virtually every election reform can cause "predictable disparities" on minorities, given preexisting disparities in "employment, wealth, and education." 141 S. Ct. at 2339. Yet Section 2 is not designed to "make it virtually impossible" to pass reforms. *Id.* at 2343.

Because Plaintiffs lack evidence regarding foreseeability, anticipation, or knowledge of disparate impacts, these factors also weigh heavily in favor of Defendants.

## 6. *Availability of Less Discriminatory Alternatives.*

While Plaintiffs make passing statements in their amended complaint alleging the existence of less discriminatory alternatives and ask for the pre-2021 status quo, *see* ECF 45 ¶¶ 138, 196, 220, they fail to put forward any evidence capable of showing that the 2021 Law is discriminatory in the first instance, much less why the

status quo was less discriminatory. *See Greater Birmingham*, 992 F.3d at 1327 ("[W]ithout proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional.").

Furthermore, a State is not required to show that "a less restrictive means would not adequately serve the State's objectives." *Cf. Brnovich*, 210 L. Ed. 2d at 781. The failure to adopt Plaintiffs' preferred solution does not mean that the Legislature failed to adopt alternatives that lessened any potentially discriminatory impact. *See Greater Birmingham*, 992 F.3d at 1327. For example, the Florida Legislature provided multiple ways for a voter to provide sufficient identification to receive a vote-by-mail ballot. *See id.* (a voter ID law that allows the use of many forms of ID, including options for a free ID does not show a failure to consider less discriminatory alternatives); *see also* Fla. Stat. § 101.62 (allowing a voter to provide a driver license number, an ID number, or the last four digits of their Social Security number).[9]

Importantly, the State Legislature considered three major iterations of the law that became the 2021 Law, and ultimately chose the least restrictive version of those three. For instance, earlier versions of the bill would not have grandfathered in those voters who made vote-by-mail requests in 2020 (thereby requiring them to make

---

[9] Voters on Medicare and Medicaid are already required to have the required ID's. ECF 283-20 at 40:23-41:15.

their next request in 2022 rather than 2024), *see* ECF 283-24 at 98; and the final bill opted to *require* drop boxes instead of banning them altogether, subject to the in-person monitoring requirement, *see* ECF 283-23, Exh. 3 at 4. Many Supervisors who had voiced opposition to earlier versions of the bill ultimately found the final version to be much more palatable after its development through the legislative process. *See, e.g.*, ECF 283-25 at 188; ECF 283-24 at 98-99 (Supervisor Earley found the bill "much more problematic in the beginning"); *id.* at 189 ("[C]ertainly my biggest concerns [with the bill], I think were resolved."); ECF 283-23 at 87 (agreeing that the final version of SB90 was "more favorable to voters" than earlier iterations).

The evidence demonstrates that the legislature considered the Supervisors' input and that their input ultimately resulted in a bill that was less restrictive. *See* ECF 283-21 at 25-28 (noting that Miami-Dade Board of County Commissioners' resolution directed their lobbyist to oppose a provision of SB90 that was later removed from final version of bill); ECF 283-23 at 86-87; ECF 283-28 at 42, 143-44. Lake County Supervisor Alan Hays, who was the chairman of the Florida Supervisors of Elections legislative committee during the relevant time period, testified that he was actively involved in the legislative process, had "frequent interchanges with the legislators" throughout the evolution of the bill, and that SB90 became "significantly better" as a result of his involvement and that of the Florida state association of Supervisors of Elections ("FSE"). ECF 283-25 at 37, 44, 140,

187.   In fact, despite opposing it initially, Supervisor Hays supported the final version of the bill. *See id.* at 43-44, 188.

In sum, because evidence adduced cannot establish intentional racial discrimination under *Arlington Heights*, this Court should thus grant summary judgment.

## C.   Defendants are entitled to summary judgment on Plaintiffs' discriminatory effect claims under Section 2 of the Voting Rights Act.

Plaintiffs' discriminatory effect claims under Section 2 of the VRA fare no better.[10]   The Act provides in pertinent part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State…in a manner which *results* in a denial or abridgment of the right…to vote on account of race or color."   52 U.S.C. § 10301(a) (emphasis added).   The discriminatory result "is established if, based on the *totality of circumstances*, it is shown that" the relevant group "ha[s] less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice."[11]   *Id.* § 10301(b) (emphasis added). The Supreme Court recently

---

[10] In fact, it is an open question whether there exists "an implied cause of action under §2" in the first instance. *Brnovich,* 210 L. Ed. 2d at 786 (Gorsuch, J. concurring). For the purposes of this motion, and this motion alone, Defendants assume that one exists.

[11] Initially, Plaintiffs fail to show how the 2021 Law keeps them from electing candidates of their choice. This is fatal.  *See Greater Birmingham*, 992 F.3d at 1329.

emphasized two tasks critical for the "totality of circumstances" analysis: (1) disentangling the "usual burdens of voting" from *unusual* burdens, *Brnovich*, 210 L. Ed. 2d at 772-73, 778-79, 781, and then (2) weighing those burdens against the State's interests, recognizing that the Act "does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives." *Id*. at 781.

In assessing the burden, the Supreme Court also stated that "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Id.* Considerations included (1) "the size of the burden imposed by the challenged voting rule," (2) "the degree to which a voting rule departs from what was standard practice when Section 2 was amended in 1982," (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision," and (5) "the strength of the state interests served by a challenged voting rule." *Id*. at 772-74.

Here, Plaintiffs lack sufficient evidence to support their allegations of discriminatory effect that could satisfy the U.S. Supreme Court's test in *Brnovich*. Because these allegations are ultimately speculative and conclusory, Defendants are entitled to summary judgment on Plaintiffs' Section 2 claim.

### 1.   *The Size of the Burden Imposed.*

Disentangling the "usual burdens of voting" from unusual burdens begins with an assessment of the "size of the burden." *Id*. at 772-73. This "highly relevant" size inquiry looks at how voters are burdened (from the minor inconvenience of walking to the mailbox or the significant burden of being required to enter, for example, a precinct in a gated community that excludes them) and how many voters are burdened (a small subset in one county or a large portion statewide). *Id.*; *see also id.* at 773 n.11. But Plaintiffs fail to provide evidence concerning both qualitative and quantitative measures of magnitude sufficient to show discriminatory effect.

The Plaintiffs' qualitative evidence clearly does not pass muster. For example, Plaintiffs' expert witness contended that requiring a voter to provide a Florida driver's license number, ID number, or the last four digits of their Social Security Number presents something more than a usual burden of voting for the voter. ECF 283-9 at 61-62 (alleging that the simple fact that one must "identify yourself" to request a ballot is cause for "concern"). There are no facts alleging why that would be the case, beyond an inchoate belief that individuals should not "have to provide any identification" to obtain an absentee ballot. *See id.* at 61. Beyond that, Florida's requirement that a voter provide some information to affirm their identity to cast an absentee ballot is well within the norm. ECF 283-1¶ 60.

