IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>          Plaintiffs,<br><br>    v.<br><br>LAUREL M. LEE, in her official capacity as Secretary of State of Florida, *et al.*,<br><br>          Defendants,<br><br>   and<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>          Intervenor-<br>          Defendants. | Civil Action No. 4:21-cv-187 (MW-MAF) |

## STATEMENT OF INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest pursuant to

28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests

of the United States in a suit pending in a court of the United States."  This case

presents important questions regarding interpretation of Section 2, 52 U.S.C.

§ 10301, and Section 208, 52 U.S.C. § 10508, of the Voting Rights Act.  Congress

has vested the Attorney General with authority to enforce the Voting Rights Act on

behalf of the United States.  *See* 52 U.S.C. §§ 10101(c), 10307(a), 10308(d).

Accordingly, the United States has a substantial interest in ensuring proper

interpretation of Sections 2 and 208.

Plaintiffs allege that provisions of Florida's omnibus elections bill, Senate

Bill 90 (2021), 2021 Fla. Laws ch. 11 ("SB 90"), violate Sections 2 and 208 of the

Voting Rights Act; Title II of the Americans with Disabilities Act; and the First,

Fourteenth, and Fifteenth Amendments to the United States Constitution.  First

Am. Compl. ¶¶ 12-13, 125-228, ECF No. 45.  On November 12, 2021, Defendants

filed a motion for summary judgment, arguing, among other things, that they are

entitled to judgment as a matter of law on all remaining claims.  Defs.' Corrected

Mot. Summ. J., ECF No. 285.

The United States files this Statement of Interest to assist the Court in

interpreting Sections 2 and 208.  Defendants' motions for summary judgment

misconstrue the legal standards governing enforcement of these provisions in three

ways.

First, Defendants misstate the means by which a plaintiff may prove a

violation of Section 2.  Defendants incorrectly apply *Brnovich v. Democratic*

*National Committee*, 141 S. Ct. 2321 (2021), to the Section 2 results standard and

also misapply the framework for analyzing a claim of discriminatory purpose

under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,

429 U.S. 252, 265-68 (1977). Second, private plaintiffs have a right of action to enforce Section 208 of the Voting Rights Act, as demonstrated by the structure, history, and consistent judicial application of the provision. Finally, Section 208 can preempt SB 90's line-warming provision. The United States files this Statement of Interest only to aid the Court in addressing these legal questions, and does not address any other issue pending before this Court.[1]

## PROCEDURAL BACKGROUND

On April 29, 2021, the Florida Legislature passed SB 90, a 48-page bill substantially modifying many aspects of Florida election law. Governor Ron DeSantis signed the legislation on May 6, 2021. That same day, the Plaintiffs in this case—the Florida State Conference of the NAACP, Disability Rights Florida, and Common Cause—as well as other civil rights groups in separate complaints filed suit against Florida Secretary of State Laurel Lee, in her official capacity, and other state officials to enjoin implementation and enforcement of several provisions of SB 90. Compl., ECF No. 1.[2] On May 17 and June 14, 2021, two

---

[1] Arguments in this Statement of Interest also apply to Defendants' Corrected Motion for Summary Judgment filed in another case challenging SB 90 now before this Court. *See* Defs.' Corrected Mot. Summ. J., *Fla. Rising Together v. Lee*, No. 4:21-cv-201 (N.D. Fla. Nov. 13, 2021), ECF No. 245.

[2] *League of Women Voters of Fla. v. Lee*, No. 4:21-cv-186 (N.D. Fla.); *Fla. St. Conf. NAACP v. Lee*, No. 4:21-cv-187 (N.D. Fla.).

additional sets of plaintiffs also filed lawsuits,[3] and on June 11, 2021, the operative First Amended Complaint in this action was filed.  *See* First Am. Compl., ECF No. 45.

