# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE
OF THE NAACP, *et al.*,
    Plaintiffs,

v.

LAUREL M. LEE, in her official
capacity as Secretary of State of
Florida, *et al.*,
    Defendants,

and

REPUBLICAN NATIONAL
COMMITTEE, *et al.*,
    Intervenor-Defendants.

Case No. 4:21-cv-187-MW-MAF

**BRIEF OF THE DISTRICT OF COLUMBIA AND THE STATES OF
NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, ILLINOIS,
MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW
MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT,
VIRGINIA, AND WASHINGTON AS AMICI CURIAE**

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI STATES ................................... 1

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT .......................................................................... 4

    I.    To Win on Summary Judgment, Florida Must Demonstrate Beyond Genuine Dispute That SB 90 Is Supported By—And Was Motivated By—Sufficiently Strong State Interests ..................... 4

    II.    Florida's Asserted Interests In Preventing Voter Fraud And Restoring Voter Confidence Do Not Warrant Summary Judgment ......................................................................... 9

        A.    Voter Fraud ................................................................. 9

            1.    There is no evidence that mail-in voting and ballot drop boxes are associated with widespread fraud .......... 9

            2.    States have myriad ways to protect election integrity without stripping voters of reliable and safe voting methods ...................................................... 17

        B.    Voter Confidence .................................................... 20

            1.    Voter confidence is a complex problem, which SB 90 does not address ............................................... 20

            2.    Voter confidence remains high by relevant measures ...................................................................... 22

            3.    States have other means to promote voter confidence ................................................................... 25

CONCLUSION ........................................................................ 28

# TABLE OF AUTHORITIES

*Cases*

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) .......................... 8, 16

*Burdick v. Takushi*, 504 U.S. 428 (1992) ............................................ 3, 7

*Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000) ............................................. 1

*City of Richmond v. United States*, 422 U.S. 358 (1975) ......................................... 5

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) .......................... 5, 16

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ............................................................ 6

*Democratic Nat'l Comm. v. Reagan*,
329 F. Supp. 3d 824 (D. Ariz. 2018) ..................................................... 8

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
775 F.3d 1336 (11th Cir. 2015) ....................................................... 7, 8

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) ...................................... 6

*Norman v. Reed*, 502 U.S. 279 (1992) .................................................. 16

*Sugarman v. Dougall*, 413 U.S. 634 (1973) ............................................. 2

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................... 5, 7

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ....................................... 6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ...................................................................... 7

*Statutes*

52 U.S.C. § 10301 ............................................................... 3, 5, 7, 8

52 U.S.C. § 10307(c) ....................................................................... 18

52 U.S.C. § 10307(e) ........................................................... 18

52 U.S.C. § 20511 ............................................................... 18

Cal. Elec. Code § 3000.5 .................................................... 17

Cal. Elec. Code § 3001 ....................................................... 17

Cal. Elec. Code § 3003 ....................................................... 17

Cal. Elec. Code § 3007 ....................................................... 17

Colo. Rev. Stat. § 1-7.5-107(4)(b)(I)(A) .............................. 11

Act of May 6, 2021, 2021 Fla. Sess. Law Serv. Ch. 2021-11 (West) ...................... 2

Fla. Stat. § 101.5601-101.595 ............................................. 27

Fla. Stat. § 101.62(1)(a) .................................................. 2, 3

Fla. Stat. § 101.62(1)(b) ..................................................... 25

Fla. Stat. § 101.62(7) ..................................................... 2, 3

Fla. Stat. § 101.68 ............................................................ 18

Fla. Stat. § 101.69(2) ..................................................... 2, 3

Fla. Stat. § 101.69(2) (2020).............................................. 19

Fla. Stat. § 101.68(2)(c)(1) ............................................... 18

Fla. Stat. § 101.69(3) ..................................................... 2, 3

Fla. Stat. § 101.6925 ......................................................... 27

Fla. Stat. § 104.041 ........................................................... 18

Fla. Stat. § 104.047 ........................................................... 19

Fla. Stat. § 104.17 ............................................................. 19

Haw. Rev. Stat. § 11-109(d) ................................................................. 12

Or. Rev. Stat. § 254.470(1) ................................................................. 12

Wash. Rev. Code § 29A.40.170 .......................................................... 12

*Executive and Legislative Materials*

Cybersec. & Infrastructure Sec. Agency, Press Release, *Joint Statement from Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020).................................................................................. 10

U.S. Census Bureau, *Voting and Registration in the Election of November 2020* (Apr. 2021) ................................................................. 10

U.S. Election Assistance Comm'n, *Ballot Drop Box* (2020) .................................. 19

Zachary Scherer, U.S. Census Bureau, *Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020* (Apr. 29, 2021).................... 10

A.B. 37, 2021-2022 Reg. Sess. (Cal. 2021)............................................. 17

Cal. Sec'y of State, *California Secretary of State Launches VoteSure Public Education Campaign Encouraging Voters to be Vigilant of Election Misinformation* (Oct. 29, 2018)........................................................ 26

Fla. Dep't of State, Press Release, *Florida Secretary of State Laurel M. Lee Credits Governor DeSantis for Successful Election Year* (Dec. 23, 2020) ....... 10

Fla. Div. of Elections, *2016 General Election*......................................... 11

Fla. Div. of Elections, *2020 General Election*.................................... 11, 16

Fla. Div. of Elections, *Voter Turnout* ................................................. 16

Governor Ron DeSantis, *State of the State Address* (Mar. 2, 2021)................. 11, 15

*Presentation by the Department of State: 2020 Election Before the S. Comm. on Ethics & Elections*, 2021 Reg. Sess. (Fla. 2021) (statement of Laurel M. Lee, Sec'y of State) ..................................... 15

A.B. 321, 81st Sess. (Nev. 2021)............................................................ 17

*Learn About Voting by Mail*, Vote.Utah.gov......................................... 12

S. 15, 2021 Gen. Assemb. (Vt. 2021) .................................................... 17

Wash. Sec'y of State, *Ballot Drop Box Usage by Year* ........................... 13

*Other Authorities*

Natalie Adona & Paul Gronke, Democracy Fund, *Understanding the Voter Experience: The Public's View of Election Administration and Reform* (Oct. 2018)......................................................................................... 24