Similarly, Plaintiffs contend that the drop box standard imposes more than the usual burdens of voting. *See* ECF 283-9 at 176-77 (alleging that the drop box standard makes voting harder because "it's placing a burden on" the Supervisor's employees, focusing exclusively on the potential for a $25,000 fine). This sounds more like an issue of budgetary constraint and institutional capacity for *the Supervisors* than an unusual burden on the voters. Regardless, if "[h]aving to identify one's own polling place and then travel there to vote does not exceed the usual burdens of voting," *Brnovich*, 210 L. Ed. 2d at 778, then Plaintiffs' allegation here cannot be sufficient to prevail on their discriminatory effect claim. This is especially so when the totality of circumstances is considered—voters may still vote through other means besides absentee voting, including early voting or voting in person on election day; a voter who is unable to drop off their absentee ballot at a drop box during early voting hours can still mail in the absentee ballot through the U.S. Postal Service. It is thus clear that these requirements are not unusually burdensome at all.[12] What's more, Florida is one of only *ten* states that *requires* voters be given a drop box as an option. ECF 283-1¶ 35; *see also id.* at 19, Table 3. The majority of states (27 in total), *prohibit* the use of drop boxes at all. *Id.*

---

[12] As the "opportunities provided" by Florida's election system are part of the assessment of the "size of the burden imposed" by that system, the factors will be considered together. *See Brnovich*, 210 L. Ed. 2d at 774 ("[C]ourts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision.").

Plaintiffs' quantitative evidence is insufficient as well. The Plaintiffs' experts assert variations of the following: "SB90 is part of a pattern of racially discriminatory voting laws and practices designed to roll back practices that make it easier to vote when they are used disproportionately by Black Floridians[.]" ECF 283-15 at 14-15; *see id.* at 122. While some of the Plaintiffs' experts analyze disparities between different races and other demographic groups, they fail to analyze the magnitude of any disparities. *See* ECF 283-12 at 76-77 (confirming that the purpose of expert report was "not to quantify that disproportionate impact, just to state that [he] believe[s] it will exist"). Thus, for those that do cite some differences across racial groups regarding use of drop boxes and absentee voting, Plaintiffs fail to provide evidence that these are of any practical significance. *Cf.* ECF 283-15 at 126 (expert acknowledged she is uncertain how much of Black voters' increased use of vote-by-mail "is explained by the pandemic").

### 2. *The Degree to which the Rules Depart from Standard Practice in 1982.*

If Plaintiffs had demonstrated with specificity the size of the burdens imposed, then the "benchmark" against which those burdens should be judged is Florida's 1982 election code, since that was the legislation in effect when Congress last amended Section 2 of the VRA. *Brnovich*, 210 L. Ed. 2d at 774; *id.* at 777 n.15. under that "benchmark," Florida's 2021 Law easily passes muster.

Like most states, in 1982 Florida allowed only in-person voting, Fla. Stat. § 101.011 *et seq.* (1973), with limited-excuse absentee voting, Fla. Stat. § 101.011 *et seq.*; *see* Fla. Stat. Ann. § 97.063 (1982).

Since 1982, Florida has made voting more convenient through the addition of mandatory and discretionary early voting days.  Fla. Stat. § 101.657.  Forty years ago, an early voting option was not even codified in law; today, supervisors are required to offer at least eight early voting days, with the provision of additional days left to the discretion of the supervisor.  ECF 283-1at 13-16.  In addition to permitting voting in-person on Election Day and during the mandatory (and additional discretionary) early voting period, Florida has since 1982 greatly expanded access to vote-by-mail ballots. Specifically, before 1996, Floridians hoping to use the convenience of vote-by-mail needed to have their ballots notarized or signed by two witnesses who themselves were registered to vote in Florida; in 1996, the Florida Legislature lowered the requirement to a single witness signature, and in 2004 repealed the witness requirement altogether.  Ch. 2004-232, § 1, Laws of Fla.; Ch. 96-57, § 4, Laws of Fla.  *Id.*  Only since 2001 have Floridians been able to vote-by-mail without a statutorily recognized justification for doing so.  Ch. 2001-40, § 53, Laws of Fla.  Now, no excuse vote-by-mail without the need for notaries or witnesses is permitted and the use of drop boxes (first used during the 2020 election cycle) are also now permitted. But safeguards for the vote-by-mail process

must keep pace with these innovations. After all, as this Court previously recognized, Florida has a "rich history of absentee-ballot fraud, including at least two elections in which courts invalidated every single absentee ballot because of widespread fraud." *Fla. St. Conf. of NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008); *see also* ECF 283-21 at 36-37 (confirming cases of individuals casting ballots in more than one jurisdiction and instances in Miami-Dade where 3PVROs altered the information provided by voters on their applications without their consent); *see also* ECF 283-23 at 106 (confirming cases of voter fraud referred to law enforcement in Hillsborough County).

Thus, the 2021 Law imposes minimal, if any, burdens when compared to voting as it existed in Florida in 1982. The sections being challenged—together with the other twenty-seven sections of the 2021 Law—work to ensure that voting remains safe *and* accessible in the State. Importantly, any departures from standard practice in 1982 *benefit* the very groups and voters that Plaintiffs purport to represent. Plaintiffs are unable to demonstrate otherwise; they instead measure the 2021 Law against the improper baseline of 2020, which is an outlier of an election held during a global pandemic. *See, e.g.*, ECF 283-4at 4-5 (criticizing Herron expert report for extrapolating from rates of Black VBM voting in 2020 as if that year was a reasonable baseline for predicting the future).

### 3. *The Size of any Disparity in a Rule's Impact on Members of Different Racial or Ethnic Groups.*

The size of any disparity is an important touchstone in the analysis because the "mere fact that there is some disparity does not necessarily mean that a system is not equally open [or] does not give everyone an equal opportunity to vote." *Brnovich*, 210 L. Ed. 2d at 774.  Here, just as Plaintiffs failed to demonstrate the size of any burden under the first factor, they have failed to provide evidence of any facts that go to the *extent* of any disparity. ECF 283-12 at 55-56 ("I do not have specific numbers I can cite to."); ECF 283-9 at 136-37 (Dr. Austin conceded she could not "predict approximately how many people would be impacted" by the vote-by-mail request provision). Simply alleging that there *is* a disparity is inadequate to create an issue of material fact regarding discriminatory effect.  A prediction discerned from historical trends is not a cognizable injury.

### 4.    *The Strength of the State Interests Served by a Challenged Voting Rule.*

Because every voting rule imposes some burden, it is important to consider the reason for the law in the first instance. *Brnovich*, 210 L. Ed. 2d at 774. "Rules that are supported by strong state interests are less likely to violate §2." *Id*. "[S]trong state interests" include, but are in no way limited to, preventing voter fraud, "[e]nsuring that every vote is cast freely, without intimidation or undue influence," *id*., and maintaining the integrity of the election system as a whole, including confidence in the system.  *Id*.