Plaintiffs allege that SB 90 violates Sections 2 and 208 of the Voting Rights Act; Title II of the Americans with Disabilities Act; and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.  First Am. Compl. ¶¶ 12-13, 125-228, ECF No. 45.  Plaintiffs seek to enjoin several provisions of SB 90, including restrictions on by-mail voting, ballot drop boxes, volunteer assistance, and relief for those in voting lines.  First Am. Compl. ¶¶ 4, 125-228.  In turn, Secretary Lee and other state officials ("Defendants") filed motions to dismiss in all four of the cases challenging SB 90, Defs.' Mot. to Dismiss, ECF No. 92, which this Court granted in part and denied in part.  Order on Mot. to Dismiss, ECF No. 249.  The remaining claims that fall under Section 2 or Section 208 of the Voting Rights Act include challenges to provisions of SB 90 relating to vote-by-mail requests and identification requirements, drop box procedures, non-solicitation restrictions, and voter registration delivery and disclaimer requirements.  On November 12, 2021, Defendants filed a motion for summary judgment, arguing, that they are entitled to judgment as a matter of law on all remaining claims.  Lee

---

[3] *Fla. Rising Together v. Lee*, No. 4:21-cv-201 (N.D. Fla.); *Harriet Tubman Freedom Fighters Corp. v. Lee*, No. 4:21-cv-242 (N.D. Fla.).

Mot. Summ. J., ECF No. 285; Latimer Mot. Summ. J., ECF No. 278 (referring

generally to the VRA without specifying a section).

## LEGAL STANDARD

Summary judgment is appropriate only where the moving party

demonstrates that based on the evidence, viewed in the light most favorable to the

nonmoving party, "there is no genuine dispute as to any material fact" and the

moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding

whether there is a genuine issue of material fact, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's

evidence as true. *Anderson*, 477 U.S. at 255. To determine which facts are

"material," a court must look to the substantive law on which each claim rests.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Allen v. Tyson Foods, Inc.*, 121

F.3d 642, 646 (11th Cir. 1997). A "genuine issue" is one whose resolution could

establish an element of a claim or defense and, therefore, could affect the outcome

of the action, *Celotex Corp.*, 477 U.S. at 322, such that it would allow a reasonable

trier of fact to find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of showing that there is no

genuine dispute as to any material fact that should be decided at trial. *Hickson*

*Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex*

*Corp.*, 477 U.S. at 323).  In determining whether the movant has met that burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.  *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

## STATUTORY BACKGROUND

Section 14(c)(1) of the Voting Rights Act, 52 U.S.C. § 10310(c)(1) defines the terms "vote" and "voting" for purposes of the Act to "include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election."

Section 2 of the Act, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  Section 2(a) prohibits any state or political subdivision from imposing or applying a "voting qualification," a "prerequisite to voting," or a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  52 U.S.C. § 10301(a); *see also* 52 U.S.C. § 10303(f)(2) (applying protections to language minority groups).  Section 2(b) provides that a

violation "is established if, based on the totality of circumstances, . . . the political process leading to nomination or election in the State or political subdivision [is] not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).  Thus, "Section 2 prohibits all forms of voting discrimination," including practices that impair the ability of minority voters to cast a ballot and have it counted on an equal basis with other voters.  *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986); *see also Brnovich*, 141 S. Ct. at 2333; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1196-98 (11th Cir. 1999).  Section 2 reaches the practices challenged by the plaintiffs here.

A violation of Section 2 can "be established by proof of discriminatory results alone."  *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1329 (11th Cir. 2021) ("GBM").  The essence of a results claim "'is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities' of minority and non-minority voters to elect their preferred representatives."  *Brnovich*, 141 S. Ct. at 2333 (quoting *Gingles*, 478 U.S. at 47).  Although the Supreme Court did not articulate a test for Section 2 claims alleging vote denial or abridgment in *Brnovich*, these challenges focus on whether voting in

a jurisdiction is "equally open," in that it provides an "equal opportunity" for all eligible citizens to participate. *Id.* at 2336-38. Openness denotes elections "without restrictions as to who may participate" or "requiring no special status, identification, or permit for entry or participation," *id.* at 2337 (internal citations and quotation marks omitted), and use of the term "equal opportunity" indicates that this analysis "include[s] consideration of a person's ability to *use* the means that are equally open," *id.* at 2338. Courts must consider the totality of circumstances, considering "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity.'" *Id.* Circumstances to consider include, but are not limited to, (1) "the size of the burden imposed," (2) the extent to which challenged provisions depart from "standard practice" in 1982 (when Congress last amended Section 2), (3) "the size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "opportunities provided by a State's entire system of voting," and (5) "the strength of the state interests served by a challenged voting rule." *Id.* at 2338-40. Whether "minority group members suffered discrimination in the past" and whether the "effects of that discrimination persist" are also relevant. *Id.* at 2340.