R. Michael Alvarez et al., *Voter Confidence in the 2020 Presidential Election: Nationwide Survey Results* (Nov. 19, 2020) ............................... 23, 24

Lonna Rae Atkeson & Kyle L. Saunders, *The Effect of Election Administration on Voter Confidence: A Local Matter?*, 40 PS: Pol. Sci. & Pol. 655 (2008) ............................................................ 24, 27

Ari Berman, *Give Us the Ballot: The Modern Struggle for Voting Rights in America* (2015) ......................................................... 2

Karlyn Bowman & Samantha Goldstein, *Voices on the Vote: Impediments and Confidence in the 2020 Election* (May 2021)............................................ 24

Orville Vernon Burton, *Tempering Society's Looking Glass: Correcting Misconceptions About the Voting Rights Act of 1965 and Securing American Democracy*, 76 La. L. Rev. 1 (2015) .................................................. 2

Bob Christie & Christina A. Cassidy, *GOP Review Finds No Proof Arizona Election Stolen From Trump*, Associated Press (Sept. 24, 2021)...................... 14

Jesse T. Clark, *Lost in the Mail? Vote by Mail and Voter Confidence*, Election L.J.: Rules, Pol., and Pol'y, Ahead of Print (Aug. 4, 2021)................ 24

Jesse T. Clark & Charles Stewart III, *The Confidence Earthquake: Seismic Shifts in Trust in the 2020 Election* (July 15, 2021) ......................................... 21

Nick Corasaniti & Davey Alba, *Facing a Deluge of Misinformation, Colorado Takes the Offensive Against It*, N.Y. Times (Oct. 20, 2020)............. 26

Edgardo Cortés et al., *Preparing for Election Day: Deadlines for Running a Safe Election*, Brennan Ctr. for Just. (May 11, 2020) ...................................... 13

Ctr. for Election Innovation, *Confidence in the 2020-2021 Elections in Georgia* (2021) ............................................................................... 22

Pam Fessler, *Ballot Drop Boxes Become Latest Front in Voting Legal Fights*, NPR (Aug. 11, 2020).................................................................... 10

Gary Fineout, *Florida Man Charged After Altering Governor's Voter Registration*, Politico (Nov. 28, 2020).................................................... 15

Thad E. Hall et al., *The Human Dimension of Elections: How Poll Workers Shape Public Confidence in Elections*, 62 Pol. Rsch. Q. 507 (2009)............... 22

Heritage Found., *A Sampling of Recent Election Fraud Cases from Across the United States* ................................................................................... 13

Elaine Kamarck & Christine Stenglein, *Low Rates of Fraud in Vote-by-Mail States Show the Benefits Outweigh the Risks*, Brookings (June 2, 2020).......... 12

Kelsey Kimber, *BOE Holds Open House Prior to Election*, The Register-Herald (Oct. 22, 2019) ................................................................. 27

MIT Election Data & Sci. Lab, *Voter Confidence* (Apr. 2, 2021).............. 21, 22, 25

Steven Mulroy, *How to Track Your Mail-In Ballot*, The Conversation (Oct. 22, 2020) ...................................................................... 27

Nat'l Conf. of State Legis., *Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home Options* (Sept. 24, 2020) ......... 11

Alfred Ng, *Election Security Officials Find No Evidence of Coordinated Fraud with Mail-In Ballots*, CNET (Aug. 26, 2020)......................................... 14

Mark Niesse, *No Fraud: Georgia Audit Confirms Authenticity of Absentee Ballots*, Atlanta J.-Const. (Dec. 29, 2020) ......................................... 14

Katherine Ognyanova et al., *The COVID States Project:
A 50-State COVID-19 Survey, Report #29: Election
Fairness and Trust in Institutions* (Dec. 2020)............................................ 23, 25

Kasturi Pananjady & Dave Altimari, *Weeks After the Election,
Secretary of the State's Efforts to Monitor Disinformation
Campaigns Ended*, Conn. Mirror (Jan. 18, 2021) ............................................ 26

Pew Rsch. Ctr., *Voters' Evaluations of the 2020 Election Process*
(Nov. 20, 2020) ................................................................................................. 22

Reality Check Team, *US Election: Do Postal Ballots Lead to Voting
Fraud?*, BBC News (Nov. 6, 2020).................................................................... 13

Allison Ross, *Late Guidance from Florida's Elections Chief Could Affect
Counties' Plans for Mail Ballot Drop Boxes*, Tampa Bay Times
(Oct. 16, 2020) ................................................................................................. 19

Betsy Sinclair et al., *"It's Largely a Rigged System": Voter Confidence and
the Winner Effect in 2016*, 71 Pol. Rsch. Q. 854 (2018) .................................. 21

Andy Sullivan, *Explainer: Fraud Is Rare in U.S. Mail-In Voting.
Here Are the Methods That Prevent It*, Reuters (July 7, 2020) ........................ 18

Elise Viebeck, *Miniscule Number of Potentially Fraudulent Ballots in States
with Universal Mail Voting Undercuts Trump Claims About Election
Risks*, Wash. Post (June 8, 2020)................................................................ 12, 18

Marina Villeneuve, *Report: Trump Commission Did Not Find Widespread
Voter Fraud*, Associated Press (Aug. 3, 2018)................................................. 14

Wendy R. Weiser, *The False Narrative of Vote-by-Mail Fraud*,
Brennan Ctr. for Just. (Apr. 10, 2020)..................................................... 9, 12, 18

## INTRODUCTION AND INTEREST OF AMICI STATES

The District of Columbia and the State of New York, on behalf of themselves and the States of California, Connecticut, Delaware, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington (collectively, the "Amici States"), file this brief as amici curiae to aid the Court.

The Amici States have a profound interest in ensuring that their citizens have access to the ballot while at the same time protecting the integrity and security of their elections. The balancing of those objectives is reserved primarily to the states by the Constitution, which allows states to "structur[e] and monitor[] the election process," consistent with principles of federalism. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). No one disputes that states have significant discretion to structure their election systems as they see fit, within reason and as permitted by law, to pursue legitimate interests such as protecting ballot access and preventing fraud.