Strong interests are implicated here. The State has a *per se* interest in preventing voter fraud because "a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Id.* at 783.[13] Because of that interest, the Florida Legislature "was not obligated to wait for something closer to home" before enacting the 2021 Law being challenged here. *Id.* The Carter-Baker Commission's report relied on by the U.S. Supreme Court explains why. *See supra* 20-21. The 2021 Law goes directly to the heart of many issues presented in the Commission. The non-solicitation provision limits the potential for third parties to pressure or intimidate voters into making certain voting selections. And the voter identification and third-party voter registration rules are focused on guarding against the kind of election fraud the Commission warned against. All of the provisions in the 2021 Law challenged by Plaintiffs further Florida's important interests in, among other things, election integrity, preventing voter fraud, and promoting uniformity, efficiency and confidence in the electoral system as a whole. In short, the 2021 Law was a legitimate use of state power to further well-known and well-accepted state interests. These interests are amply supported. *See, e.g.*, Matthews Dep., ECF 283-29 at 49, 90-91 (testifying that drop

---

[13] That said, there *is*, as this Court has previously found, evidence of election fraud in Florida. *See Browning*, 569 F. Supp. 2d at 1251; ECF 283-21 at 36-37; ECF 283-23 at 106; *see also* ECF 283-6 at 19-29 (detailing the extensive recent history of absentee ballot voter fraud in Florida).

box standard "ensure[s] the security of those boxes" through in-person monitoring); *id.* at 58 (vote-by-mail request provision is "just another layer of security" akin to "multi-factor authentication"); *id.* at 160 (explaining that "whole point" of non-solicitation provision is to ensure "those who come to vote are not harassed in any way that might be trying to influence them").

In sum, the Plaintiffs have failed to put forward facts or evidence capable of supporting their discriminatory effect claim under the VRA, therefore summary judgment is warranted.

### D. The drop box, vote-by-mail request, and non-solicitation provisions pass the *Anderson/Burdick* test.

#### 1. *Need to Quantify a Burden and Show That It Outweighs the State's Interests.*

The U.S. Constitution "provides that States may prescribe '[t]he Times, Places and Manner of holding Elections….'" *Burdick*, 504 U.S. at 433. The *Anderson/Burdick* test is therefore supposed to make it more difficult for federal courts to overturn state election laws, not less so. The whole point of these cases is that, although voting is a fundamental right, most election rules are *not* subject to strict scrutiny. *Burdick*, 504 U.S. at 433. "States—not federal courts—are in charge of setting [election] rules," *New Ga. Proj. v. Raffensperger*, 976 F.3d 1278, 1284, 1279-80 (11th Cir. 2020), and rules that govern how, when, and where voters must vote are "'inevitabl[e]'" and "necessar[y]," and "'must be…substantial'" if elections

"'are to be fair and honest'" and "'orderl[y].'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Burdick*, 504 U.S. at 433. Contrary to Plaintiffs' position, "no one is 'disenfranchised'" if they fail to heed reasonable time, place, and manner voting rules. *New Ga. Proj.*, 976 F.3d at 1282. Any inability to vote is "not caused by [the rules], but by [voters'] own failure to take timely steps to [comply]." *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973).

In sum, *Anderson/Burdick* requires Plaintiffs to satisfy a two-step inquiry, with each step imposing a heavy burden. First, Plaintiffs must prove that the challenged laws inflict a cognizable burden on their rights and quantify the burden's severity. *Timmons*, 520 U.S. at 358. The "extent of the burden... is a factual question on which the [plaintiff] bears the burden of proof," *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016), and the plaintiff must "direct th[e] Court to... admissible and reliable evidence that quantifies the extent and scope." *Common Cause/Ga. v. Billups,* 554 F.3d 1340, 1354 (11th Cir. 2009). Second, Plaintiffs must show that the burden outweighs the State's proffered interests. *Timmons*, 520 U.S. at 358. Only when an election law "subject[s]" voting rights "to 'severe' restrictions" does a court apply strict scrutiny. *Burdick*, 504 U.S. at 434. Election laws that "impose[] only 'reasonable, nondiscriminatory restrictions'" are "'generally'" justified by "'the State's important regulatory interests.'" *Id.* There is

no constitutional right to be free from "the usual burdens of voting." *Crawford*, 553 U.S. at 198.

These steps must be rigorously applied to prevent *Anderson/Burdick* from "trading precise rules and predictable outcomes for the imprecision and unpredictability of how the judicial-assignment wheel turns." *Daunt v. Benson*, 956 F.3d 396, 425 (6th Cir. 2020) (Readler, J., concurring). The test is not an invitation for courts to simply weigh "whether a rule is beneficial, on balance"; that "political question" must be resolved by legislators, not judges. *Luft*, 963 F.3d at 671. The *Anderson/Burdick* framework should almost always favor upholding State election laws because "[o]ur founding charter never contemplated that federal courts would dictate the manner of conducting elections." *Jacobson*, 974 F.3d at 1269.

Four additional points bear mention.

*First*, Plaintiffs' burden is especially high here because they must prove that the 2021 Law violates *Anderson/Burdick* on its face. Plaintiffs' claim is facial because they ask this Court to invalidate the challenged provisions across the board, not on a case-by-case basis. *See* ECF 160 ¶¶ 179-80 (alleging that the non-solicitation provision is "unconstitutionally overbroad" and deserves "facial invalidation"); *see Crawford*, 553 U.S. at 189; *League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL 1175234, at *6 (D. Minn. Mar. 29).

Because Plaintiffs challenge the 2021 Law on its face, Plaintiffs "bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200.  They must prove that "'no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  This standard is not met when "the statute has a plainly legitimate sweep." *Crawford*, 553 U.S. at 202.  Thus, even a showing that a provision imposes "an unjustified burden on *some* voters" cannot justify invalidating "the entire" provision. *Id.* at 203. Plaintiffs' arguments about "burdens tied to the peculiar circumstances of individual voters"—essentially all their arguments—are thus irrelevant for purposes of their facial *Anderson-Burdick* claim. *League of Women Voters of Minn.*, 2021 WL 1175234, at \*9.

In fact, burdens that do not affect voters generally are never relevant under *Anderson/Burdick*.[14] *See* ECF 107-1 at 10-12; *McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969) (holding that voters may be treated differently so long as they are not "absolutely prohibited from exercising the franchise.").

*Second*, when assessing whether a law burdens the right to vote, courts must consider "the landscape of all opportunities that [the State] provides to vote." *Mays*,

---

[14] As the Court rejected the broader argument at the motion-to-dismiss stage, (ECF 274 at 38-40) Defendants raise a narrower point about facial challenges. Defendants reserve the right to pursue arguments relating to *McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969) for appeal. *See* ECF 92-1 at 7-10.