Section 2 also prohibits practices adopted with a discriminatory purpose. *See Chisom*, 501 U.S. at 394 n.21; *see also Brnovich*, 141 S. Ct. at 2330. A showing of intent "sufficient to constitute a violation of the [F]ourteenth

[A]mendment" is also "sufficient to constitute a violation of [S]ection 2." *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984). Section 2 purpose claims therefore rely on the assessment of "circumstantial and direct evidence of intent" relevant to constitutional cases. *Arlington Heights*, 429 U.S. at 265-68; *see also, e.g.*, *Brnovich*, 141 S. Ct. at 2349 (applying *Arlington Heights*); *Veasey v. Abbott*, 830 F.3d 216, 229-30 (5th Cir. 2016) (en banc); *N.C. Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016). Categories of relevant evidence regarding the purpose of a challenged practice include (1) the impact of the decision; (2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; (3) the sequence of events leading up to the decision; (4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and (5) contemporaneous statements and viewpoints held by decisionmakers. *See Arlington Heights*, 429 U.S. at 266-68. "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the

voter's employer or agent of that employer or officer or agent of the voter's union."  52 U.S.C. § 10508.  As explained above, 52 U.S.C. § 10310(c)(1) provides a broad definition of the terms "vote" and "voting" that covers the practices challenged by the plaintiffs here.  *See, e.g.*, *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614-15 (5th Cir. 2017) (rejecting contention that "the term refers only to the literal act of marking the ballot"); *cf. Garza v. Smith*, 320 F. Supp. 131, 136 (W.D. Tex. 1970) (three-judge court) (defining the right to vote to include "the right to be informed"); *United States v. Louisiana*, 265 F. Supp. 703, 708 (E.D. La. 1966) (three-judge court) ("We cannot impute to Congress the self-defeating notion that an illiterate has the right [to] pull the lever of a voting machine, but not the right to know for whom he pulls the lever."), *aff'd*, 386 U.S. 270 (1967). Accordingly, courts have consistently applied Section 208 to "all aspects of the voting process."  *United States v. Berks Cnty.*, 277 F. Supp. 2d 570, 584 (E.D. Pa. 2003).

## ARGUMENT

Plaintiffs' Section 2 and Section 208 claims involve fact-sensitive inquiries that typically cannot be resolved on summary judgment.  Both on summary judgment and at trial, these factual questions must be resolved under the appropriate legal standards, and Defendants misstate them.  Defendants misinterpret *Brnovich* to establish a new, rigid framework for Section 2 claims and

incorrectly suggest that Section 208 cannot preempt Florida law.  Defendants also ignore clear and consistent judicial interpretation of Congress's intent that private plaintiffs be able to enforce the guarantees of the Voting Rights Act, including Section 208.

## I.     Section 2 Claims Typically Cannot Be Resolved on Summary Judgment.

Courts addressing Section 2 claims must consider the complete set of provisions alleged to harm minority voters, whether under a results or purpose framework, to avoid "miss[ing] the forest in carefully surveying the many trees." *McCrory*, 831 F.3d at 214; *cf. Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition.").  Section 2 results claims may address a combination of challenged practices, *see Gingles*, 478 U.S. at 45 (considering "practices or procedures that tend to enhance the opportunity for discrimination" in a challenge to multimember districts); *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 409 (5th Cir. 1991).  Similarly, purpose challenges may address the intent of provisions that taken in combination will yield an intended effect.  *See, e.g.*, *McCrory,* 831 F.3d at 231.