But those interests must be real, not pretextual. And they must actually be furthered by the relevant legislation, particularly where that legislation retrogressively restricts opportunities to vote. Although states have leeway to pursue bona fide state interests, jurisdictions cannot invoke such interests as pretexts to harm discrete blocs of unpopular voters. The history of American democracy is replete with regrettable examples of states doing just that: for example, even

indisputably discriminatory disenfranchisement devices, like the poll tax, were once "justified as a means of preventing voter fraud." Orville Vernon Burton, *Tempering Society's Looking Glass: Correcting Misconceptions About the Voting Rights Act of 1965 and Securing American Democracy*, 76 La. L. Rev. 1, 14 (2015); *see generally* Ari Berman, *Give Us the Ballot: The Modern Struggle for Voting Rights in America* (2015).

As the constitutional actors responsible for "the power to regulate elections," *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973) (internal quotation marks omitted), the Amici States have expertise in administering elections and safeguarding the integrity of their democratic systems. Indeed, the Amici States have pursued free and fair elections while *expanding* voter opportunities in ways that do not risk malfeasance, maladministration, or fraud. But Florida has taken a different tack. Florida's Senate Bill 90 ("SB 90") sharply contracts voting opportunities in the name of preventing voter fraud and restoring voter confidence. In particular, SB 90 restricts opportunities to vote by mail and limits the use of drop boxes for ballot collection. *See* Act of May 6, 2021, §§ 24, 28, 2021 Fla. Sess. Law Serv. Ch. 2021-11 (West) (codified at Fla. Stat. §§ 101.62(1)(a), (7), 101.69(2)-(3)). Yet the Amici States' own experiences using vote-by-mail and drop boxes show that it is possible to increase these voting opportunities while maintaining election security. In light of Florida's contrary approach, it is no surprise that plaintiffs allege that Florida's

measures violate, among other things, Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, and the right to vote protected by the First, Fourteenth, and Fifteenth Amendments.[1]

In defending SB 90 against these claims, Florida asserts interests in preventing voter fraud and restoring voter confidence. But in light of plaintiffs' allegations, the current record, and case law, Florida's mere invocation of those interests is not enough to warrant summary judgment in its favor.

## SUMMARY OF ARGUMENT

1. To prevail on summary judgment, Florida must show that there is no factual dispute over whether its stated interests support SB 90's specific measures. Accordingly, Florida must demonstrate (among other things) that it is beyond genuine dispute that its interests are real, not pretextual, and that its bona fide interests are sufficiently weighty to overcome the burden that the challenged provisions impose on the right to vote. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). At this early stage and on this record, the relevant case law directs that Florida's purported interests should be tested at trial.

---

[1] Given the Amici States' expertise with vote-by-mail and drop boxes, this brief only addresses the VRA and constitutional claims directed at SB 90's vote-by-mail provisions, Fla. Stat. § 101.62(1)(a), (7), and drop-box provisions, *id.* § 101.69(2)-(3).

2. Florida's claims of voter fraud and low voter confidence are unsupported by the record, undermined by the Amici States' experiences, and, in any event, insufficient to justify the burdens imposed. To begin, voter fraud is rare, and states can prevent it effectively while expanding voting opportunities. In addition, voter confidence is a complex issue, and, to the extent there is any consistent way to measure it, voter confidence is currently high. Regardless, states can address voters' concerns without imposing additional burdens, and SB 90 itself does not target the known drivers of voter confidence.

At bottom, Florida has not sufficiently met its burden on the state-interest prong of its claims to warrant summary judgment. Even if SB 90 were motivated by legitimate concerns, the means Florida chose to address them are ill-suited to the task. At the very least, issues of fact remain regarding the strength and genuineness of Florida's asserted interests. Thus, Florida's motion for summary judgment should be denied.

## ARGUMENT

**I.    To Win on Summary Judgment, Florida Must Demonstrate Beyond Genuine Dispute That SB 90 Is Supported By—And Was Motivated By— Sufficiently Strong State Interests.**

To prevail on its motion for summary judgment, Florida must demonstrate that there is no genuine dispute that SB 90 is supported by sufficiently strong state

interests to defeat each of plaintiffs' claims. Such state interests may not be assumed or presumed, but rather must be demonstrated as being beyond any factual dispute.

Plaintiffs allege, among other things, that Florida enacted SB 90 with an impermissible discriminatory purpose, SB 90 has the effect of denying or abridging the right to vote on the basis of race in violation of Section 2 of the VRA, and SB 90 places an undue burden on the right to vote. Each of these claims requires this Court to make a particularized assessment of the strength and sincerity of the purported state interests. *See, e.g.*, *City of Richmond v. United States*, 422 U.S. 358, 378 (1975) (explaining that government action "taken for the purpose of discriminating . . . has no legitimacy at all under our Constitution"); *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986) (considering an alleged Section 2 results violation, including "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous"); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) ("[A] court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." (internal quotation marks omitted)). Accordingly, a party seeking pretrial summary judgment in its favor must demonstrate that there is no genuine dispute that the electoral requirements it is imposing are supported by sufficiently strong and genuine state interests. Here,

Florida must so demonstrate as to each provision of SB 90 that is challenged by plaintiffs and as to each legal claim brought against those provisions.

As courts have explained, mere rote recitation of a cognizable state interest is not the same as proof that a particular policy was in fact animated by, or actually serves, that interest. "[T]he articulation of a legitimate interest is not a magic incantation a state can utter to avoid a finding" of a voting restriction's illegality. *Veasey v. Abbott*, 830 F.3d 216, 262 (5th Cir. 2016) (en banc) (adjudicating a Section 2 results claim). Rather, Florida must demonstrate that the policy choices it has made correspond in a meaningful way to the specific, legitimate state interests it claims to be addressing through the enacted provisions. *See id.* at 263. And courts "must take into consideration not only the legitimacy and strength of the state's asserted interest, but also the extent to which those interests make it *necessary* to burden voting rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1322 (11th Cir. 2019) (internal quotation marks omitted) (adjudicating a First Amendment right-to-vote claim).