951 F.3d at 785.  In *New Georgia Project*, for example, the Eleventh Circuit faulted the district court for not considering how the "numerous avenues" for voting in Georgia "mitigate the…impact" of the challenged provision.  976 F.3d at 1281-82. Florida has provided, if anything, more avenues.  Florida's "many… provisions that make it easy to vote cut in its favor" under *Anderson/Burdick*.  *Luft*, 963 F.3d at 675. And those provisions, considered as a whole, mean that strict scrutiny cannot possibly apply because no one in Florida is "totally denied a chance to vote" by the 2021 Law.  *Mays*, 951 F.3d at 787.[15]

*Third*, Plaintiffs cannot get around the defects of their *Anderson/Burdick* claim by asserting a "cumulative impact" theory—*i.e.*, arguing that the challenged provisions are constitutional in isolation but together constitute a severe burden. Initially, the challenged provisions are all reasonable, nondiscriminatory regulations of the kind that *Anderson/Burdick* deems perfectly constitutional.  Adding them together is just summing zeroes.  Moreover, the challenged provisions do not cumulate, legally or logically.  In any given election, a voter can vote using only one method.  A person who wants to vote early in-person is not affected by a regulation that affects VBM; a person who wants to wait in line on election day is not affected

---

[15] In fact, mail voting regulations do not implicate the right to vote at all. *See* ECF 92-1 at 7-10; *McDonald*, 394 U.S. at 807.  Because this Court rejected that argument at the motion-to-dismiss stage, Defendants are raising a narrower point about how the Court must consider all the ways that Floridians can vote. Defendants reserve their broader argument for appeal.

by the regulation of drop boxes; and so on.  The only burdens that could possibly cumulate are burdens that affect the *same method* of voting, and Plaintiffs identify precious few of those.  Thus, a "cumulative impact" theory cannot justify the relief that Plaintiffs seek.  If the unconstitutionality derives only from the provisions' cumulative force, then the defect should be remedied by invalidating only *one* of the challenged provisions.  Otherwise, the Court would be granting Plaintiffs relief beyond that necessary to remedy any injury.  *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).  And in any event, if every challenged provision must be invalidated to remedy the constitutional problem, then Plaintiffs necessarily lose because they lack standing to challenge the ban on ballot-harvesting, ECF-249, one of the provisions that they identified as contributing to the cumulative effect.

*Fourth*, on the other side of the scale, *Anderson/Burdick* treats the State's interests as a "legislative fact" so long as they are reasonable.  *Frank v. Walker* (*Frank I*), 768 F.3d 744, 750 (7th Cir. 2014).  States need not submit "*any* record evidence in support of [their] stated interests."  *Common Cause/Ga.*, 554 F.3d at 1353 (emphasis added); *Greater Birmingham Ministries, 992 F. 3d at 1334.*  States can rely on "post hoc rationalizations," can "come up with [their] justifications at any time," and have no "limit[s]" on the type of "record [they] can build in order to

justify a burden placed on the right to vote." *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020).

Relatedly, States can pass election reforms to prevent fraud without compiling concrete evidence of past fraud—let alone concrete instances of fraud in their State. States can act prophylactically to stop fraud before it starts. *See Brnovich*, 141 S. Ct. at 2348 ("[I]t should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). States can rely on instances from other jurisdictions, court decisions, general history, or common sense. *Common Cause/Ga.*, 554 F.3d at 1353; *Frank I*, 768 F.3d at 750. The U.S. Supreme Court has held that the "risk of voter fraud" is "real" and that "the prevention of fraud" is a "strong and entirely legitimate state interest." *Crawford*, 553 U.S. at 194, 196; *Brnovich*, 141 S. Ct. at 2348, 2340.

Nor is fraud prevention the only interest that can justify election reforms. *Brnovich*, 141 S. Ct. at 2348. States can act to reduce the risk of "pressure and intimidation." *Id.* States also have a legitimate interest in "improv[ing] and moderniz[ing] election procedures" that they believe are "antiquated" or "inefficient." *Id.* at 191. Promoting "orderly administration" and decreasing "voter confusion" are also legitimate state interests, *Brnovich*, 141 S. Ct. at 2345, as is the "independent" interest in protecting election "'integrity'" and restoring "voter

confidence," which in turn "encourages citizen participation in the democratic process." *Id.* at 197.

### 2. *Plaintiffs' Inability to Quantify Burdens is Fatal.*

Plaintiffs rely on expert reports to establish that a burden exists. That work is flawed. Plaintiffs' experts concede that they never quantified the burdens. This failure to quantify the burdens is fatal. Without some attempt at quantification, this Court can neither judge the alleged burdens against the pre-2021 Law baseline nor balance the burden against the State's interests.

First, Plaintiffs' experts have relied upon a number of assumptions in their reports that are not supported by any identified evidence. For example, several of their experts assume *ipso facto* that the 2021 Law was intended to reduce Black and Hispanic voting rates given that turnout for those groups was elevated in 2020 but provide no evidence supporting that proposition. ECF 283-4at 6 (analyzing Herron report); ECF 283-9 at 180 (explaining that while legislators did not express discriminatory intent in passing the 2021 Law, she considered the absence of evidence meaningful). Others present data, such as the fact that the ballots of Black voters were rejected at a higher rate than whites in 2000, without exploring plausible non-discriminatory reasons. ECF 283-4at 9. These experts extrapolate extensively from 2020 voting trends, when data from other non-pandemic years is likely more relevant. *Id.* at 6 (noting that Black voters were "significantly less likely" to have

another person deliver their ballot in 2008).  Experts need to justify the analytical choices they make; these experts have not.

In addition to Plaintiffs' experts' methodological flaws, they also failed to quantify the alleged burden that the 2021 Law imposes on Florida voters.  Dr. Burton refused to speculate on the extent of the law's effect, claiming that he was "not asked to quantify the extent of that impact."  ECF 283-12 at 67-68.  Although Dr. Herron alleged that the provisions of the 2021 Law challenged here raised the cost of voting in Florida, he refused to quantify the extent of that effect, calling it "a question for the court."  ECF 283-13 at 63-65.  Simply alleging the directionality of a change is not enough when courts also require a demonstration of the severity of the alleged burden.   Given that the extent of the burden is an essential component of *Anderson/Burdick*, this error is fatal.

### 3.    *The State's Interests Are Substantial.*

While Plaintiffs have provided little, if anything, to balance for purposes of *Anderson/Burdick*, the State has much to support the 2021 Law.

As Director of the Florida Division of Election, Maria Matthews, states in her declaration, each of the provisions at issue furthers the State's interests.  *See* ECF 283-31.  Specifically, Matthews testified that the "main focus" of the drop box standard "was to ensure the security of those boxes" by providing for continuous monitoring while they are in use, and that it did not constitute "a significant change"

from prior practice. Matthews Dep., ECF 283-29 at 49:6-21, 90:8-91:16. Matthews also explained that the personal identifying information now required by the vote-by-mail request provision is "just another layer of security to ensure that the person who is asking for the ballot is entitled to ask for it," akin to "multi-factor authentication." *Id.* at 58. Matthews testified that the notification provision provides "another way of letting the voter be informed… that they have options" for how to return their ballots, *id.* at 127:25-129:2, and that "the whole point" of the non-solicitation provision is to ensure that "those who come to vote are not harassed in any way that might be trying to influence them." *Id.* at 160. Moreover, the shortened vote-by-mail request period helps minimize mistakes that could undermine public trust in the system. ECF 283-31 ¶¶ 22-25.