Section 2 liability "is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested

electoral mechanisms." *Gingles*, 478 U.S, at 79 (internal quotation marks and citations omitted); *see, e.g.*, *White v. Regester*, 412 U.S. 755, 765-70 (1973) (striking down multi-member districts in Texas despite allowing such districts in Indiana in *Whitcomb v. Chavis*, 403 U.S. 124 (1971)); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 243-44 (4th Cir. 2014). Only after a "searching practical evaluation," *Gingles*, 478 U.S. at 47, 79, can this Court determine whether SB 90 interacts with current and lingering effects of discrimination to deny or abridge the right to vote on account of race within the meaning of Section 2.   Section 2 purpose analysis under *Arlington Heights* similarly looks to circumstances and impact specific to the jurisdiction and the enactment.  *See* 429 U.S. at 266.  In examining a summary judgment motion, courts therefore should "not weigh conflicting evidence or make credibility determinations."  *Wright v. Sumter Cty. Bd. of Elections & Registration*, 657 F. App'x 871, 872 (11th Cir. 2016) (per curiam) (quoting *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015)).

For these reasons, Section 2 claims are generally ill-suited for resolution before trial.  *See Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (en banc) (per curiam); *Wright*, 657 F. App'x at 872 (holding that the district court had "erred by improperly weighing the evidence and making credibility determinations at the summary-judgment stage."); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of*

*Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) ("Summary judgment in these cases presents particular challenges due to the fact-driven nature of the legal tests.").[4]

### A. Defendants Misapprehend the Section 2 Results Standard Under *Brnovich*

*Brnovich* did not change this standard summary judgment analysis for a Section 2 results case.  Both before and after *Brnovich*, whether a challenged practice or procedure "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 10301(a), is determined after a context-specific inquiry into the totality of the circumstances. In their summary judgment motion, Defendants reassert a faulty legal conclusion by improperly converting *Brnovich*'s "guideposts" into a putative new Section 2

---

[4] Summary judgment may be appropriate in rare Section 2 cases where the record is "undisputed in all material respects" and "supports only one rational conclusion."  *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1414 (E.D. Wash. 2014) (granting summary judgment for plaintiffs in a Section 2 vote dilution case); *see also Ga. State Conf. of NAACP*, 775 F.3d at 1346 ("The district court [in *Montes*] made an express finding that the record [was] sufficiently developed and not materially disputed before granting plaintiffs' summary judgment motion. . . . [but] the district court here did not make a comparable finding nor did the record clearly afford such a finding.") (internal quotation marks omitted).  Where, as here, there are credibility determinations to resolve, contrary evidence to weigh, and factual questions that can be elucidated by live testimony and cross-examination, summary judgment is not the appropriate means to resolve the "fact-driven nature of the legal tests" in Section 2 cases.  *Ga. State Conf. of NAACP*, 775 F.3d at 1348.

"test."  *See* Defs.' Mem. 28, ECF No. 285-1.  But the Supreme Court was explicit

in *Brnovich* that it declined to "announce a test to govern all" Section 2 challenges

and made clear that it was not suggesting courts disregard *Gingles*' so-called

Senate Factors.  *Brnovich*, 141 S. Ct. at 2336, 2340.  *Brnovich* in fact reiterated

that "[Section] 2(b) requires consideration of 'the totality of circumstances.'"  *Id.*

This Court should accordingly consider the full array of facts and circumstances

presented, rather than apply a rigid "test."[5]  The additional factors the Court

considered in *Brnovich*, such as a jurisdiction's "entire system of voting" and the

widespread use of a practice, are to be "taken into account," *Brnovich*, 141 S. Ct. at

2339, as part of the totality of circumstances in determining Section 2 liability.  In

other words, this Court should continue to apply the legal standard it used to

evaluate the motions to dismiss, when it recognized that "[e]ven at trial, failure on

some factors is not dispositive," Order on Mot. to Dismiss 45-46, ECF No. 249,

(citing *Gingles*, 478 U.S. at 45), and gave appropriate weight to evidence

concerning "the most relevant *Gingles* factors."  *Id.* at 46.

    Analyzing each challenged provision in isolation, Defendants assert that SB

90 imposes no more than "a usual burden" on minority voters.  Defs.' Mem. 10

n.5, 28-31.  This is a factual assertion that may be best reserved for trial, but

---

[5] *See Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-5391, at *25 (N.D. Ga. Nov. 15, 2021) (denying state defendants' renewed motion for summary judgment on plaintiffs' Section 2 VRA claims after *Brnovich*).