Further, courts have long recognized that an individualized inquiry is necessary into the purported interests which a restriction on the franchise allegedly serves, including into the question of whether those interests outweigh the burdens imposed by a restriction. In other words, "[v]oting rights cases are inherently fact-intensive," including for the types of claims raised by plaintiffs here. *Nipper v.*

*Smith*, 39 F.3d 1494, 1498 (11th Cir. 1994). To evaluate claims under Section 2 of the VRA, courts use a "flexible, fact-intensive test," *Gingles*, 478 U.S. at 46, and undertake a "searching practical evaluation of the past and present reality" to assess whether political processes are sufficiently "equally open" to minority voters, *id.* at 45 (internal quotation marks omitted). To determine whether an election law places an undue burden on the right to vote, courts conduct a "flexible" weighing of "the character and magnitude of the asserted injury" to the right to vote "against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). And to determine whether a voting restriction was improperly motivated by a discriminatory purpose, courts conduct "a sensitive inquiry into such circumstantial and direct evidence of intent that may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

In light of these principles, the Eleventh Circuit has aptly observed—in a decision reversing a district court's grant of summary judgment on a VRA claim— that summary judgment in voting rights cases "presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015). Particularly in fact-intensive voting rights cases such as this one, "a bench trial, with the benefit of live testimony and cross examination,

offers more than can be elucidated simply from discovery." *Id.* "Given the fundamental nature of the right at issue, the intensely local appraisal of the facts warranted, and the complex questions of fact and law that must be settled" in voting rights cases, decisions are more appropriately rendered after a bench trial. *Id.* at 1349.

The Supreme Court's decision in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), does not alter any of these longstanding principles of proof. *Brnovich* itself was decided after a ten-day bench trial, and the district court's decision was based on findings of fact drawn from witness testimony and statistical evidence that were introduced and interrogated at trial. *Id.* at 2334-35; *see generally Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824 (D. Ariz. 2018) (district court decision). In turn, the Supreme Court's decision relied on the factual record to evaluate the parties' claims, and it reaffirmed the well-established principle that "the strength of the state interests served by a challenged voting rule . . . must be taken into account" when assessing legality under Section 2. *Brnovich*, 141 S. Ct. at 2339. The Court's analysis in *Brnovich* thus further supports the conclusion that summary judgment is unwarranted here, as these questions are best resolved at trial, where the relative strength of Florida's purported interests animating each of the challenged provisions of SB 90 may be properly considered against the burden imposed on the right to vote.

**II. Florida's Asserted Interests In Preventing Voter Fraud And Restoring Voter Confidence Do Not Warrant Summary Judgment.**

With Florida's burden properly understood, the facts it proffers related to its interests here and their relationship to SB 90 are inadequate to warrant summary judgment in its favor.

**A. Voter Fraud.**

1. There is no evidence that mail-in voting and ballot drop boxes are associated with widespread fraud.

No one disputes that there is a state interest in combatting voter fraud. But the means chosen to advance that interest must be reasonably calibrated to the scope of the problem. Here, the scope of the targeted problem is vanishingly small: mail-in voting and the use of drop boxes are well-established practices in Florida and around the country, and neither has given rise to substantial fraud, as the experiences of the Amici States confirm.

To start, absentee voting is nothing new and is not a major driver of fraud. From 2000 until the 2020 election, more than 250 million votes were cast using mail-in ballots in all fifty states. Wendy R. Weiser, *The False Narrative of Vote-by-Mail Fraud*, Brennan Ctr. for Just. (Apr. 10, 2020).[2] In the 2018 midterms alone, over 31 million Americans—or 25.8% of voters—cast their ballots by mail. *Id.* Nor are ballot drop-off sites a novel phenomenon. In the 2016 presidential election, about

---

[2]     *Available at* https://bit.ly/3iUkbvz.

16% of voters nationwide submitted their ballots via drop boxes. Pam Fessler, *Ballot Drop Boxes Become Latest Front in Voting Legal Fights*, NPR (Aug. 11, 2020).[3]

Far more voters voted by mail in the 2020 general election than had done so in previous elections—approximately 43% (over 66 million) cast their ballots this way. Zachary Scherer, U.S. Census Bureau, *Majority of Voters Used Nontraditional Methods to Cast Ballots in 2020* (Apr. 29, 2021);[4] U.S. Census Bureau, *Voting and Registration in the Election of November 2020*, at tbl. 14 (Apr. 2021).[5] Hispanic and elderly voters in particular favored vote-by-mail. U.S. Census Bureau, *Voting and Registration*, *supra*. Yet despite the historic increase, states were able to put in place—or had already implemented—adequate systems to ensure election integrity. *See, e.g.*, Cybersec. & Infrastructure Sec. Agency, Press Release, *Joint Statement from Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020) (declaring the November 2020 election "the most secure in American history").[6] That was especially true in Florida, where state leaders hailed the efficiency and security of the election. Fla. Dep't of State, Press Release, *Florida Secretary of State*

---

[3]     *Available at* https://n.pr/2GM9E8V.

[4]     *Available at* https://bit.ly/30GnHac.

[5]     *Available at* https://bit.ly/3cA6bGW.

[6]     *Available at* https://bit.ly/39VmfCL.

*Laurel M. Lee Credits Governor DeSantis for Successful Election Year* (Dec. 23, 2020);[7] Governor Ron DeSantis, *State of the State Address* (Mar. 2, 2021).[8]  Florida achieved this success despite a 78% increase in the number of mail-in votes compared with the 2016 general election.  *See* Fla. Div. of Elections, *2016 General Election* 1 (showing that 2,732,075 Florida voters voted by mail in the 2016 general election);[9] Fla. Div. of Elections, *2020 General Election* 1 (showing that 4,855,677 Florida voters voted by mail in the 2020 general election).[10]  There is accordingly nothing about the previous election that justifies SB 90's restrictions on voting by mail and drop boxes in future elections.

The election security Florida enjoyed in 2020 is no outlier.  There is no evidence from *any* jurisdiction that voting by mail—or voting by drop box in particular—threatens election integrity.  Prior to 2020, five states used all-mail voting systems in which "every registered voter receives a ballot by mail."  Nat'l Conf. of State Legis., *Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home Options* (Sept. 24, 2020).[11]  Each of those states has also offered drop-off sites for absentee ballots in the past.  *See* Colo. Rev. Stat.