Dr. Moreno's report lends further support for the State's interests. Moreno explains how the 1993 Hialeah mayoral election was marred by "hundreds of ballots…forged with tracing paper and erasable ink," and how the 1997 Miami mayoral election "was plagued with widespread ballot fraud." ECF 283-6 at 18-19. Prior to the 2021 Law, local jurisdictions were forced to take matters into their own hands; Miami-Dade County, for example, adopted a local ordinance prohibiting individuals from possessing multiple absentee ballots. *Id.* at 22. Dr. Moreno concluded that the 2021 Law "is an appropriate response to Florida's history of absentee ballot fraud" and "will not have racially discriminatory effects." *Id.* at 7.

Dr. Kidd's expert report places Florida's 2021 Law in context. Kidd explains that Florida has, since 1982, made voting easier. Florida once required an excuse to vote early in addition to notarization and witness requirements, but now permits universal early voting with nothing beyond the voter's own certification that they are properly registered. ECF 283-1at 6, 9.

Indeed, Kidd discusses how Florida's standards for voting remain more lenient than those in most of the country. After the 2021 Law, Florida is now one of only ten states that affirmatively *requires* drop boxes to be provided to voters, and it is "less restrictive than over half" of all states in its restrictions on the persons authorized to return absentee ballots. *Id.* at 6-7. Two states require a witness signature for voting absentee, and four states require a copy of the voter's photo ID; Florida requires neither. *Id.* at 7-8.

Thus, the 2021 Law passes the *Anderson/Burdick* test.

### E. Defendants are entitled to summary judgment for Plaintiffs' ADA claims.

Plaintiffs also fail to produce evidence that relief could be granted pursuant to Title II of the ADA. Plaintiffs have three provisions from the 2021 Law they are challenging under the ADA: (1) Section 28's in-person monitoring requirement for drop boxes; (2) the vote-by-mail application renewal requirement; and (3) Section 29's polling place solicitation prohibition. ECF 45 ¶ 164. Each of these challenges fail.

To prevail under Title II of the ADA, a plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011); *see also* 42 U.S.C. § 12132. Importantly, the ADA does not mandate the use of any particular technology or any specific accommodation, so long as every individual has "an opportunity to participate in and benefit from the aid, benefit or service that is… equal to that afforded others." *See* 28 C.F.R. § 35.130(b)(1)(ii)-(iii); *see also* 45 C.F.R. § 84.4(b)(1)(ii)-(iii). Because the 2021 Law does not exclude or deny the opportunity for voters with disabilities to equally participate in voting, deny them the benefits of public voting services, or discriminate against voters because of their disability, Defendants are entitled to judgment on Plaintiffs' ADA claims.

### 1.    *Drop Box Standard*

Plaintiffs contend that the Drop Box Standard adds "impermissible barriers to voters with disabilities' participation in elections" by "severely curtail[ing]" their access to easily accessible outdoor drop boxes.  ECF 45 ¶¶ 79, 81, 159.  To support this assertion, Plaintiffs speculate that a result of the in-person staffing requirement will be that "many election officials will place most or all drop boxes indoors where

staff are already located, which may be less accessible to voters with disabilities." *Id.* ¶ 159. Plaintiffs fail to provide evidence showing how the in-person monitoring requirement of drop boxes excludes or denies individuals with disabilities equal access to voting, much less discriminates against individuals with disabilities.

Plaintiffs' instead ask the Court to infer three layers of speculation to support their argument. First, they ask the Court to infer that "many election officials" will opt to move their drop boxes indoors in response to Section 28's in-person staffing requirement. ECF 45 ¶ 159. However, this is contradicted by testimony of numerous supervisors who say that they will continue providing access to outdoor drop boxes during early voting in the 2022 elections as they did in 2020, and that they will make every attempt to assist their disabled constituents. ECF 283-24 at 37:15-18 (confirming the 2021 "requires me to do nothing different" with regard to the future provision of drop boxes); ECF 284-1 at 112:3-5 (confirming the 2021 law does not prohibit drop boxes from being located outside).

Second, Plaintiffs then infer that, as a result, some drop boxes "may" be less accessible to voters with disabilities because of the boxes' likely placement indoors. ECF 45 ¶ 159. Third, they infer that—the buildings—will themselves be inaccessible contrary to the requirements of the ADA, again without factual support. *See id*. Thus, far from providing evidence capable of showing an ADA violation, these arguments inadequately "pile[] speculation upon speculation." *D.C. ex rel.*

*Walker v. Merck & Co.*, 874 F. Supp. 2d 599, 609 (E.D. La. 2012).

### 2.    *Vote-by-Mail Request Provision*

Plaintiffs offer minimal to no support for their contention that the requirement to renew vote-by-mail application requests each general election cycle, rather than every two general election cycles, denies Plaintiffs' rights protected by the ADA. *See* ECF 45 ¶ 164.  They only assert that this will "impose new burdens on many voters with disabilities, who will be forced to contend with the logistical challenges of completing a VBM ballot request twice as often."  *Id.* at ¶ 94.  They provide no evidence to support this speculative assertion, failing to explain how voters with disabilities will be burdened through logistical challenges or otherwise.  Summary judgment is thus also appropriate regarding their ADA claim against the vote-by-mail request provision.

### 3.    *Non-Solicitation Provision*

Plaintiffs also assert that the non-solicitation provision inhibits family members, caregivers, volunteers, and others "from providing food or water to a voter with diabetes, or a chair to someone with limited mobility or breathing problems," and thus may expose these individuals to "potential liability for aiding…voters with disabilities," resulting in some voters with disabilities "having to choose between their health and casting their vote."   ECF 45 ¶ 161. Even if this expansive interpretation of the non-solicitation requirement were correct, the argument fails

because the 2021 Law allows for "an employee of, or a volunteer with, the supervisor" to provide "nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters…." Fla. Stat. § 102.031(4)(d).

Not one Supervisor of Elections has indicated that their staff, employees, or volunteers would refuse to provide voters waiting in line in need of assistance with water, food, or a chair. *E.g.*, ECF 283-24, 87:22-88:1; ECF 283-25 at 198:14-15. Thus, by failing to point to a single Florida county where a supervisor's employees or volunteers would be unable or unwilling to provide needed help to voters with disabilities, their ADA claims about the non-solicitation provision fails. The same is true for their argument that voters with disabilities would be excluded or denied the benefits of participation in in-person voting, or otherwise discriminated against based on the voters' disabilities as a result of the non-solicitation provision. *Cf. Harris*, 647 F.3d at 1101.

Therefore, this Court should grant summary judgment to Defendants on Plaintiffs' ADA claims.