Defendants' summary judgment argument on the question also rests on a legal error: it fails to recognize that the burdens imposed by SB 90's provisions can be compounding, as well as individually burdensome.  *See Brnovich*, 141 S. Ct. at 2339; *Gingles*, 478 U.S. at 45.  And because Defendants acknowledge that Plaintiffs can demonstrate disparities resulting from those cumulative burdens, *see* Defs.' Mem. 31, it is a factual question for trial whether those disparities present "any practical significance."  Defs.' Mem. 31; *see Wright*, 657 F. App'x at 872. "When considering disparate effect the focus should not be on absolute numbers but rather on whether the challenged requirements operate to disqualify [minority voters] at a substantially higher rate."  *GBM*, 997 F.3d 1363, 1365 (11th Cir. 2021) (quoting *Williams v. City of Dothan*, 818 F.2d 755, 764 (11th Cir. 1987)). Similarly, whether the provisions of SB 90 interact with social and historical conditions to cause an inequality in the opportunities of minority and non-minority voters to elect their preferred representatives is a factual question best suited for resolution at trial.

### B. Defendants Misapply the *Arlington Heights* Framework for Section 2 Purpose Claims

The Court in *Brnovich* recently reaffirmed that the framework for analyzing a claim of discriminatory purpose is still "the familiar approach outlined in *Arlington Heights*." *Brnovich*, 141 S. Ct. at 2349; *see also GBM*, 992 F.3d at 1321. That approach requires a "sensitive inquiry into such circumstantial and direct

evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

Courts in this inquiry "evaluate all available direct and circumstantial evidence of

intent in determining whether a discriminatory purpose was a motivating factor in

a particular decision." *City of Belle Glade*, 178 F.3d at 1189.

Defendants nevertheless again disregard the holistic approach of *Arlington*

*Heights* and instead rely on atomized disputes with individual facts, rather than

grappling with Plaintiffs' evidence as a whole.  For example, in disputing

Plaintiffs' evidence that provisions of SB 90 will have a disparate impact on

minority voters, Defendants attempt to minimize the size of the disparate impact

Plaintiffs identify and argue that "[d]isparate impacts alone are typically

insufficient to show intentional discrimination anyway."  Defs.' Mem. 12.  But

under *Arlington Heights*, no one factor need be determinative.  Defendants' failure

to grapple with the overall weight of the *Arlington Heights* factors indicates that

Plaintiffs' claims should survive summary judgment.

Furthermore, Defendants cannot defeat Plaintiffs' Section 2 intent claim

simply by recasting racial discrimination as partisan politics.  Defs.' Mem. 14, 22.

Although "partisan motives are not the same as racial motives," *Brnovich*, 141 S.

Ct. at 2349, "intentionally targeting a particular race's access to the franchise

because its members vote for a particular party, in a predictable manner,

constitutes discriminatory purpose." *McCrory*, 831 F.3d at 222.[6] Defendants'
demand that Plaintiffs "disentangle" racial from partisan motivations or "principles
of individualism, initiative, and personal responsibility traditionally associated
with conservatism" is unfounded in law. Defs.' Mem. 18, 22. Nor is it dispositive
whether Plaintiffs identify overtly discriminatory statements by legislators, *see*
Defs.' Mem. 22. "Outright admissions of impermissible racial motivation are
infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*,
526 U.S. 541, 553 (1999). Defendants' argument also discounts the possibility that
the rationales asserted by legislators are pretextual, which can be "quite
persuasive" evidence of intentional discrimination. *Reeves v. Sanderson Plumbing
Prods., Inc.*, 530 U.S. 133, 147 (2000).

By arguing that SB 90 at most aims "to minimiz[e] voter fraud and protect[]
voters against undue influence from third parties," Defs.' Mem. 18, Defendants
elide the distinction between intentional discrimination and ultimate motive. *See
Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 & n.1 (9th Cir. 1990) (Kozinski,
J., concurring in part) (describing how intentional discrimination may include
actions that serve non-racial ends). Indeed, a "smoking gun" in legislative history

---

[6] *See also, e.g.*, *Veasey*, 830 F.3d at 241 n.30 ("[A]cting to preserve legislative
power in a partisan manner can also be impermissibly discriminatory."); *Vill. of
Bellwood v. Dwivedi*, 895 F.2d 1521, 1531 (7th Cir. 1990) (Posner, J.)
("Discrimination may be instrumental to a goal not itself discriminatory.").

has never been required to prove intentional discrimination. *See City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1552 (11th Cir. 1987). The presence of additional legislative rationales "would not render nugatory the purpose to discriminate." *Hunter*, 471 U.S. at 232.