---

[7]     *Available at* https://bit.ly/3CKpEzj.

[8]     *Available at* https://bit.ly/3cQGOjW.

[9]     *Available at* https://bit.ly/3xDHlzw (last visited Dec. 3, 2021).

[10]    *Available at* https://bit.ly/32N3wba (last visited Dec. 3, 2021).

[11]    *Available at* https://bit.ly/3dgW9d8.

§ 1-7.5-107(4)(b)(I)(A); Haw. Rev. Stat. § 11-109(d); Or. Rev. Stat. § 254.470(1); *Learn About Voting by Mail*, Vote.Utah.gov;[12] Wash. Rev. Code § 29A.40.170. None has encountered widespread voter fraud.  Weiser, *supra*.

In fact, a *Washington Post* analysis of data collected by Colorado, Oregon, and Washington "identified just 372 possible cases of double voting or voting on behalf of deceased people out of about 14.6 million votes cast by mail in the 2016 and 2018 general elections."  Elise Viebeck, *Miniscule Number of Potentially Fraudulent Ballots in States with Universal Mail Voting Undercuts Trump Claims About Election Risks*, Wash. Post (June 8, 2020).[13]  That amounts to a rate of just 0.0025%.  *Id.*  Data collected by the Heritage Foundation from the five states with universal mail-in voting also found few cases of fraud: only 29 cases of fraudulent votes attempted by mail and 24 cases of duplicative voting or absentee ballot fraud out of nearly *50 million* votes cast.  Elaine Kamarck & Christine Stenglein, *Low Rates of Fraud in Vote-by-Mail States Show the Benefits Outweigh the Risks*, Brookings (June 2, 2020) (reproducing data from the Heritage Foundation's

---

[12]     *Available at* https://bit.ly/3nD2N29 (last visited Dec. 3, 2021).

[13]     *Available at* https://wapo.st/3ixefbJ.

database).[14]  This evidence illustrates that, contrary to Florida's claims, fraud in expanded vote-by-mail systems is essentially nonexistent.

Similarly, a sizable portion of the vote-by-mail states' electorate has historically voted through drop boxes, without issue.  For instance, during the 2016 presidential election, nearly three-quarters of all ballots in Colorado were returned by drop box.  Edgardo Cortés et al., *Preparing for Election Day: Deadlines for Running a Safe Election*, Brennan Ctr. for Just. (May 11, 2020).[15]  That same year, about 57% of Washingtonians voted by drop box.  Wash. Sec'y of State, *Ballot Drop Box Usage by Year*.[16]  Given the lack of any evidence of fraud tied to drop boxes, there is no well-founded reason to sharply curtail their use based on Florida's claimed concerns about potential or actual voter fraud.

Election and security experts have time and again voiced confidence in voting by mail.  Before the 2020 election, a commissioner on the Federal Election Commission said that there is "simply no basis for the conspiracy theory that voting by mail causes fraud."  Reality Check Team, *US Election: Do Postal Ballots Lead*

---

[14]     *Available at* https://brook.gs/2F4NM7X.  The Heritage Foundation caveats that its database is not "exhaustive or comprehensive."  Heritage Found., *A Sampling of Recent Election Fraud Cases from Across the United States*, https://herit.ag/2H0yBwX (last visited Dec. 3, 2021).

[15]     *Available at* https://bit.ly/2If5AOJ.

[16]     *Available at* https://bit.ly/2FkYQxT (last visited Dec. 3, 2021).

*to Voting Fraud?*, BBC News (Nov. 6, 2020) (internal quotation marks omitted).[17]

Senior intelligence officials, "who ha[d] been consulting with election workers across all 50 states," similarly stated that they found no "evidence of a coordinated effort to commit mail-in voting fraud"—let alone any evidence of drop-box-related plots. Alfred Ng, *Election Security Officials Find No Evidence of Coordinated Fraud with Mail-In Ballots*, CNET (Aug. 26, 2020).[18] Moreover, the Presidential Advisory Commission on Election Integrity, established by President Trump following the 2016 election, "uncovered no evidence to support claims of widespread voter fraud." Marina Villeneuve, *Report: Trump Commission Did Not Find Widespread Voter Fraud*, Associated Press (Aug. 3, 2018).[19] Audits of ballots cast in the 2020 general election in Georgia and Arizona have likewise revealed almost no fraud. *See* Mark Niesse, *No Fraud: Georgia Audit Confirms Authenticity of Absentee Ballots*, Atlanta J.-Const. (Dec. 29, 2020);[20] Bob Christie & Christina A. Cassidy, *GOP Review Finds No Proof Arizona Election Stolen From Trump*, Associated Press (Sept. 24, 2021).[21]

---

[17]    *Available at* https://bbc.in/2GJvUQA.

[18]    *Available at* https://cnet.co/3nnmYRu.

[19]    *Available at* https://bit.ly/2GMTpZf.

[20]    *Available at* https://bit.ly/3r3xCRX.

[21]    *Available at* https://bit.ly/3cy5Pk3.

Florida offers little serious evidence to the contrary. The weakness of its historical record of fraud is evident from its focus on two mayoral elections decades ago. *E.g.*, Defs.' Corrected Mem. of Law in Supp. of Summ. J. 3, 45, *Fla. St. Conf. of the NAACP v. Lee*, No. 4:21-cv-187 (N.D. Fla. Nov. 13, 2021), ECF No. 285-1. And it offers no contemporary incidents of significant fraud, emphasizing instead unproven allegations and an isolated incident in which a resident attempted to change Governor DeSantis's voter registration. *Id.* at 2-3. Unsurprisingly, the latter ploy was identified and "corrected immediately." Gary Fineout, *Florida Man Charged After Altering Governor's Voter Registration*, Politico (Nov. 28, 2020).[22] These scattershot examples indicate no pattern or even any considerable risk of fraud in statewide elections—let alone misconduct that existing measures could not adequately address.

To the contrary, evidence indicates that Florida's pre-SB 90 regime effectively protected ballot integrity. Florida officials praised the state's administration of the 2020 general election as "perhaps the most transparent and efficient in the nation." DeSantis, *supra*. Secretary Lee herself stated that she was not aware of a single confirmed instance of fraud related to mail-in voting in the 2020 general election, *Presentation by the Department of State: 2020 Election*

---

[22]     *Available at* https://politi.co/3xaJmTt.