### F.    Plaintiffs Fail to Demonstrate Preemption of the 2021 Law by Section 208 of the Voting Rights Act.

Plaintiffs also fail to demonstrate that Section 208 of the VRA preempts the 2021 Law because the Florida law allegedly "criminalize[s] the provision of assistance to voters with disabilities," ECF 45 ¶ 228.

#### 1.    *There is no Private Cause of Action.*

Section 208 does not provide a private right of action to Plaintiffs.  The VRA contains many sections dedicated to a remedial scheme to enforce its provisions. Some provisions are enforceable by the U.S. Attorney General, *see, e.g.*, 52 U.S.C. § 10504, and some provisions are enforceable by private litigants, *see, e.g.*, *id.* § 10302(a).  Section 208 contains no remedial scheme whatsoever. *Id.* § 10508.

No private right of action exists unless "Congress intended to create" one. *McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1222 (11th Cir. 2002).  "The Supreme Court has cautioned the judiciary to exercise restraint in implying a private right of action, and required that affirmative evidence of congressional intent to create a private remedy must exist."  *Id.*

In this case, although Congress's intent in Section 208 certainly was to allow needed assistance to voters who are disabled, blind, or illiterate, *see* JoNel Newman, *Ensuring That Florida's Language Minorities Have Access to The Ballot*, 36 Stetson L. Rev. 329, 354 (2007), Plaintiffs provide no affirmative evidence of congressional intent to create a private remedy under Section 208.  To the contrary, the legislative scheme demonstrates that Congress did not intend to create a private right of action: Congress unambiguously created private rights of action in various other sections of the VRA but conspicuously excluded it from Section 208.  Obviously then, "when Congress wished to provide a private [] remedy, it knew how to do so and did so expressly," counseling strongly against this Court "imply[ing] a private remedy,"

*Touche Ross & Co. v. Redington*, 442 U.S. 560, 571-72 (1979) (refusing to imply a private right of action under the Securities Exchange Act of 1934).  By declining to do so under Section 208, Congress demonstrated that its intent was *not* to provide a private remedy—inferring a right of action despite this weighty evidence would fly in the face of the Supreme Court's admonition to exercise restraint in implying a private right of action, *McCulloch*, 298 F.3d at 1222.

### 2.    *Section 208 Does Not Preempt Florida Law.*

Turning to the merits, Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."  52 U.S.C. § 10508.  Conflict preemption exists where a party's "compliance with both federal and state regulations is a physical impossibility," or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  The Eleventh Circuit has affirmed its presumption of non-preemption when a state acts "in a field which the States have traditionally occupied," rooted in the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001).

As the Senate Report's discussion of Section 208 states regarding its objectives and the issue of preemption of state legislation:

> The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters. State provisions would be preempted *only to the extent* that they *unduly burden the right recognized in this section*, with that determination being a practical one dependent upon the facts.

S. Rep. No. 417, 97th Cong., 2d Sess. at 62-63 (emphasis added).   Because regulating elections is a quintessential area of traditional state regulation, the Plaintiffs must overcome a strong presumption against preemption.   They cannot.

The Plaintiffs fail to produce evidence capable of demonstrating that the non-solicitation provision unduly burdens the rights of disabled voters to receive assistance by a person of the voter's choice.   Again, the Plaintiffs' reading of the non-solicitation provision as "criminaliz[ing] assistance from a friend, non-immediate family member, or non-partisan volunteer in the form of a chair, water, food, or medication provided to a voter with disabilities" is an overly expansive interpretation.   ECF 45 ¶ 226.   So, there is no conflict with the demands of Section 208 of the VRA.   In any event, the provision does not make compliance with Section 208 "impossible."   *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009); *see also* 52 U.S.C. § 10508 (requiring assistance by "a person of the voter's choice," not assistance by the voter's *first* or even *preferred* choice).

Thus, Defendants are entitled to judgment on the Section 208 claim.

**G.    The Non-Solicitation Provision Complies with the First Amendment.**

Under the non-solicitation provision, individuals cannot "engag[e] in any activity with the intent to influence or effect of influencing a voter" within a "150-feet" buffer zone.   Fla. Stat. §102.031(a)-(b).  Plaintiffs contend that the non-solicitation provision, as applied to the distribution of food and water by individuals not on the Supervisor's staff, violates the First Amendment.  This claim is flawed as a matter of law and fact. Distributing food and water is conduct, not speech. Even if it were speech, the non-solicitation provision survives any form of scrutiny.

### 1.    *The Facts Support Summary Judgment.*

Plaintiffs' challenge to the non-solicitation provision suffers an initial fatal defect: testimony from the Supervisors.  Supervisors consistently explain that the non-solicitation provision in the 2021 Law *does not require them to do anything differently than they did during the 2020 general election*.  ECF 283-26 at 167-68 ("[W]e have never allowed any sort of activity other than exit polling…within the no-solicitation zone…and we are going to continue our policy moving forward."); Bennett Dep., ECF 283-27 at 107 (reporting that no groups provided food or water to Manatee County voters in 2020).

Supervisors also favor the non-solicitation provision's 150-foot buffer to manage polling places.  Some can get raucous. *See* ECF 283-21 at 77:9-21, 20:16-

21:8; *see also id.* at ECF 283-7 at 1-2 (noting issues with "loud music" and "blow horns.").

Thus, this Court should enter judgment against Plaintiffs' First Amendment challenge to the non-solicitation provision.

### 2.      *The Non-Solicitation Provision does not Implicate the First Amendment.*

Facts aside, the non-solicitation provision does not implicate the First Amendment because it regulates only non-expressive conduct. The First Amendment does not protect "conduct," even though most conduct is "'in part initiated, evidenced, or carried out by means of language.'" *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). While regulating conduct imposes "incidental" burdens on speech, that unsurprising fact "hardly means that the law should be analyzed as one regulating…speech rather than conduct." *Id.*   Conduct must be "inherently expressive" for it to be speech. *Id.* at 66.  Stated differently, conduct must express an "identifiable" message, *Bar-Navon v. Brevard Cty. Sch. Bd.*, 290 F. App'x 273, 276 (11th Cir. 2008), to the average person. *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1347 (11th Cir. 2021).  This test is not a low bar:  An "expansive" definition of expressive conduct would allow a "limitless variety of conduct" to be labeled speech because it is "possible to find some kernel of expression in almost every activity a person undertakes." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991).

Distributing food and drink near a polling place is not inherently expressive. Such assistance could mean "Stay in line" or "Thanks for voting," but it could also mean "You look thirsty/hungry," "We'd like to get rid of these extras," "Come visit our church sometime," "Would you like to buy some water?" or "Vote for my candidate." Or it could mean that the distributor is serving the recipients for innumerable personable reasons without intending to convey any message whatsoever. A recipient cannot tell what message, if any, is being expressed without additional speech—a telltale sign that the conduct is "not…inherently expressive." *FAIR*, 547 U.S. at 66. Recipients might "understand the distribution…as merely a means to carry out an otherwise-conveyed message"—"something like 'vote!' or 'voting is important.'" *Lichtenstein*, 489 F. Supp. 3d at 767. But without that extra speech, a recipient could only "speculate" what "discernible message" or non-message is being expressed by the "mere act" of distributing food and drink. *Id*. at 767-68.