Defendants also miscast *Brnovich* to the extent they suggest it established a new standard to prove "the legislature as a whole was imbued with racial motives." Defs.' Mem. 11. The Supreme Court's reference to the motivations of the "legislature as a whole" described the *factual conclusion* reached by the district court in that case, rather than a new standard a Section 2 plaintiff must meet for an intent claim. *See Brnovich*, 141 S. Ct. at 2349-50. There, the Court was distinguishing between evidence of "a 'racially-tinged' video created by a private party" and evidence of the legislature's intent in passing the law. *Id.* at 2349. The Court nowhere suggested that statements of individual legislators should be fully *discounted* as evidence of discriminatory intent in passing the law; whether, and to what extent, individual legislators' statements are evidence of the legislature's intent is a factual question for trial.

Moreover, Plaintiffs do not need to challenge the entire bill as a product of racially discriminatory purpose as Defendants suggest. Defs.' Mem. 21. Supreme Court precedent "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes," but rather that a discriminatory

purpose was "a motivating factor" with respect to the practices being challenged. *Arlington Heights*, 428 U.S. at 265-66.  Defendants not only depart from decades of well-established caselaw, but also create a roadmap for intentional discrimination:  Under their reading, even egregious cases of intentional discrimination would be upheld if a legislature were to include neutral or beneficial provisions within bills otherwise plagued with discriminatory intent.

When it comes to intentional discrimination in voting, an isolated provision of law cannot "sanitize" the discriminatory design of a system of voting.   Plaintiffs are challenging both individual provisions of SB 90 and the discriminatory burden imposed upon minority voters resulting from the cumulative effect of the challenged provisions' interaction with each other and existing state law.  Section 2 prohibits acting with a purpose to discriminate in either event.  Ultimately, whether the provisions of SB 90 were enacted at least in part with a discriminatory purpose is a factual question for resolution at trial.

## II.    Private Plaintiffs May Enforce Section 208 of the Voting Rights Act.

Section 208 of the Voting Rights Act provides a private right of action. Although Section 208 does not contain an express private right of action, such a right is inherent in the structure of the Act, and the Supreme Court has repeatedly recognized Congress's intent to empower private citizens to enforce the Act. Congress and the Court have spoken with such clarity that courts uniformly have

heard private parties' claims under Section 208 without expressing any doubt about their ability to bring such claims. *See, e.g.*, *OCA-Greater Hous.*, 867 F.3d at 609-614 (finding that private plaintiffs had standing to sue Texas under Section 208 while acknowledging Section 208 does not explicitly create a "private right of action," and remanding to allow the district court to enter new injunction); *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 790, 798 (W.D. Ark. 2021) (stating existence of private right of action was not "a close question"); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020), *appeal dismissed*, No. 20-13360-DD, 2021 WL 4128939 (11th Cir. Mar. 9, 2021); *Democracy N.C.v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 233-36 (M.D.N.C. 2020).

Defendant Lee argues that a private right of action exists only where "Congress intended to create" one, Defs.' Mem. 51 (quoting *McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1222 (11th Cir. 2002)), but her argument disregards, rather than attempts to discern, Congress's clear intent. To be sure, more recent Supreme Court precedent has "sworn off the habit of venturing beyond Congress's intent" and indicated that the "search for Congress's intent" may begin with statutory "text and structure." *Alexander v. Sandoval*, 532 U.S. 275, 287-88 (2001). But declining to "venture beyond" Congress's intent does not mean ignoring Congress's intent entirely.