*Before the S. Comm. on Ethics & Elections*, 2021 Reg. Sess. (Fla. 2021) (statement of Laurel M. Lee, Sec'y of State),[23] despite exceptionally high turnout and unprecedented use of vote-by-mail, *see* Fla. Div. of Elections, *Voter Turnout*;[24] Fla. Div. of Elections, *2020 General Election*, *supra*, at 1.

True, "a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 141 S. Ct. at 2348. But that alone does not eliminate the requirement that a state's interest "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)). So it is no answer to plaintiffs' claims for Florida to contend that it can regulate prophylactically. It can. But its regulations must still be amply justified by the prospective problems they purport to address. And, as discussed above, decades of data across multiple states and many elections indicate that there is no encroaching problem that SB 90 could address, even prophylactically.

Moreover, the experience of other states has shown that it is possible to *expand* opportunities to vote while protecting election integrity. Although each state has approached these issues differently, the prevailing trajectory of election-procedure changes in many states has been toward increased ballot access—without

---

[23]    *Available at* https://bit.ly/3x60UjN.

[24]    *Available at* https://bit.ly/2ZkeSSv (last visited Dec. 3, 2021).

any impact on election security and integrity.  For example, numerous states have consistently expanded methods for voters to cast their ballots beyond the traditional practice of visiting polling places on Election Day.  Since 2001, California has offered all registered voters the option of voting by mail on a permanent basis.  Cal. Elec. Code §§ 3001, 3003, 3007.  During the pandemic, California also enacted legislation to mail absentee ballots to every active registered voter, *id.* § 3000.5, a change the state subsequently made permanent, A.B. 37, 2021-2022 Reg. Sess. (Cal. 2021).  Nevada has similarly enacted a law requiring that each active registered voter receive a ballot by mail, A.B. 321, 81st Sess. (Nev. 2021), as has Vermont, S. 15, 2021 Gen. Assemb. (Vt. 2021).  In short, the Amici States and others have *expanded* access to the ballot while still administering secure elections; Florida's argument that it has to *decrease* access to the ballot in order to administer secure elections must be tested at trial.

> 2.     States have myriad ways to protect election integrity without stripping voters of reliable and safe voting methods.

States can also combat voter fraud through less burdensome means than those SB 90 uses.  Indeed, the Amici States are deeply committed to protecting the integrity of their elections and have deployed an array of safeguards to ensure the security of their absentee voting systems.  There are also many common-sense practices to secure drop-off sites specifically, none of which require constricting access.

There are many standard ways that states—including Florida—can and do protect absentee ballots, however they are returned. Many states require that ballots be "printed on the proper type of paper" and "include specific technical markings" to be counted. Andy Sullivan, *Explainer: Fraud Is Rare in U.S. Mail-In Voting. Here Are the Methods That Prevent It*, Reuters (July 7, 2020).[25] Most states also print unique bar codes on mail-in ballot envelopes, which enable election officials to track ballot processing and to "identify and eliminate duplicate ballots." Weiser, *supra*. Once a voter returns his or her ballot and the bar code is scanned, "no other ballot can be cast by that voter for that election." Viebeck, *supra*. Florida itself implements a rigorous system in which elections supervisors and county canvassing boards "determine the legality of . . . vote-by-mail ballot[s]." Fla. Stat. § 101.68(2)(c)(1); *see also id.* § 101.68.

In addition, criminal and civil penalties provide a strong deterrent to voter fraud. An individual convicted of voter fraud in a federal election is subject to a $10,000 fine and/or a five-year term of imprisonment. 52 U.S.C. §§ 10307(c), (e), 20511. And many states—including Florida—also punish voter fraud with hefty fines and potential prison time under state law. *See, e.g.*, Fla. Stat. § 104.041 (punishing as a third-degree felony "any fraud in connection with any vote cast, to

---

[25]     *Available at* https://reut.rs/33zi7oE.

be cast, or attempted to be cast," with a maximum penalty of $5,000 and a five-year term of imprisonment); *id.* § 104.047 (punishing as a third-degree felony the improper request or completion of a mail-in ballot on behalf of another); *id.* § 104.17 (punishing as a third-degree felony willfully voting both in person and by mail).

In terms of drop boxes specifically, the United States Election Assistance Commission has promulgated guidance on how states can "provide[] a secure and convenient means for voters to return their mail ballot." U.S. Election Assistance Comm'n, *Ballot Drop Box* 1 (2020).[26] The Commission has suggested ways that even 24-hour *unstaffed* drop boxes can be sufficiently secure, *id.* at 5-6, and states and localities have successfully used unstaffed sites in the past, *see, e.g.*, *id.* at 3. For *staffed* drop boxes, the recommended precautions are, naturally, less rigorous: the Commission simply specifies that at all times the ballot box should be locked— only election officials should be given access to the key—and tamper evident seals should be used. *Id.* at 6. Measures like these were already used in Florida before SB 90. *See* Fla. Stat. § 101.69(2) (2020) (describing drop boxes as "secure" and requiring drop boxes at early voting sites to be staffed by election officials or "sworn law enforcement officer[s]" during early-voting hours); Allison Ross, *Late Guidance from Florida's Elections Chief Could Affect Counties' Plans for Mail*

---

[26]     *Available at* https://bit.ly/3dgz0HV.

*Ballot Drop Boxes*, Tampa Bay Times (Oct. 16, 2020) (explaining how Florida counties "us[e] locks and seals to prevent tampering" and employ "surveillance cameras" at 24-hour drop boxes).[27]

In sum, states have used a variety of methods to ensure election integrity. Florida itself already employed common measures and best practices before SB 90. As a result, there are substantial issues of fact as to the legitimacy and strength of Florida's assertions of voter fraud and whether any purported risks of voter fraud justify SB 90's burdens. Summary judgment should thus be denied.

**B.      Voter Confidence.**

Florida's alleged interest in voter confidence fares no better. Voter confidence is a multifaceted concept, yet its few documented drivers are unaffected by SB 90. And regardless, voter confidence, by many measures, remains high. In any event, states have many means of promoting voter confidence that—unlike SB 90—do not restrict the right to vote.