Rather than expression, distributing material accomplishes a utilitarian goal: It gives thirsty people drink and hungry people food. As Plaintiffs admit, they do this so that voters will stay in line and vote; people who are hungry or thirsty, the logic goes, might leave the line early. While Plaintiffs believe that their conduct facilitates voting, "facilitating voting" is "not…communicating a message." *Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057, 1084 (9th Cir. 2016). That is

true even if Plaintiffs' conduct is "the product of deeply held personal belief," has "social consequences," and "discloses" their approval of voting (or their disapproval of lines). *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126-27 (2011).

In fact, courts have held that far more direct methods of facilitating voting are not expressive conduct. Collecting and returning absentee ballots is not speech. *See Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018). Neither is collecting or returning voter-registration applications. *See Voting for Am.*, 732 F.3d at 391 & n.4. Groups in those cases also argued that their actions conveyed a message of support for voting, voters, and the democratic process. *See Knox*, 907 F.3d at 1181. Plaintiffs cannot explain why providing food and water to people waiting in line communicates this message but helping people vote does not.

As the Eleventh Circuit explained (agreeing with the Ninth Circuit), the expressive nature of "food distribution" can only be "decided in an as-applied challenge." *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) ("*FNB I*"). That is because food distribution is not "on its face an expressive activity." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006). The Eleventh Circuit concluded that certain "food sharing events" for homeless people in public parks were expressive only after considering "five…factors." *FNB I*, 901 F.3d at 1242. The contextual factors in *FNB I* are simply not met in this context. *See Burns*, 999 F.3d at 1343-47

(deeming other conduct not expressive because the factors in *FNB I* were mostly absent).  Unlike public parks, polling places are not hubs for free speech or association; and unlike the homeless, voters are not an identifiable group with a well-known need for free food and drink.  *Cf. FNB I*, 901 F.3d at 1242-43.

In sum, the 2021 Law regulates only conduct.  The non-solicitation provision thus does not implicate the First Amendment at all (and prohibiting the non-solicitation of voters obviously survives rational-basis review).

### 3.    *Even if the Non-Solicitation Provision Implicates the First Amendment, It Passes Scrutiny.*

Finally, the non-solicitation provision satisfies First Amendment scrutiny in any event.

The non-solicitation provision applies only in nonpublic forums, so it need only be "reasonable in light of the purpose served by the forum: voting." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886-88, 1883 (2018).  As relevant to Plaintiffs, the law applies inside polling places and within a buffer zone of 150 feet.  *See* Fla. Stat. §102.031(a).  The interiors of polling places are obviously nonpublic forums.  *Id.* at 1886.  And this Court should hold that, on election day, "the parking lots and walkways leading to the polling places are nonpublic forums." *United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004).  As the Supreme Court explained in *Mansky*, its fractured decision in *Burson v. Freeman* did not resolve "whether the public sidewalks and streets surrounding a polling place

qualify as a nonpublic forum." *Id*.  Justice Scalia, who provided the fifth vote in *Burson*, persuasively documented the long tradition of treating them as such. *See* 504 U.S. 191, 214-16 (1992) (Scalia, J., concurring).  A majority of the U.S. Supreme Court cited his opinion approvingly in *Mansky*, stressing that States have long restricted speech "in *and around* polling places on Election Day." 138 S. Ct. at 1883.  These buffer zones are appropriate given "the special governmental interests surrounding…polling places," the need for a "bright-line prophylactic rule," and the fact that the non-solicitation provision imposes no limit on Plaintiffs' ability to "communicate [their] message through [actual] speech." *Hill*, 530 U.S. at 728-29.

The non-solicitation provision would still be subject to only intermediate scrutiny, even if it regulated expressive conduct in a *public* forum.  The provision is content and viewpoint neutral:  It prohibits "any activity" with the forbidden intent of influencing voters. Fla. Stat. §102.031(b); *see Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th at 1291-94 (11th Cir. 2021) (*FNB II*) (explaining why a prohibition on "the provision of food…in order to meet [the public's] physical needs" was content and viewpoint neutral).  The provision resembles a time, place, or manner restriction—a quintessential content-neutral law. *See McCullen v. Coakley*, 573 U.S. 464, 479 (2014).  Food and drink can be distributed, just not at a certain place (near polling places) at a certain time (during elections); and whatever message the distribution communicates can still be uttered, just not in a certain

manner (by distributing food and drink).  *See Clark*, 468 U.S. at 294-95.  Content-neutral regulations of expressive conduct "need only satisfy the 'less stringent" standard from *O'Brien*"—*i.e.*, "intermediate scrutiny."  *FNB II*, 11 F.4th at 1294. They need only "'promote[] a substantial government interest that would be achieved less effectively absent the regulation.'"  *FAIR*, 547 U.S. at 67.

The non-solicitation provision survives strict scrutiny as well. In *Burson*, a plurality of the U.S. Supreme Court concluded that Tennessee's buffer-zone law satisfied strict scrutiny. 504 U.S. at 211.  Similar reasoning applies here because States have a "compelling interest" in protecting voters from "confusion," "undue influence," "fraud," "pressure," and "intimidation."  *Id.* at 199; *Brnovich*, 2021 WL 2690267, at *13.  States must be able to enact prophylactic provisions—rather than rely on *ex post* prosecutions—because improper influence can be subtle, hard to detect, and damaging to the electoral process in ways that cannot be undone.  *See Burson*, 504 U.S. 191, 206-07 (1992) (plurality op.).  Florida's provision is especially narrow because it regulates only the distribution of material with "the intent to influence or effect of influencing a voter."  Fla. Stat. §102.031(b); *see Williams*, 553 U.S. at 293-94 (scienter requirement bolsters law's constitutionality).

## H.   The Non-Solicitation Provision is Neither Vague nor Overbroad.

Plaintiffs' unconstitutional vagueness and overbreadth arguments directed at the non-solicitation provision must also fail.

### 1.    *The non-solicitation provision provides reasonable notice of what permitted.*

A law is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment where it "fails to provide people with ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or because it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "[R]easonably clear lines" between proscribed and permitted conduct are all that is required to pass muster under the Due Process Clause. *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Generally, the Supreme Court is reluctant to declare statutes void for vagueness. *See Parker v. Levy*, 417 U.S. 733, 757 (1974).

Plaintiffs assert that the non-solicitation provision is unconstitutionally vague because it fails to draw an absolute line separating proscribed from permitted speech and conduct within the 150-foot zone surrounding polling locations. ECF 160 ¶¶ 179-86. Their argument hinges on the use of the words "any activity" and "influence," which Plaintiffs argue "leave them to guess" "what activities are permitted or prohibited," meaning there is effectively no limit to the kinds of activities that could be criminalized within that perimeter. *Id.* ¶¶ 121, 183. They warn that "[t]he possibilities of prohibited activities are *virtually limitless*, ranging from speaking words to a voter to handing them water bottles or food." *Id.* ¶ 183. These arguments do not withstand scrutiny.