The text and structure of the Voting Rights Act confirm the existence of a private right of action.  For example, Section 3 provides for certain remedies in actions brought by "the Attorney General *or an aggrieved person* . . . under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a), (c) (emphasis added); *see also* S. Rep. No. 94-295, at 40 (1975) ("An 'aggrieved person' . . . may be an individual or an organization representing the interests of injured persons.").  Section 3's remedy for aggrieved persons to enforce the voting guarantees of the Reconstruction Amendments evinces Congress's intent to allow private enforcement of Section 208, which protects groups whose members "run the risk that they will be discriminated against at the polls and that their right to vote in state and federal elections will not be protected."  S. Rep. No. 97-417, at 62 (1982).  Similarly, Section 14(e) allows for "the prevailing party, *other than the United States*" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. § 10310(e) (emphasis added).  The availability of fees presupposes that a private cause of action is available to enforce the core provisions of the Voting Rights Act, including Section 208.  *See Shelby Cnty. v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the [Voting Rights Act] . . . when prevailing parties helped secure compliance with the statute."); *see also Newman v. Piggie Park Enters.*, 390 U.S.

400, 401 (1968) ("Congress therefore enacted the provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek judicial relief.").

Analysis of the private right of action under Section 208 "must take into account [the] contemporary legal context" in which Congress enacted it, including that the Voting Rights Act was passed "against a 'backdrop' of decisions in which implied causes of action were regularly found." *Morse v. Republican Party of Va.*, 517 U.S. 186, 231 (1996) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 698-99 (1979)). Even before Congress added Section 208 to the Voting Rights Act in 1982, it had expressed its intent to "establish[] a dual enforcement mechanism . . . [that gives] enforcement responsibility to a governmental agency, and . . . has also provided remedies to private persons acting as a class or on their own behalf." S. Rep. 94-295 at 40 (1975). Given that Section 208 was passed in a context where courts routinely heard private suits to enforce the Voting Rights Act, Congress would have been "aware of this unanimous precedent," *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015), when it added Section 208 to the Act.

The limited federal resources available for Voting Rights Act enforcement reinforce the need for a private cause of action. As the Supreme Court has noted, "[t]he Attorney General has a limited staff" who may not always be able "to uncover quickly new regulations and enactments passed at the varying levels of

state government." *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969).  This

is particularly true now that the formula in Section 4(b) of the Voting Rights Act

"can no longer be used as a basis" for requiring states and local jurisdictions to

submit voting changes for preclearance.  *Shelby Cnty.*, 570 U.S. at 557.  Thus,

"[t]he achievement of the Act's laudable goal [would] be severely hampered, . . . if

each citizen were required to depend solely on litigation instituted at the discretion

of the Attorney General."  *Allen*, 393 U.S. at 556; *see also Morse*, 517 U.S. at 231-

32 (attaching "significance to the fact that the Attorney General had urged us to

find that private litigants may enforce the Act"). [7]

---

[7] Plaintiffs also have a private right of action to enforce Section 2.  Defendants'
footnoted suggestions that this is an open question are contrary to the structure of
the Act, Supreme Court precedent, and Congressional intent.  While the Supreme
Court has never expressly held that Section 2 creates a private cause of action, the
Court has heard a series of Section 2 cases brought by private parties, *see, e.g.*,
*Brnovich*, 141 S. Ct. at 2321; *Gingles*, 478 U.S. at 30, and repeatedly has found
implied causes of action to effectuate the "laudable goal" of the Voting Rights Act.
*Allen*, 393 U.S. at 554-57 (Section 5); *Morse*, 517 U.S. at 230-34 (Section 10).
"[T]he existence of the private right of action under Section 2 . . . has been clearly
intended by Congress since 1965," S. Rep. No. 97-417, at 30 (1982), and the Court
has acted on this authority in hearing numerous private Section 2 cases, *see Morse*,
517 U.S. at 232; *Tex. Alliance for Retired Ams. v. Hughes*, 489 F. Supp. 3d 667, 689
n.4 (S.D. Tex. 2020).  And the same structural features of the Voting Rights Act,
described herein with respect to Section 208 point, with equal force toward a
private right of action under Section 2.

### III.   SB 90's Voting Line Relief Restriction is Subject to Preemption by Section 208.[8]

Defendants incorrectly suggest that Section 208 cannot preempt Florida law. Defs.' Mem. 52-53.  But their argument depends on their assertion, unsupported by any evidence, that the plaintiffs have read SB 90's restrictions too broadly.  And not only do Defendants refuse to commit to allowing the kind of assistance protected under Section 208, they argue that the election supervisor's ability to substitute an employee or volunteer into the process obviates the need for Section 208 at all.  They are mistaken.

Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, guarantees that voters who require assistance to vote by reason of blindness, disability, or inability to read or write may receive assistance "by a person of the voter's choice," with only a limited restriction.  Waiting in line at a voter's polling place is obviously an "action necessary to make a vote effective," 52 U.S.C. § 10310(c)(1), and as courts have recognized, waiting in line "may impact the right of a voter to cast his or her ballot."  *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 665 (6th Cir. 2016); *see also OCA-Greater Hous.*, 867 F.3d at 615 ("'To vote' . . . plainly contemplates more than the mechanical act of filling out the ballot sheet.").  It is

---

[8] *See also* Pls.' Mot. Partial Summ. J., *Fla. Rising Together v. Lee*, No. 4:21-cv-201 (N.D. Fla. Nov. 12, 2021), ECF No. 241 (standing and preemption claims under Section 208).

equally plain that the burdens of waiting in line can be particularly pronounced for voters with disabilities. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). Neither Defendant Lee's nor Defendant Latimer's motion for summary judgment addresses the crux of Plaintiffs' Section 208 claim: that SB 90's Line Relief Restriction is incompatible with and frustrates the primary purpose of Section 208—to ensure that voters with disabilities may receive necessary assistance in voting from a person of their choice.

Conflict preemption of a state law occurs in two circumstances: when "compliance with both federal and state regulations is a physical impossibility" and "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal quotations omitted); *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). Courts have preempted state laws that are incompatible with Section 208. *See OCA-Greater Hous.*, 867 F.3d at 614-15 (state law that limited voters needing language assistance outside the ballot box to selecting "a registered voter of the county in which the voter needing the interpreter resides" preempted); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816 (E.D. Mich. 2020) (plaintiffs stated a claim for preemption where law limited permissible assistors to "a member of the voter's household or family, or an elector registered in Michigan"); *Democracy N.C.*, 476 F. Supp. 3d at 235 ("[I]t does not

appear to this court that a 208-voter—one who is blind, . . . can be prohibited by state law from choosing the individual to assist them in voting.").

The Defendants' summary judgment motion does not address the restrictions SB 90 places on voters' ability to receive assistance from a person of their choice. Instead, Defendants argue without record citation that an interpretation of SB 90's line-warming provisions that would prohibit assistance to voters with disabilities is "overly expansive."  Defs.' Mem. 53.  But Defendants do not commit to an interpretation of SB 90 that would permit necessary assistance to voters waiting in line, and that would safeguard the right to assistance by a person of a voter's choice guaranteed by Section 208.

To the contrary:  The only exception to SB 90's broad prohibitive language is for employees of, or volunteers with, the election supervisor, Fla. Stat. 102.031(4)(b) (2021)—which far from allowing assistance by "a person of the voter's choice," 52 U.S.C. § 10508—provides a voter with no choice whatsoever. Limiting a voter's "choice" of assistors to agents of the election supervisor is inconsistent with the letter and the intent of Section 208, which is to ensure a voter can receive assistance from "a person whom the voter trusts and cannot intimidate" them as "the only kind of assistance that will make fully meaningful" their vote.  S. Rep. 97-417, at 62.  The "legitimate right of any state to establish necessary

election procedures" is "subject to the overriding principle that such procedures shall be designed to protect the rights of voters."  *Id.* at 63.

## CONCLUSION

Defendants have incorrectly applied the Section 2 standard under *Brnovich* and *Arlington Heights*, and the claims involve fact-sensitive inquiries that are inappropriate for summary judgment.  Plaintiffs also have the ability to bring a Section 208 claim, and SB 90's line-warming restriction is subject to preemption by Section 208.

Date:  December 1, 2021

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Victor J. Williamson*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
JANIE ALLISON SITTON
MICHAEL E. STEWART
VICTOR J. WILLIAMSON [DC 495783]
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Victor.Williamson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2021, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ Victor J. Williamson
Victor J. Williamson
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-0036
victor.williamson@usdoj.gov