1.      Voter confidence is a complex problem, which SB 90 does not address.

Florida argues that SB 90 is justified by its concerns about voter confidence but does not explain how SB 90 would advance that interest. Voter confidence encompasses beliefs ranging from how democratic a system is in general to how fair

---

[27]      *Available at* https://bit.ly/3x5anI5.

specific election practices are. Jesse T. Clark & Charles Stewart III, *The Confidence Earthquake: Seismic Shifts in Trust in the 2020 Election* 2 (July 15, 2021).[28] Rates of voter confidence likewise vary depending on whether voters are "asked about their confidence in the parts of the electoral process with which they have *direct* contact, such as their own vote" or "parts of the electoral process they have *indirect* contact with, such as the process in the nation as a whole." MIT Election Data & Sci. Lab, *Voter Confidence* (Apr. 2, 2021).[29] Despite the complexity of voter confidence, Florida never explains what it means by "voter confidence," how SB 90's specific measures will improve voter confidence, or what evidence supports the alleged problem with voter confidence in the state. Florida is accordingly not entitled to summary judgment because more factual exploration is needed on this state interest.

Although voter confidence is complex, political scientists have documented a few key drivers of confidence—none of which are affected by SB 90. One of the strongest influences on voter confidence is the "winner effect," in which voters perceive election efficacy positively or negatively depending on whether their preferred candidate won. *Voter Confidence*, *supra*; Betsy Sinclair et al., *"It's Largely a Rigged System": Voter Confidence and the Winner Effect in 2016*, 71 Pol.

---

[28]    *Available at* https://bit.ly/3Em2lx2.

[29]    *Available at* https://bit.ly/3cLpm0B.

Rsch. Q. 854, 854 (2018). Another strong influence is messaging from the media or politicians. *See Voter Confidence*, *supra*; Ctr. for Election Innovation, *Confidence in the 2020-2021 Elections in Georgia* (2021).[30] Finally, voters' individual experiences at the polls, particularly their interactions with poll workers, influence how they see the election as a whole. Thad E. Hall et al., *The Human Dimension of Elections: How Poll Workers Shape Public Confidence in Elections*, 62 Pol. Rsch. Q. 507, 519 (2009).

SB 90's restrictions on mail-in voting and drop boxes are unrelated to these three influences, so there is no reason to think that SB 90 will have a substantial effect on voter confidence. Indeed, "there's little evidence" that changes to election administration, other than improvements in polling place experiences (which SB 90 does not meaningfully affect), have "a direct effect on voter confidence." *Voter Confidence*, *supra*. Thus, Florida cannot support SB 90 by citing an interest that is unlikely to be affected by its reforms.

2. Voter confidence remains high by relevant measures.

Regardless of whether SB 90 can address the drivers of voter confidence, there is no real problem to address. In general, voter confidence remains high, especially regarding how voters perceive election administration close to home. Pew Rsch. Ctr., *Voters' Evaluations of the 2020 Election Process* (Nov. 20, 2020) (finding that

---

[30]     *Available at* https://bit.ly/3ctGibs.

90% of all voters, 98% of Biden voters, and 81% of Trump voters said that the 2020 elections in their communities went well).[31]  Indeed, Florida voters specifically maintain confidence in their own vote.  *Compare* Katherine Ognyanova et al., *The COVID States Project: A 50-State COVID-19 Survey, Report #29: Election Fairness and Trust in Institutions* 11 (Dec. 2020) (finding that 78% of all voters surveyed were mostly or very confident that their ballot would be properly counted in the 2020 election),[32] *with id.* at 25 (providing a state-by-state breakdown of responses showing that 78.4% of Florida voters were mostly or very confident).

To be sure, there are a few areas where voter confidence is lower, namely confidence in national results and confidence in initial changes to vote-by-mail procedures.  But these particular issues cannot justify the law Florida enacted.  First, political scientists have noticed a dip in voter confidence in the conduct of national elections relative to the conduct of elections in voters' own jurisdictions.  R. Michael Alvarez et al., *Voter Confidence in the 2020 Presidential Election: Nationwide Survey Results* 1 (Nov. 19, 2020) (finding that 81% of voters surveyed were confident that votes were counted as intended in their county, 78% in their state, and 58% across the nation).[33]  Specifically, voters are least confident in how elections

---

[31]     *Available at* https://pewrsr.ch/3DA1mJs.

[32]     *Available at* https://bit.ly/3DLraSM.

[33]     *Available at* https://bit.ly/3CCbL5Y.

are administered in other states.  *Id.*  This, however, is "a polling truism: People are generally more positive about things closer to home than what is happening nationally."   Karlyn Bowman & Samantha Goldstein, *Voices on the Vote: Impediments and Confidence in the 2020 Election* 11 (May 2021).[34]  But if Florida's goal is to improve Floridians' confidence in local election administration, then SB 90 is a solution to a problem that hardly exists.  And of course, SB 90 could not possibly address how voters feel about election security in *other* states.

In addition, political scientists have documented, in some studies, that in-person voters are generally more confident that their votes will be counted than are voters who vote by mail.  Lonna Rae Atkeson & Kyle L. Saunders, *The Effect of Election Administration on Voter Confidence: A Local Matter?*, 40 PS: Pol. Sci. & Pol. 655, 657 (2008).  But it is not clear why that it is the case.  *Id.* at 659.  One thing, however, is clear: confidence in vote-by-mail improves over time following implementation.   Jesse T. Clark, *Lost in the Mail? Vote by Mail and Voter Confidence*, Election L.J.: Rules, Pol., and Pol'y, Ahead of Print (Aug. 4, 2021) (manuscript at 11).[35]  Indeed, data showing lower confidence in vote-by-mail may be becoming outdated.   Natalie Adona & Paul Gronke, Democracy Fund, *Understanding the Voter Experience: The Public's View of Election Administration*

---

[34]  *Available at* https://bit.ly/3FtpCNS.

[35]  *Available at* https://bit.ly/3DHSjGd.