The non-solicitation provision's text reveals it cannot reasonably be interpreted to criminalize "any activity" within the no-solicitation zone—and Plaintiffs point to no language beyond the two words "any activity" that reasonably prohibits, *inter alia*, the nonpartisan provision of food, or water, or a chair to a voter.

First, contrary to the Plaintiffs' decision to read "any activity" in isolation, the canons of construction mandate that "[w]ords of a statute are not to be interpreted in isolation; rather a court must look to the provisions of the whole law and to its object and policy." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1363 (Fed. Cir. 2005). When the phrase "any activity" is construed reasonably in the context of the surrounding text and the provision as a whole, the text is unambiguous in what it prohibits: Partisan efforts of individuals or campaigns to pressure or influence voters' decisions within the buffer zone.

Second, when, as here, general terms or phrases are included in a series of more specific items, the general term should be interpreted to have meaning akin to the more specific surrounding terms and in light of the surrounding provisions. *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Using this canon, it is apparent that the non-solicitation provision does not prohibit innocent, nonpartisan assistance to voters waiting in line. Instead, the provision targets efforts to influence the decisions of voters near polling locations.

Notably, the "any activity" restriction itself is qualified by the important

phrase "with the intent[16] to *influence* or effect of *influencing* a voter," demonstrating that the provision does not extend to ordinary, run-of-the-mill activities like innocently giving voters a drink of water—rather, the restriction narrowly targets activities that have a reasonable likelihood of swaying a voter's decision on how to vote. Fla. Stat. § 102.031(4)(e) (emphasis added).

It follows that merely giving water to voters waiting in line would not be viewed as an activity "with the effect of influencing a voter." Certainly, the Florida Legislature did not need to engage in the unwieldy exercise of spelling out every potential way that individuals or political groups could influence or attempt to influence voters approaching a polling location—due process does not demand that level of enumeration to prohibit obviously unsuitable conduct in all its various permutations. Nor is that level of detail necessary to guard against the de minimis risk of inconsistent enforcement. Instead, because the non-solicitation provision identifies the prohibited conduct through its plain text and clear purpose, the provision is not unconstitutionally vague.

Third, even if the phrase "any activity" *is* vague when viewed in isolation, as Plaintiffs assert, the series of prohibited activities immediately preceding the

---

[16] The Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). Accordingly, the scienter requirement of "intent to influence…a voter" alleviates any alleged vagueness that may exist.

provision, coupled with its broader context, reveals exactly the kinds of "activities" the statute prohibits, and manifests an unmistakable purpose of prohibiting partisan solicitation near polling locations, defeating Plaintiffs' vagueness arguments. This is because the "any activity" language comes from the definition of the terms "solicit" and "solicitation" under the provision. Dictionaries confirm that "solicit" is ordinarily understood to mean to entreat, approach with a request or plea, urge, or entice to action. *See, e.g., Solicit, Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/solicit (last accessed November 9, 2021). Importantly, the word does not ordinarily include the mere act of giving assistance. The items included in the non-solicitation provision's list of prohibited actions preceding the provision at issue here bolsters this interpretation. Fla. Stat. § 102.031(4)(e).

Finally, contrary to Plaintiffs' foreboding, the carveout for supervisors' volunteers and employees bolsters the Secretary's interpretation because it confirms the exact kinds of activities the statute permits and thus does not restrict: "providing *nonpartisan* assistance to voters within the no-solicitation zone such as…giving items to voters." Fla. Stat. § 102.031(4)(e) (emphasis added). Restricting assistance within the zone to nonpartisan activities again bolsters Defendant's argument that the legislature was primarily concerned with restricting *partisan* activities.

Thus, Plaintiffs' vagueness claims fail.

## 2. *The overbreadth claims must fail.*

Because Plaintiffs' Count V pleads vagueness and overbreadth together, Secretary and Supervisors discuss the overbreadth doctrine here.[17]   The doctrine prohibits regulation of substantially more protected speech than is necessary to achieve regulatory purposes.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). A regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. at 615.   Overbreadth is, however, a "manifestly[] strong medicine" sparingly employed by courts "only as a last resort," *id.* at 613. If "a limiting construction has been or could be placed on the challenged statute," the statute is saved.  *Id.* at 613.

First, as described in the above analysis of vagueness, the 2021 Law does not prohibit the kinds of activities that Plaintiffs allege.  *See supra* at 61-65.

Second, even if the non-solicitation provision prohibits expressive conduct, as the Plaintiffs allege, that speech would still not be protected from regulation because the statute clearly regulates polling locations, which are nonpublic forums subject to content-based speech restrictions, including political advocacy prohibitions.[18]   *See Mansky*, 138 S. Ct. at 1885-86.   If the regulations of a nonpublic forum are

---

[17] The U.S. Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[18] The U.S. Supreme Court's First Amendment precedent permits states to create "nonpublic forums." *See supra* at 59-60.

reasonable, they are lawful; a separate overbreadth analysis is not appropriate. *See Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015). Here, the statute plainly targets partisan activities with the intent or "effect of influencing a voter," which is essentially identical to political advocacy that the Supreme Court has said may be restricted in polling locations. *See Mansky*, 138 S. Ct. at 1885-86.

Thus, the overbreadth doctrine does not undermine the non-solicitation provision.

## V.   <u>Conclusion</u>

For the foregoing reasons, this Court should entry summary judgment against Plaintiffs on all remaining counts in this case.

Respectfully submitted,                    Dated: November 13, 2021.

BRADLEY R. MCVAY (FBN 79034)
General Counsel
Brad.McVay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48302)
Deputy General Counsel
Ashley.Davis@dos.myflorida.com
Florida Department of State
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

*/s/ Mohammad Jazil*
Mohammad O. Jazil (FBN: 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN: 855898)

gperko@holtzmanvogel.com
Holtzman Vogel Baran Torchinsky &
Josefiak PLLC
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
Phone No.: (850) 274-1690
Fax No.: (540) 341-8809

Phillip M. Gordon (VA Bar: 96521)*
pgordon@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 20169
Phone No. (540)341-8808
Fax No.: (540) 341-8809
*Admitted *pro hac vice*

*Counsel for Secretary Lee*


*/s/ Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Phone: 850-577-9090
andy.bardos@gray-robinson.com

*Counsel for Defendants, Supervisors of
Elections for Lake and Lee Counties*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the size and font requirements in the local rules; however, the foregoing, combined with the accompanying memorandum of law, exceeds the allowable word limits. The undersigned has filed a motion to exceed the word limits. That motion was granted and increased the word limits up to 16,000 words. *See* ECF No. 280. The accompanying memorandum complies with the Court's order as it contains only 15,766 words.

*/s/ Mohammad Jazil*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing on all counsel of record through this Court's CM/ECF system.

*/s/ Mohammad Jazil*