*and Reform* 24 (Oct. 2018).[36]  Moreover, SB 90 is poorly suited to address voter confidence in mail-in voting.  For instance, SB 90 requires voters wishing to vote by mail to provide certain identification.  Fla. Stat. § 101.62(1)(b).  Yet, research does not show that requiring identification to vote has any correlation with voter confidence.  *Voter Confidence*, *supra*.  The relatively lower confidence in mail-in voting accordingly does not support SB 90's specific measures.

If anything, SB 90 may *undermine* voter confidence.  Consider the allegation that SB 90 imposes burdens on voters who wish to vote by mail.  Perceptions of voter suppression decrease voter confidence.  For example, when voters in one study were asked why they doubted the fairness of elections, the biggest problem was voter suppression—more so than voter intimidation, inaccurate counts, and foreign interference.  Ognyanova et al., *supra*, at 13.  SB 90, then, by making it more challenging for people to vote by mail or use drop boxes, may create the very problem it purports to solve.

3.      States have other means to promote voter confidence.

Finally, even if there were significant concerns among voters about election fairness or security, states can and have addressed them without imposing burdens on voters.  Because messaging is a key driver of voter confidence, states can promote confidence by combating inaccurate messaging about elections—and avoiding

---

[36]      *Available at* https://bit.ly/3rmhfQi.

spreading disinformation themselves. For example, Connecticut hired disinformation experts who tracked and flagged disinformation campaigns, allowing election officials to publicly dispel falsities before they spread. Kasturi Pananjady & Dave Altimari, *Weeks After the Election, Secretary of the State's Efforts to Monitor Disinformation Campaigns Ended*, Conn. Mirror (Jan. 18, 2021).[37] Colorado bought Google ads to run along with search terms related to disinformation campaigns, so when someone googled such a term, the top results were public service ads dispelling the disinformation. Nick Corasaniti & Davey Alba, *Facing a Deluge of Misinformation, Colorado Takes the Offensive Against It*, N.Y. Times (Oct. 20, 2020).[38] California launched a public education campaign in which voters who included an email address with their registrations would receive emails from the Secretary of State's office to increase voter awareness about election misinformation. Cal. Sec'y of State, *California Secretary of State Launches VoteSure Public Education Campaign Encouraging Voters to be Vigilant of Election Misinformation* (Oct. 29, 2018).[39] Thus, tools exist to attack one of the main sources of voters' lack of confidence—tools that, unlike SB 90, do not restrict access to the ballot.

---

[37]    *Available at* https://bit.ly/3nAQQMB.

[38]    *Available at* https://nyti.ms/3qQXpfN.

[39]    *Available at* https://bit.ly/30G1MzU.

States can also improve voter confidence through transparency. Before elections, officials can introduce themselves and voting equipment to the public through public service announcements and open houses, thereby increasing familiarity and trust. *See* Kelsey Kimber, *BOE Holds Open House Prior to Election*, The Register-Herald (Oct. 22, 2019) (describing an open house given by a local board of elections);[40] Atkeson & Saunders, *supra*, at 659 (suggesting that increasing voters' connections to their local election administrators will improve voter confidence). During elections, states can allow voters to track their mail-in ballots, so they know that their votes are counted. Steven Mulroy, *How to Track Your Mail-In Ballot*, The Conversation (Oct. 22, 2020).[41] Indeed, Florida itself already has rigorous and transparent processes for approving voting systems, tabulating votes, and verifying mail-in ballots—which may explain the already-high rate of confidence in the state. *See, e.g.*, Fla. Stat. §§ 101.5601-101.595, 101.6925. Put simply, a state need not curtail ballot access to promote confidence.

* * * *

As Amici States' experiences demonstrate, it is possible to prevent fraud and promote confidence without constricting the right to vote. At a minimum, on the present record, there is a genuine factual dispute over whether Florida's interests

---

[40]    *Available at* https://bit.ly/2Z8s8d0.

[41]    *Available at* https://bit.ly/3HGjoMs.

here are genuine and whether they can justify the restrictions SB 90 places on vote-by-mail and drop boxes, particularly where those methods of voting are favored by minority and vulnerable voters. That dispute is sufficient to defeat summary judgment.

## CONCLUSION

The Court should deny defendants' motions for summary judgment on claims challenging SB 90's vote-by-mail and drop-box provisions.

Respectfully submitted,

| | |
|---|---|
| LETITIA JAMES | KARL A. RACINE |
| Attorney General for the State of New York | Attorney General for the District of Columbia |
| | |
| STEVEN C. WU | LOREN L. ALIKHAN |
| Deputy Solicitor General | Solicitor General |
| | |
| JUDY VALE | CAROLINE S. VAN ZILE |
| Assistant Deputy Solicitor General | Principal Deputy Solicitor General |
| | |
| */s/ Jennifer L. Clark* | */s/ Adam J. Tuetken* |
| JENNIFER L. CLARK* | ADAM J. TUETKEN* |
| Assistant Solicitor General | Assistant Attorney General |
| | |
| The Capitol | Office of the Solicitor General |
| Albany, NY 12224-0341 | Office of the Attorney General |
| (518) 776-2024 | for the District of Columbia |
| jennifer.clark@ag.ny.gov | 400 6th Street, NW, Suite 8100 |
| | Washington, D.C. 20001 |
| | (202) 735-7474 |
| December 2021 | adam.tuetken@dc.gov |

*Admitted in the U.S. District Court for the Northern District of Florida

On behalf of:

ROB BONTA
*Attorney General*
State of California

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

KWAME RAOUL
*Attorney General*
State of Illinois

BRIAN FROSH
*Attorney General*
State of Maryland

MAURA HEALEY
*Attorney General*
Commonwealth of Massachusetts

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON FORD
*Attorney General*
State of Nevada

HECTOR BALDERAS
*Attorney General*
State of New Mexico

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

JOSH SHAPIRO
*Attorney General*
Commonwealth of Pennsylvania

PETER F. NERONHA
*Attorney General*
State of Rhode Island

THOMAS J. DONOVAN, JR.
*Attorney General*
State of Vermont

MARK R. HERRING
*Attorney General*
Commonwealth of Virginia

ROBERT W. FERGUSON
*Attorney General*
State of Washington

## LOCAL RULE 7.1(F) CERTIFICATION

As required by Local Rule 7.1(F), the undersigned counsel certifies that this brief contains 6,131 words.

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN